Exhibit 2

# In The Matter Of:

## CHARLIE THORNTON
v.
## FEDEX GROUND PACKAGE SYSTEM

---

## CHARLIE THORNTON
## March 15, 2006

---



**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
—————— www.TylerEaton.com ——————

## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO: 2:05-CV-00656-DRB

CHARLIE THORNTON,
    Plaintiff,
vs.
FEDEX GROUND PACKAGE SYSTEM, INC.,
    Defendant.

DEPOSITION
OF
CHARLIE THORNTON
15TH DAY OF MARCH, 2006

TAKEN BEFORE:  Gary N. Morgan
    Registered Professional
    Reporter and Notary Public

## Page 2

1   S T I P U L A T I O N
2   IT IS STIPULATED AND AGREED,
3   by and between the parties, through their
4   respective counsel, that the deposition
5   of CHARLIE THORNTON may be taken before
6   Gary N. Morgan, Commissioner, Registered
7   Professional Reporter and Notary Public,
8   State at Large;
9   That the signature to and
10  reading of the deposition by the witness
11  is waived, the deposition to have the
12  same force and effect as if full
13  compliance had been had with all laws and
14  rules of Court relating to the taking of
15  depositions;
16  That it shall not be necessary
17  for any objections to be made by counsel
18  to any questions, except as to form or
19  leading questions, and that counsel for
20  the parties may make objections and
21  assign grounds at the time of trial, or
22  at the time said deposition is offered in
23  evidence, or prior thereto.

## Page 3

1   A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       Mr. K. Anderson Nelms
5       Attorney at Law
6       Law Offices of Jay Lewis, LLC
7       847 South McDonough Street
8       P. O. Box 5059
9       Montgomery, Alabama 36104
10
11  FOR THE DEFENDANT:
12      Messrs. Robert K. Spotswood and
13        John. R. Parker, Jr.
14      Attorneys at Law
15      Law Offices of Robert K. Spotswood
16      Suite 940
17      2100 Third Avenue North
18      Birmingham, Alabama 35203
19
20  OTHERS PRESENT:
21      Mr. Kent Gastineau
22
23

## Page 4

1   I N D E X
2       PAGE:
3
4
5   EXAMINATION BY MR. SPOTSWOOD    6
6

7
8   Exhibit A    48
9   Exhibit G    61
10  Exhibit B    66
11  Exhibit C    72
12  Exhibit D    83
13  Exhibits E and F    87
14  Exhibit O    97
15  Exhibit R    107
16  Exhibit N    113
17  Exhibits S and T    119
18  Exhibit U    127
19  Exhibit V    132
20  Exhibit X    158
21  Exhibit Y    159
22  Exhibit W    163
23  Exhibit L    187

Page 5

I N D E X (Continued)

| 3 | Exhibit Z | 192 |
| 4 | Exhibit H | 228 |
| 5 | Exhibit AA | 232 |
| 6 | Exhibit BB | 233 |
| 7 | Exhibit CC | 233 |
| 8 | Exhibit DD | 234 |
| 9 | Exhibit EE | 235 |
| 10 | Exhibit FF | 237 |
| 11 | Exhibit GG | 239 |
| 12 | Exhibit HH | 240 |
| 13 | Exhibit II | 241 |
| 14 | Exhibit JJ | 242 |
| 15 | Exhibit KK | 243 |
| 16 | Exhibit LL | 244 |
| 17 | Exhibit MM | 245 |
| 18 | Exhibit M | 246 |
| 19 | Exhibit NN | 252 |

Page 6

```
 1         I, Gary N. Morgan, a
 2   Registered Professional Reporter of
 3   Birmingham, Alabama, and a Notary Public
 4   for the State of Alabama at Large, acting
 5   as Commissioner, certify that on this
 6   date, as provided by the Federal Rules of
 7   Civil Procedure of the United States
 8   District Court, and the foregoing
 9   stipulation of counsel, there came before
10   me at 847 South McDounough Street,
11   Montgomery, Alabama, on the 15th day of
12   March, 2006, commencing at 9:33 a.m.,
13   CHARLIE THORNTON, witness in the above
14   cause, for oral examination, whereupon
15   the following proceedings were had:
16
17        CHARLIE THORNTON,
18   being first duly sworn, was examined and
19   testified as follows:
20
21   EXAMINATION BY MR. SPOTSWOOD:
22        Q.   Mr. Thornton, my name is Bob
23   Spotswood, and, together with J. R.
```

Page 7

```
 1   Parker, I represent FedEx Ground in
 2   connection with the lawsuit that you have
 3   filed against it.  We're here today for
 4   the purpose of taking your deposition.
 5   Have you ever had a deposition taken
 6   before?
 7        A.   One other time.
 8        Q.   Okay.  And, so, what's going
 9   to happen here, and I'm sure this is
10   familiar with you since you've been
11   deposed before, is that I'm going to ask
12   questions, you're going to give me
13   answers.  It makes the process a lot
14   easier if you'll take your time with me
15   and I'll take my time with you, and
16   specifically I mean let me finish my
17   question before you give an answer.  It's
18   also very important for you to answer out
19   loud with words rather than with a nod of
20   the head or a huh-uh or a uh-huh because
21   that's all subject to interpretation, so
22   please speak up.
23        If at any time during the
```

Page 8

```
 1   course of the day today you have any need
 2   for a break, just let us know that, and
 3   we'll do whatever you need to do or take
 4   a break.  If at any time you don't
 5   understand any of my questions, it's okay
 6   for you to say you don't understand the
 7   question.  I want you to understand what
 8   I'm asking you is the point.
 9        If, in the course of the
10   deposition, you think later after you've
11   answered a question that you've got an
12   additional answer you want to give, you
13   want to clarify something that you said,
14   it's okay to bring it up later.  I'm
15   trying to get a full story, as you'll see
16   today, about why we're here and in this
17   litigation, so I want you to feel free
18   to, you know, if you've forgotten about
19   something, to come along later and
20   supplement what you said.
21        Are you on any medications of
22   any kind today?
23        A.   The only thing I take is
```

Page 9

1  something for hypertension.
2      Q.   And what would that be?  I
3  take some of those myself.
4      A.   It's Uretic I think is the
5  name of it.
6      Q.   Okay.
7      A.   It's a very -- it's a low
8  blood pressure tablet.
9      Q.   Okay.  And I'm sitting here
10 looking at you.  You look perfectly lucid
11 to me.  You're not under the influence of
12 any kind of drugs or alcohol or anything
13 like that that would keep you from
14 answering --
15     A.   That's correct.
16     Q.   -- properly and truthfully?
17 And tell us your full name, please, sir.
18     A.   Charlie Edward Thornton, Sr.
19     Q.   Where do you live, Mr.
20 Thornton?
21     A.   75 Pine Court, Millbrook,
22 Alabama.
23     Q.   What county is that located

Page 10

1  in?
2      A.   Elmore.
3      Q.   What's your date of birth?
4      A.   2/7/56.
5      Q.   What is your place of birth?
6      A.   Phoenix, Arizona.
7      Q.   How long have you lived in
8  Alabama?
9      A.   Since '64.
10     Q.   Tell me your educational
11 background.
12     A.   High school, one year of
13 college.
14     Q.   Where did you go to college?
15     A.   Isabella High School.
16     Q.   Where is that located?
17     A.   Chilton County.
18     Q.   Where did you go to college?
19     A.   George C. Wallace.  That's in
20 Selma, Alabama.
21     Q.   That's the community college
22 over there?
23     A.   Yes, it is.

Page 11

1      Q.   And what was your course of
2  study at the George C. Wallace Community
3  College?
4      A.   Electronics.
5      Q.   Are you married?
6      A.   Yes, I am.
7      Q.   What's your wife's name?
8      A.   Debbie.
9      Q.   How long have you been married
10 to Debbie?
11     A.   Eight years.
12     Q.   Is she employed?
13     A.   Yes, she is.
14     Q.   Where does she work?
15     A.   State Farm Insurance.  She's
16 an agent.
17     Q.   What kind of insurance
18 products does she sell?
19     A.   Life, health, property and
20 casualty, auto.  I guess the whole gamut.
21     Q.   And where is her office
22 located?
23     A.   It's on the northern bypass

Page 12

1  here in Montgomery.  I don't know the
2  exact address.
3      Q.   How long has she been a State
4  Farm agent?
5      A.   With State Farm a year -- a
6  little over a year.
7      Q.   And before she was a State
8  Farm agent, what did she do by way of
9  employment?
10     A.   She was in the insurance
11 business.
12     Q.   And who did she work for?
13     A.   AIG, American General.
14     Q.   Yes.  What kind of insurance
15 products did she sell for AIG?
16     A.   Life and health.
17     Q.   And how long had she worked
18 for AIG before she moved over to State
19 Farm?
20     A.   I would say a year and a half
21 or so.
22     Q.   Okay.  And what did she do
23 for employment before AIG?

Page 13

1    A.   She worked for Regions Bank.
2    Q.   What was her job with Regions?
3    A.   She worked in mortgage
4    finance.  I don't know what her title was
5    in mortgage finance.
6    Q.   Did she sell mortgages?
7    A.   I could not tell you.  I do
8    not know.
9    Q.   Which location of Regions did
10   she work at?
11   A.   Downtown, Montgomery.
12   Q.   All right.  And how long did
13   she work for Regions?
14   A.   21 years.
15   Q.   So, did she retire from
16   Regions then?
17   A.   Somewhat, yeah.
18   Q.   What was the circumstances of
19   her leaving Regions?
20   A.   I had -- I had opened up a --
21   a business, and she just -- she wanted a
22   break from that, plus our first
23   grandchild was born, and she wanted to

Page 14

1    spend time.
2    Q.   She basically resigned her
3    job, I guess, at Regions, is that
4    correct?
5    A.   Yeah, I would think so, yeah.
6    Q.   And what was the business that
7    you had opened?
8    A.   It was a security business.
9    Q.   What kind of security services
10   did you provide?
11   A.   Home -- well, residential and
12   business.
13   Q.   What was the name of the
14   company?
15   A.   It was American Shield.
16   Q.   Is that a sort of a franchise
17   operation or --
18   A.   No, sir.
19   Q.   It was your own --
20   A.   Yes.
21   Q.   -- company?  And American
22   Shield, was it a partnership, a
23   corporation, a LLC?  What was the

Page 15

1    structure of it?
2    A.   It was a LLC.
3    Q.   And who had an interest in
4    American Shield other than you?  Your
5    wife, did she have an ownership interest
6    in it apart from, you know, you?
7    A.   No.
8    Q.   Okay.  Did you have any other
9    employees?
10   A.   Yes.
11   Q.   How many employees did you
12   have?
13   A.   Approximately, 10 to 15.
14   Q.   When did you open the doors on
15   American Shield?
16   A.   I don't actually recall.
17   Q.   Can you give me a year?  From
18   the sounds of it, it must have been
19   like '90 -- 2002 maybe, if that coincides
20   with your wife's departure from Regions?
21   A.   It may have -- 2002, 2000 --
22   latter part of 2001.
23   Q.   Okay.  And did you later sell

Page 16

1    that business?
2    A.   No, we dissolved the business.
3    Q.   When did you dissolve the
4    business?
5    A.   I do not recall the date of
6    that.
7    Q.   Do you recall what year it
8    was?
9    A.   No, I do not.
10   Q.   You don't know if it was
11   in '04, '03 or --
12   A.   Not an accurate date, I surely
13   do not.
14   Q.   Okay.  What caused you to
15   dissolve the American Shield business?
16   A.   It -- we had some problems
17   within the business.  It just wasn't
18   profitable.
19   Q.   Can you be a little bit more
20   specific about what caused its demise?
21   A.   Not really.  There was some --
22   some -- well, there were some situations
23   that it -- it just -- as far as money, as

Page 17

1  far as the profitability of the business.
2      Q.  Right.
3      A.  It just did not -- it just was
4  not profitable, you know, as far as the
5  bottom line, and we just decided it would
6  be more feasible economically to close
7  the business.
8      Q.  Did you put it into
9  bankruptcy?
10     A.  No, no.
11     Q.  Did you pay off all of your
12  creditors?
13     A.  Yes, we did.
14     Q.  You've been married to Debbie
15  for eight years?
16     A.  Yes.
17     Q.  Were you married prior to your
18  marriage to Debbie?
19     A.  Yes.
20     Q.  How many times have you been
21  married total?
22     A.  Twice.
23     Q.  What is your first wife's

Page 18

1  name?
2      A.  Sue -- Sue.
3      Q.  And what is her current full
4  name now?
5      A.  I do not know.
6      Q.  And what was her maiden name?
7      A.  Hammond.
8      Q.  H-A-M-M-O-N-D?
9      A.  Correct.
10     Q.  And do you know where she
11  lives?
12     A.  Mississippi.
13     Q.  Do you know where in
14  Mississippi?
15     A.  No, I do not.
16     Q.  Do you know if she works?
17     A.  I do not.
18     Q.  When were you divorced from
19  Sue?  What approximate year?
20     A.  '94.
21     Q.  You mentioned that you gave a
22  deposition previously.  Was that in
23  connection with that divorce?

Page 19

1      A.  No.
2      Q.  Okay.  And you have how many
3  children?
4      A.  I have four biological, and I
5  have two stepchildren.
6      Q.  And can you tell me the names
7  and approximate ages of the four
8  biological children?
9      A.  Charlie, Jr. is 27.  I hope I
10  get this right.
11     Q.  Oh, good.  That's good.  Do
12  your best.
13     A.  Seth is 24.  Andy is 18.
14  Shelby is 14.  My stepdaughter, Tammy,
15  she's 32.
16     Q.  Yes.
17     A.  And my stepson is Justin.
18  He's 23.
19     Q.  Where is Charlie living these
20  days, Charlie, Jr.?
21     A.  Charlie lives in -- he lives
22  in Chilton County.
23     Q.  What's he doing up there?

Page 20

1      A.  He does construction.
2      Q.  And what about Seth, same
3  question?
4      A.  Seth is in the military.
5      Q.  Where is he right now?
6      A.  Fort Hood, Texas.
7      Q.  And Andy, your 18-year-old?
8      A.  Andy is home with his mom.
9      Q.  In Mississippi?
10     A.  Yes.
11     Q.  And you don't know where that
12  is?
13     A.  I don't recall the name of the
14  town.
15     Q.  Do you talk to Andy every now
16  and then?
17     A.  Yes, I do.
18     Q.  When was the last time you saw
19  Andy?
20     A.  Two weeks ago.
21     Q.  I take it that was here and
22  not Mississippi, then?
23     A.  That's correct.

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 21

1    Q.    And did he drive over here to
2  see you?
3    A.    Yes.
4    Q.    What about Shelby, where does
5  she live?
6    A.    That's a he.
7    Q.    I'm sorry.
8    A.    He lives with his mother also.
9    Q.    And you don't know the town
10  where either of these two children live?
11    A.    No, sir, I do not.
12    Q.    Do you have a phone number for
13  their residence where you would call
14  them?
15    A.    Yes, I do.
16    Q.    What's that phone number?
17    A.    I do not recall that number.
18  I don't have it memorized.
19    Q.    Do you recall the area code?
20    A.    I'm sorry?  What was the
21  question?
22    Q.    Do you recall the area code
23  where --

Page 22

1    A.    601.
2    Q.    Is it north Mississippi,
3  central Mississippi, southern
4  Mississippi?
5    A.    It's in -- around the
6  Hattiesburg area.
7    Q.    But it's not in the city of
8  Hattiesburg; it's just near Hattiesburg?
9    A.    Right.
10    Q.    Do you know where your kids go
11  to high school?
12    A.    I do not.
13    Q.    Your case is pending here in
14  the Middle District of Alabama which, if
15  my understanding is correct, basically
16  covers Montgomery County, places east of
17  Montgomery County and east of 65 going
18  south.  My question to you is do you have
19  any relatives -- I don't care if they are
20  aunts or uncles or cousins or what have
21  you -- living in Montgomery County or any
22  of those other counties I just mentioned
23  to you geographically?

Page 23

1    MR. NELMS:  To help you out,
2  that would also be Elmore and Autauga
3  Counties.  So, you're talking Autauga,
4  Elmore, Montgomery and then everything
5  east of 65 all the way down to the state
6  line in Florida.
7    MR. SPOTSWOOD:  Yes.
8    MR. NELMS:  And then 85 all
9  the way out to the Chattahoochee River,
10  and then north of 85 all the way up to
11  Tallapoosa.
12    Q.    You've got a better
13  understanding of the counties in the
14  Middle District than I do.
15    MR. NELMS:  Well, it's my
16  district, though.
17    MR. SPOTSWOOD:  I appreciate
18  it.
19    A.    I do not.  I do not have any
20  relatives.
21    MR. NELMS:  Brothers, aunts,
22  sisters, brothers.
23    A.    I have no sisters, no

Page 24

1  brothers.  I only have one living aunt on
2  my dad's side.  She lives in Chilton
3  County, but I don't think that -- does
4  it?
5    MR. NELMS:  Yeah, Chilton
6  County is part too.
7    A.    All right.  Well, I have one
8  aunt.
9    Q.    What's her name?
10    A.    Beatrice Cagle.
11    Q.    How do you spell that?
12    A.    B-E-A-T-R-I-C-E.
13    Q.    It's the Cagle part that I'm
14  having trouble with.
15    A.    Oh, C-A-G-L-E, I assume.
16    MR. NELMS:  I'm one quarter
17  Cagle.
18    A.    All right.
19    MR. NELMS:  That's how you
20  spell it.
21    A.    Thank you.
22    MR. NELMS:  My maternal
23  grandmother.

6 (Pages 21 to 24)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 25

1  **A.** Really.
2  **Q.** How about your spouse, does
3  Debbie have any relatives in these areas
4  we've been talking about?
5  **A.** No. Her relatives are in
6  Tallahassee, Florida. Other than my
7  step -- stepchildren.
8  **Q.** Right. Right. And Justin,
9  what is Justin's last name?
10  **A.** Seithalil.
11  **Q.** How do you spell that?
12  **A.** I have not -- I -- let's see.
13  Let me look.
14  MR. NELMS: You already have a
15  copy of his driver's license, right?
16  MR. SPOTSWOOD: I think I do,
17  yes.
18  MR. PARKER: At least the
19  front of the driver's license we do have.
20  **A.** It's S-E-I-T-H-A-L-I-L.
21  **Q.** And your 32-year-old, I wrote
22  it down, but I'm having a hard time
23  reading what I wrote down. What is --

---

Page 26

1  MR. PARKER: I didn't get it.
2  **Q.** -- your 32-year-old's name?
3  **A.** Lewis -- oh, first name?
4  **Q.** Yeah.
5  **A.** Tammy.
6  **Q.** So, it's Tammy Lewis?
7  **A.** Yes.
8  **Q.** And what is Tammy -- is Tammy
9  married?
10  **A.** Yes, she is.
11  **Q.** What's her husband's name?
12  **A.** Steve.
13  **Q.** And where do Steve and Tammy
14  live?
15  **A.** They live in Millbrook.
16  **Q.** Okay. What do they do for
17  employment up there?
18  **A.** Steve is a fireman with the
19  Montgomery Fire Department.
20  **Q.** Yes.
21  **A.** And Tammy is a pediatric
22  nurse.
23  **Q.** Does she work in Montgomery?

---

Page 27

1  **A.** She's not working at this time
2  because the -- her kids are small.
3  **Q.** Okay.
4  **A.** And she's home with them.
5  **Q.** Right. And how about Justin,
6  is he married?
7  **A.** No.
8  **Q.** What is Justin doing?
9  **A.** He works in the State Farm
10  office where my wife works.
11  **Q.** Okay. Just out of curiosity,
12  you know the State Farm offices, do they
13  have a defined geographic area that they
14  serve, or do they have an exclusive
15  territory, or are they out there
16  competing with each other, those various
17  State Farm offices?
18  **A.** I really -- I can't answer
19  that. I do not know.
20  **Q.** Okay.
21  **A.** I don't know.
22  **Q.** But she's on the bypass, you
23  say?

---

Page 28

1  **A.** She's on the northern bypass.
2  The agent's name that owns it is Willie
3  Durham. I do not know the address.
4  **Q.** Okay. Thank you. Are you
5  attending church at this time?
6  **A.** Yes, I am.
7  **Q.** And where do you attend
8  church?
9  **A.** Camellia Baptist Church.
10  **Q.** Where is that located?
11  **A.** In Prattville.
12  **Q.** And what's the name of the
13  pastor there?
14  **A.** Glenn Brock.
15  **Q.** What's your involvement there?
16  **A.** As much as possible.
17  **Q.** What do you do there?
18  **A.** Well, I'm just a -- I'm a
19  member there.
20  **Q.** Right. But, obviously, based
21  on your prior answer, you do other things
22  and you contribute time, I take it, to
23  other activities. That's what I'm trying

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 29

1  to --
2    **A.**  Sure.  It's just according to
3  what activities are within the church.
4  I'm not a Sunday School teacher or
5  anything like that.
6    **Q.**  Do you spend time there during
7  the week on various church-related
8  things?
9    **A.**  We do.
10    **Q.**  How many hours a week would
11  you spend at the church-related
12  activities?
13    **A.**  Well, I don't -- I really
14  don't know how many hours per week.
15    **Q.**  More than 10?
16    **A.**  Probably at least 10 to 15.
17    **Q.**  Are you involved in any other
18  community activities outside of the
19  church?
20    **A.**  No, not really unless it's
21  something to do with my -- my grandson's
22  playing sports, you know, when that's
23  in -- in session.

Page 30

1    **Q.**  Right.  Have you ever gone by
2  any name other than Charlie Thornton?
3    **A.**  No, sir.
4    **Q.**  I want to quickly get a handle
5  on what property and investments you own
6  at the present time.  Do you own your
7  home?
8    **A.**  Yes, I do.
9    **Q.**  And you gave me the address of
10  that, I think, if I remember correctly?
11    **A.**  Yes, sir.
12    **Q.**  And is your house subject to a
13  mortgage at this time?
14    **A.**  No, sir.
15    **Q.**  All right.  And could you
16  describe your home for me?
17    **A.**  I really don't understand the
18  question.
19    **Q.**  I mean, is it a three bedroom,
20  split level, six bedroom, whatever?
21    **A.**  Okay.  It's a four-bedroom on
22  a slab.
23    **Q.**  Okay.

Page 31

1    **A.**  Single level.
2    **Q.**  And it's a -- it's not a
3  manufactured home?
4    **A.**  No, sir.
5    **Q.**  It's brick and mortar?
6    **A.**  Right.
7    **Q.**  Do you have any estimate of
8  its present value?
9    **A.**  No, sir, I do not, no.
10    **Q.**  I'm not familiar with the
11  street address.  Where are you located?
12  Are you in Wetumpka, are you --
13    **A.**  No, sir.  We're in the city of
14  Millbrook.
15    **Q.**  Okay.  And how long have you
16  owned your home there?  Actually how long
17  have you lived there is what I meant to
18  ask?
19    **A.**  I've been there eight years.
20    **Q.**  Do you own any rental
21  properties of any kind?
22    **A.**  I own my father's home that
23  was deeded over to me at his death.

Page 32

1    **Q.**  Where is that located?
2    **A.**  That's in Chilton County.
3    **Q.**  And are you the only owner?
4    **A.**  Yes, sir.
5    **Q.**  Do you have an address for
6  that?
7    **A.**  2325 County Road 359,
8  Maplesville.
9    **Q.**  And what does that property
10  consist of?
11    **A.**  A home and acreage.
12    **Q.**  How many acres?
13    **A.**  Total is seven -- seven acres
14  around about.
15    **Q.**  And what's the size of the
16  home?
17    **A.**  I do not know the square
18  footage.
19    **Q.**  Give me bedrooms, just a rough
20  estimate.
21    **A.**  It's a four-bedroom.
22    **Q.**  Is it rented at the moment?
23    **A.**  It is leased with an option to

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 33

1  buy.
2      Q.    At what price?
3      A.    She's making the mortgage
4  payments on it.  Whatever the mortgage
5  is, no extra.
6      Q.    Do you remember roughly what
7  that is?
8      A.    Four -- 458 a month.
9      Q.    And you don't remember,
10  though, what the purchase price on the
11  seven acres and the house would be?
12      A.    I don't understand what you
13  mean by purchase price.
14      Q.    Well, if she's got the option
15  to buy --
16      A.    It will be the -- whatever the
17  amount is owed.
18      Q.    That's what I'm asking you,
19  what's the amount owed?
20      A.    Oh, okay.  Oh, the amount
21  owed, 50 -- 57, 58 thousand.
22      Q.    And when did you inherit the
23  property?

Page 34

1      A.    At the time of my father's
2  death.
3      Q.    Right.  Which would have been
4  when?
5      A.    Two years -- well, Daddy
6  passed away in June will be two years,
7  this coming June.
8      Q.    Okay.  June of '04.
9          MR. NELMS:  Is that correct,
10  he died in June of '04?
11      A.    Yeah, I think that's pretty
12  accurate.
13      Q.    Do you own any other real
14  estate?
15      A.    No.
16      Q.    Do you have any other -- apart
17  from your property interests that you've
18  described, do you have a portfolio of
19  stocks or bonds, a retirement fund or
20  anything like that?
21      A.    No.
22      Q.    Apart from this case, have you
23  been involved in any -- let me stop.  I

Page 35

1  got ahead of myself here.  Do you have
2  any interest at present in any business
3  of any kind?
4      A.    No, sir.
5      Q.    Are you receiving any
6  annuities or any payments on annuities or
7  pension or a disability policy or
8  anything like that?
9      A.    No, sir.
10      Q.    You mentioned earlier that you
11  had been deposed once before.  Can you
12  tell me what that was in connection with?
13      A.    It had to do with a -- with a
14  friend -- I don't even really recall.
15  There was a friend involved in selling a
16  security system to a homeowner, and I was
17  present when the transaction took place.
18  And unknowing to the individual, this
19  individual was under contract with
20  another company, and he did not disclose
21  that information to my friend.  And
22  they -- when they called me in, they just
23  wanted to know how the transaction went

Page 36

1  and what I observed.
2      Q.    So, you were just a witness to
3  this dispute, I guess?
4      A.    Yes, sir, I guess.
5      Q.    And what was the friend's
6  name?
7      A.    David Murabito.
8      Q.    How do I spell?
9      A.    M-U-R-A-B-I-T-O.
10      Q.    And do you know -- remember
11  the name of the customer in question?
12      A.    No, sir, I don't.
13      Q.    But had David been personally
14  sued in connection with the transaction?
15      A.    I do not know.
16      Q.    And why were you with him in
17  connection with the installation?  What
18  brought you there?
19      A.    Well, it wasn't the
20  installation.  It was the -- the sale of
21  the -- of the equipment.  I just happened
22  to be with him that day, and we -- it --
23  he had an appointment to go to the home,

Page 37

1 and I went with him to the home.
2     Q.    Was this at a time when you
3 had your own --
4     A.    No, sir.
5     Q.    -- company we talked about?
6 When did this all take place?
7     A.    I do not recall.
8     Q.    Ancient history, five years
9 ago, ten years ago?
10     A.    It's been probably four --
11     Q.    Okay.
12     A.    -- years or more.
13     Q.    Have you ever been named as a
14 defendant in a lawsuit?
15     A.    No.
16     Q.    Have you ever sued anybody
17 other than FedEx in this case?  In
18 other -- you can forget about your
19 divorce proceeding.
20     A.    Right.
21     Q.    I know that was a legal
22 proceeding.
23     A.    I don't understand what you

Page 38

1 mean by sued.
2     Q.    What you did here, you filed a
3 piece of paper in court and claimed
4 compensation from somebody for whatever
5 it is you think they did that caused you
6 harm or injury.
7     A.    The only other -- the only
8 other case I had was a workmen's comp
9 case, and that's been years ago.  I don't
10 know if that's suing.
11     Q.    Yes.
12     A.    But --
13     Q.    Who was the employer involved
14 in that case?
15     A.    It was Brockway Glass Company.
16     Q.    And where were they located?
17     A.    Here in Montgomery.
18     Q.    And do you remember
19 approximately when that happened?
20     A.    Approximately, not
21 accurately --
22     Q.    Yes.
23     A.    -- '79.

Page 39

1     Q.    What was the nature of the
2 dispute there?
3     A.    I had a back injury, and I
4 had -- it had to do with my workmen's
5 comp benefits.
6     Q.    Did you --
7     A.    And --
8     Q.    Go ahead.
9     A.    Getting disability on my
10 workmen's comp -- or, you know, to
11 determine the amount of workmen's comp.
12     Q.    Do you remember whether or not
13 you did get some sort of a permanent,
14 partial disability rating or finding in
15 connection with that?
16     A.    I -- I did get a percentage.
17 I don't even recall what that percentage
18 actually was.  I mean, it -- you know,
19 what they did -- I think it's just --
20 just the way that the system is.  I mean,
21 they did award a portion of disability.
22     Q.    Okay.  Do you remember or can
23 you recall what the size of the check was

Page 40

1 that you received or if you received just
2 a series of checks over a period of time?
3     A.    Well, I received workmen's
4 comp checks --
5     Q.    For a while?
6     A.    -- when I was out of work.
7     Q.    Right.
8     A.    And then I think the
9 settlement -- I don't recall the exact
10 amount --
11     Q.    Okay.
12     A.    -- of what the check was.
13     Q.    Can you give me a ballpark?
14     A.    To be truthful --
15     Q.    Yes.
16     A.    -- I really don't -- I really
17 don't remember.
18     Q.    Okay.
19     A.    I really do not remember.
20     Q.    Any other legal proceedings of
21 any kind that you can recall being
22 involved with?
23     A.    No, sir.

Page 41

1     **Q.**   And you've never sought any
2 kind of a disability --
3     **A.**   No, sir.
4     **Q.**   -- from any entity, state or
5 federal, Social Security?
6     **A.**   No, sir.
7     **Q.**   How's your health right now?
8     **A.**   Other than the hypertension, I
9 feel like it's pretty good.
10     **Q.**   All right. Do you feel like
11 the hypertension is under control with
12 the drugs you're taking?
13     **A.**   Well, not with just drugs,
14 but, you know -- yes, I feel like it's
15 pretty much under control.
16     **Q.**   Do you have a cardiologist who
17 you see every six months or so?
18     **A.**   No, I do not.
19     **Q.**   Who prescribes your medication
20 for hypertension?
21     **A.**   Dr. Marla Wool.
22     **Q.**   How do you spell the last
23 name?

Page 42

1     **A.**   W-O-O-L.
2     **Q.**   And where is Marla located?
3     **A.**   She is located in Millbrook.
4     **Q.**   And she's just a regular care
5 physician?
6     **A.**   Yes.
7     **Q.**   Apart from Marla --
8     (Off-the-record discussion.)
9     **Q.**   (BY MR. SPOTSWOOD:) Apart
10 from Marla, are you under the care of any
11 other medical professional, whether it's
12 a psychologist, a psychiatrist --
13     **A.**   No.
14     **Q.**   -- anybody else?
15     **A.**   No, sir.
16     (Off-the-record discussion.)
17     **Q.**   (BY MR. SPOTSWOOD:) Yeah, let
18 me just tell you where I'm going here to
19 kind of help bring things along, Mr.
20 Thornton. What I want to do now is move
21 to your employment history really going
22 both from basically the present backwards
23 to find out where you've actually worked

Page 43

1 basically over about a five-year period.
2 I'm going to do that, I hope, with the
3 help of the tax return information that
4 you've given me, and we have some
5 exhibits here on that, so that's where
6 we're going to start. And I'd like to
7 start with -- with 2006, and, of course,
8 I know we don't have any tax return
9 information so far, but where are you
10 working right now?
11     **A.**   UniFirst Corporation.
12     **Q.**   That's U-N-I-F-I-R-S-T?
13     **A.**   That's correct.
14     **Q.**   And where is it located?
15     **A.**   Branch office is in Millbrook.
16     **Q.**   And what is the nature of the
17 business?
18     **A.**   Uniform supply.
19     **Q.**   What is your job with
20 Uniform -- UniFirst, rather?
21     **A.**   Territory manager.
22     **Q.**   And tell me what you do as a
23 territory manager.

Page 44

1     **A.**   I manage the territory that --
2 protect a territory and, also, I sell in
3 that territory.
4     **Q.**   Do you have drivers and others
5 that report to you as the manager?
6     **A.**   No.
7     **Q.**   Well, how -- what do you do on
8 a regular basis is what I'm trying to get
9 to, what are your regular job functions?
10     **A.**   It's customer service
11 basically. I have customers within that
12 territory that I just maintain, manage,
13 make sure everything is going smoothly
14 with their deliveries and stuff like
15 that, and then I report directly to a
16 branch manager.
17     **Q.**   And, so, there is somebody
18 riding around in a truck that picks up
19 and delivers uniforms --
20     **A.**   Oh, sure.
21     **Q.**   -- to various entities, and
22 that's really the nature of the business,
23 correct?

Page 45

```
1        A.   Yes.
2        Q.   So, you are making sure that
3   the service is good and that they don't
4   have any complaints and that, you know,
5   they are paying their bills and you're
6   doing what you are supposed to be doing?
7        A.   My main function is selling.
8        Q.   And, so, how do you go about
9   doing that?  Are you soliciting people,
10  cold calling them?
11       A.   Several different ways.
12       Q.   Okay.  Well, tell me what they
13  are.
14       A.   I do cold calling, solicit,
15  referrals.
16       Q.   And are you paid on a
17  commission basis?
18       A.   Commission plus salary.
19       Q.   And what is -- tell me the
20  exact structure of your compensation.
21       A.   What do you mean by that?
22       Q.   What -- well, let's begin with
23  this:  When did you start working at
```

Page 46

```
1   UniFirst?
2        A.   It was approximately eight
3   weeks ago.
4        Q.   What is your base salary?
5        A.   My base salary is six -- six
6   hundred a week.
7        Q.   And what is your -- how is
8   your commission computed?
9        A.   It's computed several
10  different ways.  There's no set way of
11  computing commissions.  It's according --
12  it's based on what you sell, the price
13  you sell it for, length of time for the
14  agreement.
15       Q.   But you have an agreement --
16  you have it written down what your
17  commission arrangement is, I take it?
18       A.   I have a structure according
19  to the -- whatever your sale is.
20       Q.   Okay.  But you can figure out,
21  I take it, when you get a paycheck
22  whether or not your paycheck has been
23  properly computed?
```

Page 47

```
1        A.   Sure.  Yes.
2        Q.   Can you tell me what your
3   compensation has averaged since you began
4   working eight weeks ago on a weekly
5   basis?
6        A.   Six hundred a week.  I've just
7   got into the commission phase of it.
8        Q.   So, you're just now working --
9        A.   Basically in training.
10  Getting out of training.  Not actually
11  getting out of training.  I've got into
12  the selling mode.  We were in a training
13  mode.
14       Q.   So, beginning what, in April
15  you should start seeing some commission
16  checks, is that what you're saying, maybe
17  next month?
18       A.   Possibly, yeah.
19       Q.   Maybe this month too?
20       A.   Oh, I'm not -- no, it will not
21  be this month.
22       Q.   Who is your immediate
23  supervisor there?
```

Page 48

```
1        A.   Acting branch manager is Dan
2   Cohen.
3        Q.   Where is Mr. Cohen located?
4        A.   Millbrook.
5        Q.   Let me ask you to have a look
6   at Defendant's Exhibit A.
7            (Whereupon, Defendant's
8             Exhibit A was marked for
9             identification.)
10           MR. NELMS:  Have you got a
11  copy for me?  Or do you want me to get
12  my --
13           MR. SPOTSWOOD:  Yeah.  Let him
14  look at that, if you don't mind.
15       Q.   (BY MR. SPOTSWOOD:)  What I
16  want to do, first of all, is make sure I
17  have everybody you worked for in 2005,
18  and I show that you worked at True Green
19  Limited is one of the entities reflected
20  on your W-2 for 2005, and then I've
21  got -- frankly, I've got another one here
22  that I can't read.  This is -- this is
23  reflecting wages of $720.  Do you know
```

**Page 49**

1  who that was?  I can't read this.  It
2  shows an Overland Park, Kansas address.
3  Do you remember who that was?
4      A.   No, sir, I don't.
5      Q.   And, then, I show a THD At
6  Home Services.
7      A.   Yes.
8      Q.   And then I show some
9  compensation from FedEx while you were in
10  the training mode.  All right?
11      A.   Yes.
12      Q.   Apart from the income
13  reflected on these four W-2 forms, did
14  you have any other income in 2005?
15      A.   No, sir.
16      Q.   Now, let's start with --
17      A.   Okay.  I know who this is.
18      Q.   Okay.  Who is that?
19      A.   That was with DHL.
20      Q.   DHL?
21      A.   DHL.
22      Q.   A delivery service?
23      A.   Yes.  You said 2005.

**Page 50**

1      Q.   Right.
2      A.   Right?
3      Q.   Yes, sir.  Let's talk about --
4  why don't we do these in order.  Which
5  one were you first employed by in 2005?
6      A.   That would have been True
7  Green.
8      Q.   All right.  What did you do
9  for True Green?
10      A.   I was a sales rep.
11      Q.   What was the nature of their
12  business?
13      A.   They do fertilizations,
14  spraying of lawns, insect control.
15      Q.   And who was your supervisor
16  there?
17      A.   I do not even recall his name.
18  I don't know.
19      Q.   How long did you work there?
20      A.   It was a very short period of
21  time.  That was before I -- well,
22  actually it was a very short period of
23  time, and then I went on with the FedEx

**Page 51**

1  company.
2      Q.   Did you quit that job, or were
3  you terminated from it, what happened?
4      A.   I turned in my -- a notice.
5      Q.   Where was their office
6  located?
7      A.   Here in Montgomery.
8      Q.   Can you help me out a little
9  bit more than that?
10      A.   It's in the north -- it's off
11  the northern bypass.
12      Q.   It would be listed in the
13  Yellow Pages as True Green Limited?
14      A.   No, sir.  It's True Green
15  ChemLawn.
16      Q.   Okay.  And what was your next
17  employer in 2005 other than your training
18  time at FedEx?
19      A.   That would have been with DHL.
20      Q.   All right.  Which location for
21  DHL did you --
22      A.   It's here in Montgomery.
23      Q.   Do you recall roughly where

**Page 52**

1  the office is located?
2      A.   It's off the northern bypass
3  also.  I don't -- I really don't recall
4  the address.
5      Q.   What kind of facility was it?
6      A.   It's a terminal, delivery
7  terminal.
8      Q.   Who was your supervisor there?
9      A.   I do not recall his name
10  either.
11      Q.   Was it a -- can you give me a
12  description of him?
13      A.   A description of the
14  individual?
15      Q.   Yes.  You know, skin color,
16  hair color.
17      A.   He was a black guy.
18      Q.   Approximate age?
19      A.   Oh, I have no idea.  20s, 30s.
20      Q.   All right.  And what did you
21  do for DHL?
22      A.   I delivered packages.
23      Q.   Were you a -- did you have a

13 (Pages 49 to 52)

Page 53

1   particular route?
2      **A.**  Yes, I did.
3      **Q.**  Where was your route?
4      **A.**  Elmore County.
5      **Q.**  Were you an employee or an
6   independent contractor?
7      **A.**  I was an employee.
8      **Q.**  How long did you work for DHL?
9      **A.**  I don't recall that length of
10  time.
11      **Q.**  A couple of weeks, a month?
12      **A.**  It was probably around three
13  weeks, looking at the pay.
14      **Q.**  And do you have any
15  recollection of what period of time it
16  was, whether it was in the summer or was
17  it in --
18      **A.**  It was in the summer.
19      **Q.**  And what happened with respect
20  to that job?  Why aren't you still
21  working at DHL?
22      **A.**  Well, at the time I was also
23  trying to get on with -- At-Home Services

Page 54

1  is actually Home Depot, but it was
2  working 60, 70 hours a week, and the pay
3  was -- it was nothing.  $400 a week at 60
4  to 70 hours a week.  No overtime.
5      **Q.**  What was your hourly rate?
6      **A.**  I do not even know because
7  they -- they started us -- started me at
8  400.  They started everybody else at 375.
9  The only reason why they started me at
10  four hundred was because I had went
11  through the training at FedEx.
12      **Q.**  And you were working a minimum
13  of 60 hours a week without any additional
14  compensation?
15      **A.**  That's exactly right.
16      **Q.**  You were a salaried employee,
17  is that what you're saying?
18      **A.**  That's exactly right.
19      MR. NELMS:  Off the record.
20      (Off-the-record discussion.)
21      **Q.**  (BY MR. SPOTSWOOD:)  So, in
22  any event, Mr. Thornton, you quit the job
23  because you didn't like the working

Page 55

1  conditions and the compensation package
2  basically?
3      **A.**  And I had the opportunity to
4  interview with Home Depot.  Of course,
5  the pay was -- it was tough, from seven
6  to seven at night and every weekend, you
7  know.
8      **Q.**  You were working on Saturdays
9  and Sundays?
10      **A.**  Not Sunday.
11      **Q.**  But you were working Saturday?
12      **A.**  Yes.
13      **Q.**  How many hours on Saturday?
14      **A.**  Well, that would vary because
15  you had packages to deliver, and you had
16  to complete your -- your route for the
17  day.  And during the week it was not like
18  from seven to seven.  You worked until
19  you completed your -- your route for that
20  day.
21      **Q.**  And you don't remember your
22  supervisor's name over there?
23      **A.**  Honestly, no.

Page 56

1      **Q.**  Okay.  And so, you resigned
2  that job?
3      **A.**  Yes.
4      **Q.**  And, then, did you have a job
5  at the time you resigned with Home Depot?
6      **A.**  What was the question again?
7      **Q.**  At the time you resigned from
8  DHL, did you have a job with anybody
9  else?
10      **A.**  I -- yes, I had the job with
11  Home Depot.
12      **Q.**  And that's, I think, listed on
13  the W-2 form, Exhibit A, as THD At-Home
14  Services?
15      **A.**  Right, the Home Depot At-Home
16  Services.
17      **Q.**  All right.  And what was your
18  job there?
19      **A.**  Sales, selling roofing, siding
20  and window products to homeowners.
21      **Q.**  What location did you work out
22  of?
23      **A.**  Montgomery.

Page 57

1    Q.    Were you actually calling on
2    people at their homes, or was this within
3    a Home Depot store?
4        A.    No, this was actually running
5    appointments that were set up through the
6    store.  I didn't have anything to do with
7    the store.  Appointments were set up,
8    sent over to us by e-mail, and then we
9    went to the home, met with the homeowner.
10       Q.    And you would then what,
11   decide what they needed and sign them up
12   on a contract to have the roofing, siding
13   or window products purchased and
14   installed?
15       A.    That's correct.
16       Q.    And how were you compensated
17   for that?
18       A.    Strictly commission.
19       Q.    What was your commission rate?
20       A.    It varied with the product.
21   From eight to ten percent.
22       Q.    We showed that you received,
23   according to Exhibit A, your -- your W-2

Page 58

1    earnings $2689?
2        A.    Right.
3        Q.    How long did you work there?
4        A.    I worked with Home Depot up
5    until the time I took the job with
6    UniFirst.
7        Q.    So, when did you begin with
8    Home Depot, sometime in the summer?
9        A.    Yes.
10       Q.    How many hours a week were you
11   working at the Home Depot?
12       A.    That would vary, and that was
13   one of the issues with Home Depot.  Of
14   course, you had appointments set up
15   daily.  Sometimes you may have one
16   appointment.  You may have two.  Some
17   weeks you only had maybe two appointments
18   in a whole week.  That was the -- that
19   was the big issue that I had with those
20   guys.  But as far as hours, an
21   appointment would normally take two,
22   possibly three hours, but the
23   appointments were so sporadic there's no

Page 59

1    way to say, well, I had two appointments
2    each day.
3        Q.    Well, it seems like -- and
4    your answer may have just explained it.
5    It seems a very modest amount of
6    compensation running over a three-month
7    period of time?
8        A.    Well, exactly right.  As far
9    as being competitive in the market, Home
10   Depot in this area was not very
11   competitive at all.  When it comes to the
12   roofing products, in this area there's --
13   to give you an example, there's a hundred
14   and twenty roofing companies in the city
15   of Montgomery, and Home Depot, normally
16   their prices were twice as much as Joe's
17   Roofing out here, to give you an example.
18   So, they were not competitive at all.
19   And -- but I mean, you know, there was a
20   job to be done, and you were to run your
21   appointments.  There was no compensation
22   for mileage.  It was straight commission.
23       Q.    During this period -- it

Page 60

1    basically sounds like you were working
2    part-time.  During this period were you
3    working anywhere else?
4        A.    No.
5        Q.    Were you aware when you
6    accepted the position at Home Depot and
7    resigned from your job at DHL that there
8    was going to be no guarantee of any
9    particular volume of appointments in any
10   particular week?
11       A.    I knew that there would be
12   appointments, but I did not know how many
13   appointments.
14       Q.    When did you start looking for
15   something else, other than Home Depot?
16       A.    I was continually looking for
17   something with a better income from the
18   get-go.
19       Q.    I think -- where is that
20   printout?
21       MR. PARKER:  Look at the
22   exhibit list.  It's Exhibit G.
23       MR. NELMS:  While we're off

Page 61

1    the record.
2         MR. SPOTSWOOD: Yeah.
3         (Off-the-record discussion.)
4         (Said deposition was in recess
5         at 10:32 a.m. until 10:38
6         a.m., after which the
7         following occurred:)
8    Q.   (BY MR. SPOTSWOOD:) Have a
9    look at Exhibit G from the stack over
10    there.
11         (Whereupon, Defendant's
12         Exhibit G was marked for
13         identification.)
14    Q.   This was the document I think
15    that was produced to us in response to
16    our request for what other jobs you were
17    looking for during this period of time,
18    and what I want to know is what exactly
19    did you make application for from this
20    list that's shown here on Defendant's
21    Exhibit G?
22    A.   Oh, there's -- there's no
23    telling. There's no way I can tell you

Page 62

1    that. There were several I made
2    application for. Everything that I
3    clicked on on this right here I made
4    application. I sent a resume to.
5    Q.   But you're not saying you --
6    you -- I mean, what we have here is a
7    website that says careerbuilder.com?
8    A.   Exactly right.
9    Q.   And it's got a bunch of job
10    titles here, and everything from sales
11    manager to field service representative
12    to driver, there are 18 pages, according
13    to this thing, and at least on this
14    particular one, this is 1-18 of 18. And
15    I guess what I'm asking you is I assume
16    you didn't apply for all of these jobs.
17    Do you know what you applied for?
18    A.   Yes, I did. I sent resumes to
19    all of these jobs. Those are the ones
20    that were -- it showed that I applied.
21    As a matter of fact, there's more than
22    that because if you'll see at the top, it
23    says deleted after two months.

Page 63

1    Q.   Yes.
2    A.   I never realized that I would
3    need this until I got the information
4    from Andy, and that's when I went on and
5    tried to catch it and print it off -- off
6    the Internet.
7    Q.   And, so, what you're saying,
8    if I look down on the bottom here to the
9    location on the Internet, it says, among
10    other things, careerbuilder.com, job
11    seeker jobs, my saved jobs. So, on
12    jobs -- on this careerbuilder.com, did
13    you have a list of saved jobs that you
14    were trying to print this from?
15    A.   That -- this is the saved jobs
16    list.
17    Q.   Okay.
18    A.   The ones that I applied to.
19    Q.   And are you saying -- it says
20    1-18 of 18, so are -- am I missing
21    something here? Is this just page one of
22    18 pages worth of jobs that you
23    actually --

Page 64

1    A.   That's one of 18 of 18.
2    Q.   Oh, I see, of the actual jobs
3    listed above. All right.
4    A.   This is all that I could pull
5    off, and then if you go to -- on the back
6    page there's one monster.com. Those are
7    the ones there that I sent resumes to.
8    But there were several, more
9    because I -- like I say, it deleted them
10    off after two months.
11    Q.   So, you applied -- let's just
12    look over here on the last -- the second
13    to the last page, you applied for a
14    restaurant manager job?
15    A.   I surely did.
16    Q.   And you applied as a
17    collector?
18    A.   Yes.
19    Q.   You applied as a benefits
20    recruiter?
21    A.   Yes.
22    Q.   Had you ever worked in the
23    restaurant business?

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 65

1  A.  No.  But I felt like I had
2  management experience.
3  Q.  And can you tell us what
4  companies you were making applications
5  for?  For example, on 1/21/2006, it says
6  managers and assistant managers.  Do you
7  remember who that was?
8  A.  No, I do not.
9  Q.  It says apply online, question
10 mark.  What does that mean?
11 A.  I have no idea.  That's their
12 website.  That's -- I didn't -- these
13 are -- but I know this:  These are the
14 ones that I applied to.
15 Q.  Okay.  But you were not able
16 to, when you printed this out, to also
17 print out what job it was; you couldn't
18 click on the job and find out what job it
19 was, who you were actually applying to?
20 Surely there's some more detail here.
21 A.  I knew I had to have a list of
22 where I had applied.
23 Q.  Yes.

Page 66

1  A.  This is what I went to and
2  printed off.
3  Q.  Okay.
4  A.  Whether I could have went in
5  and printed off each, I don't know if I
6  could have done that or not.
7  Q.  All right.  I want to go to
8  your 2004 tax return, which, along with
9  the W-2 forms, is marked as Exhibit B.
10     (Whereupon, Defendant's
11     Exhibit B was marked for
12     identification.)
13 A.  Can I ask you a question
14 outside?
15     MR. SPOTSWOOD:  Sure.  Go
16 ahead.
17 A.  If you don't mind, I'd
18 appreciate it.
19     (Said deposition was in recess
20     at 10:44 a.m. until 10:48
21     a.m., after which the
22     following occurred:)
23 Q.  (BY MR. SPOTSWOOD:)  Is

Page 67

1  Exhibit B the tax return you and your
2  wife filed for the tax year 2004 with the
3  federal government?
4  A.  Yes.
5  Q.  And does it accurately reflect
6  all of the income that you and she
7  received that year?
8  A.  Yes.
9  Q.  It reflects that you received
10 some $28,358 in wages from American
11 General Life and Accident Insurance
12 Company, on page --
13 A.  Correct.
14 Q.  -- two.  What were you doing
15 for American General?
16 A.  I was an agent.
17 Q.  What kind of products were you
18 selling?
19 A.  Life and health.
20 Q.  And how long did you have that
21 job?
22 A.  It was 14 months.
23 Q.  And your wife had a similar

Page 68

1  level of income from the same company.
2  What was she doing?
3  A.  She was an agent.
4  Q.  And where was your office
5  located?
6  A.  In Montgomery.
7  Q.  Did you guys work out of your
8  home, or were you working from an office?
9  A.  No, we worked out of an
10 office.
11 Q.  Do you remember what the
12 address was of that office?
13 A.  No, sir.  It was on the
14 Atlanta Highway.
15 Q.  So, if I'm not mistaken here,
16 from the looks of things, you worked all
17 of 2004 for American General?
18 A.  Yes.
19 Q.  And why did you -- when did
20 you terminate your employment at American
21 General?
22 A.  It would have been December of
23 2004.

17 (Pages 65 to 68)

Page 69

1  Q.   And why did you decide to
2  leave that job?
3  A.   The actual reason was because
4  of chargebacks, people dropping their
5  insurance and them charging me back for
6  the commissions that they had already
7  paid, and that was -- that's the reason.
8  Q.   If I understand the way that
9  works, and please correct me if I'm
10 wrong, the chargeback, the company had a
11 policy that allowed them to come back and
12 deduct from your other commission checks
13 that you were earning certain commissions
14 that you had already been credited when
15 people canceled a policy within a period
16 after the sale?
17 A.   That's correct.
18 Q.   And that was a policy that you
19 didn't care for and didn't think was
20 appropriate?
21 A.   I don't understand your
22 question.
23 Q.   What caused you -- what was

Page 70

1  the problem you had with that policy?
2  A.   I didn't have a -- well, it --
3  you're talking about the company policy.
4  Okay.  When you said policy, I'm sorry, I
5  thought you were talking about the
6  insurance policy.
7          It was the amount that hit.
8  It had actually -- over a short period of
9  time going into the latter months of
10 2004, there was so much business that
11 dropped off the books that my pool that I
12 drew my income from was just about
13 nothing, so my income had dropped
14 tremendously.
15 Q.   And that was because there was
16 poor retention, is that the terminology?
17 A.   A very poor retention not --
18 throughout the company, business
19 retention.
20 Q.   So, you thought that was not a
21 good economic deal for you and you quit?
22 A.   It was not, no.
23 Q.   And looked for something else?

Page 71

1  A.   Right.
2  Q.   And what were you --
3  A.   I was still a licensed agent
4  -- agent at the time.
5  Q.   And what did you then look
6  for?
7  A.   I went to work with True
8  Green.  As a matter of fact, they lost
9  several agents at the end of 2004 because
10 of the same problem.
11 Q.   Who owned the agency where you
12 worked?
13 A.   It was company owned.
14 Q.   Who was your immediate report,
15 direct supervisor?
16 A.   Lee Crawford.
17 Q.   Is he still there, as far as
18 you know?
19 A.   I do -- I don't know.  I
20 really don't know.  I haven't -- I don't
21 know.
22 Q.   Did your wife, Deborah, also
23 terminate her employment there?

Page 72

1  A.   Yes, she did.  Not at the same
2  time.
3  Q.   It looks like she also worked
4  at least for a period of time with
5  Liberty National.  What was she doing
6  there?
7  A.   She was an agent.
8  Q.   Was that before or after her
9  time with American General?
10 A.   That was before.  As a matter
11 of fact, she took the job -- I was
12 offered the job at State Farm, but at the
13 time I was with -- going through FedEx,
14 and I declined the job and recommended
15 her -- her the job with State Farm.
16 Q.   And she took that job?
17 A.   And she took that job.
18 Q.   Let's have a look at
19 Defendant's Exhibit C, which is, I
20 believe, your tax return for 2003.
21         (Whereupon, Defendant's
22         Exhibit C was marked for
23         identification.)

18 (Pages 69 to 72)

Page 73

1    Q.   Let me ask you to confirm that
2 Exhibit C is your federal income tax
3 return for the calendar year 2003 plus
4 the W-2 forms reflecting income you and
5 your wife received that year?
6    A.   Yes, sir.
7    Q.   It looks to me from this tax
8 return that you and your wife reported a
9 total of $25,884 in wages and salaries
10 for that year, is that correct?
11    A.   Yes, sir.
12    Q.   And is that -- is that, in
13 fact, the total income that you and she
14 received for that year?
15    A.   Yes, sir.
16    Q.   I may be missing something
17 because it appears that I do not have W-2
18 forms that add up to all that much money.
19    MR. PARKER:  I think he may
20 have had self-employment income.
21    Q.   Is that correct?  Did you have
22 some self-employment income this year,
23 2003?

Page 74

1    A.   No.
2    MR. NELMS:  I don't know.
3    A.   I mean --
4    Q.   Oh, I see.  Okay.  Let's flip
5 over to salary and wages report which
6 is -- which is the -- it looks to me like
7 it's about -- oh, I don't know.  I didn't
8 number these pages.  I'll count them.  If
9 I did that correctly, it's on page 19 of
10 this exhibit.
11    A.   Okay.  That's where we're at.
12    Q.   Yeah.  It looks like we have
13 federal wages from Liberty National Life
14 of $16,713.  Whose wages were those, your
15 wife's or yours?
16    A.   Oh, I -- I don't know.  It's
17 not listed on there which one was which.
18 I have no idea.
19    Q.   Does anybody know what T
20 hyphen S means at the top of that form?
21    MR. NELMS:  I was thinking
22 salary or tips or something like that,
23 but I -- I looked down there and there

Page 75

1 was T's next to them.  And I said, well,
2 that's not right.  They didn't get tips.
3 Taxpayer, maybe, I don't know, spouse --
4    Q.   That's what I thought it might
5 be, spouse and then taxpayer.  Did your
6 wife work that year at J. B. Hunt --
7    A.   No.
8    Q.   -- or American General Life?
9    A.   No, that was me.
10    Q.   I think that's what that
11 probably means then.
12    Would it be your recollection
13 that in 2003 your wife did, in fact, earn
14 the majority of the income from Liberty
15 National, that she worked there a lot
16 longer than you did?
17    A.   She -- yes, she did work there
18 longer than I.
19    Q.   Okay.  So, based on that -- I
20 mean, this indicates that you received
21 wages from J. B. Hunt Transport of $1800,
22 wages of $3900 from American General Life
23 and wages of $3471 from Liberty National?

Page 76

1    A.   Yes.
2    Q.   Would that all suggest to you
3 that it's your wife who earned the
4 $16,713 from Liberty National?
5    A.   All I can say is that she was
6 there longer than I at Liberty National.
7    Q.   Okay.
8    A.   I mean --
9    Q.   I think the form actually is
10 self-explanatory here.  If you note below
11 those figures I just gave you --
12    A.   Right.
13    Q.   -- it says taxpayer $9,171;
14 spouse, $16,713, for a total of $25,884,
15 and you are listed as the taxpayer here
16 on the second line, if joint return, SP
17 first name and initial, which is your
18 spouse.  So, does that clarify things?
19    A.   Some -- somewhat, I guess.
20    MR. NELMS:  If I might, is
21 that your Social Security number?
22    A.   Yes, it is.
23    MR. NELMS:  Okay.  And you're

---

Page 77

1   identified as taxpayer, right?
2     **A.**   That's what he's saying, yes.
3     **Q.**   And you don't -- you don't
4   have any reason to dispute that is what
5   I'm trying to get to?
6     **A.**   No, sir.
7     **Q.**   All right. So, good. Tell me
8   the order of your employment with these
9   companies in 2003. Who were you employed
10   by?
11     **A.**   Well, it was J. B. Hunt
12   actually first and then Liberty National.
13     **Q.**   And then American General?
14     **A.**   American General.
15     **Q.**   What were you doing for J. B.
16   Hunt Transport?
17     **A.**   J. B. Hunt, I was a recruiter
18   for those guys.
19     **Q.**   What was J. B. Hunt?
20     **A.**   It's a trucking company. It's
21   a transportation company.
22     **Q.**   Are they an LTL carrier? Less
23   than truckload?

Page 78

1     **A.**   Beg your pardon?
2     **Q.**   What kind of carrier are they?
3     **A.**   Just over-the-road
4   tractor-trailer.
5     **Q.**   And they'll pick up less than
6   a truckload and take it place to place?
7     **A.**   I have no idea. I do not know
8   that.
9     **Q.**   So, what, you were recruiting
10   drivers for them?
11     **A.**   Yes. Yes.
12     **Q.**   How would you go about doing
13   that?
14     **A.**   Just solicitation at the
15   different truck stops, fliers.
16     **Q.**   Put ads in the paper?
17     **A.**   I never put any ads in the
18   paper.
19     **Q.**   All right. And how were you
20   compensated by J. B. Hunt?
21     **A.**   It was -- they paid me weekly.
22     **Q.**   Were you on a salary, or did
23   your success rate --

Page 79

1     **A.**   It was a salary.
2     **Q.**   Do you recall what the weekly
3   salary was?
4     **A.**   No, sir, I do not. I do not
5   recall.
6     **Q.**   And did you quit that job?
7     **A.**   I left there to go to work
8   with Liberty National.
9     **Q.**   So, you resigned from that
10   employment?
11     **A.**   Yes, I did.
12     **Q.**   Where was the location that
13   you worked out of for J. B. Hunt?
14     **A.**   Arkansas.
15     **Q.**   Okay.
16     **A.**   Yeah, it was Arkansas. Home
17   headquarters.
18     **Q.**   The headquarters for J. B.
19   Hunt?
20     **A.**   Yes.
21     **Q.**   Do you remember the name of
22   your supervisor there?
23     **A.**   No, I do not.

Page 80

1     **Q.**   How long did you work for J.
2   B. Hunt total?
3     **A.**   I have no -- I don't -- I have
4   no recollection -- recall of that. I do
5   not know. I don't remember.
6     **Q.**   Okay. And then I think you
7   said you went directly to Liberty after
8   that?
9     **A.**   Yes.
10     **Q.**   And what were you doing for
11   Liberty?
12     **A.**   I was an agent.
13     **Q.**   Selling?
14     **A.**   Life and health.
15     **Q.**   And that was pure commission,
16   salary plus commission?
17     **A.**   There was a training salary,
18   and then it went from the training
19   salary -- you had a training salary, and
20   then you had a commission pool that you
21   drew your pay off of percentagewise.
22     **Q.**   Yes.
23     **A.**   And that's the way that

Page 81

1  worked.  I don't remember what the
2  training salary was right offhand.
3      Q.   All right.  And then you
4  resigned from your employment at Liberty,
5  is that correct?
6      A.   No, actually that was before I
7  was a licensed -- I had my insurance
8  license, and in the state when you take
9  your license to become an agent, you
10  have, if I'm -- I think I'm correct with
11  this.  I think you can take your test
12  twice.  If you fail it twice, you've got
13  to wait six months before you take your
14  test again.
15     Q.   Yes.
16     A.   And I did not pass my tests.
17  Well, they could not keep me on.  So, I
18  moved -- I mean, that ended my job,
19  basically.
20     Q.   Do you remember when you
21  failed the test and had to leave?
22     A.   No, sir, I do not.  I don't
23  remember that.  I know I went from there

Page 82

1  to -- to American General and went
2  through their training, and, I mean, I
3  had no problems passing the test.  I --
4  you know, I -- I received my license at
5  that point in time with American General.
6      Q.   So, did you have a six month
7  period of unemployment there?
8      A.   No, huh-uh.  It was just very
9  quick transition, maybe a week to two
10  weeks, you know.
11     Q.   And then you were able to
12  retake the exam --
13     A.   Yes.
14     Q.   -- before that six months
15  period expired?
16     A.   Oh, yes.  It was either -- I'm
17  saying six months.  It may have been four
18  months.  Four to six months you had a
19  downtime that the State would not let you
20  take the test, but I took it, and I
21  passed it.
22     Q.   Did you have any periods of
23  unemployment during 2003, or were you

Page 83

1  employed each week during that year?
2      A.   No, sir, I was employed.
3      Q.   Have a look at, if you would,
4  Defendant's Exhibit D, which is your 2002
5  tax return.
6          (Whereupon, Defendant's
7          Exhibit D was marked for
8          identification.)
9      Q.   This reflects wages, salaries
10  and tips on page three, I'm looking at
11  line seven, of $22,837.  And then
12  business income of $4402 and then a
13  capital loss of $3,000, for total income
14  that year of $25,146.  Is that correct?
15  Is that what your total income was that
16  year?
17     A.   Yes.
18     Q.   And on the wages component, it
19  looks like we have for you wages of a
20  little over $5900 from Dixie
21  Homecrafters.  That's on page one, the
22  second W-2, correct?
23     A.   Yes, sir.

Page 84

1      Q.   And, then, we have roughly
2  $971 from SCI Management, LP?
3      A.   Yes.
4      Q.   What is that entity?
5      A.   That's -- I worked with --
6  actually it was Green -- Green --
7  Greenwood Funeral Service.  Cemetery, not
8  the funeral home, but the cemetery.
9      Q.   What were you doing with them?
10     A.   I was sales, lots.
11     Q.   Selling lots in a cemetery?
12     A.   Yes.  And headstones and stuff
13  like that.
14     Q.   And then the next page of the
15  Exhibit D, I show you as having roughly
16  $4800 in income from Sears Home
17  Improvement Products?
18     A.   Yes.
19     Q.   What were you doing with them?
20     A.   It was home improvement.
21     Q.   Was that --
22     A.   Windows and siding.
23     Q.   Were you calling on people, a

---

Page 85

1  similar deal --
2      A.   Yes.
3      Q.   -- where the store sets up an
4  appointment and --
5      A.   No, sir.  This was not
6  connected to the store at all.  It was
7  actually -- our appointments were
8  generated out of Atlanta through fliers,
9  telemarketing and such, and we would run
10  the leads from that.
11     Q.   By running leads, you would
12  then call on people?
13     A.   Appointments.  No, sir, I
14  didn't, but they did, so it was
15  appointments.  It was set appointments.
16     Q.   Okay.  Was that a commission
17  only deal?
18     A.   Yes, sir, it was.
19     Q.   How long did you work for
20  Sears Home Improvement?
21     A.   Oh, I don't know.  I worked
22  with those guys until they closed the
23  office here in Montgomery.

Page 86

1      Q.   And what were you doing with
2  Dixie Homecrafters?
3      A.   Same -- same thing, a few more
4  products.  They had siding and gutters.
5      Q.   What was the sequence of your
6  employment here in 2002?
7      A.   I was with Home -- I was with
8  Home Depot.  I went with Dixie
9  Homecrafters and then with SCI.
10     Q.   Well, you said Home Depot.
11  Did you mean to say Sears Home
12  Improvement?
13     A.   Oh, I'm sorry.  Yes, Sears
14  Home Improvement.
15     Q.   Okay.  And how long during
16  2002 did you work for each of these?
17     A.   I do not recall.
18     Q.   And Exhibit D is your tax
19  return that you filed with the government
20  for calendar year 2002?
21     A.   Yes, sir.
22     Q.   Why don't you take a quick
23  look at Exhibits E and F?

Page 87

1      (Whereupon, Defendant's
2  Exhibits E and F were marked
3  for identification.)
4      Q.   Are these two -- let's look at
5  E first.  Is Exhibit E your 2001 federal
6  income tax return?
7      A.   Yes, sir, it is.
8      Q.   And does it accurately reflect
9  the income you and your wife received for
10  that year?
11     A.   Yes, sir.
12     Q.   And when I flip over to the
13  same salary and wages report that we just
14  talked about a minute ago for another
15  return, page 11 --
16     A.   Okay.
17     Q.   -- it looks like for the
18  taxpayer, which we determined is you, we
19  have a little over $28,000 for Sears Home
20  Improvement, $3,300 for Swift
21  Transportation --
22     A.   Yes.
23     Q.   -- $418 for Drivers

Page 88

1  Management?
2      A.   Right.
3      Q.   Those are all of the jobs you
4  had that year?
5      A.   Yes.
6      Q.   And were you working with
7  Swift Transportation and then resigned
8  from them --
9      A.   Yes, I did.
10     Q.   -- to go to work at Sears?
11  Correct?
12     A.   Yes.
13     Q.   So, did you work the bulk of
14  the year at Sears, does it appear?
15     A.   I do not recall if it was the
16  bulk of the year on not.
17     Q.   Well, certainly the bulk of
18  your earnings were with Sears that year?
19     A.   Yes.
20     Q.   And, then, what is Drivers
21  Management?
22     A.   It was just a -- I guess a
23  training division of Swift.

CHARLIE THORNTON vs. Case 2:05-cv-00656-MEF-DRB   Document 27-3   Filed 04/18/2006   Page 25 of 107   CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

March 15, 2006

---

**Page 89**

1  Q.   What did you do for Swift?
2  A.   I drove for those guys.
3  Q.   Were you an over-the-road
4  driver?
5  A.   No, a regional.
6  Q.   What does that mean?
7  A.   Southeast, just the southeast.
8  Q.   But you were driving a big
9  tractor-trailer truck?
10  A.   Yes.
11  Q.   And how was your compensation
12  computed for that?
13  A.   So much per mile.
14  Q.   And did you own your truck or
15  rent it?
16  A.   No, sir, it was company owned.
17  Q.   Company-owned truck.  I'm
18  sorry.
19  A.   Yes, sir.
20  Q.   And did you resign that job to
21  go to work at Sears?
22  A.   Yes, I did.
23  Q.   Okay.  Let's go to Exhibit F,

---

**Page 90**

1  which is your 2000 federal tax return, is
2  it not?
3  A.   Yes, sir.
4  Q.   And that's for both you and
5  your wife Deborah?
6  A.   That's correct.
7  Q.   If you'll flip over to about
8  page five or so, I am seeing an income
9  from partnership and S corporations of
10  roughly $18,986 from an entity called
11  Security Experts, LLC?
12  A.   That's correct.
13  Q.   Is that the company that you
14  owned?
15  A.   That was the -- that was the
16  other company.  I had actually two
17  security companies.
18  Q.   Okay.  And how long had you
19  owned -- who else owned an interest in
20  this, anyone other than you, did your
21  wife?
22  A.   Yes.
23  Q.   Who else owned an interest in

---

**Page 91**

1  it?
2  A.   David Murabito.
3  Q.   Okay.
4  A.   We were just actually
5  partners.
6  Q.   Okay.  I may have asked this
7  previously, but where is David today?
8  A.   David is in Tampa, Sarasota,
9  Florida area.
10  Q.   What's he doing down there?
11  A.   He works for Home Depot
12  At-Home Services.  The last I spoke with
13  him, he was with Home Depot.
14  Q.   I see in addition to the
15  income from that entity on the salaries
16  and wages report that we've been looking
17  on the previous tax returns, this one
18  shows taxpayer, namely, you receiving
19  $21,997 from Edison Security?
20  A.   Yes.
21  Q.   Who owned Edison Security?
22  A.   Wes-Tech Edison.
23  Q.   And where is it located?

---

**Page 92**

1  A.   They closed their -- they are
2  no longer in this area.
3  Q.   Okay.
4  A.   As far as a branch office.
5  Q.   Are they still in business
6  now?
7  A.   I have no idea.
8  Q.   So, you were an employee for
9  them?
10  A.   I was a salesman.
11  Q.   And did you at the same time
12  have your own security company, as well?
13  A.   No, I did not.
14  Q.   So, you -- did you resign from
15  Edison to start your own company?
16  A.   No, sir, they closed the
17  office, and after that is when I opened
18  Security Experts.
19  Q.   Did your wife also work for
20  Edison Security or not?
21  A.   No, sir, she did not work for
22  Edison Security.
23  Q.   What was she doing at this

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 93

1  period?
2      A.   I don't know.
3      Q.   Also I see some income from an
4  entity on here called Best Security
5  Systems, Inc. of $1,587?
6      A.   Right.  That was another
7  independently-owned security company here
8  in Montgomery.
9      Q.   And who worked for them, you
10  or your wife?
11      A.   Actually when Edison shut
12  down, I went to work for Best for a very
13  short period of time, then I opened -- I
14  just -- yeah, that's what I was trying to
15  think.  And then David and I opened the
16  Security Experts.
17      Q.   What about the other company
18  that you mentioned previously, was there
19  any income from that reported this year?
20      A.   In 2000?
21      Q.   Yes.
22      A.   No, that was before 2000.
23  Apparently it was before.

Page 94

1      Q.   All right.  I don't see any
2  income from Regions at this juncture
3  either as of 2000, so she must have
4  resigned from Regions before that as
5  well?
6      A.   Yes.
7      Q.   Have you ever been arrested
8  for anything?
9      A.   No, sir.
10      Q.   Not as a child or minor?
11      A.   No.
12      Q.   Have you ever had any kind of
13  a misdemeanor charge --
14      A.   No, sir.
15      Q.   -- or any kind of criminal
16  charge against you?
17      A.   No, sir.
18      Q.   -- of any kind?  Say again.
19      A.   No, sir.
20      Q.   What did you do at Best
21  Security Systems in 2000?
22      A.   I was a sales rep.
23      Q.   And was that cold calling

Page 95

1  or --
2      A.   Yeah, cold calling.
3      Q.   In 2000, we also see a little
4  bit of income, I think, from Capital
5  Chevrolet, wages and salary report?
6      A.   Yeah, it was for a short
7  period of time I was with those guys as a
8  salesman.
9      Q.   Selling cars?
10      A.   Yes.
11      Q.   New cars, used cars?
12      A.   Yes.
13      Q.   Both?
14      A.   Yes.
15      Q.   And then there's also a
16  reference to Osiris, O-S-I-R-I-S, Holding
17  Company on the wages and salary report?
18      A.   I don't have a clue to what
19  that is.
20      Q.   Okay.  Do you own an
21  automobile at this time?
22      A.   Yes, I do.
23      Q.   Does your wife own one as

Page 96

1  well?
2      A.   Yes, we did.  Yes, she does.
3      Q.   Do y'all own them together?
4      A.   Yes, we do.
5      Q.   What are they, make, model,
6  year?
7      A.   I've got a -- she's got a 2000
8  Mazda Miata.  I have a '93 Nissan Sentra
9  that I use for work.
10      Q.   Yes.
11      A.   And I have a 1990 Toyota, a
12  four-wheel-drive.
13      Q.   As a part of the initial
14  disclosures that the court required be
15  produced in this case and that were
16  produced by your counsel last year, we
17  had -- we received some tapes.  We had
18  those tapes transcribed by a court
19  reporter.
20      A.   Right.
21      Q.   And last week we sent the
22  transcript to your counsel and basically
23  asked that you have a look at them and

Page 97

1  let us know if you thought they were
2  accurately transcribed or not. Have you
3  done that?
4      A.  I have looked at them.
5      Q.  Okay. Let me ask you to take
6  a look at --
7          MR. PARKER:  It should be
8  Exhibit --
9          MR. NELMS:  M.
10         MR. PARKER:  M and O.
11     Q.  Let me ask you to take a look
12 at Exhibit O first of all.
13         (Whereupon, Defendant's
14         Exhibit O was marked for
15         identification.)
16     A.  Okay.
17     Q.  And I'm going to ask you --
18 and that's -- it has on the cover phone
19 conversations, Charlie Thornton slash
20 FedEx. It has an index which I know is
21 not something that you created. That's
22 something that the court reporter
23 created, and it has a series of names of

Page 98

1  people --
2          MR. PARKER:  I don't think
3  that their exhibits have an index.
4      A.  I don't have that.
5          MR. PARKER:  The ones, the
6  court reporters and theirs, they just
7  start at the first page.
8      Q.  Okay. Sorry. Okay. In any
9  case, Exhibit O, according to the court
10 reporter who listened to the tapes, is a
11 true and correct transcription of what's
12 on the tapes. My question to you is,
13 having read and reviewed these tapes and
14 having made the tapes and having reviewed
15 these transcripts, do you have any
16 quarrel with the accuracy of what is in
17 front of you as Exhibit O?
18     A.  I have not been able to
19 compare apples to apples as far as
20 reading the total accuracy of the
21 documents here. I cannot say they are
22 100 percent accurate because I did not
23 listen to the tape and then read the

Page 99

1  transcript with it.
2      Q.  Okay.
3      A.  So --
4      Q.  All right. Did you see
5  anything from your own recollection of
6  the tapes in reading through the
7  transcripts that you thought was
8  inaccurate?
9      A.  There again, I can't say. You
10 know --
11     Q.  Why can't you answer that
12 question?
13     A.  Because if I read something --
14 I mean, I'm reading this and knowing
15 what's coming off the tape may be worded
16 differently, I -- I cannot say with
17 100 percent accuracy that it is exactly
18 the way it came off the tape because I
19 did not take the tape, listen to the tape
20 and read the transcript at the same time.
21     Q.  You already told me that.
22 What I'm asking you is, based on reading
23 the transcript, did you see anything in

Page 100

1  it, based on your own participation in
2  these conversations, that you thought was
3  wrong? That's my question.
4      A.  No.
5      Q.  Did you make any recordings of
6  any conversations with any FedEx
7  employees other than those that are
8  reflected in the transcripts in front of
9  you as Exhibit O?
10     A.  No, sir.
11     Q.  It's true, is it not, that you
12 did not tell any of the people whose
13 conversations you recorded as shown in
14 Exhibit O that you were recording the
15 conversations?
16     A.  That is true.
17     Q.  So, none of these people that
18 you were talking to, as reflected on
19 Exhibit O, had any reason to know that
20 you were recording the conversations
21 because you didn't tell them that you
22 were recording them?
23     A.  I did not tell the individuals

Case 2:05-cv-00656-MEF-DRB    Document 27-3    Filed 04/18/2006    Page 28 of 107

Page 101

1  that I was recording, no.
2      Q.   It's true, though, that you
3  had a number of conversations with FedEx
4  employees that you did not record,
5  correct?
6      A.   Prior to me recording these,
7  not after I started recording. Every
8  conversation after the fact was recorded.
9      Q.   And when did you make your
10 first recording, what date?
11     A.   I do not recall that date.
12     Q.   Was it May the 19th?
13     A.   I do not recall the date.
14     Q.   Okay. I think we're going to
15 be able to figure that out, but we'll get
16 to that.
17          But your testimony is whatever
18 the earliest date is that we have -- for
19 which we have a recorded conversation,
20 from that point forward, every
21 communication you had with FedEx or with
22 Mr. Primus at the bank was recorded by
23 you?

Page 102

1      A.   Yes, sir.
2          MR. NELMS: Excuse me. Every
3  telephone conversation.
4      A.   Yes, telephone.
5      Q.   Okay. You had other
6  conversations not on the phone with
7  people that were not recorded.
8      A.   No, sir.
9      Q.   Okay. Well, that's what I'm
10 trying to figure out.
11     A.   Okay. No, sir, I did not.
12     Q.   So, whatever the earliest date
13 is where we -- where you recorded a
14 conversation, you had no communications
15 with FedEx, anybody at FedEx, other than
16 one that was actually recorded?
17     A.   That's correct.
18     Q.   And you knew you were calling
19 some people in Pittsburgh, Pennsylvania,
20 correct?
21     A.   That's exactly right.
22     Q.   Are you aware, as you --
23     A.   Well, let me back up. The

Page 103

1  phone numbers -- I talked to one
2  individual that was in Honolulu, Hawaii.
3      Q.   Yes.
4      A.   And I did not know I was
5  calling Honolulu, Hawaii.
6      Q.   But you know that you made
7  several telephone calls to people in
8  Pittsburgh, Pennsylvania, correct?
9      A.   I made phone calls to
10 Pittsburgh, Pennsylvania.
11     Q.   And you recorded the calls?
12     A.   Yes, I did.
13     Q.   Are you aware, as you sit here
14 today, that it is a crime under
15 Pennsylvania law to record a conversation
16 and not tell the other person you're
17 recording it?
18     A.   I was not aware of that. I
19 was making the phone call from the State
20 of Alabama. They did not call me.
21     Q.   Okay. Are you aware of that
22 now?
23     A.   If you're making me aware of

Page 104

1  it.
2      Q.   You've not heard that before
3  today?
4      A.   No, sir, I have not.
5          MR. NELMS: Hang on a minute.
6  You and I talked about it.
7      A.   What?
8          MR. SPOTSWOOD: I didn't mean
9  to inquire into your communications.
10         MR. NELMS: I know, but if
11 you're not telling him about the
12 conversations that you and I have had, I
13 waive any attorney-client privilege.
14 We --
15     A.   Oh, we've talked, sure.
16         MR. NELMS: All right. Did
17 I --
18     A.   I thought he was talking about
19 FedEx.
20         MR. NELMS: Well, y'all be
21 clear.
22     Q.   (BY MR. SPOTSWOOD:) You've
23 just revealed, I guess, that you did have

26 (Pages 101 to 104)

Page 105

1  some communications with your counsel
2  about that issue. I don't mean to
3  inquire into those, but you did discuss
4  those issues, correct?
5      MR. NELMS: Right. I waive
6  any privilege. Do you wish to waive any
7  privilege that we might have related to
8  this specific issue of whether or not you
9  were aware, of course, after the fact
10  that it is a crime in Pennsylvania to
11  record conversations without letting the
12  party being recorded know that, in fact,
13  they are being recorded? Do you waive
14  that part of the attorney-client
15  privilege?
16      A.    Sure.
17      MR. NELMS: It's your
18  privilege, not mine.
19      A.    I mean, I don't really -- I
20  mean, I'm wanting to understand what
21  you're saying to me.
22      Q.    (BY MR. SPOTSWOOD:) Well, let
23  me just ask it this way.

Page 106

1      A.    Okay.
2      Q.    Before you talked with your
3  counsel, did you have any idea or
4  knowledge of what the law was in
5  Pennsylvania about recording
6  conversations?
7      A.    No, sir, I did not.
8      MR. NELMS: There you go.
9      Q.    When you recorded these
10  conversations, did you record all the
11  conversation or some of it?
12      A.    All the conversation.
13      Q.    What kind of equipment did you
14  use to do that?
15      A.    Just a hand -- a hand-held
16  recorder off of a speaker phone, my home
17  phone.
18      Can I take a moment? I need
19  to run to the restroom.
20      MR. SPOTSWOOD: Absolutely.
21      (Said deposition was in recess
22      at 11:32 a.m. until 11:39
23      a.m., after which the

Page 107

1  following occurred:)
2      Q.    (BY MR. SPOTSWOOD:) On
3  Exhibit O, and I know you guys don't have
4  this -- what's our last exhibit?
5      (Whereupon, Defendant's
6      Exhibit R was marked for
7      identification.)
8      Q.    We'll take a look at this in a
9  second. This is the index that the court
10  reporter did that apparently is not on
11  your -- on your page. It says here,
12  "These conversations were transcribed in
13  the order listed above just as they were
14  recorded on the audiotapes." And my
15  question to you is from -- can you
16  confirm that these are listed here in
17  date order? In other words, the first --
18      A.    No, sir, I can't confirm it.
19  There's no way I can confirm it unless I
20  listen to the tape and heard the dates
21  themselves, but I can't accurately --
22      Q.    Well, I don't believe, with
23  one or two exceptions, that there are

Page 108

1  dates stated on the transcripts.
2      A.    Well, I -- I remember after I
3  said the date on the -- on the tape. I'm
4  not saying I did it on each and every one
5  of them, but I can recall doing that.
6      Q.    I recall one instance where
7  you did, too, and that's what I'm looking
8  for right here to see if I can find it.
9  I read through these, I'll tell you, very
10  recently.
11      A.    Yeah, I noticed one of them.
12  But I know there was more than one
13  occasion that I actually put the date on
14  there.
15      Q.    Here we go. On page 21, that
16  is the first reference I see to a date,
17  and it says -- and page 21 is after
18  your -- the recordings of the
19  conversations of Jeff White, Kent
20  Gastineau and then again Kent Gastineau.
21  And on page 21 it says these calls were
22  made on May 19th '05. Do you see that?
23      A.    Yes, sir.

---

Page 109

1    Q.   And, so, would that be your
2  best recollection that that's when those
3  calls were made, preceding from page one
4  to page 21?
5    A.   I cannot say with 100 percent
6  accuracy that all of these calls were
7  made on the 19th.  Apparently the one
8  that I spoke to, Angela --
9    Q.   Yes?
10   A.   -- what it's saying to me
11  now --
12   Q.   You're the one recording these
13  calls.
14   A.   -- is that this -- this call
15  was made on the 19th.
16   Q.   Can you explain why it says
17  calls, plural?
18   A.   No, I cannot explain that.  I
19  did not -- I did not do this
20  transcription.
21   Q.   Well, I understand that, but I
22  can -- I can assure you this was done by
23  a very competent professional.

---

Page 110

1    A.   I don't even question that.  I
2  don't question that.
3         MR. NELMS:  Object to the
4  form.
5    A.   What --
6    Q.   I'm really kind of struggling
7  with here is, I mean, why are you having
8  a hard time figuring this out.  These are
9  very straightforward questions here.
10  We've got a phone call to Jeff White, you
11  know, you -- you're trying to find him.
12  You don't have any success.  That's pages
13  one through three, and then starting on
14  page four, which really kind of goes --
15  goes in sequence here.  When you called
16  Jeff White, whom you didn't get, he told
17  this person Cheryl to tell you to call
18  Kent, so that's what you do, you call
19  Kent.
20   A.   Okay.
21   Q.   And then you have this
22  conversation with Kent apparently as
23  recorded here.

---

Page 111

1         MR. NELMS:  Bob, is there a
2  question in here?
3         MR. SPOTSWOOD:  Yeah, I'm
4  going to get to it.
5         MR. NELMS:  Well, I'm going to
6  object to characterizations of the
7  deponent's willingness or ability to
8  answer the question.  He's answering them
9  as you're asking them.  Characterizations
10  otherwise are really not your province.
11   Q.   Well, I -- my question is very
12  simple.  Why can't you confirm for me
13  with this transcript in front of you that
14  these calls, just as it says here on page
15  19, were made -- I'm sorry, page 22, were
16  made on the 19th of May?
17         MR. NELMS:  I object to the
18  form again because it's asked and
19  answered.
20         MR. SPOTSWOOD:  Well, it
21  hasn't been asked and answered after he's
22  just had a chance to look through what
23  we're talking about, and that's what I'm

---

Page 112

1  asking you to do, and if you need to read
2  the first 22 pages here --
3    A.   I have read those.
4    Q.   Okay.  Now, my question to you
5  is isn't it true that the calls that
6  precede page 21 were made on the 19th of
7  May just like you say they were?
8    A.   I cannot confirm that.  I
9  cannot.  And I am being honest.  I cannot
10  confirm that.
11   Q.   Okay.  What calls do you think
12  you were talking about near then?  Do we
13  need to get the tape recorder out and
14  listen to the tapes?
15         MR. NELMS:  Object to the
16  form.  Just try to answer his question
17  the best you can.
18   A.   I cannot confirm that, Bob.
19  I'm sorry.
20         MR. NELMS:  Why don't you ask
21  him what his impression is?
22   Q.   I'm glad to do that.  Is it
23  your best impression that these three

Page 113

1  calls were made on the 19th?
2      A.   As far as looking at this
3  particular document --
4      Q.   Yeah.
5      A.   -- the impression that this
6  document gives me that these calls were
7  made. As far as me knowing they were
8  made, I cannot confirm that.
9      Q.   Okay.
10         MR. NELMS:  Let's take a
11  break.
12         MR. SPOTSWOOD:  Okay.  Thank
13  you.
14         MR. NELMS:  Am I --
15         MR. SPOTSWOOD:  No, go ahead.
16         (Said deposition was in recess
17         at 11:46 a.m. until 11:49
18         a.m., after which the
19         following occurred:)
20      Q.   (BY MR. SPOTSWOOD:)  Let's
21  turn to Exhibit N for a minute.
22         (Whereupon, Defendant's
23         Exhibit N was marked for

Page 114

1      identification.)
2      Q.   Do you have that in front of
3  you?
4      A.   Yes, sir, I do.
5      Q.   This is a transcript of a tape
6  that we received from your counsel as a
7  part of the initial disclosures in the
8  case, and it purports to be a statement
9  that you dictated.  Does this, in fact,
10  appear to be a statement that you
11  dictated into the tape recorder?
12      A.   Yes, sir.
13      Q.   Did you see, in reviewing this
14  transcript, any errors that were
15  noticeable to you, recognizing that you
16  haven't done a word-by-word transcript
17  versus tape comparison?
18      A.   No, sir.
19      Q.   I know that when I originally
20  read through this that I wrote on the
21  cover of it May 19th, and I suspect I did
22  that because somewhere in here it says
23  the date you recorded it.

Page 115

1         MR. PARKER:  I believe it's on
2  the last page.
3      Q.   Yes, it is, on page 53, it
4  says, "Today is the 19th, and that's all
5  I have for today, so I'll end this
6  conversation now."
7         So, would it be your best
8  judgment that this would have been
9  recorded by you on the 19th of May?
10      A.   Yes, sir.
11      Q.   Of 2005?
12      A.   Yes, sir.
13      Q.   Okay.  And my recollection is
14  you filed this lawsuit on May the 25th of
15  2005?
16      A.   I don't recall the date.
17      Q.   Is this the first time that
18  you had recorded conversations with
19  persons without advising them that you
20  were doing so?
21      A.   Yes, sir, it is.
22      Q.   And have you done it since
23  this time?

Page 116

1      A.   No, sir.
2      Q.   According to your amended
3  complaint, your first introduction to
4  FedEx Ground came when you read a
5  newspaper advertisement for an
6  information session about FedEx Ground
7  independent contractor positions, is that
8  correct?
9      A.   That's correct.
10      Q.   What paper did you see this ad
11  in?
12      A.   The Montgomery Advertiser.
13      Q.   Do you recall what the ad
14  said?
15      A.   No, sir, I do not recall it
16  verbatim.
17      Q.   You don't have a copy of it,
18  do you?
19      A.   No, sir, I don't.
20         MR. NELMS:  I'm sorry, a copy
21  of the ad?
22         MR. SPOTSWOOD:  Yes.
23         MR. NELMS:  Yeah, it was in

Page 117

1    the initial disclosures.
2        A.    We had several copies.
3            MR. NELMS:  If it's not, I'll
4    give it to you now.
5            MR. PARKER:  I don't think we
6    got it.
7            MR. NELMS:  I've got it.
8    Sorry.
9            MR. PARKER:  We had a list of
10   documents.
11           MR. NELMS:  This is the
12   original.  We can put it in the record.
13   Find it for me, please.
14       A.    What.
15           MR. NELMS:  I forget what
16   it -- is that it (indicating)?  No.
17       A.    (Examining document.)
18           MR. NELMS:  It may not be on
19   that page.  It may be on the other page.
20       A.    Here it is right here.  That's
21   it, independent contractors which were --
22   no, this is for June.
23           MR. NELMS:  This is --

Page 118

1        A.    This is where they was, you
2    know, keeping on advertising.  This is
3    the June paper, but we had a -- I went --
4            MR. NELMS:  Point to it for
5    me.
6        A.    It's right here.
7            MR. NELMS:  All right.
8        A.    That's the same ad.
9            MR. SPOTSWOOD:  Do you want --
10   can we get somebody to take a picture of
11   that?
12           MR. NELMS:  Yeah, do you want
13   me to copy that front page?  We've got
14   whatever our -- where did it go?
15           MR. PARKER:  What are you
16   looking for?
17           MR. GASTINEAU:  A copy of this
18   right here.
19           MR. NELMS:  Oh, all right.
20   You already got a copy.  One second.
21           MR. SPOTSWOOD:  And be sure
22   you get me a date on that, too, if you
23   can arrange to copy it so it has a date

Page 119

1    on it.
2            (Said deposition was in recess
3            at 11:54 a.m. until 11:57
4            a.m., after which the
5            following occurred:)
6            (Whereupon, Defendant's
7            Exhibits S and T were marked
8            for identification.)
9        Q.    All right.  Have a look here,
10   if you would, at Defendant's Exhibit S.
11   This is a copy of a classified ad from
12   the paper June the 12th, 2005.
13           MR. SPOTSWOOD:  And, Counsel,
14   if I understand you correctly, this came
15   from The Montgomery Advertiser, is that
16   correct?
17           MR. NELMS:  Yes.
18       Q.    And is this similar to the ad
19   that you saw back in January?
20       A.    This is the exact ad except
21   for the dates when the sessions would be.
22           MR. NELMS:  I want to put that
23   in.

Page 120

1        Q.    Do you have -- hang on a
2    second.
3            (Off-the-record discussion.)
4        Q.    (BY MR. SPOTSWOOD:)  Do you or
5    your counsel -- I will ask you both this:
6    Is this the only ad like this that y'all
7    have?
8            MR. NELMS:  Charlie says that
9    he went and copied some more.
10       A.    I did not copy them.  I went
11   to the -- to the library, and I went back
12   in the archives of the newspaper and
13   brought the originals.  I cut the
14   original out and brought them in.
15           MR. NELMS:  To me?
16       A.    Yes, brought them to the
17   office, gave them to Audrey.
18           MR. NELMS:  I will get them
19   for you when I can find them.  I don't
20   see them in my file.
21       A.    Because there were times in
22   between January and May the ad was still
23   being run, so I got from January all the

Page 121

1 way through May and above -- beyond, and
2 I brought them in and gave them to
3 Audrey.
4 　　　　MR. SPOTSWOOD:  And Audrey is
5 an employee here in the firm?
6 　　　　MR. NELMS:  Yes, secretary.
7 　　　　MR. SPOTSWOOD:  Okay.
8 　　Q.　(BY MR. SPOTSWOOD:)  Going
9 back to our discussions for just a
10 minute --
11 　　　　MR. NELMS:  Keep going, Bob.
12 　　Q.　-- we've -- you -- you have
13 testified, if I remember it correctly,
14 that you did not record all of your
15 conversations with Kent Gastineau or
16 other employees because some of those
17 conversations either were in person, and
18 you recorded none of those, right, so
19 far?
20 　　A.　Let me say this:  I had no
21 conversations with anybody face-to-face
22 after I recorded -- started the
23 recordings on the telephone.

Page 122

1 　　Q.　Okay.
2 　　A.　Before that there was no
3 recordings --
4 　　Q.　All right.
5 　　A.　-- either on the phone, you
6 know, or off, face-to-face.
7 　　Q.　All right.  Why did you think
8 it was appropriate to record
9 conversations with these individuals who
10 you recorded?
11 　　　　MR. NELMS:  Object to the
12 form.  Answer the question.
13 　　A.　Oh, okay. I'm sorry.  Because
14 I had prepared myself to go to work.  I
15 had put myself out on a limb.  I had put
16 myself in a position where I really
17 thought I had an excellent, excellent
18 opportunity to go to work for -- to go to
19 work for an excellent company, and the
20 night -- the night before I was to get
21 into that truck and start my job, Kent
22 calls me and tells me I cannot go to
23 work, that he had signed off on some

Page 123

1 documents and signed in the wrong place
2 and was going to have to have them
3 documents e-mailed back to him before I
4 could go to work.  And I had put my
5 livelihood on the line, my credit on the
6 line, and I had a $50,000 vehicle sitting
7 in my driveway with FedEx all over it,
8 and uniforms to this day that are hanging
9 in my closet to go to work.  And I wanted
10 to know what was going on, and if I,
11 Charlie Thornton, did not prepare myself
12 or get my ducks in line, nobody else was
13 going to do it for me.  And I had to have
14 proof of what -- what was going down
15 because I was in a really, really bad
16 situation.  I had a truck sitting out
17 there that had a seven hundred and
18 something dollar payment on it that was
19 due in two weeks and had no -- no job.
20 My livelihood, my wife, my family was on
21 the line.
22 　　　　Now, I'm just answering it
23 truthfully, Bob, truthfully.  And I had

Page 124

1 been given the run-around for so long, I
2 had to protect myself.
3 　　Q.　And why did you record your
4 history that's reflected in Exhibit N?
5 　　A.　Because it was the best way at
6 the time for me to bring it back in my
7 mind and record it on tape other than
8 writing it down.
9 　　Q.　Okay.
10 　　A.　I could think and talk at the
11 same time and put it down.  It would be
12 more accurate this way than writing it.
13 　　Q.　Is it fair to say that by the
14 time you started recording these
15 conversations that you decided that you
16 were going to sue FedEx?
17 　　A.　No, sir.  It was not.  It was
18 not.  But I wanted to -- I wanted to have
19 something that I could hold somebody to.
20 Kent had called me, and he had asked me
21 how many years I wanted on the contract.
22 I wanted two years.  He was taking care
23 of it.  I trusted the man.  I trusted

31 (Pages 121 to 124)

CHARLES THORNTON v. FEDEX
CASE 2:05-cv-00656-MEF-DRB     Document 27-3     Filed 04/18/2006     Page 34 of 107
FEDEX GROUND PACKAGE SYSTEM

CHARLES THORNTON
March 15, 2006

**Page 125**

1 everybody in FedEx from the trainer I
2 went and trained with in Birmingham to
3 everybody. I was excited because I was
4 not just looking for this for myself. I
5 was looking at it for four boys down the
6 road because I had investigated this, my
7 wife and myself, and I knew that it could
8 possibly be a future for my -- my boys
9 down the road. And, no, I did not. I
10 did not have, when I started recording
11 this, intentions on suing anybody. My
12 intentions were to have a job.
13     **Q.** Six days later you filed a
14 lawsuit?
15     **A.** Six -- six days. How long
16 does it take you to make up your mind?
17        MR. NELMS: Just answer the
18 question.
19     **A.** I knew -- yes, six days later.
20        MR. NELMS: If that was a
21 question.
22        MR. SPOTSWOOD: It was a
23 question.

**Page 126**

1     **Q.** (BY MR. SPOTSWOOD:) Did your
2 wife attend the sessions that you
3 attended, which I think from some -- let
4 me break this question down.
5        When did you attend the
6 informational session about becoming a
7 driver, contractor?
8     **A.** January.
9     **Q.** Does January 4 stick with you?
10     **A.** I cannot recall the date, but
11 it was in January. I believe it was on a
12 Thursday.
13     **Q.** Okay. Did anybody attend with
14 you, your wife?
15     **A.** Yes, my wife. And she's a
16 sharp lady, I can tell you.
17        MR. NELMS: Answer his
18 questions.
19     **Q.** Do you know whether either you
20 or she made any notes of any kind in
21 connection with this?
22     **A.** Yes, I did.
23     **Q.** Where are those note?

**Page 127**

1     **A.** I gave those notes to Andy.
2        MR. SPOTSWOOD: I'm supposed
3 to have that. I mean, we have asked it
4 every which way known to man for any
5 documents he has related to any of this.
6 We don't have them.
7        MR. NELMS: Off the record if
8 that's all right with you.
9        MR. SPOTSWOOD: Yes.
10        (Off-the-record discussion.)
11        (Said deposition was in recess
12     at 12:06 p.m. until 12:38
13     p.m., after which the
14     following occurred:)
15        (Whereupon, Defendant's
16     Exhibit U was marked for
17     identification.)
18        MR. SPOTSWOOD: I am putting
19 this U on a blank part of this piece of
20 paper here.
21        MR. NELMS: Understood.
22        (Off-the-record discussion.)
23     **Q.** (BY MR. SPOTSWOOD:) Mr.

**Page 128**

1 Thornton --
2     **A.** Yes, sir.
3     **Q.** -- I'm going to show you what
4 I've marked as Defendant's Exhibit U,
5 which is a two-page -- it's front and
6 back, got writing on the front and back.
7     **A.** Yes.
8     **Q.** These are notes of yours, are
9 they not?
10     **A.** Yes, sir, they are.
11     **Q.** And is everything on these two
12 pages in your handwriting?
13     **A.** Yes, sir, it is. Okay.
14 Except -- I'm sorry. Let me back up.
15 Except for -- except for one at the
16 bottom of the first page here, you see
17 the little star that says what areas are
18 open.
19     **Q.** Yes.
20     **A.** My wife wrote that.
21     **Q.** All right. And -- okay.
22     **A.** And if you see out to the
23 side, I asked that question. It says

| Page 129 | Page 131 |
|---|---|

Page 129

1    Montgomery, Troy and Wetumpka, Elmore.
2    Q.   Yes.
3    A.   And that was the response --
4 that was a response from Stan.
5    Q.   All right. Where did this
6 session with Stan take place?
7    A.   The Holiday Inn 85 in
8 Montgomery.
9    Q.   And who else presented
10 information about the company other than
11 Stan?
12    A.   No one.
13    Q.   How many people were in
14 attendance?
15    A.   I do -- I really don't recall.
16 There was probably seven to ten people
17 there.
18    Q.   What do you recall, whether
19 you look at these notes or not, that Stan
20 said about the job itself?
21    A.   Well, I recall it's pretty
22 much been embedded in my mind. I recall
23 everything he actually said. He went

Page 131

1 being an independent contractor?
2    A.   Yes, sir.
3    Q.   Is that what the job was
4 described as?
5    A.   Yes. He said that -- well, he
6 told us that he was the ground manager,
7 but he was pretty much running both
8 ground and home delivery and that the --
9    Q.   This was a seminar for
10 becoming a -- or a presentation or an
11 information session about becoming a home
12 delivery, independent contractor driver?
13    A.   Yes, sir. Yes, sir.
14    Q.   Did he describe the contract
15 that the independent contractors would
16 have to sign?
17    A.   He did not get into the
18 contractor.
19    Q.   Did he tell you, though, you'd
20 have to sign a written contract?
21    A.   He did not say that.
22    Q.   Okay. You understood that
23 later, I guess, when you saw that book

Page 130

1 into the presentation, and everybody left
2 except my wife and one other individual.
3 It was a gentleman.
4    Q.   When you say they left, you
5 mean in the middle of the presentation,
6 at the end of the presentation?
7    A.   At the end of the
8 presentation.
9    Q.   Okay.
10    A.   And, so, we at that time was
11 asking him questions, and --
12    Q.   What was his presentation
13 basically? What was the substance of
14 what he provided to you at the
15 presentation?
16    A.   Well, the substance of the
17 presentation was that they were in need
18 of contractors and he described the job,
19 how hard the job would be. He described
20 the pay of the job, the training, and
21 that you had to be able to secure
22 financing on a delivery type vehicle.
23    Q.   Did he say anything about

Page 132

1 we've been passing around here?
2    MR. NELMS: Object to the
3 form.
4    A.   Does that mean answer?
5    Q.   Yes.
6    A.   This is new to me. I don't
7 know. I signed so many different
8 documents while I was there. I was under
9 the assumption that I had signed off to
10 be a contractor because the phone call
11 that I received from Kent asking me about
12 the one- or two-year contract, I asked
13 him to explain it to me, and he just said
14 it's either a one- or two-year. They
15 review your performance, and -- and, you
16 know, it's based on that. I said
17 definitely I want two years.
18    (Off-the-record discussion.)
19    Q.   (BY MR. SPOTSWOOD:) Let me go
20 ahead and mark that. This is marked as
21 Defendant's Exhibit V.
22    (Whereupon, Defendant's
23 Exhibit V was marked for

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 133

1    identification.)
2        Q.    This is, I'll state for the
3    record, a document that your counsel
4    produced to us today.  It's called P & D
5    Contractor Business Guide.  It has a
6    number up on the top of the first page,
7    06789 P 149 RES, and it has on the inside
8    a this week fuel supplement page that's
9    dated 3/22, and then it's hard to tell
10   what year of 2000 it is, because it's cut
11   off.  And, then, it has a -- starts with
12   FedEx home delivery standard contractor
13   operating agreement.  Then it has a table
14   of contents, agreement, leased equipment,
15   various attachments.  When did you
16   receive this book?
17       A.    As far as the date, I'm not
18   sure.  I can't recall the date when I
19   received it.  It was in -- well, I just
20   don't recall the date.  It was before I
21   received the truck.
22       Q.    It was before you received the
23   truck?

Page 134

1        A.    Yes, sir.
2        Q.    Was it in -- as early as
3    February that you saw that?
4        A.    I do not recall.
5        Q.    Do you recall whether it was
6    immediately before you received the
7    truck?
8        A.    I do not recall.
9        Q.    Just before you received the
10   truck?
11       A.    I know -- I know that I
12   received it before I received my truck.
13       Q.    Okay.  Let me, if I may,
14   Counsel, unless you need it, let me call
15   your attention to the agreement in here
16   which is in the second tab, a standard
17   contractor operating agreement.  Did you
18   read this document?
19       A.    Yes, I have.
20       Q.    You did?
21       A.    Yes, I have.
22       Q.    And when we get over here to
23   the end of this document, there is a

Page 135

1    page -- on page 29, there is a signature
2    line for FedEx Home Delivery, and there
3    is a contractor line, and it asks for
4    signature, typed name, witness.  Did you
5    ever sign a contract like this?
6        A.    Like I said earlier, I signed
7    so many documents, I do not -- I do not
8    know if it was that document or not.
9        Q.    All right.  So, as we sit here
10   today, and I can assure you that --
11       A.    I was told that this document
12   here was for me to keep.
13       Q.    All right.  Who told you that?
14       A.    Kent.
15       Q.    What I'm -- what I can tell
16   you is that your lawyers have not
17   produced a signed contract for me, okay?
18   And I take it you never provided one to
19   them?
20       A.    I gave Andy everything I have.
21       Q.    All right.  And I can tell you
22   that our files do not reflect a signed
23   contract from you.  And your testimony

Page 136

1    today is you can't really remember
2    signing a contract like this?
3        A.    I signed so many documents I
4    do not -- I do not recall what documents
5    I actually signed.  But I do know that
6    Kent called me and told me he was putting
7    me in for two years.
8            MR. NELMS:  Just answer his
9    questions.
10       A.    Okay.
11       Q.    And that that was the contract
12   that he was going to request for you, he
13   was going to request a contract for two
14   years?
15           MR. NELMS:  Object to the
16   form.
17       A.    He never --
18       Q.    Sir?
19       A.    He never said that to me.  He
20   didn't ever --
21       Q.    Well, what does it mean to you
22   when he said he was going to put in for
23   two years?  Doesn't that mean request a

Page 137

1 two-year contract for you?  Are you
2 trying to tell me something else?
3     A.    No, I'm telling you that the
4 phone conversation was he was signing me
5 up for two years.
6     Q.    All right.
7     A.    And he was submitting it --
8 submitting it.
9     Q.    All right.
10     A.    There was never a request.
11     Q.    Oh, you never requested a
12 two-year contract?
13     A.    No.
14         MR. NELMS:  Object to the
15 form.
16     Q.    You didn't?
17         MR. NELMS:  Answer his
18 question, if you can.
19     Q.    You didn't?
20     A.    What?
21         MR. NELMS:  Answer his
22 question if you can.
23     A.    Pardon me, re --

Page 138

1     Q.    You didn't respond to his
2 inquiry about one or two years with a
3 request for a two-year contract?
4     A.    I -- what I asked him on the
5 phone was what does the -- what does the
6 one- or two-year contract mean because I
7 was going to be a long-term employee, and
8 he explained it to me this way:  FedEx
9 has the right to renew it.  It's
10 according to the way you perform in the
11 field.  You keep your maintenance up on
12 your truck and keep your -- keep yourself
13 in line with FedEx rules and regulations.
14 I said two years because I -- hey, I'm
15 not going anywhere.
16     Q.    But you don't view that as
17 requesting a two-year contract?
18         MR. NELMS:  Object to the
19 form.
20     A.    No, I do not.
21     Q.    Okay.
22     A.    He asked me --
23     Q.    One-year or two-year and you

Page 139

1 said I'd like a two-year, right?  It's
2 not hard.
3     A.    Right.
4     Q.    All right.  I know that -- Mr.
5 Thornton, I know that a lot of different
6 things happened that we're going to talk
7 about during the course of this three- or
8 four-month period, and I will tell you
9 that one of the things I really think
10 would be helpful for both of us is that
11 if we try to do this sort of over a time
12 line, so that's what I'm going to try to
13 do.  I just want you to know where I'm
14 going.
15         On this sheet, Defendant's
16 Exhibit U here, if I may, can I look at
17 your original --
18     A.    Yes.
19     Q.    -- because I noticed that
20 there was a little yellow highlighter on
21 the original for W-E-P-T Elmore, which I
22 assume means Wetumpka?
23     A.    Yes.

Page 140

1     Q.    Okay.  Why is there this
2 highlighter there?
3     A.    No, I have no idea why it's on
4 there.
5     Q.    No significance to you?
6     A.    No.
7     Q.    There's also a question mark
8 by Troy.
9     A.    Right.
10     Q.    What's the significance of
11 that if you can recall?
12     A.    I was told at the time that
13 they had someone that possibly -- would
14 possibly be taking that route over, but
15 it wasn't for sure.
16     Q.    Okay.  And the specific
17 question that your wife asked, I take it,
18 since you said this is her handwriting in
19 brackets, what areas are open, that was a
20 question that you asked or that she
21 asked?
22     A.    She wanted me to ask.
23     Q.    And you asked it --

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 141

1    A.    Yes, sir, I did.
2    Q.    -- to Stan?  Was that at the
3  conclusion of the session when most
4  everybody else had left?
5    A.    Yes.
6    Q.    And then you wrote down his
7  response?
8    A.    Yes, sir, I did.
9    Q.    Montgomery, maybe Troy, I
10  guess, question mark, Troy and Wetumpka,
11  Elmore?
12    A.    That's correct.
13    Q.    Okay.  Up at the top here you
14  marked down Joe McDonald, Thursday.
15  What's the significance of that?
16    A.    Joe McDonald was the -- well,
17  Thursday actually is the date that the
18  meeting was held, the session.
19    Q.    Yes.
20    A.    Joe McDonald, he was the
21  terminal manager --
22    Q.    Yes.
23    A.    -- in Birmingham, and that's

Page 142

1  who I was to report to for training.
2    Q.    And there's a number listed
3  there.  Is that Stan Trott's number,
4  277-0030?
5    A.    Yes, sir.
6    Q.    And we have another number
7  here listed 395-8387 and underneath that
8  dock.  What is that?
9    A.    I do not recall that number.
10  I know it has something to do with FedEx.
11  It may be a phone number out on the dock.
12  I don't -- I can't remember.
13    Q.    All right.  And you had on the
14  line right next to dock, it says 50,000
15  and then 75,000 year income.
16    A.    Right.
17    Q.    So, that means a range of
18  income 50,000 to 75,000, is that what
19  that meant to you?
20    A.    Yes.
21    Q.    And then it says truck average
22  35,000 per year cost?
23    A.    Right.

Page 143

1    Q.    Okay.  And then there's a
2  462-4690 phone number.  What's that
3  number, if you remember?
4    A.    I don't -- I don't -- I don't
5  recall.  I don't know what that number
6  is.
7    Q.    All right.  And the next item
8  here is eight-day course, you pay.  What
9  does that mean?
10    A.    The course in Birmingham was
11  eight days, and --
12    Q.    What was that course for?
13    A.    It was for training.  It was
14  for Smith driver training.  It was for
15  the hand-held scanner training.  It was
16  with -- taught by Omar Newman.
17    Q.    And was that -- when you say
18  you pay, what does that mean?
19    A.    Well, it was -- we was -- we
20  was asking questions about whether to
21  stay there in Birmingham in a motel or
22  come -- drive back, and he said, well, if
23  you elect to stay, you'll pay.  You'll

Page 144

1  pay for the room.
2    Q.    You were paid for the training
3  time, I take it --
4    A.    Yes, sir.
5    Q.    -- in this course?  And then
6  there's a bracketed benefits, you pay.
7  What does that mean?
8    A.    Okay.  That is your benefits
9  as far as your insurance, your
10  responsibility for your own medical
11  insurance.
12    Q.    As an independent contractor,
13  you pay for all of that stuff on your
14  own?
15    A.    Yes, sir.  Yes, sir.
16    Q.    All right.  And then we have
17  Gastineau, Kent, his phone number.
18  390-0480, is that what that means?
19    A.    That's correct.
20    Q.    And then there's a straight
21  line down the middle of the page there,
22  and to the right of it it says starting
23  time and then three-week month.  What

Page 145

1  does all that mean?
2     A.  The question I asked Stan was
3  once you complete your training in
4  Birmingham and you come out, you've got
5  to drive to the terminal, and how long
6  does that actually take before you're
7  assigned and you're out on the road
8  working.  He said three weeks to a month.
9     Q.  And then the next line is a
10  van number?
11     A.  That was the number they
12  issued me on my van.
13     Q.  Okay.  Well, that -- what I'm
14  trying to figure out, I guess, from this
15  page in part, is that is obviously
16  something you didn't write down on the
17  day of this meeting?
18     A.  No, sir.  You're right.
19     Q.  That's something you wrote
20  down later when you knew that?
21     A.  Right.
22     Q.  Okay.  And then the next item
23  here we've got to the left of the three

Page 146

1  months -- three week month entry, I see
2  S --
3     A.  That's State Farm.
4     Q.  -- Farm.
5     A.  That was the phone number to
6  my wife.
7     Q.  And then Jeff White, a 404
8  number?
9     A.  Yes, sir.  That was --
10     Q.  Is that something written down
11  later?
12     A.  Yes, sir.  It actually was.
13  That was the number to Kent's boss or
14  Stan's boss.
15     Q.  Whom you called much later in
16  the process?
17     A.  Yes.
18     Q.  And then below that we have
19  Tuesday, hyphen, 6 p.m., ground second
20  front on right; what does that mean?
21     A.  That was when I was to report
22  at the terminal here in Montgomery.  It
23  says 6 o'clock in the morning, and that

Page 147

1  was just which door to go in.
2     Q.  6 p.m. at night it looks like,
3  is 6 p.m. right?
4     A.  Well, it was actually in the
5  morning.  I don't know why I put p.m. on
6  it.
7     Q.  Okay.  And that was to report
8  to begin the process of --
9     A.  Of training.
10     Q.  -- training and completing
11  paperwork and that stuff?
12     A.  Yes, I completed a lot of
13  paperwork.
14     Q.  Okay.  And then we got a
15  number on the right 36116.  What does
16  that mean?
17     A.  That -- that is a zip code,
18  that Montgomery route, that is the zip
19  code of that route.
20     Q.  Who told you that?
21     A.  Well, Kent told me that.
22     Q.  Okay.  So, this wasn't
23  something written on this piece of paper

Page 148

1  the presentation day when Stan was there?
2     A.  No, sir.
3     Q.  All right.  Was anything
4  else -- well, no.  I withdraw that.
5         Then we have motel plus
6  Birmingham plus kids.  What does that
7  mean?
8     A.  I don't know.  It was probably
9  something to jog my memory about my kids,
10  but when I was going to be -- well, just
11  the motel Birmingham -- I was just doing
12  some --
13     Q.  Just doodling?
14     A.  Doodling, I guess, on that to
15  jog my memory.
16     Q.  What about underneath the next
17  line there, we have a 1-800 number for
18  Joe McConnell.  Was that something that
19  was written down the day of --
20     A.  That was --
21     Q.  -- the seminar?
22     A.  No, that was after I went to
23  the -- before I ever went to Birmingham,

37 (Pages 145 to 148)

Page 149

1  I went to the terminal to see Stan
2  because I had to go to the terminal.  I
3  had to do paperwork there, and I got this
4  information on who to contact at the
5  Birmingham -- Birmingham terminal where I
6  was going for training, and he gave me
7  Joe's number.  He gave me the 1-800
8  number there.
9      Q.    All right.  And, then, to the
10 left of that, we have FedEx B'ham, and
11 then -- what was that all about, those
12 entries there, and then it says M-O-R-I-O
13 or M-A.
14     A.    That's Mario.  He was a -- he
15 was an individual at the Birmingham
16 terminal that I called to confirm
17 everything, and that's who I spoke to, so
18 I just wrote his name down.
19     Q.    Yes.  And then to the left of
20 our exhibit sticker here, we have
21 March 29th, Joe, 423-296-0253.  What's
22 that about?
23     A.    I had talked to Joe --

Page 150

1      Q.    Is this Joe McConnell?
2      A.    Yes, it's Joe McConnell -- on
3  a couple of occasions to see what was
4  actually going on because I was getting
5  the runaround as far as asking questions,
6  and nobody seemed to know as far as my
7  paperwork being processed and stuff, so I
8  knew that Joe -- I knew that Joe was
9  coming from Birmingham to Montgomery kind
10 of -- until the transition with Kent took
11 place.
12     Q.    Yes.
13     A.    And I knew he was the go-to
14 man, so that's the reason why I was
15 calling him.
16     Q.    All right.  And then
17 underneath the sticker we have in
18 brackets 24 January?
19     A.    Right.
20     Q.    What was the significance of
21 that?
22     A.    Actually that may be the date
23 the session was held on.  If not, I

Page 151

1  really don't know.
2      Q.    All right.  And then to the
3  right of that we've got more Joe
4  McConnell numbers, it looks like.  Is
5  that what those are?
6      A.    Yes, sir.  That's just a --
7  other than the 1-800 number.
8      Q.    All right.  And then back,
9  next line down, two open, eight day.
10 What does that mean?
11     A.    I have no clue.  I don't know.
12     Q.    Is that your handwriting,
13 though?
14     A.    Yes, sir, it is.
15     Q.    And then flip the page over,
16 if you would.  What is -- what's the
17 significance of these items?  Just start
18 on the top line.  We've got a 404 number,
19 which I know is Atlanta.
20     A.    That was a -- when all this
21 was coming down, they were trying to tell
22 me they wanted me to be a contractor out
23 of Anniston, Alabama.  DC, these are

Page 152

1  actually the -- the first and last
2  initials of a recruiter for FedEx, and
3  this -- I believe this may have been his
4  cell number or a number that I could
5  locate him because he had called and
6  wanted to talk to me and left his number.
7      Kelly Womble --
8      Q.    When was that?
9      A.    That was -- that was after
10 May.  Because that's when they were
11 asking me about going to Anniston, and
12 that was just -- there was no way that
13 was feasible, so I turned around and I
14 called the terminal manager in Anniston.
15     Q.    Kelly Womble?
16     A.    No, Tony DeRosa.
17     Q.    Okay.
18     A.    And --
19     Q.    256 looks like that might be
20 an exchange over there.
21     A.    And Tony didn't have a clue to
22 what I was even saying.  He said that
23 will never happen, Charlie.  The route

Page 153

1 that they are offering you, I already
2 have a guy trained. As a matter of fact,
3 that guy that was training for that
4 particular route was the one who wound up
5 purchasing my truck. But they were
6 saying, oh, we've got one in Anniston,
7 but it just wasn't feasible.
8     Q.   Okay. So, your point is that
9 you had talked to Tony DeRosa who told --
10 what about -- who is Kelly Womble?
11     A.   She's a lady that worked in
12 his office, that answered the phone that
13 day.
14     Q.   Okay. So, when you talked to
15 Tony, you just had the conversation you
16 just described?
17     A.   Right.
18     Q.   Where he said, no, in fact,
19 there wasn't an opportunity there or --
20     A.   Exactly right. He said there
21 was no opportunity there. He didn't know
22 what -- he didn't even know why they was
23 even approaching me with that

Page 154

1 opportunity, that there was no
2 opportunity.
3     Q.   All right. But in any event,
4 you said that was not practical for you
5 to have a route in Anniston?
6     A.   Not living in Elmore County.
7     Q.   All right. Well, let's --
8 let's -- let's look at this next -- this
9 is a one, two, three, four --
10         MR. NELMS: Is that original?
11         MR. SPOTSWOOD: Yeah.
12     A.   Oh, the name of that
13 individual, Joe -- I'm sorry. Bob.
14     Q.   Yes.
15     A.   DC, it was Darrell Clark.
16     Q.   Darrell Clark, okay.
17     A.   Darrell Clark.
18     Q.   What are you looking at there
19 that answered that question for us?
20     A.   Well, this is looking at --
21 this was a meeting that FedEx had on
22 6/14/05, and it was held by Tricia Jones
23 and Darrell Clark, and I believe Kent was

Page 155

1 doing the one in the evenings, and this
2 is some notes I wrote down, MVR, DOT
3 background check, Tuesday through
4 Saturday, which was the schedule that you
5 worked. Home delivery. Peak -- they
6 spoke about the peak season, holiday,
7 home base. They said 60 to 65 a year and
8 over.
9         When I went into the meeting,
10 and there is a tape on this, I asked them
11 specifically about routes. Darrell
12 Clark, his reply to me -- and if they had
13 any contractors that were waiting. He
14 said, yes, we have an individual waiting,
15 but this individual is very picky in what
16 he is wanting, and I knew all along that
17 they was -- they probably were talking
18 about me.
19     Q.   So, where did this meeting
20 take place?
21     A.   At the Holiday Inn.
22     Q.   So, you went to the advertised
23 informational session like the one you

Page 156

1 had attended for Stan?
2     A.   Yes, I did.
3     Q.   And this is obviously after
4 you had filed your lawsuit. And I take
5 it Darrell Clark had no clue who you
6 were?
7     A.   No, sir, he did not.
8         MR. NELMS: By the way, just
9 for the record, he didn't do this per my
10 instructions.
11     Q.   How many people were at this
12 meeting?
13     A.   Probably half a dozen.
14     Q.   Okay. If I heard your
15 testimony correctly, they said that there
16 was a person kind of in line, but that
17 person was very picky, and you figured
18 they were talking about you?
19     A.   I assumed they were, they were
20 talking about me. They said they had a
21 gentleman.
22     Q.   So, what is the significance
23 of 60- to 65-year and over? What does

39 (Pages 153 to 156)

Page 157

1   that mean?
2       A.   Oh, 60 to 65,000 and over
3   income.
4       Q.   I see.  As opposed to, you
5   know, before expenses?
6       A.   Oh, they didn't say that.
7       Q.   But that would be consistent
8   with what you wrote down from the first
9   meeting, 50 to 75, less expenses.
10      A.   Yeah, that's right.
11      Q.   Isn't that what Stan had told
12  you?
13      A.   Yeah, he said 50 to 75 a year
14  income.  He didn't say less expenses.
15      Q.   All right.
16      A.   Expenses -- but, yeah.
17      Q.   All right.  And then was it
18  your -- your note here says peak season,
19  holiday, home base.  What's the
20  significance of that comment?
21      A.   It was just -- there was no
22  significance.  They were going over the
23  peak season of the year, which is during

Page 158

1   the holidays.
2       Q.   During the Christmastime?
3       A.   Right.
4       Q.   And home base, what was that a
5   reference to?
6       A.   Just home terminal, in the
7   area that you lived.
8       Q.   Okay.  And what we've been
9   talking about are the notes reflected on
10  Defendant's Exhibit X here, correct?
11      A.   Correct.
12           (Whereupon, Defendant's
13           Exhibit X was marked for
14           identification.)
15      Q.   Was there some sort of a
16  sign-up sheet at these meetings?
17      A.   No, sir.
18      Q.   So, if somebody wasn't
19  interested, they didn't have to leave any
20  indication of having attended?
21      A.   It was not -- I did not see a
22  sign-up sheet --
23      Q.   Okay.

Page 159

1       A.   -- when I went in.
2       Q.   Anything else on those yellow
3   sheets --
4       A.   No, sir.
5       Q.   -- or is that unrelated to the
6   litigation or your communications with
7   anybody at FedEx?
8       A.   No.
9           MR. NELMS:  Off the record.
10          (Off-the-record discussion.)
11          (Whereupon, Defendant's
12          Exhibit Y was marked for
13          identification.)
14      Q.   (BY MR. SPOTSWOOD:)  Yeah, let
15  me -- this is -- it says Iraq and then it
16  says career?
17      A.   Well, I had a son that was
18  over there in Iraq fighting.
19      Q.   Right.
20      A.   And that was a -- actually
21  that has to do with some kind of access
22  number that I had to use to be able to
23  call him.

Page 160

1       Q.   Okay.
2       A.   So, I mean, you know, I'm just
3   doing some doodling because he would
4   e-mail me, and I would write stuff down.
5       Q.   All right.
6           MR. NELMS:  Keep that.
7       A.   Yeah, I'm going to.
8           MR. NELMS:  Put it in your
9   pocket.
10      Q.   Defendant's Exhibit Y here,
11  these are your notes, correct?
12      A.   Yes, sir.
13      Q.   And it says job apps at the
14  top, 6/13.  It lists several items.
15  What's the significance of this?  Are
16  these places that you were looking for a
17  job?
18      A.   Yeah, I had contacted some of
19  these people.  I had contacted Dixie
20  Homecrafters because I knew this guy
21  there.  Friendly Ford.  You know,
22  Wal-Mart in Prattville, I don't know what
23  that really is, if it was a contact.

Tyler Eaton Morgan Nichols & Pritchett Inc.

| Page 161 |
| --- |

1    Dairy Fresh, Farmers Ranch and Health,
2    because this guy had called and left his
3    number, and he's -- he could see from my
4    resume where I had sold insurance.
5        Q.    Yes.
6        A.    But because of this situation,
7    my insurance, I've lost my insurance
8    license, and I told -- you know, I spoke
9    to him, and I told him I can't do that
10   now.  I'd have to go back and retest and
11   everything.
12        And then this is the meeting
13   that I went to on the 12th.  And I don't
14   know -- okay.  This is -- well, this was
15   DHL.
16       Q.    So, this was the meeting you
17   went to in connection with getting a job
18   at DHL?
19       A.    Yeah, I assume it is.
20       Q.    Okay.  By the way, I looked
21   further at the W-2, the best I could read
22   it.  It looks like you might have been
23   working for one of the contractors for

| Page 162 |
| --- |

1    DHL rather than for DHL?
2        A.    They are contractors.
3        Q.    Okay.  So, they have a similar
4    situation to FedEx, their drivers are
5    independent contractors, and then those
6    contractors can hire employees to work
7    for them?
8        A.    No, sir.  It's -- it's
9    different from that.  What it is --
10       Q.    Well, who were you working for
11   is what I'm asking you?
12       A.    Well, I was working -- I guess
13   you would say it's Ozark Delivery.  He's
14   a franchise.  The guy -- an individual
15   purchases a franchise, and that's the way
16   DHL works, and then they work under the
17   DHL umbrella.  Everything is labeled DHL.
18   It was actually Ozark Delivery Service or
19   something like that.  But it's not like a
20   driver.  He was not a driver.
21       Q.    I understand.  All right.
22       MR. NELMS:  Just so I
23   understand.  SO, you were an employee of

| Page 163 |
| --- |

1    Ozark.  Ozark was a franchisor of or
2    franchisee of --
3        A.    DHL.
4        MR. NELMS:  -- DHL.
5        MR. SPOTSWOOD:  We've got
6    three or four pages on this one, and we
7    might want to make a quick copy of this
8    so you can follow along with me.
9        (Off-the-record discussion.)
10       (Whereupon, Defendant's
11       Exhibit W was marked for
12       identification.)
13       Q.    (BY MR. SPOTSWOOD:)  I'm
14   looking at Exhibit W, Mr. Thornton, which
15   is four pages of handwritten notes, I
16   think, that are in your handwriting,
17   correct?
18       A.    Yes, sir.
19       Q.    Okay.  At the top of the first
20   page, can you tell me what that's about,
21   that reference to Curtis and just copay?
22       A.    Yes, that was an individual at
23   Mega Life and Health where I put an

| Page 164 |
| --- |

1    inquiry in as far as receiving health
2    insurance through Mega Life.  That was
3    the individual I contacted.  And it says
4    tonight or Friday.  That was a time that
5    they had available that they could come
6    set -- visit with me and the wife as far
7    as doing the insurance.
8        Q.    Okay.  That was a health
9    insurance policy that you were going
10   to --
11       A.    We took it out.
12       Q.    -- consider or took out?
13       A.    Yes, that's right.
14       Q.    All right.  What's the next
15   sentence?
16       A.    Willie Durham?
17       Q.    Yes.
18       A.    Willie -- Willie Durham is the
19   agent that my wife actually works for who
20   owns the State Farm franchise.
21       Q.    Yes.
22       A.    He had called me on that day
23   to offer me the job as far as an agent

Page 165

1 working for him. Well, at that time I
2 had bigger and brighter plans, and that's
3 when I recommended my wife to him.
4    Q.    Okay. And then underneath
5 here we have Alfa, bi-monthly and then
6 have some --
7    A.    That's just basically
8 information from Alfa on health
9 insurance.
10    Q.    And then the next entry here?
11    A.    That was my van number. It
12 says Workhorse truck. And that was the
13 cost of the Workhorse van, and 72 months
14 down payment or down, and I don't know
15 what those figures are. But, anyway, it
16 figures up to be what the -- I was going
17 to be paying per month and all that good
18 stuff.
19    Q.    All right. And then I see
20 some figures on the bottom here about Tim
21 Edmunds and contractor relations. This
22 is -- this was, I take it, late in the
23 game when you were in the process of

Page 166

1 trying to figure out what your situation
2 was with the van, correct?
3    A.    Well, it says talk to -- I
4 talked to him on 5/18. I -- yes. It was
5 around the 18th of May, and then he gave
6 me my -- that's when I got my -- the ID
7 number and my work area number.
8    Q.    And as I recall, we're talking
9 about Richard Gene. It's written down
10 here. I don't know how -- which is the
11 correct spelling, but your conversation
12 with Richard Gene. You actually had more
13 than one was -- we have it as J-E-A-N,
14 and you have it here as G-E-N-E, correct?
15    A.    Well, I may be -- I may be
16 wrong.
17    Q.    I don't know which one of us
18 is correct on that.
19    A.    I don't know.
20    MR. NELMS:    You both may be
21 wrong.
22    A.    That's true.
23    Q.    And you would have recorded

Page 167

1 this conversation with Richard Gene,
2 correct?
3    A.    I assume that I -- I know I
4 recorded a conversation with Mr. Gene.
5    Q.    From the looks of the
6 transcript, you left a message. I'm
7 looking at Exhibit R. It looks like you
8 left a message for him, and then he
9 called you back, and your actual phone
10 call with Mr. Gene is found on page 45 of
11 that transcript. I'm sorry. 41 -- no,
12 45. That's correct.
13    A.    (Examining document.)
14    Q.    Does that look right?
15    A.    Yes, sir.
16    Q.    And then your note here, it
17 says talk to on 5/18/05, so would it
18 be -- would that help us figure out that
19 this conversation that was recorded
20 happened on 5/18/05?
21    A.    Yes, sir. That's my
22 handwriting. I put that down.
23    Q.    All right. And you don't

Page 168

1 recall, do you, any other conversation
2 other than the one conversation you had
3 with Mr. Gene or -- actually there's
4 another one reflected on the tape here.
5 It's Richard Gene 131. Let me see if you
6 actually spoke with him then. I saw -- I
7 do see in the transcript that you had a
8 relatively short conversation with him on
9 pages 131 and 133. This is the third
10 entry here -- and you do say these calls
11 were made on the 19th of May, so I take
12 it --
13    A.    Well, this -- the particular
14 time I took these notes here, they were
15 made on the 18th.
16    Q.    Right.
17    A.    5/18.
18    Q.    And I think there was a long
19 conversation on one occasion?
20    A.    Apparently so, yes, sir.
21    Q.    And then you called him back?
22    A.    Yes, sir.
23    Q.    And -- or you left him a

Page 169

1    message, he or one of the two of you.
2    No, you reached him. Well, actually, no,
3    it looks like you left him a message.
4    That's what you did on that time.
5         So, maybe that was the only
6    occasion, according to those transcripts,
7    that you actually talked to Gene was that
8    one time. You left him two messages. Do
9    you have any recollection of talking to
10   him more than once personally?
11       A.   No, sir, I don't. I know I
12   spoke to him -- I know I spoke to him. I
13   don't know --
14       Q.   And this note reflects, then,
15   that would have been on the 18th of May?
16       A.   Yes, sir.
17       Q.   All right. Do you know what
18   work area is defined by these numbers on
19   this sheet, 112-069?
20       A.   No, sir, I do not.
21       Q.   And then the top of page two
22   of Exhibit W, we have referenced a truck,
23   668 -- truck insurance, 668. Was that

Page 170

1    how much your truck insurance was per
2    year?
3        A.   I -- well, I'm not really
4    sure. It may be a -- it's possible. I'm
5    not really sure. I know it says truck
6    insurance $668.
7        Q.   Okay.
8        A.   I'd have to look at the
9    policy.
10       Q.   All right. And then I see
11   reference to your lawyers here. I know
12   who they are.
13       A.   Yes.
14       Q.   Who is Patrick Hale?
15       A.   He was an attorney that
16   recommended Andy.
17       Q.   And then down below that I see
18   Jeff White. Who is Jeff White?
19       A.   That, I assume, is the -- he's
20   either an engineer with FedEx or Kent's
21   boss. I'm not really sure.
22       Q.   And is that -- is -- the very
23   first conversation recorded on Exhibit R

Page 171

1    is listed as a phone call to Jeff White,
2    and you -- actually, it doesn't look like
3    you spoke to Jeff. You spoke to somebody
4    by the name of Cheryl and left a message
5    for Jeff.
6        A.   You mean Exhibit O?
7        Q.   Yes, just looking at the first
8    two pages of that.
9        A.   Oh, yes. I see. I know you
10   said R. I was looking for R.
11       Q.   Oh, yeah. Sorry about that.
12       A.   Yes. That's correct. I
13   assume Cheryl was the office or someone.
14       Q.   Do you recall speaking to Jeff
15   White?
16       A.   Oh, sure, I spoke to Jeff
17   White maybe a couple of occasions.
18       Q.   And what did you talk to Jeff
19   about?
20       A.   I don't recall. I'd have to
21   go back to the transcripts to look in
22   there.
23       Q.   I don't see any recorded

Page 172

1    conversations with Jeff White.
2        A.   I know on one occasion I spoke
3    to Jeff. This was the Saturday -- I
4    don't recall the date, but the Saturday
5    of the week I was supposed to start work
6    and because I was wanting to know what
7    was going on, and he said at that time he
8    was going into a meeting and he had all
9    of my paper -- all of my paperwork into
10   the meeting, and he would get back in
11   touch with me the following week. And I
12   never heard from him.
13       Q.   And is that what prompted you
14   to call him on this occasion where you
15   recorded the effort to reach him?
16       A.   It may be that -- possible
17   that that's it.
18       Q.   Okay.
19       A.   But I -- because I know before
20   I recorded these I had had conversations
21   with Jeff to find out what was going on.
22       Q.   Okay.
23       A.   Because I didn't know what to

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 173

1  do. I didn't know what to do.
2      Q.   And you have some notes down
3  here underneath the Jeff White phone
4  number on this Exhibit W, page two. Were
5  those the things that you were going to
6  tell him about if you reached him, is
7  that sort of your outline of topics?
8      A.   It may have been. It may have
9  been. Or I know it was some things I put
10  down on paper pertaining to the
11  situation.
12     Q.   And then below those we have
13  this note: "Spoke to Omar Newman on the
14  20th. Jim French, regional director."
15  Was that the 20th of May?
16     A.   It would have been.
17     Q.   And do I understand from this
18  that he told you to contact Jim French, a
19  regional director, or --
20     A.   Yes.
21     Q.   Did you do that?
22     A.   I believe I tried. I'm -- I
23  really don't remember if I had a

Page 174

1  conversation with Jim or not.
2      Q.   I don't see any transcript of
3  it. I'll say that.
4      A.   Okay. But it's possible that
5  I left a message for him to call, and I
6  never heard from him.
7      Q.   And these other transcripts do
8  reflect when you left messages, so I
9  guess you just didn't record that, if, in
10  fact, you called him?
11     A.   If I would have heard from
12  him, I would have recorded it.
13     Q.   All right. And would you have
14  recorded it if you had left him a message
15  on or after the time you started making
16  these conversations, recordings?
17     A.   Ask that again.
18     Q.   That was a pretty botched up
19  question.
20     A.   Oh, that's fine.
21     Q.   If you had called him on or
22  after the dates when you started making
23  these recordings --

Page 175

1      A.   Yes.
2      Q.   -- would you have recorded the
3  fact that you called him and left him a
4  message?
5      A.   I would have -- yes, I would
6  have. If I would have had a number, I
7  don't -- I don't -- Omar may have -- I
8  really don't think I had a number for
9  Jim. I think Omar was going to have him
10  call me, if I recall correctly. If I had
11  had a number for him and would have
12  called, I would have definitely have
13  recorded it because I may have got him on
14  the phone.
15     Q.   All right. And then on the
16  top of the next page we have an address
17  1015 Seaton Court, Montgomery, 36116. Is
18  that Kent's home address?
19     A.   It may be. I'm --
20     Q.   I recall from the transcript
21  that you -- that you asked him what his
22  home address was.
23     A.   Okay. Yes. I remember now.

Page 176

1  Yes. Yes.
2      Q.   Okay. So, this is what you
3  were writing down while you were on the
4  phone with him recording the
5  conversation?
6      A.   Yes.
7      Q.   Okay. And then underneath
8  that it says letter to Kent and then --
9  that's number one, and then two, Jeff. I
10  understand letter to Kent. What does
11  two, Jeff mean. Paren two, Jeff?
12     A.   This was pertaining to my
13  truck payment.
14     Q.   Okay.
15     A.   I remember that. And --
16     Q.   Jeff White then, is that who
17  you're referring to there?
18     A.   Yes. Yes.
19     Q.   And that was kind of the
20  action plan, you were going to write a
21  letter to Kent, and then you were also
22  going to get in touch with Jeff?
23     A.   Well, I -- yes.

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 177

1    Q.    If you want to explain, I'm
2    interested in it.
3    A.    No, I'll wait for a question.
4    Q.    Okay.  Then to the right it
5    says make a case, paren, write it out,
6    close paren, history and present.  What
7    does that refer to?
8    A.    That was some notes I was just
9    writing when I was -- after I talked to
10    Andy.
11    Q.    Oh, okay.  Then, underneath
12    that we have route given to -- I'm having
13    a little trouble reading this?
14    A.    Yes.
15    Q.    Could you decipher that for
16    me?
17    A.    Yes.  It says given -- says
18    route given to Tina.  That's the
19    Montgomery route.  That's 36116.  Isaac,
20    which was training for Troy, he accepted
21    that.  When I was there, he didn't know
22    if he was going to take it, and Kent
23    didn't know if he wanted him to have it.

Page 178

1    And then Wetumpka, the Elmore/Wetumpka
2    route that I was -- well, actually it was
3    given to Pettaway.  I don't even remember
4    Pettaway's first name.
5    Q.    Okay.  And then the next thing
6    you have written down here is advertise
7    to sell truck?
8    A.    Right.  That was something
9    that Andy told me I needed to do, which I
10    understood that I had to start some type
11    of advertisement.  How are you going to
12    sell a FedEx truck, though?  But that was
13    just a note.
14    Q.    And you wrote down two year
15    contract?
16    A.    Right.  That was pertaining to
17    the conversation with Kent.
18    Q.    All right.  And then we've got
19    a one -- I can't tell if --
20    A.    1-800 or -- I don't know what
21    that number is.
22    Q.    All right.  Do you know who it
23    is or --

Page 179

1    A.    No, sir, I don't.
2    Q.    And then it says SS and
3    driver, or diver, rather?
4    A.    I don't know.  I don't -- I
5    don't recall.
6    Q.    All right.  And then the last
7    page here, can you explain those entries
8    for me?
9    A.    No, sir, I really don't.  It
10    was something that I just -- I wrote down
11    there to jog my memory pertaining to
12    something.  I guess it took place on the
13    14th of April and had to do with a truck
14    and insurance.  I don't know why I put
15    paid also on there, but anyway.  I don't
16    recall.
17    Q.    All right.
18    MR. NELMS:  Let's break for a
19    minute.
20    MR. SPOTSWOOD:  Absolutely.
21    (Said deposition in recess
22    at 1:30 p.m. until 1:45 p.m.,
23    after which the following

Page 180

1    occurred:)
2    Q.    (BY MR. SPOTSWOOD:)  What
3    specifically did Mr. Trott say at your
4    information session about a route, if you
5    can remember, apart from what's written
6    on your notes that we've already talked
7    about?
8    A.    Well, that -- that was -- that
9    was my biggest concern, and after the
10    meeting -- after the meeting, we actually
11    met with Stan in the lobby, my wife and
12    I, and we asked him more questions.  And
13    he specifically said that they -- being
14    specific as far as what he was telling
15    us, that there was three available out of
16    the terminal in Montgomery.  And which he
17    had already named them.  And I was
18    telling him, hey, that would be -- you
19    know, the Wetumpka/Elmore route would be
20    great because I live in Elmore County.  I
21    know Elmore County, and I just thought
22    that that was just a Godsend, and
23    basically that was -- I didn't push it

| Page 181 | Page 183 |
|---|---|

**Page 181**

1 any further. There was no need. He was
2 telling us that there were three routes
3 available.
4    Q.  Okay.
5    A.  Or two, possibly three,
6 because of the other guy in -- with Troy.
7    Q.  Did he make any specific
8 reference to any of the other drivers at
9 that time, Derrick Pettaway, for example?
10    A.  No, sir.
11    Q.  All right. And he said that
12 there are routes available, might be
13 routes available?
14    A.  There are.
15    Q.  May be routes available?
16    A.  No, sir.
17    Q.  What was his exact
18 terminology, if you can remember?
19    A.  There are three -- two to
20 three routes that are available in the
21 Montgomery terminal.
22    Q.  Yes.
23    A.  They were not sure about Troy,

**Page 182**

1 but they knew that 36116 and
2 Wetumpka/Elmore, Elmore County, those
3 routes were available.
4    Q.  All right.
5      (Off-the-record discussion.)
6    Q.  (BY MR. SPOTSWOOD:) And when
7 you say the routes were available, aren't
8 you necessarily talking about these
9 routes would be available in the future
10 if you were successful in completing your
11 screening and your training?
12    A.  Everything hinged on being
13 successful. That doesn't mean that the
14 routes were not still available to
15 someone. But I was successful.
16    Q.  Right. And did you -- did he
17 tell you whether or not others might wind
18 up with those routes?
19    A.  No, sir, it was never
20 mentioned to me.
21    Q.  All right. So, are you saying
22 here today that you viewed what Mr. Trott
23 said to you that day as a promise that

**Page 183**

1 those routes were going to be available
2 to you if you get through the training?
3    A.  It was a definite. I viewed
4 it as a definite.
5      MR. PARKER: Definite what?
6    Q.  No, no. I do need an
7 explanation of that terminology. You
8 viewed it as a definite. A definite
9 what?
10    A.  Well -- okay. When he was
11 telling us that they are available --
12    Q.  Yeah.
13    A.  -- there's two available,
14 possibly three that are available.
15    Q.  Yes.
16    A.  But you've got to meet this
17 certain criteria. I knew that I could
18 meet the criteria.
19    Q.  Right.
20    A.  It was just up to knowing
21 which one I would accept.
22    Q.  Did you feel that if those
23 routes changed or, you know,

**Page 184**

1 circumstances were different at the time
2 that you finally had become qualified
3 that it would have been wrong or unfair
4 for those routes not to be given to you?
5    A.  Sure. At -- now, state your
6 question again.
7    Q.  Yeah.
8      MR. NELMS: Object to the
9 form.
10    Q.  Did you feel -- you know, here
11 you go. You go to an informational
12 session. You haven't been to the first
13 leg of training. You have not signed a
14 contract, you have not demonstrated
15 yourself to be qualified to do anything
16 for FedEx, yet, if I'm hearing you
17 correctly, what you're saying is the
18 moment you walk out of that room in your
19 mind you had a contract with FedEx to
20 give you a route?
21      MR. NELMS: Object to the
22 form.
23    A.  No.

Page 185

1    Q.   That's not what you're saying?
2    A.   No, that's not what I'm
3  saying.
4    Q.   All right.
5    A.   I'm saying that if Charlie
6  went through the process, which a
7  contract was never mentioned, I will
8  state that, but if I went through the
9  training that FedEx wanted you to go
10  through, if I jumped through all the
11  hoops that they had aligned, that, of
12  course, I would have a route because
13  there was two, possibly three routes open
14  for a contractor.  That is the reason why
15  they had the informational session.
16    Q.   Did he tell you that's why he
17  had the informational session?
18    A.   Yes.
19    Q.   Did he not say that they liked
20  to have people lined up --
21    A.   No, sir.
22    Q.   -- in the pipeline?
23    A.   No, sir.  That never ever came

Page 186

1  up.
2    Q.   Never occurred to you that
3  FedEx would have a desire to have
4  qualified, trained people lined up in the
5  event openings were available?
6    MR. NELMS:  Object to the
7  form.
8    A.   No, sir.  No, sir.  It was
9  never put that way.  They needed people
10  to go to work, to be contractors.
11    MR. NELMS:  Answer his
12  questions.
13    Q.   You said a contract was never
14  mentioned, but he was describing a job as
15  an independent contractor, correct?
16    A.   Right, yes.
17    Q.   And, so, didn't you understand
18  from that that eventually you would have
19  to sign a written contract?
20    A.   No, I did not.
21    Q.   You didn't understand that?
22    A.   No, I did not.
23    MR. NELMS:  Object to the

Page 187

1  form.
2    MR. SPOTSWOOD:  Too late.
3    (Off-the-record discussion.)
4    Q.   (BY MR. SPOTSWOOD:)  Look with
5  me, if you would, at Defendant's Exhibit
6  L.
7    A.   L.
8    MR. NELMS:  I think I have L.
9  One second.  Let me get it for you.
10    Q.   These are the documents, I'll
11  tell you, that were produced by FedEx as
12  a part of its initial disclosures in the
13  case.
14    (Whereupon, Defendant's
15    Exhibit L was marked for
16    identification.)
17    Q.   And I want you to flip over
18  with me, if you would, to -- do you see
19  they are numbered at the bottom
20  right-hand -- it says FXG and then
21  numbers on the bottom of the page?
22    A.   Yes, sir.
23    Q.   I want to look at the

Page 188

1  contractor driver information sheet which
2  goes on for a few pages.  All right.  Is
3  this something that you submitted to
4  FedEx?  You might have done it online.
5  I'm not sure exactly how this works.
6    A.   Yes.
7    Q.   And let's look at the first
8  couple of pages here, 04, 05, 06.  Did
9  you fill the information out here that's
10  reflected on those pages?
11    A.   Yes, sir.
12    Q.   You gave some references.  Who
13  is Jeff Owens?
14    A.   He's a friend of mine.
15    Q.   What does he do?
16    A.   As a matter of fact, he's
17  working with UniFirst now, same company
18  I'm with.
19    Q.   All right.  Mike Proper, what
20  does he do?
21    A.   He was a sales manager.  I
22  don't know where Mike is.  I haven't
23  stayed in contact with him.

---

Page 189

1    Q.    Where was he a sales manager
2  at the time that you completed this?
3    A.    American General.
4    Q.    And Ray Harris, where was he a
5  sales agent?
6    A.    American General.
7    Q.    Okay.  Let's flip over to page
8  07.  This is the contractor driver
9  information sheet, and on the left-hand
10  side it says CDAS.  Is this another
11  document that you completed yourself?
12    A.    Yeah.
13    Q.    Did you do it online?  Was
14  this something --
15    A.    Yes.
16    Q.    -- that you sat at the
17  computer and filled out?
18    A.    Yes.
19    Q.    Where?
20    A.    At the terminal.
21    Q.    All right.  And then over on
22  page ten, that's your signature there,
23  1/14/05, is that correct?

---

Page 191

1  note on the top here, have repeated --
2  have called repeatedly at 615-749-2198.
3  Local number does not give out any
4  information.  Is that your handwriting or
5  somebody else's writing?
6    A.    No, sir, that is not mine.
7    Q.    Do you know whose that is?
8    A.    No, sir, I don't.
9    Q.    Okay.  What this apparently is
10  is a reference questionnaire, and I take
11  it what is going on is you completed the
12  top part, is that right?
13    A.    Yes, sir.
14    Q.    And then they were trying to
15  get information and they weren't having
16  any luck is what I think is going on
17  here.
18        As it stands, Trott, he was
19  the one helping you through this process?
20    A.    No, sir.  There was a young
21  lady, and I do not recall her name that
22  got me set up on the computer to do
23  everything --

---

Page 190

1    A.    Yes, sir.
2    Q.    And then the next document I
3  have here is FedEx Ground -- this is the
4  one -- actually I'm not sure where the
5  Bates numbers are on this.  Oh, here they
6  are right here.  It's on the sticker in
7  the middle of the page FXG 11 and 12, 13.
8  Are these other documents that you
9  completed in connection with the
10  contractor employment process?
11        MR. NELMS:  I'm sorry.  I
12  didn't understand which pages you were
13  actually referring to.
14    Q.    It's 11, 12, 13.  Yeah, they
15  are in the middle here.  See they are on
16  the little stickies is what they are.
17        MR. NELMS:  I don't see that
18  one.  Anyway, I'm --
19    A.    Oh, I see 11.  This must be
20  11.  This must be 12.
21    Q.    Right.
22    A.    Yes, sir.
23    Q.    Okay.  There's a little sticky

---

Page 192

1    Q.    All right.
2    A.    -- that I needed to do.
3    Q.    All right.  It does look like
4  Stan is the one who is signing the
5  documents down here on the 14th.  Is that
6  when you were completing these papers,
7  January the 14th?
8    A.    Yes, sir, apparently so.
9    Q.    If we flip on back to 18 --
10    A.    Okay.
11    Q.    -- it says driver's receipt,
12  and it says you're acknowledging the
13  receipt of FedEx motor carrier safety
14  regulations, which I think is --
15        MR. PARKER:  They are in a bag
16  behind Andy.
17    A.    Yes, sir, that's that little
18  manual or one of them.
19    Q.    And is this the book that they
20  gave you?  I'm just going to mark that as
21  Exhibit Z.
22        (Whereupon, Defendant's
23        Exhibit Z was marked for

---

Case 2:05-cv-00656-MEF-DRB    Document 27-3    Filed 04/18/2006    Page 51 of 107

Page 193

1    identification.)
2    A.    Yes, sir.
3    MR. SPOTSWOOD:  And, Gary,
4    I'll tell you right now I'm not
5    interested in copying the whole book,
6    just the cover page.
7    (Off-the-record discussion.)
8    Q.    (BY MR. SPOTSWOOD:)  I'm
9    sorry.  You answered that question?
10   A.    Yes, sir, I did.
11   Q.    And if you look with me on 19,
12   document number 19, it says at the top
13   Home Delivery Driver Qualification
14   Control Form.  That reflects that you
15   were a full QPDL graduate as of
16   apparently 1/21/2005.  Had you completed
17   all your training by then?
18   A.    I don't know what QPDL stands
19   for.
20   MR. GASTINEAU:  Quality --
21   quality --
22   Q.    Let him answer.
23   MR. GASTINEAU:  Pickup and

Page 194

1    delivery training.
2    A.    Okay.
3    MR. GASTINEAU:  But the form
4    was -- that's the day the form was filled
5    out, and that's -- right after that,
6    Charlie went to Birmingham to take the
7    QPDL class.
8    Q.    Okay.  I know we're not
9    supposed to have a round robin here.
10   MR. NELMS:  I understand.
11   Q.    But sometimes it's quicker to
12   do that.  So, is that what happened,
13   after you filled that form out, you went
14   to Birmingham and took the class?
15   A.    Well, this is my first time to
16   see this, but I -- yes.
17   Q.    Okay.
18   A.    I went to Birmingham.
19   Q.    All right.
20   (Off-the-record discussion.)
21   Q.    (BY MR. SPOTSWOOD:)  I'm
22   looking at page 23, which is the P & D
23   Contractor/Driver Safety Instruction

Page 195

1    Summary.
2    A.    Yes, sir.
3    Q.    Was this form completed by
4    you?  Are these your signatures along
5    here?
6    A.    Yes, sir, these are my
7    signatures.
8    Q.    And is that Stan Trott's notes
9    on the right or somebody else's, if you
10   know, facilitator's signature line?
11   A.    I do not recognize it.  I
12   would -- I do not recognize the
13   handwriting.  I don't know.  I can't
14   judge that.  I know that that's me here.
15   Right here.
16   MR. NELMS:  And he points to
17   the left side.
18   A.    Somebody signed off here.  I
19   don't have a clue who that may be.
20   Q.    And then over here on pages --
21   page 25, we have a -- a Contractor/Driver
22   Safety Instruction Summary.
23   A.    Yes, sir.

Page 196

1    Q.    And these have various dates
2    on them, 2/3/05, 2/15/05, 1/31/05 and so
3    forth.  Looks like the last one is
4    2/3/05, and the facilitator is Omar
5    Newman.
6    A.    Correct.
7    Q.    And what exactly did Omar do
8    with you?
9    A.    We had instructural training
10   -- classroom training.
11   Q.    And that was up in Birmingham?
12   A.    Yes, sir, in Birmingham.
13   Q.    And Omar was running the show
14   up there?
15   A.    Right.  And then we had driver
16   training out in the -- in Birmingham.
17   And then we also had to --.
18   Q.    Who rode around with you in
19   Birmingham?
20   A.    Well, there was -- there was
21   two other fellows, and Omar.
22   Q.    Do you remember the others?
23   A.    No, sir, I don't remember

---

Page 197

1  their names.  And then we had -- and
2  there was a young lady that also went
3  with us.  Then we had -- had a driving
4  course that we had to drive over,
5  backing, turning, such as that.  We had
6  to pass that.
7      Q.    If we flip over to pages 27
8  and 28, have you ever seen this document
9  before?  It's a record of a road test,
10 paren, safety ride, showing the observer
11 as Omar Newman, date of observation,
12 1/31/05?
13     A.    No, sir, I have not seen this,
14 but I believe this is what he had -- was
15 checking off the day I was driving.
16     Q.    All right.  And then over here
17 on page 35, it looks like we have a order
18 form for business support contractors for
19 uniforms.  Is that something that you
20 signed?
21     A.    Yes, sir, I did sign that.
22     Q.    All right.  If we flip over to
23 pages 36 and 37, this says CRS (sic)

---

Page 198

1  Observation - Critical Safe Driving
2  Behavior.  I can't quite make out the
3  signature.  Can you tell me who that is?
4  Is that --
5      A.    Where -- where is the
6  signature?
7      Q.    On page 37.
8      A.    37.
9      Q.    On the left.  That's the
10 signature of the observer.
11     A.    I remember the young fellow,
12 but I --
13        MR. PARKER:  Jermaine Wilson,
14 I think, Jermaine.
15     A.    Yeah, Jermaine.
16     Q.    Wilson?
17     A.    Yeah, I know his last name was
18 Wilson.
19     Q.    Okay.
20        MR. PARKER:  With a J.
21     Q.    Flip over, if you would, to
22 pages 39 and 40.  This is called a
23 Primary Service Area Analysis Worksheet.

---

Page 199

1  It looks like it's dated -- I'm not sure
2  if that's 2/9/05 or 2/4/05, but what
3  is -- what was this?
4      A.    This was actually observations
5  while I was driving, times that we were
6  in the field and I was driving and
7  delivering.
8      Q.    Did you complete this, or did
9  Jermaine?
10     A.    No, sir, Jermaine did.
11     Q.    All right.  What other
12 conversations did you have with Stan
13 Trott regarding whether or when you might
14 be successful in obtaining a contract for
15 a route?  You told me about the
16 conversations that happened after the
17 meeting in January.  What was the next
18 discussion you had with Stan about --
19 Stan about any route?
20     A.    The only discussion I had with
21 Stan after the meeting was when I went to
22 the terminal, my wife and I had looked
23 this over, and I had decided that it was

---

Page 200

1  something that I would like to pursue, so
2  I went to the terminal, and I met with
3  Stan at that time.  And I mentioned the
4  Elmore route, Elmore/Wetumpka route, and
5  he said he didn't have a problem with
6  that, but there were things that we had
7  to go through to get everything started.
8  So, basically that's when he started on
9  all the paperwork.
10        The only other conversation I
11 had with Stan was he was asking me when I
12 was going to training, and after that I
13 don't really recall if Stan was there --
14 still there when I came back from
15 training or not.  I don't think Kent was,
16 but I don't know if Stan was either, you
17 know.  But I did, you know --
18     Q.    So, you think you might have
19 had one other conversation with him --
20     A.    About the --
21     Q.    -- when you came back to the
22 facility here in Montgomery and completed
23 your initial application paperwork about

---

Page 201

1 a route?
2    A.   Oh, yes, I met with him the
3 day that I told him that I was very
4 interested --
5    Q.   Right.
6    A.   -- to do the paperwork.
7    Q.   Right.
8    A.   And I made my request known to
9 him at the time.
10    Q.   And your --
11    A.   He said that was -- that would
12 be great.  That's all.
13    Q.   And your request was that when
14 you became qualified you would want to
15 have the route in Elmore County?
16    A.   Correct.
17    Q.   And how did you come to know
18 that Stan Trott left or had retired?
19    A.   He told us at the beginning of
20 the informational meeting that he was
21 going to retire, and that's how I learned
22 -- because I had never met Stan before.
23    Q.   Okay.

Page 202

1    A.   He said he had three or four
2 months left or something like that.
3    Q.   Okay.  And once Stan was gone
4 from the scene, which from your testimony
5 may have been at least by the time you
6 returned to Montgomery after your
7 training up in Birmingham, did you
8 then -- did your contact then become Kent
9 Gastineau?
10    A.   No, sir, it was -- actually it
11 was Joe McDonald -- Mc -- what was his
12 name?  I can't remember Joe's last name.
13        MR. GASTINEAU: McConnell.
14    A.   McConnell.  Right.  It was Joe
15 McConnell.
16    Q.   What was Mr. McConnell's job?
17    A.   He was the -- from what I
18 understand, he was the terminal manager
19 in Birmingham, and he was also working in
20 Montgomery just back and forth.
21    Q.   Okay.
22    A.   I really -- I didn't know that
23 much about him because I was on the move

Page 203

1 doing things, but that's what I
2 understand his position was until they
3 could get an individual to fill the slot.
4    Q.   Which was Kent?
5    A.   Well, my understanding at the
6 time that Kent was coming down to fill
7 in -- or not fill in, but manage home
8 delivery, whereas Stan was managing both.
9    Q.   And you had expressed interest
10 and were seeking to become qualified as a
11 home delivery contractor, correct?
12    A.   Yes, sir.  Yes.
13    Q.   All right.  Apart from what
14 you've told me, do you recall any other
15 discussions you had with Mr. Trott?
16    A.   No, sir.  I think actually
17 that was the last time I spoke to Stan.
18    Q.   Okay.  Did you ever have any
19 discussions with Mr. McConnell or Mr.
20 Gastineau about a driver in Troy by the
21 name of George McKlinney -- I'm sorry,
22 McKinley, M-C-K-I-N-L-E-Y?
23    A.   No, sir.  In Troy?  Was that

Page 204

1 -- was that your question, Bob?
2    Q.   Right.  He, as I understand
3 it, was a driver from Troy up through
4 December of 2004?
5    A.   Oh, no, sir.
6    Q.   You don't recall any
7 discussions with anybody --
8    A.   No, sir.
9    Q.   -- with anybody about him?
10    A.   The only person that I knew
11 that was driving in Troy was a young man
12 by the name of Isaac.
13    Q.   And that's Isaac Scott?
14    A.   I never knew his last name.
15    Q.   Did anyone ever tell you or
16 mention anything to you about the opening
17 in Elmore County being dependent upon
18 perhaps a change in staffing with Mr.
19 Pettaway or a loss of one of his routes?
20    A.   The only -- the only thing I
21 knew about Pettaway was that he was
22 driving -- he had a route in Millbrook.
23    Q.   Yes.

Page 205

1    A.    And that was all I knew that
2  Pettaway had.
3    Q.    Millbrook is in Elmore County?
4    A.    It's in Elmore County.
5    Q.    Right.  And all you knew about
6  it was what?
7    A.    He had -- he had a route in
8  the Millbrook area that may have went
9  into Autauga County, Prattville, I don't
10  know.  But I knew he drove in Millbrook.
11    Q.    Okay.  What had you been told
12  about the availability specifically in
13  terms of an area, a geographic area about
14  Elmore County, a route being available in
15  Elmore County?
16    A.    Basically, it was in the
17  Wetumpka area.
18    Q.    And who is talking to you?
19  Who is telling you this?
20    A.    Kent.
21    Q.    Okay.  So, when did Kent come
22  onto the scene?
23    A.    I do not recall the -- the

Page 206

1  dates.
2    Q.    Was it in March?  Was he in
3  there part-time, full-time?
4    A.    I do not recall the date.  I
5  do not know.  I was too busy.
6    Q.    What were you busy doing?
7    A.    I was riding with not just
8  this fellow Jermaine.  I rode with other
9  drivers.  I -- you know, and Kent might
10  have been there.  I'm not sure.
11    Q.    What were you doing when you
12  were riding with other drivers?  Is this
13  more training or --
14    A.    It was basically more -- more
15  training.
16    Q.    And when you were training
17  with drivers, you were getting paid for
18  that, right?
19    A.    Yes.
20    Q.    All right.  I thought you had
21  told me that -- that you -- who else did
22  you ride with?  You said --
23    A.    I rode with one -- I rode with

Page 207

1  one other driver.
2    Q.    Do you remember the name of
3  that person?  Was it a woman or a man?
4    A.    It was a -- it was a -- it was
5  a young man.  I do not recall his name.
6    Q.    And how many days did you ride
7  with that other driver?
8    A.    I don't actually recall the
9  amount of -- the amount of days.  I just
10  do not.  I'm sorry.
11    Q.    Do you think you had more than
12  two weeks total --
13    A.    No.
14    Q.    -- of --
15    A.    No.
16    Q.    -- training days?
17    A.    Oh, yes, training days, but
18  not with just one individual.
19    Q.    All right.  How many days --
20  training days do you think you actually
21  rode?
22    A.    I can't recall.  I can't
23  remember.

Page 208

1    Q.    15, less than 15?
2    A.    I do not recall, I mean.
3    Q.    And where were you actually
4  doing the rides with this other
5  individual?
6    A.    In the Montgomery area.  I
7  do -- I don't know what zip code.
8    Q.    Things that are in a different
9  area from the ones you did with Jermaine?
10    A.    It was a different area.  The
11  one that I rode with Jermaine was
12  actually El -- Wetumpka and 36116, the
13  ones that were supposedly open.  And then
14  one other time Isaac was sick, and I ran
15  his route in Troy.
16    Q.    And did you do that by
17  yourself, when you ran Isaac's route?
18    A.    There was -- yeah, there was
19  days that I went by myself, and there was
20  days that Jermaine actually went with me.
21  For what reason -- I don't know for what
22  reason.
23    Q.    And what -- how many times did

1  you fill in for Isaac down in the --
2       A.   Just one -- one time.
3       Q.   -- Troy?
4       A.   Yes, in Troy.
5            MR. NELMS:  I don't understand
6  something.  You said that you went to
7  Troy to cover the route, and sometimes
8  Isaac went with you.
9       A.   No, not Isaac.  Jermaine.
10           MR. NELMS:  Jermaine went with
11 you.  I'm sorry.
12      A.   Yes, the customer service guy
13 that was over this.
14      Q.   Completing your paperwork --
15      A.   Yes.
16      Q.   -- and your training program?
17      A.   Yes.
18           MR. NELMS:  But you only
19 covered that Troy route once.
20      A.   Right, while Isaac was out
21 sick with the flu or whatever.
22           MR. NELMS:  And you went by
23 yourself.

1       A.   Yeah, when I say Troy, Pike
2  County basically.  I mean, it was a very
3  rurial -- rurial -- rural route, so.
4       Q.   What was your understanding of
5  Mr. Scott's status when you were working
6  towards obtaining a driver's position in
7  February and March and April?
8       A.   Who was Mr. -- who is Scott?
9       Q.   Who you have been calling
10 Isaac.
11      A.   Oh, Isaac, what his position
12 was.
13      Q.   Was he working as a temp
14 driver trying to get on as a -- as a
15 contractor, or do you know?
16      A.   I don't know what his status
17 was.  All I know is that from what I knew
18 from Kent and talking to Isaac that that
19 route had been offered to him, and he was
20 in the feeling it out to see if he wanted
21 to accept it.  And Kent could never
22 actually pin him down, and I even made
23 reference to Kent.  Kent, I'll take the

1  route.
2       Q.   Did you at any point in
3  time -- did at any point in time Kent ask
4  you if you were interested in the route
5  and you initially told him, no, you
6  weren't, the route in Troy?
7       A.   I never told him that I was
8  not interested in the route, but
9  preferably I was interested in close to
10 home, the Elmore County/Wetumpka route,
11 because I had --
12      Q.   But didn't he at some point in
13 time ask you if you were interested in
14 taking the Troy route and you declined,
15 said you really weren't interested in it?
16      A.   No, sir, because I inquired
17 through -- through Dodge Vans about
18 buying a Sprinter van to run that route.
19 And they sent me brochures.
20      Q.   Isn't that because you changed
21 your mind a week or two later and came
22 back and said you might be willing to
23 consider it?

1       A.   I was willing to take whatever
2  route they was willing to give me.
3       Q.   You weren't being picky in
4  March?
5       A.   Picky?
6       Q.   Yes.
7       A.   No.
8       Q.   You didn't tell him at one
9  point in time that you were not
10 interested in Troy?
11      A.   I told Kent that I was
12 interested in Wetumpka, if I had a choice
13 in the matter, but if I did not have a
14 choice in the matter, I would take the
15 Troy route.  If I was not interested in
16 it, I would have never inquired about a
17 van and talked to Chad Primus about even
18 financing a van.
19      Q.   People change their minds
20 every day.
21      A.   Sure, sure, sure.
22      Q.   You didn't go through a change
23 of heart on this?

CHARLIE JOHNSTON v. FEDEX GROUND PACKAGE SYSTEM
Case 3:05-cv-00656-MEF-DRB     Document 27-3     Filed 04/18/2006     Page 56 of 107

CHARLIE THORNTON
March 15, 2006

Page 213

1      A.    No, I -- I left it open as an
2 option.
3      Q.    And I guess you've already
4 said that Mr. Scott had been working for
5 a period of weeks, I take it, as a
6 temporary driver down there --
7            MR. NELMS:   Object to the
8 form.
9      Q.    -- in Troy. Was that -- was
10 that your understanding of what he was
11 doing?
12      A.    I have no idea. All I know is
13 Isaac was running the route. I don't
14 know if he was a temp -- I don't know if
15 he -- I don't even know what -- I know
16 nothing about Isaac except he got in that
17 van every day and he headed toward Troy.
18      Q.    Okay.
19      A.    If he had been through the
20 training process or not, I don't know.
21      Q.    Okay.
22      A.    I do not know.
23      Q.    Do you recall having a

Page 214

1 conversation with Kent where he explained
2 to you why he had given the Troy route to
3 Isaac?
4      A.    No, Isaac was already on that
5 route when I came back from Birmingham
6 training.
7      Q.    I mean, giving him a -- giving
8 him a contractor position on that route,
9 not just driving it, but as a contractor?
10      A.    The only thing I know from
11 Kent concerning Isaac is that Kent could
12 not pin the boy down and that he relayed
13 to me that he was having problems getting
14 financing on a van. And when he would go
15 to him and say Isaac, what are your
16 plans, what are your plans, are you going
17 to take this route, he never would give
18 him an answer. That's all I know.
19      Q.    Did Mr. Gastineau ever talk to
20 you about the possibility that something
21 might open up in Elmore County depending
22 upon, you know, how things played out
23 with Mr. Pettaway?

Page 215

1      A.    It was already open in Elmore
2 County. Kent didn't want Pettaway to get
3 the Wetumpka route because Pettaway was a
4 problem. He didn't keep his records on
5 his truck. He was just a problem all the
6 way around.
7      Q.    What other kind of problems
8 other than records?
9      A.    I don't know. All I know is
10 maintenance on the truck and such as
11 that. I mean, I can't recall every --
12 every conversation we had, but he did not
13 want him to get that route. And he
14 suggested that I go and get my map book.
15 Why would I go to the --
16            MR. NELMS:   Just answer his
17 questions.
18      A.    Okay.
19      Q.    And how was it that Mr.
20 Pettaway was going to get this route?
21      A.    I don't know.
22      Q.    Was he going to be able to
23 expand his core territory or something

Page 216

1 along those lines?
2            MR. NELMS:   Object to the
3 form.
4      Q.    Did you have any understanding
5 of that?
6            MR. NELMS:   Object to the
7 form.
8      A.    I don't know. I don't know
9 the procedure for getting an extra route.
10      Q.    Now, you said that you
11 understood that there was a route open
12 over there in Elmore County. Who told
13 you that?
14      A.    Stan Trott.
15      Q.    I'm talking about in your
16 conversations with -- is it -- did Kent
17 tell you that?
18      A.    Stan Trott told me that it was
19 open in the beginning.
20      Q.    Right.
21      A.    And it was just the same way
22 with Kent. That was open.
23 Elmore/Wetumpka, that area was open,

Page 217

1  36116 was open.
2  **Q.**  You keep referring to 36116.
3  **A.**  That's in Montgomery.  That's
4  a Montgomery route.
5  **Q.**  And who was working that
6  route?
7  **A.**  My understanding, nobody.  It
8  was just being filled in.
9  **Q.**  Temporary drivers were working
10  it?
11  **A.**  From what I understand, there
12  was ground drivers doing home delivery
13  service out there.
14  **Q.**  Okay.
15  **A.**  So, I mean, I didn't know all
16  the ins and outs, you know.  I took them
17  for what -- their word.
18  **Q.**  Well, that's what I'm trying
19  to understand, precisely what it is that
20  Kent told you was the situation in Elmore
21  County, which is apparently what you said
22  you were really interested in.
23  **A.**  He told me that the Wetumpka

Page 218

1  route in Elmore County was open, that I
2  needed to go to and purchase my map book.
3  I went and purchased my map book.
4  **Q.**  And that cost you how much
5  money?
6  **A.**  That was $25.
7  **Q.**  Yes.
8  **A.**  He showed me actually a map
9  book, what it looked like, and how it was
10  gridded out from the 911 people.  I went
11  directly up there.  I purchased it for
12  $25.
13  **Q.**  And you got that from the
14  police department?
15  **A.**  It was not in the police
16  department.  It was emergency management
17  office.
18  **Q.**  What discussions did you have
19  with Kent Gastineau about the route in
20  Montgomery that you described just a
21  moment ago?
22  **A.**  We didn't have --
23  MR. NELMS:  36116?

Page 219

1  **A.**  Yeah.
2  **A.**  The only discussions that we
3  had was that I was available for either,
4  and Isaac was still on the board.  We
5  didn't discuss that one that much because
6  we knew what I was leaning toward.  So,
7  we discussed the Wetumpka route more than
8  anything.  We even went on the computer,
9  and he pulled it up on the computer and
10  showed me an outline of the territory
11  there, where it went, into what -- next
12  to what county, you know, it bumped up
13  against and everything.
14  **Q.**  Did you doubt that he was
15  trying to do what he could to give you a
16  hand and get you into that route?
17  **A.**  I never doubted Kent for one
18  moment.  I thought the man was telling me
19  the truth.  I mean, I was excited about
20  it.
21  **Q.**  Okay.
22  MR. NELMS:  Can we take a
23  minute?

Page 220

1  MR. SPOTSWOOD:  Yeah, sure.
2  (Said deposition was in recess
3  at 2:42 p.m. until 2:50 p.m.,
4  after which the following
5  occurred:)
6  **Q.**  (BY MR. SPOTSWOOD:)  Your
7  complaint says that Kent Gastineau met
8  with you on April the 19th of 2005,
9  quote, to sign the contract for Elmore
10  County, and that Mr. Gastineau said --
11  stated, and I'm quoting from the
12  complaint, quote, stated that there was a
13  paperwork problem but that the route
14  belonged, close quote, to you.  Is that
15  what he said to you?
16  **A.**  Yes, sir.
17  **Q.**  And you remember that
18  specifically?
19  **A.**  Yes, sir, I do.
20  **Q.**  What was the paperwork
21  problem?
22  **A.**  I don't have a clue what the
23  paperwork -- there were so many paperwork

Page 221

1  problems, that was one of the main
2  issues, what -- why is there so many
3  paperwork problems?  I was always
4  addressing that, always, why --
5      Q.    Well, try to focus on my
6  question here.  This is apparently an
7  important meeting.  You've quoted it in
8  the complaint, April 19th.  You said
9  there was a paperwork problem, but the
10  route belonged to you.  What specifically
11  did he tell you -- I can see that you
12  were upset about that.  What did he tell
13  you?
14      A.    Basically it was out of his
15  hands, and it had went up the chain of
16  command, and several people had to sign
17  off on that, and it was up the chain.
18      Q.    Okay.  Did he give you any
19  specific explanation for what might have
20  happened or --
21      A.    No, sir, he did not.
22      Q.    All right.  Did he give you
23  any assurances or say anything to you

Page 222

1  about his hope to get it worked out in
2  the future?
3      A.    No, he never used that
4  terminology.
5      Q.    What did he say to calm your
6  nerves, if anything?
7      A.    It was just a time, time
8  factor, being on someone's desk.  Omar
9  Newman's desk had to sign off on it, and
10  there were some other individuals that
11  had to sign off on it, and they just --
12  just in passing had not signed off on it.
13      Q.    On April the 19th, did he sit
14  down at the computer and attempt to print
15  off a contract for you, do you know?
16      A.    No, there was a time on the
17  computer that we were trying to get some
18  type of document, and we couldn't access
19  it through the computer.
20      Q.    Do you know whether or not
21  that document was, in fact --
22      A.    No, I do not.
23      Q.    -- the contract that's here in

Page 223

1  Exhibit V?
2      A.    No, sir, I do not.  My
3  understanding was all my documents -- I
4  don't even know what I was supposed to be
5  signing off on that day, but I do know
6  that my other documents were actually in
7  other people's hands to be signed off on
8  because I know that there was a
9  procedure.  Omar stated that to me.  And
10  he pulled it up on his file saying
11  Charlie will sign off here, here, here
12  and here.  I'm just going by what they
13  tell me.
14      Q.    The complaint says that Mr.
15  Gastineau gave you, quote, an official
16  route book.  Is that the book you went
17  off and -- what are you talking about
18  there, the book -- what's the official
19  route book?
20      A.    I have no idea what the
21  official route book, what that's
22  pertaining to.
23      Q.    Okay.  Well, it's your

Page 224

1  complaint.  I know you didn't write it.
2      A.    Maybe it was the map book.
3      Q.    Is that what you think you're
4  thinking about as the official route
5  book, perhaps?
6      A.    Possible.
7      Q.    Okay.  The complaint says and
8  at this time you were, quote, encouraged
9  to continue working toward preparing for
10  the time when he would work the Elmore
11  County route.  That's a quote out of your
12  complaint.  Is that what he said to you?
13      MR. NELMS:  That's terrible
14  language.  Whoever wrote that needs to --
15      Q.    Did he give you some words of
16  encouragement to hang in there for a
17  while?
18      A.    Sure.  He did.  Exactly -- he
19  surely did, I mean.  And it may have been
20  coming to him down the chain.  It was all
21  a paperwork issue.  From Jeff White on
22  up.
23      Q.    You -- I think your van might

---

Page 225

1 have arrived or did arrive on the
2 premises on May the 3rd, does that sound
3 right to you?
4    A.   It's possible.  I don't really
5 recall the exact date.
6    Q.   Whatever date the van arrived,
7 did Mr. Gastineau attempt to print out a
8 contract for you to sign in the form
9 contained in the book here, Exhibit V?
10    A.   I do not recall that.
11    Q.   Did he tell you the day that
12 your van arrived, though, that the
13 computer system would not give him
14 approval for a contract and a route?
15    A.   No, sir.
16    Q.   He didn't tell you that?
17    A.   No, sir.
18    Q.   What did he tell you that day?
19    A.   He called me and told me the
20 van had arrived.
21    Q.   Yes.
22    A.   I went to the terminal.  He
23 went out and done the maintenance check

Page 226

1 on the van, checked it over.  I told him
2 I was taking it home, I was going to have
3 a radio installed, wash it, be ready to
4 go.  He gave me a start date.
5    Q.   What was the start date?
6    A.   It was the Tuesday after
7 Mother's Day.
8    Q.   Tuesday after Mother's Day?
9    A.   I don't recall the date.
10    Q.   But as of May the 3rd, you had
11 no hint there was going to be any problem
12 or that there was a problem at that time?
13    A.   Paperwork problem.
14    Q.   You did know on the 3rd when
15 the van arrived there was still paperwork
16 problems, correct?
17    A.   No.  No.
18    Q.   You didn't?
19    A.   I did not.  Because I knew
20 that I had not -- the van had been
21 issued, and the issuance of the van would
22 not have taken place if there was a
23 paperwork problem.

Page 227

1    Q.   Okay.  And who told you that?
2    A.   I knew that FedEx would not
3 issue a van with a contractor ID number,
4 DOT number, unless the chain of command
5 at FedEx had not signed off on
6 everything.  Chad Primus at Stearns Bank,
7 which he had been doing this for years,
8 and I knew that that's what it would
9 take.
10    Q.   Because Chad told you that or
11 somebody else did?
12    A.   No, I knew that.  I mean, I
13 just knew that through Kent probably, I
14 knew that they would not issue -- why
15 would a company issue you a van unless
16 everything was A-okay?
17    Q.   I would suspect that would be
18 an error, yes, sir.
19    A.   Okay.
20    Q.   Let's talk about the van
21 purchase.  I need the documents
22 reflecting the purchase and sale of the
23 van.  Where are those documents?  I don't

Page 228

1 know that we've ever seen any documents
2 dealing with the sale of the van.
3       MR. SPOTSWOOD:  That's
4 correct.  Those are exhibits --
5       MR. SPOTSWOOD:  Hang on.  Let
6 me just go off the record here for a
7 second.
8       (Off-the-record discussion.)
9    Q.   (BY MR. SPOTSWOOD:)  Pull
10 Exhibit H out for us, if you would, Andy.
11       (Whereupon, Defendant's
12       Exhibit H was marked for
13       identification.)
14    Q.   Let's look at the second page
15 of Defendant's Exhibit H, which is the --
16 appears to be a conditional sales
17 contract with Stearns Bank.  Is that your
18 signature on the bottom of the pages, on
19 the first two pages of that three-page
20 contract?
21    A.   Yes, sir, it is.
22    Q.   And, then, we have your
23 signature -- those are your initials on

---

Page 229

1  your first two.  Then we have your
2  signature on the last page, is that
3  right?
4     A.  Yes, sir.
5     Q.  How much money did you sell
6  the -- first let me stop and ask this
7  question of counsel.
8     MR. SPOTSWOOD:  To this day I
9  have not seen any documents dealing with
10  the sale of the van.
11     MR. NELMS:  Do you have any
12  documents dealing with the sale of the
13  van we don't have?
14     A.  No, sir, other than in that
15  packet.
16     Q.  (BY MR. SPOTSWOOD:)  Let me
17  ask you a question.  Did you do any
18  paperwork in connection with the sale of
19  the van?
20     A.  Sure, Chad Primus, he worked
21  everything up and sent me the paperwork
22  to sign off on it, and I signed it back
23  to him.

Page 230

1     Q.  Did you keep a copy of that?
2     A.  All the copies I had, I gave
3  to them, to Andy.  I'm pretty sure that I
4  did.
5     MR. NELMS:  Now, I've -- let's
6  go off the record.
7     (Off-the-record discussion.)
8     Q.  (BY MR. SPOTSWOOD:)  Let me
9  ask you this, Mr. Thornton.  I know we
10  don't have apparently the documents
11  reflecting the sale of the van.  Do you
12  recall, as we sit here today, what the
13  terms of the sale were?
14     A.  My terms?
15     Q.  Yeah, what -- what did -- what
16  did --
17     A.  He assumed payments on it.  He
18  just assumed the van, the payments on the
19  van.
20     Q.  Okay.  So, you didn't get
21  any cash back from -- that you had
22  fronted for the down payment or title
23  or --

Page 231

1     A.  Tag, no, sir.
2     Q.  -- or tag or any of that?
3     A.  I did not.
4     Q.  And what happened -- what
5  happened to the radio, did he purchase
6  the radio?
7     A.  He purchased the radio.
8     Q.  He did purchase the radio?
9     A.  Yes, sir.  The day he picked
10  it up he purchased the radio and --
11     Q.  Did he pay you what you had
12  paid for the radio?
13     A.  Yes, sir, he did.  Him and --
14  I don't remember the fellow's name, but
15  him and his -- Tony DeRosa, Tony brought
16  him down to the home, and they picked it
17  up.
18     Q.  Tony was the manager up there
19  in Anniston?
20     A.  Anniston, yes.
21     Q.  Do you remember the guy's name
22  who bought it?
23     A.  No, sir, I do not remember.

Page 232

1     (Off-the-record discussion.)
2     (Whereupon, Defendant's
3  Exhibit AA was marked for
4  identification.)
5     Q.  (BY MR. SPOTSWOOD:)  Mr.
6  Thornton, is this -- you tell me what
7  this is.
8     A.  Okay.  This was the down
9  payment on the truck.
10     Q.  What are we looking at there?
11  Did you charge that to a credit card?
12     A.  Yes, sir, I did.
13     Q.  What credit card did you
14  charge it to?
15     A.  It was my Visa, National Bank
16  of Omaha.
17     Q.  All right.  And the amount of
18  the down payment on the van was the
19  1,029.50?
20     A.  Yes, sir.
21     Q.  And that was a postdate of
22  April the 22nd, correct?
23     A.  Correct.

Page 233

1     Q.   And that's -- we've been
2  talking about Exhibit AA, I believe.
3       (Whereupon, Defendant's
4       Exhibit BB was marked for
5       identification.)
6     Q.   I'm now going to ask you to
7  identify Exhibit BB.
8     A.   This is actually a renewal
9  notice that I received not too awfully
10  long -- well, received 10/3/05 on the --
11  on the tag of the van.
12     Q.   So, this is not something that
13  you had actually paid then, I take it?
14     A.   No, sir, I did not pay it.  I
15  just put it in there.
16       (Whereupon, Defendant's
17       Exhibit CC was marked for
18       identification.)
19     Q.   Exhibit CC, is this the sales
20  receipt for the --
21     A.   Radio.
22     Q.   -- radio?
23     A.   Right.

Page 234

1     Q.   Is that correct?
2     A.   Yes, sir.
3     Q.   And the buyer whose name we
4  haven't figured out quite yet reimbursed
5  you in total for the three thirty-five oh
6  four?
7     A.   Yes, sir.
8       (Whereupon, Defendant's
9       Exhibit DD was marked for
10       identification.)
11     Q.   I'm going to show you
12  Defendant's Exhibit DD.  This is the
13  registration certificate, is it not, for
14  the van?
15     A.   Yes, sir.
16     Q.   And it reflects a total tag
17  and tax payment and title fee of
18  $1,533.35?
19     A.   That's correct.
20     Q.   And now, did you get any kind
21  of a refund for any of this amount?
22     A.   No, sir.
23     Q.   Was this -- frankly, I'm not

Page 235

1  sure that I understand how this works.
2  You obviously paid upon the purchase
3  state tax, county tax, city tax, total
4  sales tax of $1,351.88, correct?
5     A.   Yes, sir.
6     Q.   And you got no reimbursement
7  at all from the transaction with the
8  new --
9     A.   None, no, sir.
10     Q.   So, this was an out-of-pocket
11  expense for you?
12     A.   Yes, sir.
13     Q.   All right.  I am marking this
14  back of this receipt as Defendant's
15  Exhibit EE.
16       (Whereupon, Defendant's
17       Exhibit EE was marked for
18       identification.)
19     Q.   It is a receipt from Harbor
20  Freight Tools, listing a hand truck and a
21  lashing, ST.  I'm not sure what that
22  means.  What are these items?
23     A.   It's a hand truck that I

Page 236

1  purchased for the truck to use on the
2  truck for delivery.
3     Q.   And the lashing, what was
4  that?
5     A.   That was just to strap it into
6  the truck where it wouldn't be moving
7  around.
8     Q.   Was this an out-of-pocket
9  expense that you had, $29.68?
10     A.   Yes, sir.
11     Q.   Okay.  I'm not going to mark
12  this.  I'm seeing a receipt here.  You
13  apparently paid on your credit card for
14  the tag amount of 153335.
15     A.   Let's see if that was a credit
16  card or a debit.  Yeah, it was credit.
17  It was credit.
18     Q.   All right.
19     MR. NELMS:  Can we staple that
20  to the --
21     MR. SPOTSWOOD:  Yeah, that's
22  fine.
23     MR. NELMS:  That way --

Page 237

1    MR. SPOTSWOOD: We'll just
2  make that a part of Exhibit DD.
3    MR. NELMS: Does that read
4  okay with you?
5    COURT REPORTER: Yes.
6  (Off-the-record discussion.)
7  (Whereupon, Defendant's
8    Exhibit FF was marked for
9    identification.)
10   Q.    (BY MR. SPOTSWOOD:) I've
11 marked this one Exhibit FF, which are
12 documents that we received from you
13 today, and it is a variety of different
14 documents. I just want to walk through
15 them with you if I can. The first page
16 is a bill of sale from FedEx Ground to
17 you for the Workhouse, correct?
18   A.    Yes, sir.
19   Q.    And it shows the selling price
20 of $33,797, correct?
21   A.    Correct.
22   Q.    All right. The next page is
23 an insurance identification card that

Page 238

1  shows insurance on the vehicle effective
2  4/16/05 and expiring 2/1/06, correct?
3    A.    Correct.
4    Q.    I take it you did cancel the
5  policy immediately when you sold the van
6  to the -- whoever it was you sold it to?
7    A.    Yes, I contacted them and let
8  them know. They still sent me a notice,
9  though.
10   Q.    Did you ever pay any insurance
11 premiums on it?
12   A.    No, not after -- not after
13 that.
14   Q.    I guess my question in part
15 is, did you pay any premiums ever for
16 insurance? They might have billed you
17 after the fact, in which case maybe you
18 didn't pay the bill. I just don't know.
19 That's what I'm asking.
20   A.    I can't recall. I really
21 can't recall. I had to pay something to
22 get the insurance.
23   Q.    And this is a Protective

Page 239

1  Insurance Company additional insured
2  endorsement that names FedEx Ground as
3  named insured and additional insured,
4  Charlie Thornton, correct?
5    A.    Correct.
6    Q.    The cover page of the
7  insurance?
8    A.    Correct.
9    Q.    Correspondence is the next
10 page from Protective to you regarding --
11 basically providing proof of coverage.
12   The next document is a
13 Department of Revenue permit basically
14 for operation of the vehicle before the
15 title comes through, correct?
16   A.    Yes, sir.
17   Q.    The next document is just an
18 envelope from Protective. All right.
19 Correct?
20   A.    Yes, sir.
21   (Whereupon, Defendant's
22    Exhibit GG was marked for
23    identification.)

Page 240

1    Q.    Mr. Thornton, I'm showing you
2  Defendant's Exhibit GG, which I believe
3  is an application for the insurance
4  coverage that you purchased which
5  consisted of a life insurance policy as
6  well as a disability insurance policy.
7    A.    Right.
8    Q.    Life insurance paying off
9  almost $51,830, and then the disability
10 coverage providing you 750 -- $730 a
11 month in disability benefits, correct?
12   A.    Correct.
13   (Whereupon, Defendant's
14    Exhibit HH was marked for
15    identification.)
16   Q.    What I've got marked as
17 Exhibit HH is a cover page from
18 Protective Insurance, a certificate of
19 group independent contractor work
20 accident insurance effective 4/26/05, and
21 then the actual policy group independent
22 contractor work accident insurance
23 certificate, which is several pages. Is

Page 241

1  this all material that you received
2  from --
3      A.    Yes, sir.
4      Q.    -- Protective in connection
5  with your vehicle?
6          (Whereupon, Defendant's
7          Exhibit II was marked for
8          identification.)
9      Q.    Let me show you Exhibit II.
10  Is this a letter you received from Chad
11  Primus, the account manager at Stearns,
12  dated April 15th?
13      A.    Yes, sir.
14      Q.    It appears to ask you to
15  return various documents and execute them
16  along with a check payable to Stearns for
17  $967.50?
18      A.    That's correct.
19      Q.    And that includes an advance
20  payment of $668?
21      A.    Correct.
22      Q.    And documentation fee of
23  $299.50?

Page 242

1      A.    That's correct.
2      Q.    Now, is that -- is that the
3  out-of-pocket costs you incurred in
4  connection with this van separate from --
5      A.    Yes.
6      Q.    -- any insurance-related
7  issues?
8      A.    Yes, sir.
9      Q.    Okay.  And you paid that money
10  by, I take it, a check?
11      A.    No, that was with a credit
12  card.
13      Q.    Was it?
14          (Whereupon, Defendant's
15          Exhibit JJ was marked for
16          identification.)
17      Q.    All right.  And Exhibit JJ is
18  a letter from you dated May 6th -- I'm
19  sorry, from Stearns Bank, the customer
20  service department, to you dated May 6th,
21  2005?
22      A.    Yes, sir.
23      Q.    And that tells you about

Page 243

1  payments, insurance and taxes?
2      A.    Yes, sir.
3      Q.    And it advises you that your
4  next payment is due 5/25/05?
5      A.    Correct.
6      Q.    And I think these documents
7  that we've just been through were mailed
8  in this envelope, if I'm not mistaken.
9  Do you know?
10      A.    Yeah, flip that up and you can
11  tell what.
12      Q.    Okay.  So, these --
13      A.    Yeah, those are.
14          (Whereupon, Defendant's
15          Exhibit KK was marked for
16          identification.)
17      Q.    The insurance documents came
18  in this envelope --
19      A.    Correct.
20      Q.    -- is that correct?  And
21  that's Exhibit KK.  And that's got a
22  postmark of May 2nd on it, correct?
23      A.    Yes.

Page 244

1      Q.    I'm not going to mark that.
2          (Whereupon, Defendant's
3          Exhibit LL was marked for
4          identification.)
5      Q.    Exhibit LL is your money
6  receipt for the map book you described in
7  the amount of $25?
8      A.    That's correct.
9      Q.    I haven't been keeping up with
10  the numbers here, but do you know what
11  this Regions receipt relates to?  It's in
12  the amount of 1351.88?
13      A.    I don't.  I can find that out,
14  though.
15      Q.    Okay.  If you could find
16  out --
17      A.    I know it has something
18  pertaining to something, or it wouldn't
19  be in there.  I don't know.
20      Q.    If you can figure that out and
21  let me know in the morning, that would be
22  good.
23          (Off-the-record discussion.)

Page 245

1    (Whereupon, Defendant's
2    Exhibit MM was marked for
3    identification.)
4    Q.    (BY MR. SPOTSWOOD:)  I'll show
5    you Defendant's Exhibit MM which is a
6    two-page handwritten note here.  Can you
7    tell me what this reflects?
8    A.    (Examining document.)  It's
9    just an itemized statement of expenses
10   going to training.
11   Q.    Were you reimbursed by FedEx
12   for those expenses?
13   A.    No, sir.
14   Q.    What do they consist of?
15   A.    Oil, gas, lunch, gas, shoes I
16   bought.
17   Q.    So, you were basically keeping
18   those for tax purposes to keep up with
19   your expenses in connection with --
20   A.    I really don't know how -- I
21   know my wife wrote this out because
22   actually this is showing an automatic
23   deposit of where they paid me right here.

Page 246

1    That's a deposit.  I was -- that's an
2    auto -- automatic deposit there.
3    Q.    I see.
4    A.    There's no amounts there, so I
5    don't know what -- the only thing it's
6    showing that I -- I don't know why she
7    just put something there, the 5878, and
8    this is just scribble on the back.
9    Q.    All right.  On the 19th of May
10   you wrote Kent a letter, correct?
11   A.    That's correct.
12   Q.    And is that letter shown on
13   the second page of Defendant's Exhibit M?
14   A.    That's correct.
15   (Whereupon, Defendant's
16   Exhibit M was marked for
17   identification.)
18   Q.    And you enclose with that
19   letter the first page of Exhibit M?
20   A.    That's correct.
21   Q.    Was the -- did you also
22   enclose with the letter the document
23   that's marked KG 003 so that he would

Page 247

1    know -- which appears to be the address
2    to which the payments should be sent?
3    A.    Correct.
4    Q.    So, these three documents
5    consisted of your communication -- your
6    written communication with Kent?
7    A.    Right.  I mailed it to his
8    home.
9    Q.    All right.  Did you mean what
10   you said here in this letter?
11   A.    I surely did.  That was our
12   conversation.
13   Q.    Did he ask you when -- when he
14   had indicated that he would take care of
15   making the payment that was due on the
16   25th, did he ask you not to tell anybody
17   about that because he might get into some
18   trouble about it?
19   A.    Yes, sir.
20   Q.    Did he explain to you why he
21   might get into some trouble about it?
22   A.    No, he did not explain it.  He
23   just wanted it to be between us.

Page 248

1    Q.    Did you keep it between the
2    two of you?
3    A.    No, I did not.
4    Q.    Who did you tell about it?
5    A.    I told Jeff White.
6    Q.    And who is Jeff White?
7    A.    He's either an engineer or
8    Kent's boss.
9    Q.    What did you say to Jeff about
10   it, or is that in that record -- one of
11   those recorded conversations?
12   A.    It -- it may possibly be.  I'm
13   not quite for sure.  There's only one.
14   Q.    I don't think you reached Jeff
15   that day.
16   A.    Well, I spoke to Jeff about
17   it.  I know I did.  My main concern was
18   how that payment was going to be made,
19   and it wasn't being made, and I wanted to
20   know -- I'm a chain of command guy.  I
21   mean, I can't go to him and then I'm
22   going -- if I can't get answers, go
23   above.  And, so, I called Jeff.

Page 249

1    Q.   Well, did -- when you called
2 Jeff, did you think that Kent was not
3 going to make good on his promise to make
4 the payment?
5    A.   I wasn't sure if he was or not
6 because it was a situation that was not a
7 very nice situation for either party, and
8 I had already been appeased to the point
9 of it was ludicrous, and I just said I'm
10 not sure, but I knew somebody was going
11 to come after Charlie for the payment.
12    Q.   So, what do you remember
13 saying to Jeff about the payment?
14    A.   I really don't recall the --
15 the whole conversation. I mentioned it
16 to Jeff that my main concern was what is
17 going on with my paperwork, and I had a
18 payment due in X amount of weeks. And
19 someone was going to make that payment,
20 and I told him at the time that Kent --
21 Kent said that he would make the payment.
22    Q.   And did it later turn out that
23 FedEx made that first payment?

Page 250

1    A.   I don't know who made the
2 payment, if anybody made the payment.
3 All I know is that Chad was able to find
4 somebody.
5    Q.   And since that some person
6 just took over the payments, you're not
7 really sure how good a deal he got,
8 whether he got one payment better deal
9 than might otherwise be the case?
10    A.   Well, I remember the
11 conversation with Chad, and it may be in
12 here.
13    Q.   I think it is.
14    A.   I don't remember the whole
15 conversation. The guy got a good deal.
16 I think he got a good deal anyway. But
17 Chad really helped me out with that
18 truck.
19    Q.   Previously you had indicated
20 that you started recording conversations
21 with everyone you talked to at FedEx
22 beginning with the first conversation on
23 here, which we know is at least the 19th,

Page 251

1 maybe earlier than that, possibly the
2 18th. But your testimony today is that
3 you did talk to Jeff about this issue
4 after you wrote this letter to Charlie,
5 so I need some clarification there. Do
6 you think you might have told Jeff about
7 the commitment that Kent had made before
8 you actually wrote the letter to Kent?
9    A.   I don't recall. I really
10 don't recall.
11    Q.   Could it have been, though,
12 before you actually wrote the letter?
13    A.   It's possible. It's possible.
14    Q.   I tell you what I'd like to
15 do, I think, is take a break at this
16 juncture because I really need to spend
17 some time looking at this document, I
18 think.
19    MR. NELMS: Or we can just
20 start over in the morning, whatever you
21 want to do.
22    MR. SPOTSWOOD: Yeah, I mean,
23 it suits me to start in the morning if I

Page 252

1 could take this with me. I'd actually
2 rather not take it with me, so let me see
3 if we can shoot a picture of this.
4    MR. NELMS: Yeah, give it here
5 and let me just get them to copy that off
6 real quick.
7    MR. SPOTSWOOD: Copy the
8 cover, too, if you don't mind.
9    MR. NELMS: Before y'all go
10 out tonight, let's make sure we have
11 everything in order.
12    MR. SPOTSWOOD: Sure,
13 absolutely.
14    (Whereupon, Defendant's
15    Exhibit NN was marked for
16    identification.)
17    (Said deposition was in recess
18    at 3:34 p.m. until 9:30 a.m.
19    on the morning of March 16th,
20    2006. All subsequent
21    testimony of Mr. Thornton is
22    contained in Volume II of his
23    Deposition.)

In The Matter Of:

# CHARLIE THORNTON
## v.
# FEDEX GROUND PACKAGE SYSTEM

---

## CHARLIE THORNTON
## March 16, 2006

---



# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
www.TylerEaton.com

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 16, 2006

---

**Page 253**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO: 2:05-CV-00656-DRB

CHARLIE THORNTON,
    Plaintiff,
vs.
FEDEX GROUND PACKAGE SYSTEM, INC.,
    Defendant.

VOLUME II DEPOSITION
OF
CHARLIE THORNTON
16TH DAY OF MARCH, 2006

TAKEN BEFORE: Gary N. Morgan
    Registered Professional
    Reporter and Notary Public

---

**Page 255**

1          A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4     Mr. K. Anderson Nelms
5     Attorney at Law
6     Law Offices of Jay Lewis, LLC
7     847 South McDonough Street
8     P. O. Box 5059
9     Montgomery, Alabama 36104
10
11  FOR THE DEFENDANT:
12    Messrs. Robert K. Spotswood and
13       John. R. Parker, Jr.
14    Attorneys at Law
15    Law Offices of Robert K. Spotswood
16    Suite 940
17    2100 Third Avenue North
18    Birmingham, Alabama 35203
19
20  OTHERS PRESENT:
21    Mr. Kent Gastineau
22
23

---

**Page 254**

1       S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED,
3  by and between the parties, through their
4  respective counsel, that the deposition
5  of CHARLIE THORNTON may be taken before
6  Gary N. Morgan, Commissioner, Registered
7  Professional Reporter and Notary Public,
8  State at Large;
9      That the signature to and
10 reading of the deposition by the witness
11 is waived, the deposition to have the
12 same force and effect as if full
13 compliance had been had with all laws and
14 rules of Court relating to the taking of
15 depositions;
16      That it shall not be necessary
17 for any objections to be made by counsel
18 to any questions, except as to form or
19 leading questions, and that counsel for
20 the parties may make objections and
21 assign grounds at the time of trial, or
22 at the time said deposition is offered in
23 evidence, or prior thereto.

---

**Page 256**

1         I N D E X
2          PAGE:
3
4

5  EXAMINATION BY MR. SPOTSWOOD -  258
6  CONTINUED
7  EXAMINATION BY MR. NELMS     366
8  REEXAMINATION BY MR. SPOTSWOOD  383
9  EXAMINATION BY MR. NELMS -    385
10 CONTINUING
11 REEXAMINATION BY MR. SPOTSWOOD  401
12 REEXAMINATION BY MR. NELMS    403
13 REEXAMINATION BY MR. SPOTSWOOD  405
14 REEXAMINATION BY MR. NELMS    409
15
16
17 Exhibit OO        258
18 Exhibit PP        261
19 Exhibit QQ        262
20 Exhibit RR        276
21 Exhibit TT        284
22 Exhibit SS        285
23 Exhibit UU        287

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

**Page 257**

1    I N D E X (Continuing)
2
3    Exhibit VV          316
4    Exhibit WW          330
5    Exhibit I           333
6    Exhibit J           334
7    Exhibit K           335
8    Exhibit XX          359
9    Exhibit YY          363
10   Exhibit ZZ          382
11   Exhibit AAA         411
12
13
14
15
16
17
18
19
20
21
22
23

**Page 258**

1    MARCH 16, 2006          9:35 A.M.
2
3        CHARLIE THORNTON,
4    having been previously duly sworn, was
5    examined and testified further as
6    follows:
7
8    EXAMINATION BY MR. SPOTSWOOD - CONTINUED:
9            (Whereupon, Defendant's
10           Exhibit OO was marked for
11           identification.)
12       Q.   Let me ask you to have a look,
13   Mr. Thornton, at Exhibit NN.
14       A.   Okay.  I've got it right here.
15       Q.   Okay.  Can you tell me what
16   these are, please, sir?
17       A.   Yes, sir.  At the top that CFF
18   basically is a -- there was two financing
19   companies, one that pertained to the
20   truck purchase.  One was CFF.  The other
21   was Stearns Bank.  Those are the phone
22   numbers that I received.  I do not know
23   who I received them from.  And the other

**Page 259**

1    information, the contract FedEx P500,
2    that was the truck model, a P500.  The
3    1.19 stop, I do not know what that is.
4    For some reason, I wrote that down.  But
5    you can see I wrote under there lease to
6    own, Chad, 72 months.
7        Q.   And Chad is a reference to
8    Chad Primus at Stearns Bank?
9        A.   Yes, sir.  Under that you'll
10   see physical, Trice, okay.  That was a
11   young lady at the terminal.  She was
12   admin clerk.
13       Q.   She was the person who helped
14   you with the paperwork at the front end
15   that you talked about yesterday?
16       A.   Yes, sir.  Yes, sir.  And she
17   was going to -- I'm pretty sure she may
18   have set up my physical, and some of that
19   writing under that is actually my wife's
20   writing because she spoke to Chad about
21   the purchase of the truck as far as
22   interest rates and stuff like that, so
23   that was conversation they had.  And

**Page 260**

1    which was the better of the two as far as
2    the purchase.  This out to the side --
3        Q.   Yes, sir.
4        A.   -- that's my wife's writing
5    also.
6        Q.   The 299.50 --
7        A.   Yes.
8        Q.   -- one month, 705?
9        A.   Right.
10       Q.   And so forth?
11       A.   Yes, sir.  It sure is.  And
12   let's see.  Those directions that are
13   under the bottom.
14       Q.   Yes, sir.
15       A.   I do not know where those
16   directions are to.  For some reason, I
17   wrote those down Exhibit 255, Frankfurt.
18   That -- for some reason, I had to take
19   some directions for something, and I
20   wrote it on there.  Then below that is
21   information on -- it's just references,
22   Jeff Owens, Mike Proper and Ray Harris.
23       Q.   Those are the three names that

Page 261

1  you listed on your application materials
2  as references --
3      A.   Yes, sir.
4      Q.   -- if I recall correctly?
5      A.   That's correct.  That just
6  looks like a copy of something.  Okay.
7          (Whereupon, Defendant's
8          Exhibit PP was marked for
9          identification.)
10     Q.   Just another little
11 housekeeping item here.  Let me show you
12 what I'm going to mark as Defendant's
13 Exhibit PP, and this is the first five
14 pages of the Elmore County, Alabama E
15 9-1-1 map book.
16     A.   Yes, sir.
17     MR. NELMS:  Bob, do you want
18 me to stipulate that that's
19 representative of the entire --
20     MR. SPOTSWOOD:  Yeah.  I'll
21 get to it.  This is the map book that
22 is -- I've got a multipage map book here.
23 I've only marked the first few pages as

Page 262

1  Exhibit PP, and I just want to confirm
2  that this is the map book that you talked
3  about yesterday for which -- which you
4  purchased for $25 --
5      A.   That's correct.
6      Q.   -- in order to become more
7  familiar with the route that you had
8  hoped to receive in Elmore County?
9      A.   That's correct.
10     Q.   I want to show you Defendant's
11 Exhibit OO.  Is this a FedEx home
12 delivery pamphlet titled The
13 Entrepreneurial Spirit that you received
14 in the course of seeking to become a
15 contractor?
16     A.   Yes, sir.
17         (Whereupon, Defendant's
18         Exhibit QQ was marked for
19         identification.)
20     Q.   I now want to turn to your
21 notes, and I know you have the originals
22 over there.  Yesterday we made a copy of
23 your notes, and they are 20 pages long,

Page 263

1  if I remember correctly, and that's
2  Defendants QQ.  As far as I'm concerned,
3  since your counsel made these copies for
4  me, I think we're on the same page that
5  I've got a complete set here.
6          First of all, can you identify
7  Exhibit QQ as a true and correct and
8  accurate copy of handwritten notes that
9  you and your lawyer produced to us
10 yesterday?
11     A.   Yes, sir.
12     Q.   A couple of general questions
13 first about these.  This is a time line,
14 the first entry on the first page says
15 time line.  When did you actually make
16 these notes?  And let me be very precise
17 here.  Did you make these notes on the
18 dates that are indicated here?
19     A.   No, sir.  I did not.
20     Q.   Do you recall when, then, did
21 you actually make these notes?
22     A.   The exact date, no, I don't
23 recall.  It was after Andy and I had our

Page 264

1  conversation as far as my rights, and
2  Andy told me what to do because I didn't
3  know what to do.
4      Q.   Okay.  So, it was sometime,
5  I'm going to guess, within the last week
6  of May 2005 given that the lawsuit was
7  filed --
8      A.   Either May or June, the first
9  of June, yes.
10     Q.   Was it before or after your
11 complaint was actually filed, do you
12 remember that, because that was filed on
13 the 25th of May, I believe?
14     A.   I don't recall.
15     Q.   Did you use some materials to
16 reconstruct the time line and information
17 that was here, other notes, or was it
18 basically your recollection of events?
19     A.   It was my recollection.  Yes.
20     Q.   Okay.  And I know that we've
21 already marked and identified -- it's
22 actually Exhibit N, a transcription of
23 your history, I guess, at FedEx Ground.

3 (Pages 261 to 264)

Page 265

1  Was this prepared before or after you
2  made the verbal history that's before us
3  as Exhibit N, if you remember?
4      A.   I don't really recall if it
5  was before or after.
6      Q.   All right.
7      A.   It may have been around the
8  same time because it's possible it was
9  very close to the same -- both of them
10  were close to the same time.  I don't
11  recall which was which.  I know I -- I
12  just don't recall.
13      Q.   On the first page, second
14  paragraph, there's a note, first or
15  second week Jan.  Is that your
16  handwriting?
17      A.   All of this is my handwriting.
18      Q.   All right.  On page six, the
19  second sentence beginning "the last day,"
20  I'm just unclear -- there's an
21  interlineation of the word Joe, and I'm
22  just unclear exactly what this means.  As
23  I read it, it says, "The last day of

Page 266

1  class or the day before, I met Joe 2 or
2  the 3rd, and we talked about Montgomery
3  and the areas that are open."  Do you see
4  that there?
5      A.   Yes.
6      Q.   I just don't understand
7  what -- what's being referenced there by
8  2 or the 3rd.
9      A.   That's the second or -- I
10  don't recall what I meant, whether it was
11  the 2nd or the 3rd of the month or the
12  second or the third meeting I had with
13  him.
14      Q.   And this is -- this particular
15  entry, if you flip over to the prior
16  page, is for a time period February 1
17  through 10, correct, when you were given
18  your training in Birmingham?
19      A.   Yes.  So, it must have been --
20  that must have been a date.  I would
21  assume that it would be a date, 2nd or
22  3rd.
23      Q.   And you're talking about Joe

Page 267

1  McConnell there?
2      A.   Yes, sir, I am.
3      Q.   And over to the next page,
4  which is a reference to February 8th, is
5  the reference there on the third line, "I
6  met with Joe."  That's Joe McConnell
7  again?
8      A.   Yes, sir.
9      Q.   And he introduced you to Kent
10  Gastineau?
11      A.   That's correct.
12      Q.   And that was the first date on
13  which you had ever met Kent, is that
14  correct?
15      A.   That's correct.
16      Q.   Let me call your attention
17  several pages forward in your notes there
18  to February the 15th, Tuesday.
19      A.   Yeah.
20      Q.   Is it correct on that day, and
21  this is what it says, you and Jermaine
22  ran the Troy route?
23      A.   We ran the -- yes, sir, we

Page 268

1  did.  We actually ran the -- the royal --
2  the rural part of the -- part of the
3  route there.
4      Q.   What was that route?  Did it
5  actually go all the way down into the
6  city of Troy, Alabama and the surrounding
7  counties or what?
8      A.   It went into the -- that
9  particular day it was the surrounding
10  counties and some of the outlying small
11  towns.  I don't recall the -- remember
12  the names of the towns, but it wasn't
13  directly inside the city.  It was on the
14  outskirts.
15      Q.   Is that route contiguous to a
16  route that serves Montgomery County, or
17  was there something in between those two
18  routes?
19      A.   No.  My best recollection, it
20  is part of Montgomery County also because
21  I'm thinking it was Pike Road, the
22  Matthews area, and I believe they are in
23  Montgomery County.

4 (Pages 265 to 268)

---

Page 269

1  Q.   And then you go south from
2  there all the way down to Troy?
3  A.   Yes, sir, and outlying areas.
4  Q.   The next sentence here says,
5  "The fellow that ran this route was out
6  sick, which at this time the Troy route
7  had not been assigned to anyone
8  permanently." And that was Isaac Scott
9  who was running it --
10  A.   That's correct.
11  Q.   -- regularly, wasn't it? You
12  then say here, "This route that we ran
13  was very rural and very long, and
14  Jermaine said they had a problem keeping
15  drivers on it."
16  A.   That's correct.
17  Q.   And you say, "We got lost
18  several times because of bad directions.
19  To say the least, it was not a positive
20  experience."
21  A.   That's correct.
22  Q.   And then you go on to say,
23  "Jermaine said he did not think that

---

Page 270

1  Isaac was sick. He felt that he was
2  getting tired of putting in 13- and
3  14-hour days, and he told me or said I
4  should not ask for this route."
5  A.   That's correct.
6  Q.   And that's, in fact, what
7  Jermaine said to you?
8  A.   That's exactly right.
9  Q.   And then the next day,
10  February 16th, you say here, "Isaac was
11  still out, so Kent asked me to run that
12  (sic) route and that I would not have to
13  run out of the town, that I would only
14  run inside the city, which that was okay
15  by me, but I also told him that morning
16  that if Isaac did not come back or quit
17  because no one could reach him, I would
18  take the Troy route, but I would prefer
19  Wetumpka or the Montgomery route over
20  Troy, and he said that he hoped Isaac
21  would be back."
22  A.   Yes, sir.
23  Q.   And when you wrote this down,

---

Page 271

1  this was sometime in late May, and it was
2  based on your recollection of your
3  discussions a couple of months
4  previously?
5  MR. NELMS: Object to the
6  form. Answer the question.
7  A.   Yes, sir.
8  Q.   You had no other notes to help
9  you recall exactly what was said between
10  you on this occasion?
11  A.   No, sir, I do not.
12  Q.   And you hadn't tape recorded
13  any of those conversations --
14  A.   No, sir.
15  Q.   -- that you -- you need to let
16  me finish.
17  A.   I'm sorry.
18  Q.   You hadn't tape recorded any
19  of the conversations that we've been
20  talking about or that are reflected
21  really at all on this exhibit?
22  A.   No, sir.
23  Q.   On the next page, you say

---

Page 272

1  here, "That morning -- which I take it is
2  a reference to February 16th -- "Kent and
3  I discussed my paperwork, and he said
4  everything that needed to be sent to
5  corporate had been sent to be signed off
6  on, and that it should only take a few
7  days." Correct so far?
8  A.   Yes, sir.
9  Q.   "I stated to him that was
10  great and that I did not want to be a
11  temp driver."
12  A.   Correct.
13  Q.   And then it says here in
14  parentheses, "Jermaine had said that if I
15  agreed to be a temp driver (sic) that
16  they would drag their feet and only pay
17  me minimum and not contractor pay,"
18  correct?
19  A.   That's correct.
20  Q.   That's what Jermaine had said
21  to you?
22  A.   That's exactly right.
23  Q.   And then you go on to say

---

5 (Pages 269 to 272)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

---

Page 273

1  here, "But if at any time between now and
2  everything was approved, I will help him.
3  All he had to do was call, and Kent said
4  okay.  He also felt Isaac was going to
5  take the Troy route."
6      A.    That's correct.
7      Q.    And, then, your notes go on to
8  talk about the unfortunate death of your
9  wife's mother?
10     A.    Correct.
11     Q.    So, you were basically --
12     A.    Might I add one thing?
13     Q.    Sure.
14     A.    On this one I told Kent that I
15 would help him in any way possible.  We
16 had discussions on, you know, if he was
17 shorthanded or whatever, and I made
18 several phone calls.  As a matter of
19 fact, he told me that he may need me to
20 run some -- a route on a Saturday, and I
21 would call him like on Friday and, no, we
22 don't need you to do that.  I was willing
23 to do anything, you know, because I was

---

Page 274

1  just waiting.  I was in limbo.
2      Q.    All right.  Your notes reflect
3  that you were out of town February 17th,
4  through the 22nd, in connection with the
5  illness of your wife's mother, is that
6  correct?
7      A.    Yes, sir.
8      Q.    And then when you returned on
9  February 23rd, according to your notes,
10 you called Kent to let him know that you
11 were back in town.  And among other
12 things, you, quote, asked about my
13 paperwork, and at that time he had not
14 heard anything.  That was the report that
15 day?
16     A.    Correct.
17     Q.    And then on Thursday, the 24th
18 of February, you got the word that your
19 wife's mother had died, and you were
20 basically out of town from that day,
21 Thursday, the 24th, until the 28th of
22 February when you returned from
23 Tallahassee?

---

Page 275

1      A.    Correct.
2      Q.    On March the 1st, according to
3  your notes, you went to the terminal to
4  check with Kent and let him know that you
5  were home and see how things were going.
6  Correct so far?
7      A.    Correct.
8      Q.    And he said then that Kent --
9  I'm sorry.  Strike that.
10        Your notes state the
11 following:  "Kent stated to me that
12 Stan -- and that's a reference to Stan
13 Trott, correct?
14     A.    That's correct.
15     Q.    -- "had not sent the correct
16 paperwork in at the beginning my process,
17 and he had to correct some items and that
18 he was sorry and that the paperwork had
19 gotten into the wrong hands, so it was
20 going to take some (sic) more time."
21 That's what Kent told you that day?
22     A.    That's correct.
23     Q.    You said -- I'm sorry.  Strike

---

Page 276

1  that.
2        Continues, and he said -- "He
3  should know something in a few days, and
4  he would call me ASAP."
5      A.    Correct.
6      Q.    You go on to say -- and this
7  may have been what you were talking about
8  just a moment ago.  "So, I told him to
9  let me know if someone did not show up to
10 call me, and he said okay.  That day he
11 also gave me my ID badge which expires
12 (sic) 5/31/06, and he also gave me my
13 uniforms that came in," correct?
14     A.    Yes.
15        (Whereupon, Defendant's
16        Exhibit RR was marked for
17        identification.)
18     Q.    And the ID package in question
19 is what we've marked here as Exhibit RR?
20     A.    Yes, sir, it is.  You need
21 that back?
22     Q.    Yes, sir.  Thank you.
23     A.    You also need this one.

---

6 (Pages 273 to 276)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

---

Page 277

1    Q.   Thank you.  Let me go back to
2  the entries on February the 9th,
3  Wednesday, February 9th, if you can
4  flip back to that.
5    A.   Okay.  All right.
6    Q.   And this describes your -- I
7  guess your first day driving with
8  Jermaine Wilson.  This is the beginning,
9  I think, of your driving certification
10 ride?
11   A.   That's correct.
12   Q.   So, this was your first day
13 with Jermaine?
14   A.   Correct.
15   Q.   And you state here, "During
16 our deliveries we talked about how the
17 terminal needs someone on this route
18 because they did not have a permanent
19 driver for this route, and it was stated
20 by Jermaine that the whole terminal was a
21 mes because of Ground running home
22 delivery and Home-D running ground."  Is
23 that correct so far?

Page 278

1    A.   That's correct.
2    Q.   "But he hoped with Kent's help
3  they would get it fixed, and the biggest
4  problem was Stan, but he was to retire
5  soon."  Correct so far?
6    A.   Yes, sir.
7    Q.   By correct, I mean that's a
8  correct statement of what Jermaine was
9  telling you?
10   A.   Correct.  Correct.
11   Q.   What did you understand him to
12 mean in connection with home running
13 ground and ground running home?  What did
14 you understand that to mean?
15   A.   Well, you had -- you had the
16 ground side, and you had home delivery
17 side, and this is the way I interpreted
18 what he was saying because I had heard
19 things, not just that conversation, other
20 guys talking, that Stan has nothing to do
21 with -- with Kent, but Stan had guys on
22 the ground side delivering home delivery
23 packages and vice versa, and it was

Page 279

1  just -- it was just mixed up, and it's
2  not supposed to be run that way.
3    Q.   What was your understanding of
4  how the work was to be divided?
5    A.   Well, I was just at that time
6  getting a grasp on what packages were to
7  be delivered to what particular
8  customers, and I understood that home
9  delivery meant home delivery, you know,
10 to individuals' homes, and ground dealt
11 more with business.  And you had guys
12 with ground delivering home delivery
13 packages and the home delivery delivering
14 ground packages.  And it was -- and there
15 was favoritism.  There was favoritism
16 because of Stan's being a ground guy, he
17 might give more packages to the ground
18 guys, and that's the way I interpreted
19 what he was saying.
20   Q.   Okay.  We then get into March
21 2nd, March 3rd, March 4th.  On those
22 dates you did not hear anything from
23 Kent, is that correct?

Page 280

1    A.   That's -- that's correct.
2    Q.   And no conversations with
3  anyone at FedEx, I take it?
4    A.   That's correct.
5    Q.   Then we get over to March 5th,
6  Saturday and you had, according to this,
7  received a call from Jermaine "on
8  Saturday morning around 10:30 which he
9  left a message on the recorder asking if
10 I could come in and work for two hours,
11 that he could not deliver 20 to 30
12 packages."  You didn't get that message
13 in time to respond is what I take it from
14 the sense of this?
15   A.   Yes, that's correct.
16   Q.   All right.  You make one entry
17 here for March the 8th, Tuesday, through
18 March the 12th, Saturday.  You say,
19 "During this week I heard about
20 my paperwork.  I made call to Kent and
21 expressed I needed to know something, and
22 all I got was the paperwork is getting
23 put together."  What exactly did Kent say

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 281

1  to you?  Is that what he said?
2      A.    Basically, yes, that's what he
3  said.  And I think the paperwork at that
4  time was totally out of Kent's hands, and
5  it was up the chain of command.
6      Q.    "I called Joe McConnell in
7  Birmingham at the terminal and expressed
8  to him that Kent did not seem to know
9  much about my paperwork, so I asked him
10  to check for me."  Correct so far?
11      A.    Yes, sir.
12      Q.    "And he said he would, and he
13  was going to call Kent and have him call
14  me back.  By the end of the week, nobody
15  had called me."  Is that all correct?
16      A.    That's correct.
17      Q.    Did you have any substantive
18  discussion with Joe McConnell about what
19  was going on or why the paperwork had not
20  come through or any of that?
21      A.    Well, Joe didn't know why
22  either, but he -- but I knew he was the
23  go-to man because Kent was new, and there

Page 282

1  was nobody else there to contact.
2      Q.    And then we move into the next
3  week, Tuesday, March 15th, through
4  Saturday, March 19th.  You state here,
5  "Again this week was making phone calls
6  to Kent and Joe."  How many calls that
7  week did you make to Kent, if you can
8  remember?
9      A.    I don't recall, but I didn't
10  want to make so many that I harassed him
11  because, I mean, it -- each time I made a
12  phone call, he really didn't know what
13  was going on.
14      Q.    Right.
15      A.    Neither did -- did Joe.
16      Q.    It says here you "also called
17  Omar Newman, and Omar said that he had
18  already signed off on my paperwork."  And
19  that's what he told you?
20      A.    Yes, sir.
21      Q.    Did he give you any assessment
22  or description of what the problem was or
23  what the hangup was?

Page 283

1      A.    The only thing that Omar would
2  say was he didn't understand what was
3  taking so long.  And I knew that he had
4  to sign off on the paperwork, and
5  basically it -- it was left at that.  He
6  didn't know where else to go, but it left
7  his hands and went up another chain of
8  command.
9      Q.    And then you say here, "So, I
10  was back at the starting line."  That's
11  just an observation about your feelings
12  essentially?
13      A.    That's correct.
14      Q.    Then we move to Tuesday, March
15  22nd through Saturday, March 26th.
16  "During this week, calls were made to
17  Kent, and I still called Joe, and Chad
18  from Stearns Bank was wanting to know if
19  I knew anything."  Let me stop there and
20  ask you what, if anything you recall
21  specifically about your conversation
22  with Kent -- conversations with Kent that
23  week.

Page 284

1      A.    It was basically the same
2  conversation, Kent, have you heard
3  anything?  Not yet, not yet, not yet.
4      Q.    And the same for Joe --
5      A.    Yes, sir.
6      Q.    -- McConnell?
7      A.    That's correct.
8      Q.    This may be the first
9  reference I see here to Chad.  Is this
10  when you first began talking with Chad
11  about financing on the truck?
12      A.    No, sir.  I had already been
13  approved, and it was just waiting in the
14  wings.  Chad started calling me wanting
15  to know what was going on, and had I
16  heard anything about the approval.
17      Q.    This is a little out of order
18  and stepping back some, but I'm going to
19  interject a couple of e-ails here.
20          (Whereupon, Defendant's
21          Exhibit TT was marked for
22          identification.)
23      Q.    I just marked them out of

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

---

Page 285

1  order too.  Is Exhibit TT an e-mail that
2  you sent to Omar Newman on February the
3  23rd of 2005 about your status?
4      A.   (Examining document.)  Yes,
5  sir, it is.
6      Q.    And is Exhibit -- did you get
7  any response to that?  Did he e-mail you
8  back, for example?
9      A.   I don't recall if he e-mailed
10 me back or not.
11     Q.    Have you checked your e-mails
12 for any e-mail correspondence about this
13 matter?
14     A.    The only correspondence that I
15 could find is what I've got right here.
16         (Whereupon, Defendant's
17         Exhibit SS was marked for
18         identification.)
19     Q.    Let me ask you to look at
20 Exhibit SS.  Is this an e-mail that you
21 sent to Omar on the 24th of February of
22 2005?
23     A.    (Examining document.)  Yes,

Page 286

1  sir, it is.
2      Q.    On this day -- I'm not sure
3  what date this is because this is an
4  entry under the whole week, but under the
5  week -- under the entry for the week of
6  March 22nd through 26th, you say --
7      A.    What week was that again?  I'm
8  sorry.
9      Q.    I'm still under the March 22nd
10 through March 26th period.
11     A.    Yes, sir.
12     Q.    You say here Chad had called
13 you, I take it, wanting to know if you
14 knew anything?
15     A.    Correct.
16     Q.    And you said what?
17     A.    No.
18     Q.    And you also recite here,
19 "Chad also called Kent to see what was
20 going on, and Kent told Chad as soon as
21 he heard the approval, he would --
22     A.    E-mail him.
23     Q.    -- e-mail him."

Page 287

1      A.    Correct.
2      Q.    And then you mentioned here
3  "Chad at Stearns could not release
4  financing to FedEx until all of my
5  paperwork had been approved and a truck
6  ID (sic) was given," right?
7      A.    Correct.
8      Q.    That's what he told you?
9      A.    Yes, sir.
10         (Whereupon, Defendant's
11         Exhibit UU was marked for
12         identification.)
13     Q.    All right.  I'm going to show
14 you a document marked for identification
15 as Exhibit UU.  Is that an e-mail that
16 you sent on March the 28th to Omar?
17     A.    Yes, sir, it is.
18     Q.    Take a second to look at that.
19     A.    (Examining document.)  All
20 right.
21         MR. NELMS:  I'm reading it.
22     A.    Okay.  There you go.
23     Q.    You state here in the second

Page 288

1  sentence, "I went into the terminal
2  Saturday the 26th and picked up a P/D
3  contractor business guide and talked to
4  Kent."  Is that correct?  Is that what
5  you did?
6      A.    Yes, sir.
7      Q.    And is the business guide that
8  you're talking about Defendant's Exhibit
9  V?
10     A.    Yes, sir, that's correct.
11     Q.    And, so, that would clarify
12 that the date that you actually received
13 that would have been on the 26th of
14 March, Exhibit V?
15     A.    I assume that's correct.
16     Q.    And you apparently talked to
17 Kent that day, and this is what the
18 e-mail Exhibit UU states:  "I know that
19 you had already signed off my file
20 several days, but he was saying that he
21 had just received it on the 25th, so I
22 did not say anything."
23         And this was -- what you are

9 (Pages 285 to 288)

Page 289

1  reciting here, if I understand this
2  correctly, is what Kent was telling you
3  about getting the sign off by Omar on
4  your file?
5      A.   Yes, sir, that's correct.  I'm
6  just thinking back.
7      Q.   Yes, sir.  Did you get any
8  kind of a response from Omar to this
9  e-mail that you can recall?
10     A.   I'm not sure -- I don't think
11  I had an e-mail response.  I'm not sure
12  if he called me or not.  I mean, it may
13  be in the transcript where we discussed
14  that.  I'm not really sure.
15     Q.   But sitting here today, you
16  don't remember?
17     A.   No, sir, as far as e-mail, I
18  don't.
19     Q.   And you can't remember any
20  specific telephonic response to this,
21  unless it's otherwise reflected in the
22  transcripts?
23     A.   Right.

Page 290

1      MR. NELMS:  Those being the
2  telephone transcripts that we have, the
3  recorded telephone transcripts.
4      MR. SPOTSWOOD:  Yeah, I assume
5  he -- none of those conversations are in
6  this time frame, so I assume what he's
7  talking about is his narrative which is
8  Exhibit N.
9      Q.   Turning to your entry for
10  Tuesday the 29th of March through
11  Thursday, the 31st of March, it says
12  here, "I talked to Chad, which Chad
13  talked to Jeff White, an engineer with
14  FedEx, and I also called him and talked
15  to him for the first time."
16     A.   Correct.
17     Q.   Who is him?
18     A.   Jeff White.
19     Q.   And what was Jeff White's
20  position, as you understood it?
21     A.   He was an engineer.
22     Q.   He was a -- what kind of an
23  engineer, one of these route planning

Page 291

1  engineers?
2      A.   Yes, sir.  I assume that's
3  correct.
4      Q.   Industrial engineers?
5      A.   Route planning, I assume.  He
6  was the one who planned the routes and
7  everything.
8      Q.   Who told you that that was
9  somebody you should be talking to?
10     A.   I think I received a phone --
11  his phone number from Kent.  And I knew
12  he was the next man up the -- up the
13  ladder.
14     Q.   All right.  So, what did Jeff
15  tell you when you reached him?
16     A.   Well, it's stated in here.  He
17  would find out something.  I don't recall
18  exact words.  I'd have to read this.
19     Q.   Whatever is on this piece of
20  paper is as good as it's going to get --
21  as it will get about your recollection?
22     A.   Well, I'm not sure if that's
23  as good as it will get.  I know that --

Page 292

1  well, as I put on here, he said that he
2  was glad that I called him, and he was
3  going to find out something.  And there
4  may be more to it than that down, you
5  know, in the entry, but on this
6  particular date.
7      Q.   Well, do you recall what Jeff
8  White said about your approval status?
9      A.   It was still all a paperwork
10  problem.
11     Q.   Okay.  And this note also
12  says, "Kent called on Wednesday, the 30th
13  and asked I could come in on Thursday and
14  pick up my contractor business guide."
15  And you did that, as reflected here in
16  this e-mail, Exhibit UU, correct?
17     A.   Yes.
18     Q.   When you picked up your
19  contractor business guide, what did you
20  and Kent talk about?
21     A.   If I recall correctly, we -- I
22  picked that up.  He explained to me that
23  this was the business guide as far as --

Page 293

1  as far as the regulations with FedEx. We
2  went from there into the terminal, and we
3  talked about the Wetumpka route. He
4  pulled it up on a map on the computer and
5  showed me where -- like I stated
6  yesterday, where the route branched out
7  into Elmore County. And --
8      Q. Did he at that time actually
9  try to print a contract out for you on
10 the computer system and was not able to
11 do so, or do you remember that?
12     A. No, sir, I don't recall that.
13     Q. Okay. And the contractor
14 business guide, did you take this home
15 and have a look at it?
16     A. Yes, sir.
17     Q. Did you ask them any questions
18 about it?
19     A. No, sir.
20     Q. Do you know who was working in
21 the Wetumpka area at this time?
22     MR. NELMS: Object to the
23 form.

Page 294

1      A. Nobody, as far as I knew. It
2  was just being filled in.
3      Q. By whom?
4      A. Oh, I don't know. It was not
5  a permanent individual doing it. I mean,
6  it was just different people.
7      Q. Your next entry here shows
8  April 1st and 2nd, Friday and Saturday,
9  "I heard nothing on these (sic) days."
10 And then we move -- is that correct?
11     A. That's correct.
12     Q. And then we move to April 5th
13 through April 9th, Tuesday through
14 Saturday. "During this week, I called
15 Kent, and he told me that he and Jeff --
16 and that's Jeff White, correct?
17     A. Correct.
18     Q. -- "was pushing everything
19 through, but he was still trying to get
20 Isaac to finish financing on his van, but
21 he could not get a commitment from him."
22 Is that correct?
23     A. That's correct.

Page 295

1      Q. And then it says this: "I
2  told Kent that I would take the Troy
3  route, that I needed to go to work so I
4  could pay my bills, and I asked him what
5  I needed to do." Correct so far?
6      A. Yes, sir.
7      Q. "He told me to check on a
8  Sprinter van with Chad. I called Chad to
9  see if I could. His reply was that FedEx
10 did not like contractors to use the
11 Sprinter, but he would check to see." Is
12 that all correct so far?
13     A. Correct. Yes, sir.
14     Q. "So, I told Kent, and he was
15 going to try to get in touch with Isaac.
16 Kent said he would not return his
17 calls" -- and he's referring to Isaac
18 there, I take it?
19     A. Correct.
20     Q. "But he would let me know, and
21 we would be getting together about the
22 Wetumpka route." Correct?
23     A. Yes, sir.

Page 296

1      Q. That's the last of your notes.
2      A. Right.
3      Q. And, then, we really don't
4  have anything in writing from April the
5  9th until you started recording phone
6  calls, which I think is sometime after
7  the 15th of May. So, my question to you
8  is what was going on between then and
9  these last entries, which would be
10 roughly five weeks or so?
11     A. It's probably in the -- in
12 the --
13     Q. In your narrative?
14     A. Yes.
15     Q. Exhibit O -- N, rather?
16     A. N.
17     MR. NELMS: Gary, did we -- we
18 didn't admit the original, we admitted
19 the copy.
20     MR. SPOTSWOOD: Yeah.
21     MR. NELMS: Okay.
22     MR. SPOTSWOOD: Exhibit QQ.
23     MR. NELMS: Okay.

Page 297

1  **Q.**   (BY MR. SPOTSWOOD:)  And I'm
2  looking at Exhibit N, at pages 20 and 21,
3  and does that reflect your best
4  recollection of what was going on in the
5  April time frame we've been talking
6  about?
7  **A.**   I'll need to go over that.
8  (Examining document.)
9  **Q.**   Let me be specific with you --
10  well, let me give you a couple of minutes
11  to have a look at pages 20 through 23.
12  **A.**   (Examining document.)  You say
13  through 23?
14  **Q.**   Yes.
15  **A.**   Okay.  I've reviewed that.
16  **Q.**   Okay.  Actually over on page
17  24 it states, "Kent had an Elmore County
18  911 map book that the emergency response,
19  the emergency management response office
20  issues up in Elmore County.  He said,
21  Charlie, you need to get you one of these
22  because this will really simplify your
23  job."  And then you explain some more

Page 298

1  about what he said about it.  Does this
2  take place on the same day that you
3  picked up your -- this conversation the
4  same day that you picked up your
5  contractor's business guide?
6  **A.**   I do not recall.
7  **Q.**   Okay.
8  **A.**   It was either that day or
9  after.
10  **Q.**   Soon after, a day or two
11  after?
12  **A.**   I do not recall.
13  **Q.**   On page 24 and 25, at the
14  bottom of the page, you state here after
15  you say, "I wait and I wait and I wait."
16  You say, "And I called Chad, and Chad was
17  telling me that he had spoke to Kent, and
18  as soon as they -- FedEx gave him the
19  approval number, that he was going to
20  e-mail Chad.  And Chad said he would let
21  me know, you know, as soon as he got the
22  number and then would release the papers,
23  and I would still have to do some

Page 299

1  things."
2  **A.**   Right.
3  **Q.**   "But, anyways, Chad gave me a
4  call, and he told me that the number had
5  come through on the e-mail to Kent at the
6  terminal in Montgomery."  Do you know
7  what day that was?
8  **A.**   No, sir, I do not know the day
9  or the date.
10  **Q.**   But in any event, according to
11  this, Chad said he would be sending you
12  the paperwork.  He would overnight it to
13  you, and that would allow the van to be
14  released, correct?
15  **A.**   Correct.
16  **Q.**   So, you then get a telephone
17  call from Kent, correct?
18  **A.**   Correct.
19  **Q.**   He asked you how long did you
20  want your contract to be, one year or two
21  years, correct?
22  **A.**   That's correct.
23  **Q.**   And you told him "may as well

Page 300

1  go two years because I didn't plan on
2  going anywhere."
3  **A.**   Correct.
4  **Q.**   And he responded okay, quote,
5  he was going to go ahead and put me down
6  for a two-year contract, close quote,
7  period?
8  **A.**   Correct.
9  **Q.**   And your response was "that's
10  fine, you know, that's great."
11  **A.**   That's correct.
12  **Q.**   So, the next day you get your
13  paperwork, and you go down to Kent's
14  office, correct?
15  **A.**   Where are you at?  Oh, the
16  next -- okay.  I went in -- (Examining
17  document.)
18  **Q.**   Well, you say, "I'm not sure I
19  went in that day or it was the next" --
20  **A.**   That's correct.
21  **Q.**   -- "but it was real close."
22  So, it was either that day or the next
23  day?

Page 301

1    A.    Correct.
2    Q.    So, you go down to his office.
3  You get online with him and you complete
4  your insurance coverage application?
5    A.    Correct.
6    Q.    And then you had received the
7  packet of materials from Chad, and you
8  had signed all the paperwork on that and
9  returned it to Chad?
10    A.    Had it notarized.
11    Q.    Okay.  Is everything else I
12  just got through saying correct?
13    A.    That's correct.
14    Q.    So, the van arrives, and I'm
15  now on page 29 where you talk about
16  inspecting the van, checking things off,
17  checking the oil and so forth, and you're
18  doing all that with Kent, correct?
19    A.    Correct.
20    Q.    And then your statement says,
21  "At that time he said -- and you're
22  referring to Kent -- "we need to get
23  online where I can get you to sign some

Page 302

1  things, correct?
2    A.    Correct.
3    Q.    So, you go into the terminal,
4  and you got on a PC, and -- Kent got on
5  the PC, I take it, is that correct?
6    A.    Correct.
7    Q.    And he said, well, there must
8  be something wrong because I can't get
9  on.  I can't get on the -- you know, into
10  the area that I need, the page that I
11  need to get on.  Is that correct?  Is
12  that what he told you?
13    A.    That's correct.
14    Q.    And your statement says, "He
15  said the reason why he couldn't get on
16  was because they had been doing some work
17  on the computers because of the uplink on
18  the scanner.  The scanner that scans the
19  packages, and (sic) they had updated some
20  stuff on it, and he said that's probably
21  what it was."  That's what he told you
22  that day?
23    A.    That's correct, but can I make

Page 303

1  a statement, please?
2    Q.    Yeah, sure.
3    A.    We didn't go on.  We -- we
4  didn't go on the PC in the office.
5    Q.    Okay.
6    A.    We went to the inside of the
7  terminal and got on the PC inside the
8  terminal.  I don't know why, but that's
9  the terminal -- the one we got on.
10    Q.    Okay.  But you were on a, you
11  know, PC that was at the facility there?
12    A.    Correct.  That's correct.
13    Q.    And Kent then says, according
14  to your statement, as soon as it comes
15  up, I'll give you a call and you can come
16  back in and sign off, and that's when you
17  left.
18    A.    That's correct.
19    Q.    So, you then had the radio
20  installed, and we've talked about that
21  already.  And you called him the next day
22  and asked what's going on, and he said,
23  quote, it's still not up, correct?

Page 304

1    A.    Correct.
2    Q.    And then he says to you, I
3  will tell you I'll -- "I tell you what
4  we're going to do.  We're going to start
5  you next Tuesday.  Next Tuesday.  This is
6  the Tuesday after Mother's Day."
7    A.    Correct.
8    Q.    "And he said we can sign
9  that -- we can sign that document Tuesday
10  morning.  It won't take no time to sign
11  it."
12        And was it your understanding
13  the document he's talking about is the
14  contract and the --
15    A.    No, sir.
16    Q.    -- and the P & D contractor
17  business guide?
18    A.    No, sir.
19    Q.    What did you think the
20  contract was for, Mr. Thornton?
21        MR. NELMS:  Object to the
22  form.
23    A.    I didn't --

---

Page 305

1    Q.    Did you not think that you had
2  to sign a contract?
3          MR. NELMS:  Object to the
4  form.  Object to the form.
5    A.    I didn't know what document he
6  was talking about.  He didn't say a
7  contract.  He didn't state what it was.
8  He said he had some things that he needed
9  me to sign.
10   Q.    Okay.  And after looking at
11 this P & D contractor business guide, the
12 centerpiece of which is a signed
13 contract --
14         MR. NELMS:  Object to the
15 form.
16   Q.    -- you didn't think you had to
17 sign a contract to become a contractor?
18         MR. NELMS:  Object to the
19 form.
20   A.    He never told me to sign
21 anything.
22   Q.    Okay.
23         MR. NELMS:  I would like the

---

Page 306

1  record to reflect that, in my humble
2  opinion, Bob's tone and intonation in the
3  last couple of questions verges on
4  harassment.
5          MR. SPOTSWOOD:  I don't
6  appreciate that, Andy.
7          MR. NELMS:  Including the
8  tossing of Exhibit V, as in Victor, onto
9  the table.
10         MR. SPOTSWOOD:  This is not
11 your deposition.  If your witness feels
12 like I'm harassing him, he is free to say
13 that.  I have asked him fair and
14 reasonable questions in a professional
15 manner for two days, and your description
16 of my behavior is inaccurate.
17         MR. NELMS:  The audiotape will
18 reflect the tone of your voice.
19   A.    Can I say one thing?
20         MR. NELMS:  To me?
21   A.    Pertaining to that document.
22         MR. NELMS:  Answer his
23 questions.

---

Page 307

1    A.    Okay.
2    Q.    (BY MR. SPOTSWOOD:)  Okay.  On
3  page 32 at the bottom and page 33 at the
4  top.  In your narrative, you state, and
5  you're talking about Kent, "He told me
6  one time when I was talking to him about
7  the paperwork, he said that some guy
8  named -- there was a guy there, you know,
9  like I was saying, his name was
10 Jermaine."  And then, "Well, there was a
11 guy named Jerome that messed up my
12 paperwork."
13         Was it Jerome or Jermaine who
14 messed up your paperwork?
15   A.    I understood that it was
16 Jerome.  I was just making a distinction
17 that there was two people with similar
18 names.
19   Q.    All right.  And what was
20 Jerome's last name?
21   A.    I have no clue.  I never met
22 him.
23   Q.    And did Kent tell you who he

---

Page 308

1  was, where he was located, any
2  particulars about Jerome?
3    A.    No.
4    Q.    So, according to this, on
5  Monday night as Kent was coming back from
6  Chattanooga, Tennessee where he had
7  lived -- where his family lived at the
8  time, and it's a Monday, I take it.  This
9  is the Monday after Mother's Day?
10   A.    Yes, sir.
11   Q.    He said, quote, I've got some
12 bad news.  He said -- I quote him.  I
13 have messed up some paperwork.  Correct?
14 That's what he told you?
15   A.    Correct.
16   Q.    He goes on to say here,
17 according to your statement, "I signed
18 some -- the wrong documents, and blah,
19 blah, blah.  And I sent them in, and I
20 shouldn't have and -- one excuse after
21 another.  He said you can't start
22 tomorrow."  Did he explain what paperwork
23 he had messed up?

---

---

Page 309

1     A.   No, sir. Just paperwork.
2     Q.   Okay. And you responded,
3 "What do we need to do?" And, "He said,
4 well, while I was in Chattanooga, I went
5 by the terminal in Chattanooga, and I
6 straightened everything out, and I sent
7 it from Chattanooga to corporate (sic)."
8 That's what he told you on that same
9 telephone call we've been talking about?
10     A.   Yes, sir.
11     Q.   And then he went on to say, I
12 should be hearing back from them
13 Wednesday or Thursday. If I hear from
14 them on Wednesday, we will start you on
15 Thursday," correct?
16     A.   Correct.
17     Q.   You describe the rest of that
18 conversation. Anything else take place
19 in that conversation other than what's
20 transcribed here --
21     A.   No.
22     Q.   -- or what you've summarized
23 here?

---

Page 310

1     A.   No, sir.
2     Q.   And you say -- so, Wednesday
3 rolls around, and you did not hear
4 anything from him, correct?
5     A.   Correct.
6     Q.   And Thursday rolled -- came
7 around, according to this statement, and
8 you went to the terminal?
9     A.   Correct.
10     Q.   And you didn't have an
11 appointment to see him, obviously?
12     A.   No, sir.
13     Q.   And you say here, "He looked
14 at me like I was fixing to jump on him or
15 say something to him." Did he appear to
16 be a little afraid of you, is that what
17 you're saying here?
18     A.   No, sir, he just seemed to be
19 sort of nervous or on edge.
20     Q.   Startled to see you perhaps?
21     A.   Perhaps.
22     Q.   And he told you, according to
23 this transcript here, "he had not heard

---

Page 311

1 from anybody and that what we was looking
2 at was just starting the next Tuesday."
3 That would have been the -- the Tuesday
4 the week after Mother's Day, correct?
5     A.   Yes, sir.
6     Q.   And then you say, "well, that
7 particular date would have been the 17th
8 of May." So, what you're saying here is
9 that Tuesday, that following Tuesday,
10 would have been -- would be the 17th of
11 May, if I'm reading this correctly, one
12 week after Mother's Day, which I think is
13 the 10th?
14     A.   Yes. Yes, sir.
15     Q.   So, this then gives clarity to
16 the dates. The first Tuesday he told you
17 that you would go to work would have been
18 the 10th, and he called you on the 9th
19 and told you that he had messed up and
20 that you would not start until the 12th
21 if everything came back, correct?
22     A.   Correct.
23     Q.   So, you call him on the 14th,

---

Page 312

1 which is a Saturday, asking what was
2 going on. Wait a minute. Step back
3 here. Then your statement goes back to
4 discussions with him on the 12th where
5 you say what's got me concerned -- you
6 basically talked to him about the fact
7 that you've got a truck payment due on
8 the 25th, and you're not going to have
9 the money to make it.
10     So, what did he tell you about
11 that when you were expressing concern
12 about the upcoming truck payment and no
13 route on this occasion?
14     A.   Well, at that time that's when
15 he expressed to me that he would be -- he
16 would make the truck payment.
17     Q.   All right. I see that later
18 down here. Okay. Kent said -- on the
19 bottom of the page, "Kent said I'm going
20 to make your payment for you. I have
21 talked it over with my wife, and I feel
22 like I owe this to you." That's what he
23 said to you, talking about on the bottom

---

15 (Pages 309 to 312)

Page 313

1 of page 36?
2    A.    Yes, sir.
3    Q.    And in the meantime, you had
4 spoken with Chad who said you had a
5 ten-day grace period after the 25th?
6    A.    That's correct.
7    Q.    Is it correct that you could
8 not afford to make that payment yourself?
9          MR. NELMS:  Object to the
10 form.
11    A.    I could have dug down in
12 savings.  But just other than going into
13 savings, retirement money, no.
14          MR. NELMS:  Can we break?
15          MR. SPOTSWOOD:  Yeah.
16    A.    I need to go to the restroom.
17          (Said deposition was in recess
18          at 10:53 a.m. until 11:03
19          a.m., after which the
20          following occurred:)
21    Q.    (BY MR. SPOTSWOOD:)  I want to
22 go back to Exhibit V for a second.  Isn't
23 it correct that Kent Gastineau showed

Page 314

1 this to you and told you that this, in
2 fact, would be the standard contract
3 operating agreement that you would
4 eventually have to sign?
5    A.    No, sir.
6          MR. NELMS:  Object to the
7 form.
8    Q.    He never told you that this
9 was going to be the document that would
10 define your business relationship with
11 FedEx Ground?
12          MR. NELMS:  Object to the
13 form.
14    A.    No, sir.
15    Q.    Or FedEx Home Delivery?
16    A.    If Kent Gastineau would have
17 told me to read that and sign off, I
18 would have sat right there and read it
19 and signed it and handed it back to him
20 because I signed every other document
21 they asked me to sign.
22    Q.    No, I understand.  I'm not
23 saying to you that he asked you to sign

Page 315

1 this specific document.  I'm saying that
2 this was the form of the contract --
3    A.    No, he never went over that.
4 He told me I just needed to read this
5 book.  He did not go to that page and
6 state that.
7    Q.    Okay.  But couldn't you figure
8 that out from looking at this document?
9 You already testified that you took it
10 home and then you read it.  Didn't you
11 then understand that you were going to
12 have to sign a contract?
13    A.    No, I did not.
14          MR. NELMS:  Object to the
15 form.
16    Q.    You didn't figure that out?
17    A.    No, I -- no, I did not.
18    Q.    Okay.  Did he talk to you
19 about how the compensation system would
20 work and how much money you'd get paid
21 per delivery and that sort of thing?
22    A.    He surely did.  He explained
23 to me the core zone.  Each core zone paid

Page 316

1 a different amount.  Each route paid a
2 different amount.  As far as the fuel, he
3 gave me the -- the sheet over there to
4 show me how the fuel was paid.
5          (Whereupon, Defendant's
6          Exhibit VV was marked for
7          identification.)
8    Q.    Let's mark that separately.
9 This is a document that has been just
10 sitting inside the little flap here on
11 Exhibit V, but I'll just mark that
12 separately.  This is Exhibit VV, what you
13 have just testified to in reference --
14    A.    Correct.
15    Q.    -- to the fuel supplement?
16    A.    Correct.
17    Q.    And you didn't understand or
18 know exactly what document he was trying
19 to print out at the terminal on the day
20 we just talked about, whether that was a
21 contract or not?
22    A.    That's correct.
23    Q.    But in any case, you couldn't

Case 3:05-cv-00656-MEF-DRB     Document 27-3     Filed 04/18/2006     Page 83 of 107

| Page 317 | Page 319 |
|---|---|

**Page 317**

1   print out the document that he needed to
2   allow you to go to work?
3       A.   He could not print out the
4   document that he was trying to print.  I
5   don't know what document that was.
6       Q.   And at least as far as he was
7   concerned, and he's the guy who controls
8   whether you work that day, he couldn't
9   put you to work without getting that
10  document to print out?
11      A.   I don't know.
12      Q.   All right.  You had a
13  conversation with him on Saturday, the
14  14th of May, according to this, and I'm
15  looking at the bottom of page 37 and the
16  top of page 38.  "I called him and I said
17  you know -- I asked him, I said, have you
18  heard anything.  He said, no, I have not
19  heard anything.  He said, Charlie, you
20  know -- he sounded real nervous.  He said
21  I'm going to make your payment.  He said
22  but if you talk to anybody at FedEx, you
23  do not tell them that I am I am going to

**Page 319**

1   And that's Jeff White you're talking
2   about, right?
3       A.   Correct.
4       Q.   And that's before you recorded
5   conversations, so that conversation is
6   not recorded, correct?
7       A.   Correct.
8       Q.   "And I told Jeff, I said,
9   Jeff, if you want to call Kent and tell
10  Kent he can call me, that will be fine."
11  So, you waited until Monday, which was
12  the 16th.  I waited until the early
13  afternoon.  You called Kent that
14  afternoon, and this is when you get the
15  news.  "He says, Charlie, there's no
16  routes available.  They did not approve
17  the route.  They messed up the truck,
18  this, that and the other (sic)."  Is this
19  the first time that he told you that the
20  route just was not approved, correct?
21      A.   Correct.
22      Q.   And when you say here -- and
23  this is Kent supposedly talking, they

| Page 318 | Page 320 |
|---|---|

**Page 318**

1   make your payment."  Is that correct?
2       A.   That's correct.
3       Q.   And then you go on to say
4   here, "So in my mind, I'm thinking I'm
5   going to turn around, when I get off the
6   phone with Kent, I'll going to call Jeff
7   White and find out what's going on with
8   him.  So, I finished my conversation with
9   Kent.  He just sounded like he could
10  not -- he was beating around the bush,
11  doesn't give me an answer why he hadn't
12  got it back.  He's -- he just sounded
13  like there was a major problem."  That's
14  what your statement says here so far,
15  correct?
16      A.   Correct.
17      Q.   "I called Jeff.  Jeff said,
18  Charlie, I've got your contract.  He said
19  I've got your contract in my hand.  I've
20  got your paperwork from your truck in my
21  hand."  I'm going to call -- "I'm going
22  into a meeting at 3:00, and I will call
23  you and let you know what's going on."

**Page 320**

1   messed up the truck, did you understand
2   that to mean they shouldn't have let you
3   get the truck without that route being
4   approved?
5       A.   No, sir.  At the time I did
6   not understand what he was talking about.
7       Q.   Okay.  But you understood that
8   later, that's what he was talking about?
9       A.   Not in those -- I don't -- I
10  never did know what he meant by messed up
11  the truck.
12      Q.   Okay.  But according to this
13  statement, you told him, "You mean I
14  don't even have a route to go to work,
15  and you guys have approved this truck?"
16      A.   Correct.
17      Q.   So, you didn't think that's
18  what he was talking about when he said
19  messed up the truck?
20          MR. NELMS:  Object to the
21  form.
22      A.   I didn't understand what he
23  meant by messed up the truck.

Page 321

1  Q.  Okay.  So, you then called
2  Jeff White, correct?
3  A.  Correct.
4  Q.  And this is, again, on Monday,
5  if I'm not mistaken, the 16th?  That's
6  how it seems --
7  A.  Yes, sir.
8  Q.  -- the same day you were
9  talking to Kent?
10  A.  Yes.
11  Q.  And if I understand your notes
12  here correctly, you didn't really have a
13  substantive conversation with Charlie
14  about what happened here, but you just
15  agree that you all have a conference call
16  in -- on the 17th and talk about the
17  situation?
18  A.  You're talking about with
19  Jeff?
20  Q.  Yes.
21  A.  Yeah, Jeff told me to call him
22  the next day.  That's correct.
23  Q.  He didn't tell you what

Page 322

1  happened or --
2  A.  No, sir.  He was just brief,
3  to the point.
4  Q.  And then when you later talked
5  to Kent on that same day, according to
6  your statement, the only thing he said to
7  me was that Jeff told him, him being
8  Kent, that he blind-sided him.  Who blind
9  sided whom here.  I'm a little bit
10  confused, that Kent had blind-sided Jeff?
11  A.  Correct.
12  Q.  "I couldn't get it out of him
13  what he meant by blind-sided him" is what
14  you say here?
15  A.  Right.  That's correct.
16  Q.  And you say here, "I kept on
17  asking him, well, Kent, what do you mean
18  by blind-sided me."  What did Kent say in
19  response?
20  A.  Whatever the document here
21  says.  I don't recall.  I would have to
22  read this.
23  Q.  Well, go ahead because I don't

Page 323

1  see that answer to that question in here.
2  A.  He said, well, with this route
3  and like this, and it's -- so, I mean,
4  they should have known their job.  They
5  should have known their job.  It wasn't
6  for me to know their job.  They should
7  have known their job and whatever.
8  Q.  Well, that's what I'm having
9  trouble with.  Who's talking here, you or
10  Kent?
11  A.  Kent.
12  Q.  Kent is saying they should
13  have known their job?
14  A.  Let me go back and read this.
15  Q.  It wasn't for me, Kent, to
16  know their job; they should have known
17  their job or whatever?  I'm just having
18  trouble --
19  A.  That's Kent.  That's what Kent
20  said.
21  Q.  All right.  And then you
22  called Jeff back, according to this
23  statement.  This is still Monday, the

Page 324

1  16th, correct?
2  A.  Correct.
3  Q.  And you called Jeff back, and
4  you told him about the truck payment
5  situation.  You told him that Kent said
6  he was going to make the payment.
7  A.  I told Jeff that after the
8  fact that Jeff just -- he sounded like he
9  didn't give a crap.  That was my
10  responsibility, and he didn't care.
11  Well, I was already upset, and that's
12  when I proceeded to tell him that Kent
13  said he would make a payment.  I was
14  very, very, very frustrated.
15  Q.  And your testimony is that
16  Jeff didn't appear to be concerned about
17  the situation?
18  A.  Prior to telling him about
19  Kent?
20  Q.  Yeah, that you had a truck,
21  you didn't have a route --
22  A.  That's exactly right.  Exactly
23  right.

18 (Pages 321 to 324)

Page 325

1  Q.   Well, what words did he use to
2  give you the impression that he wasn't
3  concerned about your situation?
4  A.   It was my responsibility that
5  FedEx had no responsibility.
6  Q.   And then we come to Tuesday,
7  which is the 17th, and you talk to a
8  young woman named Carol, correct, right?
9  A.   Correct.
10  Q.   And that's when we start
11  recording conversations, correct?
12  A.   I am not sure.
13  Q.   Well, let's just see if we can
14  figure this out. It's not very hard.
15  Here is Exhibit O, and the very first
16  entry here is phone call to Jeff White,
17  and one transcript calls her Carol and
18  the other transcript calls her Cheryl.
19  Are these the same people that you're
20  talking about?
21  A.   Yes.
22  Q.   Okay. So, we couldn't figure
23  out before what date that conversation

Page 326

1  was, but it would appear, then, that this
2  is Tuesday, the 17th of May that your
3  phone call to Jeff White as reflected on
4  Exhibit O occurred.
5  A.   When I spoke to Carol, it was
6  the day of the conference call. It
7  should have been the day of the
8  conference call.
9  Q.   All right. And you -- well,
10  look here. On your own recorded notes,
11  you say, Come Tuesday at 10:15 I made a
12  phone call, and the number was. You give
13  the number. "And I talked to a young
14  lady by the name of Carol. I told her
15  who I was and the reason why I was
16  calling, and I wanted -- I needed to
17  speak to Jeff. And she told me that Jeff
18  was in a meeting and that she needed to
19  go back there and tell him I was on the
20  phone. So, she did that. And when she
21  came back, she said Jeff told me to tell
22  you that he would call you that
23  afternoon -- which was Tuesday

Page 327

1  afternoon -- he would call me and talk to
2  me." And you gave her your phone number,
3  got off the phone. All right.
4  Isn't that the conversation
5  that's recorded here?
6  A.   Sure.
7  Q.   All right. Well, that's all
8  I'm trying to find out.
9  A.   Well, I'm not -- I'm not sure
10  if that's when the conversations were
11  being taped. That's all I'm saying.
12  Yeah, that's correct. You're correct.
13  Q.   So, this is the conversation
14  that you're making reference to here? I
15  need to be more specific for the record.
16  The conversation that we just talked
17  about here in Exhibit O is the
18  conversation that you are describing on
19  page 43 of Exhibit N?
20  A.   Possible. I'm not even
21  looking at it. I probably need to look
22  at it too.
23  Q.   That's Exhibit N right there

Page 328

1  in front of you. Just flip off --
2  actually you've got --
3  MR. NELMS: He's on page 43.
4  Q.   You're on page 43. Here's
5  Exhibit O, and that's what I'm talking to
6  you about, and, you know, it's very
7  short.
8  A.   Right.
9  Q.   It's just two pages.
10  A.   That's correct.
11  Q.   And that would clarify that
12  this conversation happened on Tuesday,
13  the 17th of May?
14  A.   You're correct. That's
15  exactly right.
16  Q.   And from that point forward,
17  all of your communications with FedEx
18  that were on the phone were recorded?
19  A.   Correct.
20  Q.   And then you make reference to
21  a conversation with Kent in this
22  statement I called Kent, and that's one
23  of the recorded conversations here, I

Page 329

1  take it. You recorded all your
2  conversations with Kent after that point
3  in time?
4      A.   Yes, sir.
5          MR. SPOTSWOOD: I have
6  probably about an hour or so more to go.
7  I'd like to take a lunch break, if we
8  could.
9          MR. NELMS: Okay. I didn't
10 realize it was that late.
11         MR. SPOTSWOOD: Yeah. And
12 come back. I don't care, a quarter to
13 one. If that's all right. About an hour
14 and 15 minutes, and then I think we'd
15 probably be able to wrap everything up by
16 two or three, if that's all right with
17 you guys.
18         MR. NELMS: Okay. That's
19 super.
20         (Said deposition was in recess
21         at 11:22 a.m. until 1:08 p.m.,
22         after which the following
23         occurred:)

Page 330

1          (Whereupon, Defendant's
2          Exhibit WW was marked for
3          identification.)
4      Q.   (BY MR. SPOTSWOOD:) Let me
5  show you Defendant's Exhibit WW, Mr.
6  Thornton, and these -- I think your
7  attorney will agree with me, are the
8  documents that were just faxed today to
9  Jay Lewis from Stearns Bank, so can you
10 confirm that's what we're looking at
11 here?
12     A.   Yes, sir.
13     Q.   All right. Most of these
14 documents in here I think we've already
15 talked about. What I do see, though, is
16 a premium refund receipt schedule, and
17 this is in connection with your life and
18 disability coverage that you got in
19 connection with the vehicle. It says a
20 date -- it has a date of cancellation,
21 6/30/05. It says the policy was in force
22 for two months, and it shows a refund of
23 $871.68, and I think that's against this

Page 331

1  premium up here of 922.57, so the
2  difference between those two numbers
3  would appear to be what your
4  out-of-pocket cost was for the insurance.
5  And, then, on disability, that premium
6  was $2,368.63. It looks like the refund
7  here was $2,237.79. So, we have totals
8  in both places, so your total refund was
9  $3,109.47, and your total charged premium
10 was $3,291.20, so the actual cost
11 differential to you was the difference
12 between those two numbers. Does that
13 sound right?
14     A.   Are you saying they refunded?
15     Q.   I'm saying there was a refund
16 of this premium according to these
17 records.
18     A.   That's news to me.
19     Q.   All right. Well, let's go off
20 the record for just a second.
21         (Off-the-record discussion.)
22     Q.   (BY MR. SPOTSWOOD:) Let's go
23 back on the record here. Mr. Thornton,

Page 332

1  was it your understanding that this
2  premium total here of $3,291.20 was part
3  of what was included in the note in the
4  total amount of -- well, let me strike
5  that.
6          And I think we've already been
7  through this conditional sales contract,
8  too, but the second document in Exhibit
9  WW is the conditional sales contract, and
10 it says, "Buyer agrees to pay $35,148.88
11 as and for the purchase of the
12 equipment," which was the truck, correct?
13     A.   Right.
14     Q.   And, then, "Buyer further
15 agrees to further pay $3,291.20 as
16 premium for the credit insurance
17 coverage, which premium is to be included
18 in the periodic installments referred to
19 in paragraph 4(b) below," correct?
20     A.   Correct.
21     Q.   Okay. So, that was included.
22 So, what happened here, apparently when
23 we go back and look at the cancellation,

20 (Pages 329 to 332)

| Page 333 | Page 335 |
|---|---|

**Page 333**

1  is that this was -- this amount that we
2  talked about $3,109.47 was something that
3  was credited over against the outstanding
4  indebtedness when it was refunded.  Is
5  that the way you understand it would have
6  worked, if you know?  You may not know?
7      A.   Well, that's the way it reads.
8  Now, when you say refunded --
9      Q.   I mean basically given to the
10 bank in partial payoff of the
11 obligations, correct?
12     A.   Yes.  Yes.
13         (Whereupon, Defendant's
14         Exhibit I was marked for
15         identification.)
16     Q.   If you would, please have a
17 look at Defendant's Exhibit --
18         MR. PARKER:  I.
19     Q.   -- I.  I was going to ask if
20 these are the -- if this document is the
21 initial disclosure form that your counsel
22 provided in connection with the lawsuit.
23     A.   (Examining document.)  Yes.

**Page 334**

1          (Whereupon, Defendant's
2          Exhibit J was marked for
3          identification.)
4      Q.   Now, if you would, have a look
5  at Exhibit J.  I'd like you to confirm
6  for me that these are your answers to the
7  first request for production of documents
8  in this case.
9      A.   (Examining document.)  I
10 really don't understand this document
11 right here.  What is it?
12     Q.   Well, this is -- these are --
13 Exhibit J is, I will tell you, a
14 pleading, or rather a discovery response
15 that was served on us by your counsel,
16 and it is signed by your counsel.  You're
17 not actually required to sign this
18 document yourself, and I don't think you
19 did.
20     A.   Oh, I see.  Okay.
21     Q.   But I believe it is undisputed
22 that this is -- these are the responses
23 you made to our request for production of

**Page 335**

1  documents.  Is that your understanding as
2  well?
3      A.   Yes.
4      Q.   All right.  Now, let me ask
5  you to have a look at Defendant's Exhibit
6  K.
7          (Whereupon, Defendant's
8          Exhibit K was marked for
9          identification.)
10     Q.   Now, these were served on us
11 and appear to be your answers to our
12 interrogatories.
13     A.   Yes.
14     Q.   And you did, in fact, sign
15 those, did you not?
16     A.   Yes.
17     Q.   Going back for a second to the
18 two security companies that you had an
19 ownership interest in.  My recollection
20 is that I did ask you some questions
21 about the sale of American Shield, but I
22 forgot to ask you about the sale of
23 Security Experts.  Did you and your

**Page 336**

1  partner in that business sell that
2  business?
3      A.   No, we just dissolved the
4  business.
5      Q.   So, you didn't actually
6  recover any income from the sale of
7  either one of those businesses?
8      A.   No, I did not.
9      Q.   Do you remember when Security
10 Experts was shut down?
11     A.   Not -- no, sir, I -- not
12 exactly as far as a date.
13     Q.   In your answer to
14 interrogatory number seven, if you'll
15 look at Exhibit K there, you were asked
16 identify any offers of employment or
17 specific employment opportunities that
18 you declined in 2005, and your answer
19 then was none.
20     A.   Right.
21     Q.   If I recall correctly from
22 your testimony, you did, in fact, have an
23 opportunity to go to State Farm that you

21 (Pages 333 to 336)

Page 337

1  declined in 2005, is that right?
2  　　A.　That is exactly right.
3  　　Q.　Okay.  And that's the
4  opportunity that your wife took advantage
5  of, correct?
6  　　A.　I recommended her for the job.
7  　　Q.　And she was offered it and
8  took it?
9  　　A.　Yes.  Yes.
10  　　Q.　Apart from that opportunity --
11  and that's what she's doing today, if I
12  remember correctly?
13  　　A.　That's right.
14  　　Q.　Apart from that opportunity,
15  were there any other offers of employment
16  or specific opportunities for employment
17  that you declined in 2005?
18  　　A.　No, sir.
19  　　Q.　I am going to call your
20  attention to interrogatory 11.  In that
21  interrogatory we asked you about damages,
22  and specifically we asked you to identify
23  and describe in detail any damages

Page 338

1  incurred by the plaintiff allegedly
2  resulting from any act or omission on the
3  part of FedEx Ground, including the
4  nature of the damages, the total amount,
5  the method of computation and any
6  evidence you intend to use to support or
7  substantiate any such damages.  And I
8  want to ask you some questions now about
9  your response.  Your first response is I
10  lost income.  What income did you lose?
11  　　A.　Working income as far as being
12  employed.
13  　　Q.　Being employed as what, a
14  driver for FedEx?
15  　　A.　No, just income.
16  　　Q.　All right.  And you say you
17  lost income.  Is that because during this
18  roughly five-month period of time you
19  were aggressively looking to get a job at
20  FedEx and you were not looking elsewhere?
21  　　A.　That's exactly right.  I was
22  not looking to get a job.  I felt like I
23  had the job.

Page 339

1  　　Q.　All right.  You then say --
2  any other lost income that you were
3  talking about except for what you just
4  described?
5  　　A.　Sure.  After the fact of being
6  unemployed after all this came to a
7  screeching halt, loss of income there.
8  　　Q.　Until you could find a job?
9  　　A.　Right.
10  　　Q.　Do you have any idea how much
11  lost income you're talking about?
12  　　A.　No, I do not.
13  　　Q.　You then say, as part of your
14  damage request, I lost medical insurance
15  for the family.  What medical insurance
16  were you talking about?
17  　　A.　My medical insurance for me
18  and my wife, family coverage.
19  　　Q.　And you --
20  　　A.　I could not afford it.
21  　　Q.　You couldn't afford it because
22  you didn't have the job with FedEx that
23  you had hoped to get?

Page 340

1  　　A.　Yes.
2  　　　　MR. NELMS:  Object to the
3  form.
4  　　Q.　When did you obtain medical
5  insurance for the family in 2005?
6  　　A.　I do not remember the -- the
7  date.
8  　　Q.　Is it something that you got
9  through your wife's employment?
10  　　A.　No.
11  　　Q.　But you and she had to go out
12  and buy a policy?
13  　　A.　Yes.
14  　　Q.　And you don't remember exactly
15  when that was?
16  　　A.　It was during the five months.
17  　　Q.　That you got a policy?
18  　　A.　Yes, I did.
19  　　Q.　Okay.  If I understand you
20  correctly from your responses to these
21  interrogatories, you did have a medical
22  expense of $475 that you had to pay with
23  your credit card because you did not have

Page 341

1   insurance.  That's in response to
2   interrogatory 13.
3       A.   That's correct.
4       Q.   Did you have any other medical
5   related or hospital or expenses that were
6   unreimbursed by insurance during this
7   period when you didn't have insurance?
8       A.   No, sir.
9       Q.   When did you lose the
10  insurance policy that you ultimately
11  wound up -- when was the last time before
12  you bought the policy in this five-month
13  period that you previously had had an
14  insurance policy for medical care?
15      A.   Restate the question, please.
16      Q.   What I'm trying to find out is
17  how long were you uninsured, from what
18  period up until -- you said at some point
19  in time in the five-month period we've
20  been talking about, you know, from
21  January through May, that you did go
22  ahead and get an insurance policy?
23      A.   Correct.

Page 342

1       Q.   You went out and bought one?
2       A.   Correct.
3       Q.   My question to you is how long
4   a period of time had you been uninsured?
5       A.   Previous to that?
6       Q.   Yes.
7       A.   I was not uninsured.  I was
8   under a COBRA plan.
9       Q.   Okay.  So, you were paying
10  your COBRA coverage?
11      A.   Yes.
12      Q.   And then -- well, then maybe
13  you were never uninsured.  That's what
14  I'm trying to find out.  When were you
15  uninsured?
16      A.   After I canceled my -- the
17  policy that we went out and took with
18  Mega -- Mega Health and Life.  When I
19  knew that this -- okay.  Let me back up.
20          We took out the policy when
21  the COBRA ran its course.
22      Q.   Which is what, usually
23  18 months or so?

Page 343

1       A.   Well, it -- the COBRA had not
2   actually ran its course.  The COBRA was
3   more expensive than what we were taking
4   out.
5       Q.   Okay.
6       A.   So, we inquired of Mega Health
7   and Life, had a representative to come
8   down and sit down with us, and we took
9   out a policy.  That was a lot cheaper
10  than COBRA.
11      Q.   Okay.
12      A.   And we kept that until I just
13  knew I could not continue to pay 600
14  something dollars a month or thereabouts.
15      Q.   All right.  And, then, so, how
16  long after that policy was terminated
17  were you uninsured?
18      A.   I'm uninsured now.
19      Q.   You don't have any health
20  insurance at this time?
21      A.   No, sir.
22      Q.   And is your wife -- does she
23  have any insurance?

Page 344

1       A.   He does not supply insurance.
2       Q.   No, I'm asking is she covered
3   by a health insurance policy?
4       A.   No, she is not.
5       Q.   Are any of your children
6   covered by any health insurance?
7       A.   I can't speak for them.  They
8   are on their own.
9       Q.   Okay.  And have you had -- let
10  me ask this question again:  Have you had
11  any medical expenses that you've had to
12  pay out of your own pocket that otherwise
13  would have been paid by insurance except
14  for the $475?
15      A.   Sure.
16      Q.   Okay.
17      A.   My wife's medicine.  She takes
18  a thyroid medication.  As far as myself,
19  basically if I went to PriMed for flu,
20  which I have had and the medication, you
21  know, that was prescribed from that, I've
22  had to pay it out my pocket.
23      Q.   Do you have any idea generally

23 (Pages 341 to 344)

Page 345

1  of how much money we're talking about?
2      A.   No, sir, I -- I do not.  I
3  wouldn't -- I would hate to say and it be
4  incorrect.
5      Q.   Okay.  But it would have been
6  treatment at a -- for the flu --
7      A.   Yes.
8      Q.   -- and any related medications
9  for that?
10      A.   Yes.
11      Q.   Do you have any judgment of
12  how many times you visited Prime Care or
13  Prime Aid?
14      A.   I think it's been maybe two to
15  three times.
16      Q.   You then list as an element of
17  damages stress, and along with that, you
18  also say "my health declined."  Can you
19  tell me what stress-related or
20  health-related issues that you attribute
21  specifically to what we've been talking
22  about involving FedEx Ground?
23      A.   There's a number of things.

Page 346

1  Stress related to seeking employment,
2  stress of no additional income coming in,
3  the worry, stress between the wife and
4  myself trying to figure out what we're
5  going to do because this was such a --
6  you know, it was such a positive thing,
7  and then, boom, it was like the rug was
8  pulled out from under me.  I mean, you
9  know, I don't know if you can put it in
10  words to accurately explain how stress
11  works on you, but it definitely worked on
12  me, keeping it inside, thinking about it
13  continuously, and every -- you know,
14  looking for the job and stuff like that.
15      Q.   Okay.
16      A.   And that has caused my blood
17  pressure to -- I never had a problem
18  before.  I didn't even realize what the
19  problem was until I went to the doctor.
20  I thought I was going to die or pass out.
21      Q.   And the reference about going
22  to the doctor, is that your visit to Dr.
23  Marla Wool --

Page 347

1      A.   Yes.
2      Q.   -- on August the 10th, 2005?
3      A.   (Nodding head affirmatively.)
4      Q.   Correct?
5      A.   Yes.
6      Q.   And what were your symptoms
7  when you went to see her?
8      A.   I had been having a breathing
9  problem, extreme headaches.  My eyes felt
10  like they were swollen, couldn't sleep.
11  Such as that.  And it -- it just got to
12  the point where I felt like I had to go
13  and do something.
14      Q.   All right.  So, she did an
15  evaluation of you?
16      A.   Yes.
17      Q.   What did she diagnose you
18  with?
19      A.   My blood pressure was
20  extremely high.  She wondered how I had
21  not already possibly had a stroke.
22      Q.   And, so, she diagnosed you
23  with hypertension?

Page 348

1      A.   Hypertension, yes, sir.
2      Q.   And she prescribed medications
3  for you, and we've already talked about
4  that?
5      A.   Yes, sir.  Yes, sir.
6      Q.   Are you still taking your
7  hypertension medication?
8      A.   Yes, sir.
9      Q.   And have you had any follow-up
10  visits with Dr. Wool?
11      A.   Yes, I have.
12      Q.   And what has she been telling
13  you about your hypertension?
14      A.   Basically it's just a review
15  of the medication and how it's working
16  and see if it's regulated.
17      Q.   Is it?
18      A.   Yes.
19      Q.   Were there any other impacts
20  on your health other than what you've
21  described so far?
22      A.   Not really.  I mean, it was --
23  you know, there's -- no.

24 (Pages 345 to 348)

Page 349

1    Q.    The next item of damages that
2  you mentioned is "lost my home due to
3  significant loss in income." I thought
4  your home was paid for and --
5    A.    It is. I have two homes. I
6  inherited my father's home, and --
7    Q.    That's the one in Chilton
8  County we discussed?
9    A.    That's correct.
10    Q.    All right. And how did you
11  lose that home?
12    A.    Well, I -- I took out a
13  mortgage on the home in 2004 to pay off
14  my home here and do some things in the
15  home and --
16    Q.    When you inherited the
17  property, it was free and clear of any
18  kind of mortgage, correct?
19    A.    Right. And --
20    Q.    What was the amount of the
21  mortgage that you took out in 2004,
22  roughly?
23    A.    60,000. And I had a -- my son

Page 350

1  was living there, which there was no
2  problem with that, and he was -- he was
3  basically making the payments, and then
4  he had -- he had to move out because of
5  his job, so I had to put the home up for
6  sale. I could not make the payments in
7  2005. The house appraised for 80 --
8  84, $85,000, and I had to make a
9  decision, because I could not make the
10  payments, either to lease the house out
11  with the option to buy at the payoff
12  price.
13    Q.    Which was roughly 60 grand?
14    A.    Well, at that time it was not
15  60. I think it was like -- I'm not
16  really sure exactly what it was at the
17  time. Mid-fifties. Or either lose the
18  house. And I had to draw up -- have the
19  papers drawn up stating that, you know,
20  as long as they -- and I believe
21  they will. As long as they'll make the
22  payments and do what they -- I will not
23  kick them out of the house. They can do

Page 351

1  anything to the property, land. You
2  know, I just needed somebody to secure
3  that money because my name was on the
4  line until they can get financing. And
5  this was the only opportunity that I had,
6  and I had to take -- take an opportunity.
7    Q.    And who is living in the house
8  now?
9    A.    Keith Mitchell. Keith
10  Mitchell and his wife Lorna.
11    Q.    Are they any relationship to
12  you?
13    A.    Yes, she is.
14    Q.    What is she?
15    A.    She's like a step-cousin.
16    Q.    Okay. So, she's related
17  directly to your wife?
18    A.    No, she would have been -- she
19  would have been related to me.
20    Q.    Okay. Right. And I'm sure
21  there are documents that reflect this?
22    A.    Oh, yes, I have those
23  documents.

Page 352

1    Q.    And when was this deal
2  structured and put into place?
3    A.    It was -- I don't know the
4  exact date. It was the latter part of
5  2005.
6    Q.    The other thing you say here
7  is, as an element of damage, is that "it
8  depleted my savings." Can you be more
9  specific about what you mean by that?
10    A.    Well, Debbie and I had
11  savings. Also, when her mother passed
12  away, she inherited some money. It took
13  that money and our savings to -- to make
14  ends meet.
15    Q.    For 2005?
16    A.    Yes. And that was -- I think
17  that was very hard on my wife because of
18  the money that her mother had saved for
19  her.
20    Q.    Do you recall the amount of
21  the inheritance?
22    A.    No, sir, I do not.
23    Q.    The next item that you list

Page 353

1  here is "lost the down payment on my
2  truck and tag for my truck." The truck
3  you're talking about and the down payment
4  and the tag is the truck that's been the
5  subject of much discussion in these last
6  two days, correct?
7       A.   That's correct.
8       Q.   You then say, quote, I was
9  extremely embarrassed and humiliated
10 after having to tell family and friends I
11 was no longer employed. Given -- I guess
12 I -- can you explain that to me?
13      A.   Well, of course, you know, we
14 live in a -- we live in a cul-de-sac, at
15 the back end of the cul-de-sac. I know
16 my neighbors, and, you know, everybody
17 knew that I was going to work for FedEx.
18 I mean, just in talking. We talk.
19 Church members, pastor, you know, we --
20 in general talk, and, you know, they
21 would ask how things are going, and then
22 it's -- it's very humiliating to tell
23 someone, well, you know, this is -- I

Page 354

1  don't understand what's going on. You
2  don't have the answers to their
3  questions. They are concerned, but you
4  just don't know how to answer those
5  questions, and it is very humiliating.
6  And then, you know, you're going to work
7  for, you think, what is a great company.
8  Or you're going to represent a great
9  company. And then you're in a position
10 to where you're looking for a job and
11 people are concerned and say, you know,
12 how is it going looking for a job and all
13 like that. I mean, it's very humiliating
14 and stressful.
15      Q.   Are there any other elements
16 of damages that you haven't told us
17 about? That's all you listed in your
18 interrogatory responses. Anything else?
19      A.   Well, you know, like I was
20 saying earlier, it's taken a toll on me
21 as far as my health, as far as Debbie and
22 I -- it's been stressful for me and my
23 wife, not knowing what's around the

Page 355

1  corner. And the most puzzling thing of
2  the whole ordeal, and maybe it's just
3  because of the person I am, because I've
4  always been taught to have high
5  integrity, be honest with people and
6  treat everybody right, is why in the
7  world, since I went through what I went
8  through and was asked -- asked to do what
9  I was asked to do, somebody didn't have
10 the decency and the respect to just pick
11 up the phone and say, Charlie, we're
12 wrong; we need to find out why and let
13 you know why or make some type of amends.
14 It was like we don't give a crap about
15 you. You're finished, boom. And I'm
16 left like a fish out of water, and we
17 know what a fish does out of water, to
18 flounder at my own expense.
19      We -- you know, we lost --
20 we -- it was a stressful situation
21 altogether because my wife lost her
22 father in December. My wife lost her
23 mother in February. December of 2004 he

Page 356

1  passed away; February of 2005, she passed
2  away. My dad had passed away a year
3  before. A year and a half before that,
4  my mom passed away. We were trying -- we
5  were trying to deal with all this, and
6  then, bam, this comes in too, you know.
7  But it's -- it's very stressful. I hope
8  none of you guys ever have to go through
9  this.
10      Q.   Have you had any counseling
11 from any kind of a healthcare
12 professional?
13      A.   No, sir, just my pastor.
14      Q.   And have you and your wife had
15 any marriage counseling that you
16 attribute in any way to this situation?
17      A.   No, sir, just the pastor of
18 the church, which we've known him for
19 years.
20      MR. SPOTSWOOD:  Off the record
21 for a second.
22      (Off-the-record discussion.)
23      (Said deposition was in recess

26 (Pages 353 to 356)

Page 357

1    at 1:42 p.m. until 1:45 p.m.,
2    after which the following
3    occurred:)
4    A.    I have one other thing.
5    Q.    Go ahead.
6    A.    As far as damages also, I've
7    always paid my child support.  I have one
8    son that is -- still with his mom, and
9    there was no way that I could pay my
10   child support.  I have just hoped and
11   prayed that she has not come after me for
12   that, which she has not, but I still owe
13   it to her and --
14   Q.    How do you pay child support?
15   Do you mail her a check?
16   A.    No, sir.  I go through the
17   court system to where everything is
18   documented.
19   Q.    And how much in arrearage are
20   you in your child support?
21   A.    I couldn't really tell you an
22   exact figure.  I don't know.
23   Q.    Give me a within $10,000

Page 358

1    estimate.
2    A.    I -- I'm not even going to
3    speculate on that.  I don't know.  I know
4    it's $358 a month, but I do not know --
5    Q.    Well, do you remember the last
6    time you made a child support payment?
7    A.    No, I'd have to look.  That
8    was -- it was in 2005, but I don't know
9    when the last -- the last month.
10   Q.    And where is that Family
11   Court --
12   A.    Chilton County.
13   Q.    -- pending?  Chilton County.
14   And what's the style of the case?  Would
15   it be Thornton versus Thornton?
16   A.    I assume, yeah.
17   Q.    I know you probably told me
18   this already, but what is your wife's
19   name now, your former wife's name?
20   A.    Cahill.
21   Q.    Cahill?
22   A.    (Nodding head affirmatively.)
23   Q.    K-A-Y-H-I-L-L?

Page 359

1    MR. NELMS:  K or C.
2    A.    It's a C.
3    Q.    C-A-Y --
4    A.    C-A -- yeah.  I assume.  We
5    don't correspond.
6    Q.    I understand.
7    (Whereupon, Defendant's
8    Exhibit XX was marked for
9    identification.)
10   Q.    Let me show you Defendant's
11   Exhibit XX, which is a document that was
12   produced to you yesterday.  What is that?
13   A.    (Examining document.)  On,
14   this is just a -- this was pulled up on
15   Careerbuilder as far as a job posting of
16   FedEx when this -- it was --
17   Q.    What did it --
18   A.    10/12/2005.  They had actually
19   posted another job opening -- no, it was
20   September the 24th of 2005 when it was
21   posted for -- for Home Delivery, for
22   another contractor, Ground and FedEx Home
23   Delivery for the Montgomery area.

Page 360

1    Q.    All right.
2    A.    And it -- and it says asked
3    for Kent Gastineau, operations manager.
4    Q.    All right.  So, did you call
5    up Kent Gastineau and tell him you still
6    wanted a job?
7    A.    No, sir, I did not.  No.  No.
8    Q.    The fact of the matter is that
9    you had had it with FedEx at the time you
10   filed this lawsuit, correct?
11   MR. NELMS:  Object to the
12   form.
13   Q.    You were no longer interested
14   when you filed this lawsuit?
15   A.    I did not file a lawsuit.  I
16   came to Andy asking him what my rights
17   were.
18   Q.    Well, you filed a lawsuit,
19   sir.
20   A.    I did, after counsel with
21   Andy.
22   Q.    All right.
23   A.    I did not have any hard

27 (Pages 357 to 360)

Page 361

1   feelings toward anybody. I was very
2   disgusted because they had not treated me
3   as fair as I had treated them, and I
4   could not understand several things like
5   job postings when I'm sitting at home
6   waiting for the phone to ring to go to
7   work, they are still putting ads in the
8   paper wanting people to come to work to
9   be a contractor. Now, if you can make
10  heads or tails of that, you're a better
11  man than I am.
12      Q.   Well, have you seen or heard
13  or learned anything from your experience
14  with FedEx that indicates to you, and you
15  were there, that somebody other than you
16  got a route in Montgomery, Alabama other
17  than Isaac Scott during this period we're
18  talking about?
19      A.   Somebody else got a route?
20      Q.   Yes.
21      A.   The only ones that I know that
22  got a route were the other contractors
23  that were assigned the routes that were

Page 362

1   said -- that were available.
2       Q.   I mean, somebody from outside
3   the company who wasn't already a driver,
4   did anybody outside the company other
5   than Isaac Scott who was temporary get a
6   route during this period of time we're
7   talking about?
8           MR. NELMS: When you say "this
9   period of time we're talking about," are
10  you talking about during his period of
11  time from, say, January till --
12          MR. SPOTSWOOD: Yeah, till he
13  sued us.
14          MR. NELMS: Till May.
15          MR. SPOTSWOOD: Yeah.
16          MR. NELMS: Of 2005.
17          MR. SPOTSWOOD: Yeah.
18          MR. NELMS: Okay. If you
19  know.
20      A.   You're saying someone else got
21  a route.
22      Q.   No, I'm asking you if you're
23  aware of anybody else getting a route.

Page 363

1       A.   Oh, no, no, no, no, no, no.
2       Q.   But you seem to be critical of
3   the fact that the company is soliciting
4   interest in people to --
5       A.   It's very misleading.
6       Q.   You consider anytime that they
7   have an informational session without
8   having a specific route available to be
9   misleading?
10      A.   It is misleading if it is
11  handled the way it was handled with me.
12          (Whereupon, Defendant's
13          Exhibit YY was marked for
14          identification.)
15      Q.   All right. Let me show you
16  Defendant's Exhibit YY. Is this a
17  copy --
18      A.   Yes, it is.
19      Q.   -- of the front of a credit
20  card, an American Express business card
21  with your name on it that you were given,
22  I'm going to assume, in April, maybe
23  of '05?

Page 364

1       A.   Yes.
2           MR. SPOTSWOOD: Are you going
3   to have some questions, do you think?
4           MR. NELMS: (Nodding head
5   affirmatively.)
6           MR. SPOTSWOOD: All right. If
7   you don't hold me strictly to the -- you
8   know, don't cover anything new, I'm going
9   to pass the witness to you, and I'm
10  going -- while you're asking your
11  questions, I'll look at my notes to see
12  if I've got anything else.
13          MR. NELMS: Okay. That's fair
14  enough.
15          MR. SPOTSWOOD: I'll do that.
16      A.   Can I run to the restroom?
17          MR. NELMS: No. Just kidding.
18          (Said deposition was in recess
19          at 1:52 p.m. until 1:54 p.m.,
20          after which the following
21          occurred:)
22      Q.   (BY MR. SPOTSWOOD:) Let me
23  ask a couple of other questions before

28 (Pages 361 to 364)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 16, 2006

---

**Page 365**

1 you get started, Andy. On Exhibit YY,
2 who gave that to you?
3     **A.** American Express.
4     **Q.** Was it sent to you in the
5 mail?
6     **A.** Yes.
7     **Q.** Okay. Did Kent say anything
8 to you about it?
9     **A.** About receiving this?
10     **Q.** Yes.
11     **A.** No.
12     **Q.** Did you say anything to him
13 about it?
14     **A.** Not that I had received it,
15 no.
16     **Q.** Okay. Did you put any
17 expenses on it, use it in any way?
18     **A.** No.
19     **Q.** As we sit here today, you
20 didn't -- I didn't see any kind of an
21 envelope or anything with it. Do you
22 know when you actually received it?
23     **A.** I received it after I -- my

**Page 366**

1 truck was delivered.
2     **Q.** All right.
3     **A.** Because I put my gas expense
4 the first time on my other credit card.
5     **Q.** Okay.
6     (Off-the-record discussion.)
7     MR. SPOTSWOOD: All right.
8 Thank you, sir.
9     (Said deposition was in recess
10     at 1:55 p.m. until 2:00 p.m.,
11     after which the following
12     occurred:)
13     MR. NELMS: Were you finished,
14 Bob?
15     MR. SPOTSWOOD: Yeah, on the
16 same condition that I told you a minute
17 ago. Don't hold me to your questions and
18 I think I'm probably done.
19     MR. NELMS: Well, if -- off
20 the record.
21     (Off-the-record discussion.)
22
23 EXAMINATION BY MR. NELMS:

**Page 367**

1     **Q.** Charlie, I'm going to ask you
2 a few questions. A lot of the questions
3 that I ask you are going to be directly
4 related to questions that you've already
5 heard today, so I may refer to them on
6 and off.
7     First of all, I believe we've
8 already talked about the first meeting
9 that you had that was an informational
10 session, and it was held at the Holiday
11 Inn, and Stan Trott was the presenter.
12 Is that a correct statement?
13     **A.** Yes.
14     **Q.** Okay. During that meeting,
15 did Mr. Trott have any literature or
16 paraphernalia with him that had the FedEx
17 logo on it?
18     **A.** No.
19     **Q.** All right. We saw some
20 brochures today and yesterday that were
21 given to you -- well, let's start with
22 this FedEx Home Delivery bag. How did
23 you come to receive this?

**Page 368**

1     **A.** That was given to me by Kent.
2     **Q.** All right. When?
3     **A.** I don't recall a date.
4     **Q.** Okay.
5     **A.** It was after my training.
6     **Q.** All right. And for the
7 record, I'm holding up a black zip bag
8 that's approximately ten by 13 inches.
9 I'm not going to put it on the record.
10 Now I'm holding up a laminated five by
11 eight and a half card that has FedEx
12 Ground on it. Do you recognize it?
13     **A.** Yes.
14     **Q.** Okay. Where did you receive
15 this?
16     **A.** That came in with the packet,
17 the brown bag -- the black bag, I'm
18 sorry.
19     **Q.** Okay. In the meeting that
20 we've talked about in January of '05, the
21 one where Mr. Trott was the presenter,
22 did Mr. Trott at any point in time
23 present you -- explain to you that he was

29 (Pages 365 to 368)

Page 369

1  with Federal Express?
2      A.   Yes.
3      Q.   What position did he say he
4  held with Federal Express?
5      A.   He was a ground manager.
6      Q.   Manager?
7      A.   Yes.
8      Q.   Okay.  And did he wear any
9  clothing that had Federal Express logo on
10  it?
11      MR. SPOTSWOOD:  I object to
12  the form.  I think, and let me explain to
13  you what I'm concerned about, you're
14  using the terminology Federal Express.
15  FedEx Ground Package Systems, Inc. is a
16  separate entity, and I don't think
17  there's any question that what we're
18  talking about is FedEx Ground Package
19  Systems, Inc. of which FedEx Home
20  Delivery is a part.
21      MR. NELMS:  That's an
22  outstanding point.  I apologize.
23      Q.   Let me get this right then.

Page 370

1      In the meeting with Stan Trott
2  in January of 2005, did Mr. Trott wear
3  any attire that included the FedEx logo?
4      A.   He had a jacket on, a FedEx
5  Ground jacket on.
6      Q.   Okay.  You already said he
7  represented to you that he was the
8  manager?
9      A.   Yeah.
10      Q.   All right.  Did he tell you
11  where he was the manager?
12      A.   The Montgomery terminal.
13      Q.   Okay.  Did he tell you how
14  long he had been working for FedEx?
15      A.   Yes, he did.  I don't recall
16  the years, but it was many.
17      Q.   Okay.  And did he give you or
18  did you have the opportunity to receive
19  any literature at that meeting?
20      A.   No, sir.
21      Q.   Okay.  Did you sign any
22  contracts at that meeting?
23      A.   No, sir.

Page 371

1      Q.   And I believe you've already
2  testified that there was no form for you
3  to fill out as an attendee of the
4  meeting, is that correct?
5      A.   That's correct.
6      Q.   Okay.  When you left that
7  meeting or the seminar or however we want
8  to characterize it that day in January of
9  2005, were you left with the impression
10  that you could become a contractor with
11  FedEx?
12      MR. SPOTSWOOD:  Object to the
13  form, leading, suggestive.
14      Q.   Answer, please.
15      A.   Yes.
16      Q.   Okay.  How did you come to
17  that belief?
18      A.   By the questions that my wife
19  and I asked him during the meeting and a
20  one-on-one outside the meeting.
21      Q.   Okay.  When you say him, you
22  mean Stan Trott?
23      A.   Yes, Stan Trott.

Page 372

1      Q.   Okay.  And what, if anything,
2  did he tell you that led you to come to
3  these conclusions; specifically what did
4  he tell you?
5      A.   He specifically told me that
6  there were -- there was actual criteria
7  that would have to be met, that they had
8  two, possibly three openings, and if the
9  criteria were met, they were -- they were
10  going to fill the on the grounds and I
11  needed to come -- if I was interested,
12  truly interested, come to the terminal.
13      Q.   And did Mr. Trott explain to
14  you what these criteria were?
15      A.   He went -- as far as the
16  meeting, he went into the driver training
17  and the securing the loan on the truck.
18      Q.   Okay.  And I believe you've
19  already testified for us in your
20  deposition that you came to a conclusion
21  that you wanted to become a contractor
22  with FedEx, is that correct?
23      MR. SPOTSWOOD:  Object to the

Page 373

1  form, leading, suggestive.
2     A.   Yes.
3     Q.   Okay.  Did there come a point
4  in time when you believed that you wanted
5  to be a contractor with FedEx?
6        MR. SPOTSWOOD:  Object to the
7  form, leading and suggestive.
8     Q.   Answer.
9     A.   Yes.
10    Q.   All right.  How did you
11  express that interest to FedEx?
12       MR. SPOTSWOOD:  Same
13  objection, based on the prior question.
14    A.   Well, I told Mr. Trott that
15  night that the wife and I would talk
16  about it, and I was definitely
17  interested, and I would call him and set
18  up a time to come to the terminal, and I
19  proceeded with that and went to the
20  terminal and moved forward.
21    Q.   Okay.  Did he provide you with
22  any paperwork to be signed?
23    A.   At what time?

Page 374

1     Q.   When you met him at the
2  terminal?
3     A.   I proceeded to do the
4  paperwork -- the day I went to the
5  terminal, I had Trice put me online to do
6  the paperwork online.
7     Q.   Okay.
8        MR. SPOTSWOOD:  Is that
9  Teresa?
10    A.   Bob, I don't know how --
11       MR. GASTINEAU:  It's Trice.
12    A.   Trice.
13       MR. SPOTSWOOD:  Okay.
14    Q.   (BY MR. NELMS:)  So, Stan
15  Trott instructed you to come to the
16  terminal?
17    A.   If I was interested.
18    Q.   And you did?
19    A.   Yes.
20    Q.   All right.  Do you remember
21  the date that you went to the terminal
22  and met with Stan Trott?
23    A.   No, sir, I don't.

Page 375

1     Q.   Did you meet with Stan Trott
2  the day you went to the terminal?
3     A.   Yes, sir.
4     Q.   All right.  Was he wearing any
5  clothing that had a FedEx logo on it?
6     A.   FedEx jacket.
7     Q.   Did his shirt have any FedEx
8  logos on it?
9     A.   I don't recall.
10    Q.   Okay.  And you did sign some
11  paperwork?
12    A.   Yeah.
13    Q.   What did you sign?
14    A.   I do not recall.
15    Q.   Okay.  Do you recall whether
16  or not any of that paperwork had the name
17  FedEx on it or had the FedEx logo on it,
18  either one?
19    A.   I'm pretty sure it did.
20    Q.   Okay.  And what did you do
21  after you signed this paperwork?
22    A.   I met back with him and left.
23    Q.   Now, are you saying you had a

Page 376

1  meeting that day with Stan Trott or you
2  had another meeting with Stan Trott on a
3  subsequent day?
4     A.   It was not a meeting.  I had
5  completed the paperwork and told him I
6  was completed -- it was complete, and
7  after that, it was like when everything
8  was processed, I would go for a drug
9  screen, do a drug screen.
10    Q.   These are things that Stan
11  Trott told you you would need to do?
12    A.   Yes.
13    Q.   Okay.  And in response to the
14  things that you were told that day by Mr.
15  Trott, what actions did you take next in
16  any way related to FedEx?
17       MR. SPOTSWOOD:  Object to the
18  form of the question.  That is an
19  incredibly broad question.  It basically
20  asks him to tell you everything we've
21  been talking about for the last day and a
22  half.
23       MR. NELMS:  Actually I think

31 (Pages 373 to 376)

Page 377

1  the question asked him what happened
2  next. It's serial in chronological
3  order, what did you do next related --
4  related to FedEx. What singular thing
5  did you do?
6      A.   Drug screen.
7      Q.   (BY MR. NELMS:)  All right.
8  What prompted you to have a drug screen?
9      A.   That was company policy for --
10  it was company policy you had to have a
11  drug screen.
12      Q.   It was FedEx's policy that you
13  have a drug screen?
14      A.   Yes.
15      Q.   Okay. Where did you go to get
16  your drug screen?
17      A.   I don't recall.
18      Q.   Okay. How did you know to get
19  there?
20      A.   Well, they gave me the
21  information.
22      Q.   Who did?
23      A.   One of the young ladies in the

Page 378

1  office.
2      Q.   Did she work --
3      A.   I can't recall if it was Trice
4  or another one.
5      Q.   Okay. To the best of your
6  knowledge, did that person work for
7  Federal Express?
8      A.   Yes.
9      Q.   FedEx, excuse me. So then you
10  went and got your drug screen, right?
11      A.   Yes.
12      Q.   All right. What singular
13  event or action did you take next in
14  chronological order that is related to
15  FedEx?
16      A.   The best of my knowledge, it
17  would have been securing a date for
18  training in Birmingham.
19      Q.   All right. And how did you
20  know to do that?
21      A.   Through Stan's office.
22      Q.   Is it safe to say someone at
23  FedEx told you to secure a date for

Page 379

1  training?
2          MR. SPOTSWOOD:  Object,
3  leading and suggestive.
4      A.   They actually told me the date
5  at FedEx.
6      Q.   Who is they?
7      A.   One of the young ladies in the
8  office.
9      Q.   What office?
10      A.   FedEx. FedEx Ground office.
11      Q.   To the best of your knowledge,
12  is that person an employee of FedEx?
13      A.   Yes.
14      Q.   Did you go to the training?
15      A.   Yes.
16      Q.   How did you know where it was?
17      A.   I was given directions.
18      Q.   By whom?
19      A.   The ladies in the office,
20  employees -- FedEx Ground employees.
21      Q.   Okay. And where was the
22  training?
23      A.   Birmingham.

Page 380

1      Q.   Okay. And did there come a
2  point in time when you arrived in
3  Birmingham for the training?
4      A.   Yes.
5      Q.   Okay. Was it in a building?
6      A.   Yes.
7      Q.   Okay. Were there any signs or
8  logos on this building?
9      A.   It was the Drury Inn. It was
10  a hotel.
11      Q.   Okay. And did you meet in a
12  conference room?
13      A.   Yes.
14      Q.   Okay. Were you given anything
15  when you got there?
16      A.   Yes, a manual to follow along.
17      Q.   Okay. Is that manual here
18  today in the exhibits that we've
19  presented?
20      A.   No, it's not.
21      Q.   Okay. Do you know where it is
22  now?
23      A.   Yes, I do.

|  | Page 381 |
|---|---|
| 1 | **Q.** Where is it? |
| 2 | **A.** It's at my home. |
| 3 | **Q.** It is? |
| 4 | **A.** Yes. |
| 5 | **Q.** All right. Why haven't we |
| 6 | gotten it? |
| 7 | MR. SPOTSWOOD: That's a good |
| 8 | question. |
| 9 | **A.** I apologize, but it's at home. |
| 10 | **Q.** Okay. |
| 11 | **A.** It's just -- |
| 12 | MR. NELMS: Not only do we |
| 13 | need it, but we need to get a copy to |
| 14 | Bob, okay? |
| 15 | **A.** Sure. |
| 16 | MR. NELMS: All right. |
| 17 | MR. SPOTSWOOD: Actually I'm |
| 18 | very disturbed by this revelation. I |
| 19 | mean, I've concluded an examination here |
| 20 | for two days without having in front of |
| 21 | me what I think could be a pretty |
| 22 | important piece of paper, and, frankly, I |
| 23 | would suggest that he get in the car and |

|  | Page 382 |
|---|---|
| 1 | go get it and bring it back here. |
| 2 | MR. NELMS: We'll adjourn for |
| 3 | an hour. Go get it. |
| 4 | **A.** That's fine. It's nothing |
| 5 | more than a manual. |
| 6 | MR. NELMS: And if you have |
| 7 | any other documents, please, please, |
| 8 | please, if you can think of them, think |
| 9 | of them while you are driving to |
| 10 | Millbrook and think of them while you're |
| 11 | there. |
| 12 | **A.** Sure. |
| 13 | MR. SPOTSWOOD: I'm sorry, |
| 14 | Andy. I -- off the record here. |
| 15 | (Off-the-record discussion.) |
| 16 | (Said deposition was in recess |
| 17 | at 2:16 p.m. until 3:14 p.m., |
| 18 | after which the following |
| 19 | occurred:) |
| 20 | (Whereupon, Defendant's |
| 21 | Exhibit ZZ was marked for |
| 22 | identification.) |
| 23 | |

|  | Page 383 |
|---|---|
| 1 | REEXAMINATION BY MR. SPOTSWOOD: |
| 2 | **A.** Apologize for that. It was in |
| 3 | a bookcase at the house. |
| 4 | **Q.** Let me -- before we go on |
| 5 | here, Exhibit ZZ, tell me what this is. |
| 6 | **A.** That's the manual that we |
| 7 | used, training manual in Birmingham with |
| 8 | Omar Newman. |
| 9 | **Q.** And it's -- on the first page |
| 10 | it says Quality P & D Learning |
| 11 | Participant Manual, June 2003, correct? |
| 12 | **A.** Correct. |
| 13 | **Q.** And this is the manual that |
| 14 | you were given when you got to |
| 15 | Birmingham? |
| 16 | **A.** That's correct. |
| 17 | **Q.** And who gave it to you? |
| 18 | **A.** Omar Newman. |
| 19 | **Q.** And is it the manual that was |
| 20 | used during the course of your -- I'm not |
| 21 | sure how many days this went on, but I |
| 22 | can see that there are at least -- |
| 23 | **A.** I think it was like 16 to |

|  | Page 384 |
|---|---|
| 1 | 17 days -- no. I'm sorry. Nine, eight |
| 2 | to nine days. |
| 3 | **Q.** Were days one through nine |
| 4 | classroom -- I'm sorry, one through eight |
| 5 | classroom training, and then I'm looking |
| 6 | at the -- I'm looking at -- I'll tell you |
| 7 | I'm looking at the table of contents here |
| 8 | and it says day nine, ride with certified |
| 9 | contractor and then driver safety program |
| 10 | and then days ten through 14 -- I'm not |
| 11 | sure what this means. It says 14 day |
| 12 | quality P & D learning curriculum. |
| 13 | MR. GASTINEAU: That means |
| 14 | that you ride with the service manager, |
| 15 | and they deliver packages. Sometimes the |
| 16 | service manager would be driving and |
| 17 | delivering, and sometimes the trainee. |
| 18 | **Q.** So, is that what happened to |
| 19 | you, what was described by Kent? |
| 20 | **A.** I assume so. I -- when I was |
| 21 | in Birmingham, Omar -- it was classroom |
| 22 | training also. It was split up in |
| 23 | driving because we had four individuals. |

Page 385

1  So, morningtime classroom; afternoon time
2  would be in the van driving.
3      Q.   Do you remember who was with
4  you in the training program by name?
5      A.   No, sir, I don't remember
6  their names.
7      Q.   Do you remember where they
8  were from?
9      A.   Well, two of the guys worked
10  out of the Birmingham term -- terminal,
11  and the young lady was out of Montgomery.
12      MR. SPOTSWOOD:  Okay.  All
13  right.
14
15  EXAMINATION BY MR. NELMS - CONTINUING:
16      Q.   I believe when we left off you
17  were just describing your training in
18  Birmingham, and you just answered for Bob
19  some of my questions.  After your
20  training in Birmingham -- excuse me.  How
21  many days was that training in
22  Birmingham?
23      A.   Eight to nine days.

Page 386

1      Q.   Okay.  Did you have to pay
2  Federal Express -- excuse me, FedEx, any
3  money to take that class or take that
4  training?
5      A.   No.
6      Q.   What regarding FedEx did you
7  do when you completed your training with
8  FedEx?
9      A.   The completion of this
10  training (indicating)?
11      Q.   The training that we described
12  that you took in Birmingham.
13      A.   After our training was
14  complete, we was told by Joe McConnell to
15  report on the following week to the
16  terminal in Montgomery.
17      Q.   Did you know Joe McConnell to
18  be an employee of FedEx?
19      A.   Yes.
20      Q.   Okay.  And did you report to
21  the Montgomery terminal?
22      A.   Yes.
23      Q.   Okay.  Who did you report to

Page 387

1  when you arrived at the terminal?
2      A.   I report -- I reported to -- I
3  believe it was to Stan, and that was when
4  he introduced me to Kent.
5      Q.   All right.  And did you
6  understand Kent to be an employee of
7  FedEx?
8      A.   Yes.
9      Q.   Did you have any knowledge to
10  what his job position was?
11      A.   I had been told he would be
12  the Home Delivery manager.
13      Q.   At any time were you required
14  to take a physical examination?
15      A.   Yes.
16      Q.   Who paid for the physical
17  examination?
18      A.   FedEx.
19      Q.   Okay.  Where was the physical
20  examination taken?
21      A.   In Montgomery.
22      Q.   Was it done by a doctor?
23      A.   Yes.

Page 388

1      Q.   Do you remember his or her
2  name?
3      A.   No, it was a gentleman that
4  done the physical, DOT physical.
5      Q.   All right.  Do you remember
6  where the physical was?
7      A.   Family Care Center.  I think
8  it was Family Care.  Family something off
9  of Vaughn Road.  Vaughn and Bell.
10      Q.   Okay.  What, if anything, did
11  you do once you reported to the FedEx
12  terminal in Montgomery, as instructed?
13      A.   Well, I was assigned to a
14  gentleman by the name of Ron, and I
15  learned that by reading transcripts to
16  ride with him for a day.
17      Q.   Who instructed you to do that?
18      A.   It was Joe.  Now, back up.
19  The day I reported to the terminal in
20  Montgomery, it was not Stan.  It was Joe.
21  I mean, this has been a long time.  It
22  was Joe that I reported to, and he
23  introduced me to Kent.

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 389

1    Q.    All right.  We've seen an
2 exhibit that was admitted in your
3 deposition during the course of your
4 deposition testimony today that was an
5 identification badge.  Do you recall
6 that?
7    A.    Yes.
8    Q.    Okay.  How was it you came to
9 have an identification badge?
10    A.    It was assigned to me from the
11 term -- terminal, in Montgomery.
12    Q.    By FedEx?
13    A.    By FedEx.
14    Q.    You've made mention of the
15 fact that you have some articles of
16 clothing --
17    A.    Yes.
18    Q.    -- that you called uniforms
19 that you were to wear as a -- do you have
20 these uniforms today?
21    A.    Yes, I do.
22    Q.    Okay.  Do they have FedEx
23 logos on them?

Page 390

1    A.    They have FedEx Home Delivery
2 on them.
3    Q.    Okay.  Who, if you know, paid
4 for those uniforms?
5    A.    FedEx.
6    Q.    Okay.  How did you come to
7 have those uniforms?
8    A.    They -- they were ordered from
9 the terminal.
10    Q.    Who ordered them?
11    A.    I believe it was Kent.
12    Q.    Okay.  Do you recall Exhibit
13 H --
14    A.    Yes.
15    Q.    -- that Mr. Spotswood showed
16 you?
17    A.    Yeah.
18    Q.    Okay.  And are those documents
19 that came from Stearns Bank regarding the
20 financing of your FedEx truck?
21    A.    Correct.
22    Q.    Okay.  I ask you to turn to
23 page two.  Can you identify this

Page 391

1 document, page two of the composite
2 Exhibit H?
3    A.    Yes.
4    Q.    Okay.  Does it identify who
5 the seller of the truck is?
6    A.    Yeah.  Yes, it does.
7    Q.    Can you tell me for the record
8 who the seller of the truck is?
9    A.    It says FedEx Home H --
10    Q.    All right.
11    A.    -- slash Montgomery, Alabama.
12    Q.    Okay.
13        MR. SPOTSWOOD:  I object to --
14 I think the record should be clear.  It
15 does say FedEx H slash Montgomery,
16 Alabama.
17        (Off-the-record discussion.)
18    Q.    (BY MR. NELMS:)  I'm going to
19 show you what's already been marked as
20 Defendant's Exhibit QQ.
21    A.    Yes.
22    Q.    And I believe you told us that
23 is a -- basically a diary that you've

Page 392

1 written regarding the events that
2 occurred related to FedEx, is that
3 correct?
4        MR. SPOTSWOOD:  Object to
5 leading.
6    A.    That's correct.
7    Q.    Tell me what QQ is, please,
8 for the record.
9    A.    It's a time line or diary of
10 events.
11    Q.    And, again, if you could tell
12 us was this diary written in one day, or
13 did you write it over a period of time?
14    A.    It was written over probably a
15 two-day period.
16    Q.    Okay.  Is it contemporaneous,
17 that is to say, did you write the events
18 down as they occurred?
19    A.    I done my best to do that,
20 yes, I did.
21        MR. SPOTSWOOD:  I -- I'm not
22 sure he understood your question.
23    Q.    I'm going to clarify that.

Page 393

1    **A.**  Okay.
2    **Q.**  What I'm asking is, as an
3 event would occur, would you write that
4 event down in this diary marked as QQ,
5 the very same day that the event
6 occurred?
7    **A.**  Oh, no.
8    **Q.**  Okay.
9    **A.**  No.
10    **Q.**  And you wrote the diary over
11 maybe a two-day period of time, right?
12    **A.**  Yes, two- to three-day period,
13 I would say.
14    **Q.**  Okay.  So, you used your
15 memory --
16    **A.**  Yes.
17    **Q.**  -- of the -- let me finish the
18 question.  So, you used your memory of
19 the events, and you wrote those events as
20 you remembered them down in this diary
21 marked as QQ?
22    **A.**  Right.
23    MR. SPOTSWOOD:  Object to

Page 394

1 leading.  You've got to give me a chance
2 to get in there, so just take your time.
3    MR. NELMS:  Yeah.
4    **Q.**  (BY MR. NELMS:)  The events
5 that give rise to the lawsuit that brings
6 us here today, Charlie, is your
7 recollection of those events greater
8 today than it was when you wrote the
9 diary marked as QQ?
10    MR. SPOTSWOOD:  Object to
11 leading, suggestive, vague.
12    **A.**  No.
13    **Q.**  Okay.  And I ask you to look
14 at what's been marked as Exhibit N.
15    **A.**  Yes.
16    **Q.**  Okay.  And I believe you've
17 already testified that that's a
18 transcript of a tape recording that you
19 made of the events related to FedEx, is
20 that correct?
21    **A.**  That's correct.
22    **Q.**  Okay.  And today is March the
23 16th, 2006, is that correct?

Page 395

1    **A.**  Correct.
2    **Q.**  Okay.  And if you will, please
3 tell us again when did you record this
4 audiotape that the transcript is made
5 from?
6    **A.**  It would have been the latter
7 part of May of 2005 or the first of June.
8    **Q.**  From your experience related
9 to your personal memory of any event,
10 does your memory get weaker over a period
11 of time?
12    MR. SPOTSWOOD:  Object to
13 leading, vague.  I'd also note for the
14 record that on page 53 of Exhibit N he
15 says it's the 19th.  He's already
16 testified it was done the 19th of May.
17    **Q.**  He's going to do this the
18 whole time, just let him speak, and when
19 he finishes, answer my question.
20    **A.**  Would you ask me the question
21 again, please, sir?
22    **Q.**  Does your memory fade over a
23 period of time?

Page 396

1    MR. SPOTSWOOD:  Object to
2 leading.
3    **A.**  Some things; some things no.
4    **Q.**  Okay.  Would you say that your
5 recollection of the events that bring us
6 here today and the transcript that you
7 made that's marked here as N is greater
8 today or less today in detail than it was
9 when you made this transcript?
10    MR. SPOTSWOOD:  I object to
11 the form.
12    **A.**  As far as recall, some things
13 are very fresh.  There are some things
14 that, after looking at this, it brings it
15 back to my memory.
16    **Q.**  Okay.  That's not my question.
17    **A.**  Okay.
18    **Q.**  Is your memory of the events
19 greater today, or was it greater on the
20 day that you made the tape?
21    **A.**  It was greater on the day that
22 I made the --
23    MR. SPOTSWOOD:  I'm sorry,

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 397

1 because of the quick answer, I meant to
2 object to the form of that.
3          MR. NELMS:  Too late.
4          MR. SPOTSWOOD:  Too late.
5          MR. NELMS:  All right.
6          MR. SPOTSWOOD:  Please note
7 for the record that Mr. Nelms just yelled
8 at me and is being abusive to the
9 opponent.
10          MR. NELMS:  And I'm
11 threatening to throw things at him, too.
12          (Off-the-record discussion.)
13     Q.    (BY MR. NELMS:)  I ask you to,
14 again, look at what's been marked as
15 Defendant's Deposition Exhibit WW, and --
16     A.    Yes.
17     Q.    -- ask you if you recognize
18 that document?
19     A.    Yes.
20     Q.    Okay.  And what is it?
21     A.    It's from Stearns Bank
22 Equipment Finance Division.
23     Q.    I ask you to turn to page two

Page 398

1 of the exhibit, and does it indicate --
2 does it -- first of all, what is page
3 two?
4     A.    Conditional sales contract.
5     Q.    Okay.  Does it indicate who
6 the seller of the ve -- of the truck is?
7     A.    Yes.
8     Q.    Who?
9     A.    FedEx H slash Montgomery,
10 Alabama.
11     Q.    Okay.  I'll ask you to look at
12 what is page nine of this composite
13 exhibit and describe for us what this is.
14     A.    It's a bill of sale.
15     Q.    Does it indicate who the '
16 seller is?
17     A.    Yes, it does.
18     Q.    Who does it say is the seller?
19     A.    FedEx Ground.
20     Q.    Okay.  Does it give an
21 address?
22     A.    Yes.
23     Q.    What is the address?

Page 399

1     A.    1000 FedEx Drive, Moon
2 Township, Pennsylvania.
3     Q.    Okay.  I note that at the top
4 of page nine of this Exhibit WW that
5 there is some -- some lettering that
6 looks to me like it came from a fax
7 machine.  Do you see that?
8     A.    Yes.
9     Q.    Okay.  Does it indicate from
10 whom this document was faxed?
11     A.    Yes, it does.
12     Q.    Okay.  And is there a
13 telephone number there, what looks like a
14 telephone number there?
15     A.    Yes.
16     Q.    Okay.  And is the area code
17 412?
18     A.    Correct.
19     Q.    All right.  Do you have any
20 knowledge of what area code -- what area
21 412 belongs to?
22     A.    No.
23     Q.    I ask you to look at page ten

Page 400

1 of the Exhibit WW, please, and tell me
2 what that is.
3     A.    It's a certificate of origin
4 for a vehicle.
5     Q.    Okay.  And I ask you to turn
6 the page to 11, please.  And describe for
7 us what this is, if you can.
8     A.    It is the origin of the
9 vehicle.
10     Q.    The back side of the --
11     A.    Well, the back side, I guess.
12     Q.    Okay.  Does it indicate who
13 the seller is on this title?
14     A.    Yes.
15     Q.    Tell us, please.
16     A.    FedEx Ground Package Systems,
17 Incorporated.
18     Q.    Does it give an address?
19     A.    Yeah.
20     Q.    Can you tell us what the
21 address is?
22     A.    1000 FedEx Drive, Moon
23 Township, PA.

## Page 401

1  MR. NELMS:  That's it.  If
2  you've got anything else, go ahead.
3  MR. SPOTSWOOD:  I do not,
4  subject to what we discussed previously
5  regarding any additional documents that
6  come in from Stearns regarding the sale
7  of the vehicle.
8
9  REEXAMINATION BY MR. SPOTSWOOD:
10  Q.   I do want to ask just one last
11  question, and that is, do you have any
12  other documents that in any way relate to
13  the matters that we've been talking about
14  for the last day and a half?
15  MR. NELMS:  Objection, vague.
16  A.   No, sir, I have no documents.
17  All I have is -- all I have is the
18  uniforms.
19  Q.   All right.  And you reviewed,
20  I assume, the request for production of
21  documents in the case?
22  MR. NELMS:  Objection,
23  leading.

## Page 402

1  MR. SPOTSWOOD:  I'm allowed to
2  lead.  You're not.
3  MR. NELMS:  Actually what are
4  you calling him, a hostile witness?
5  MR. SPOTSWOOD:  I think I am
6  certainly allowed to lead the plaintiff,
7  and, yes, as to me, he's quite hostile.
8  MR. NELMS:  Okay.
9  Q.   As a matter of law.  I don't
10  mean to suggest you've been hostile, sir.
11  You're just on the other side of the V in
12  a piece of litigation.
13  A.   What was the question again,
14  Bob?  I'm sorry.
15  Q.   Well, let me just be specific
16  with you.  We have a request for
17  production of documents that I previously
18  showed you.
19  A.   Yes.  Oh, yes.
20  Q.   And it's Exhibit J.  And it
21  has a number of requests for information,
22  and I just want to be certain that you
23  don't have anything else at home or on a

## Page 403

1  bookshelf that's responsive to that?
2  A.   I have nothing.  I have
3  absolutely nothing other than uniforms.
4  MR. SPOTSWOOD:  I would say
5  that I think that it's fairly within the
6  issues embraced here with respect to
7  damages and the request for any documents
8  that we see the lease/purchase documents
9  that we talked about in connection with
10  the Chilton County house since he's
11  claiming damages in connection with that.
12
13  REEXAMINATION BY MR. NELMS:
14  Q.   Have you got any documents
15  relating to the lease of the house up in
16  Chilton County?
17  A.   Yeah.  They were drawn up.
18  Q.   Did you use a lawyer for that?
19  A.   Yes, I did.  McAnnally in
20  Millbrook.
21  Q.   Gary?
22  A.   Gary.
23  Q.   Do you have like a closing

## Page 404

1  package or something?
2  A.   Yeah.  In his envelope, the
3  whole nine yards.
4  Q.   Okay.  Do you have any strong
5  objection to him seeing that?  I mean,
6  you've told him all the terms already.
7  A.   No, I have no problem with
8  that.  It's just --
9  MR. SPOTSWOOD:  I'd just like
10  you to get those documents together and
11  send them along, and then whenever the
12  Stearn documents come in, send those
13  along.
14  A.   May I ask a question?
15  MR. SPOTSWOOD:  Yes, sir.
16  A.   What -- what is the purpose of
17  that?  I mean --
18  MR. NELMS:  Well, he said just
19  a while ago, part of your claim is you
20  had to sell your house because you
21  couldn't afford to make the payments.
22  A.   Right.  Well, I was talking
23  about the full value of the house.  I'm

Page 405

1    just -- yeah, like I said, the house was
2    appraised for 80 something thousand, and,
3    you know, I'm -- I'm -- I ain't gained
4    anything, but I have no problem with the
5    paperwork. I'll be --
6
7    REEXAMINATION BY MR. SPOTSWOOD:
8       Q.   Right. And as I understood
9    your testimony, basically what you're
10   saying is that you think that you took
11   out a mortgage of roughly $60,000, so you
12   got $60,000 in your pocket on the house?
13      A.   Right.
14      Q.   And because of the financial
15   situation, you couldn't keep the payments
16   up, so you may wind up in basically, if I
17   understand what you testified to, you
18   might wind up selling the house to these
19   people because of the circumstances you
20   were in for $20,000 less than you
21   consider the value of the house to be
22   because of the appraisal?
23      A.   Correct.

Page 406

1       MR. NELMS: And you said that
2    the people that bought it were cousins?
3       A.   Yes, she is a cousin. She is
4    a -- they are the only ones I had make me
5    an offer on the house.
6       Q.   Did you put an ad in the
7    newspaper for the house?
8       A.   I did not put an ad in the
9    newspaper.
10      Q.   Did you --
11      MR. NELMS: Did you have a
12   realtor.
13      A.   No. I do not have a realtor.
14      Q.   In view of that, how do you
15   know you couldn't sell your house for
16   $80,000 to somebody?
17      MR. NELMS: Is that question
18   on the record?
19      MR. SPOTSWOOD: Yes.
20      MR. NELMS: Object. Go ahead.
21      A.   I had it on the market for a
22   while.
23      Q.   During what period?

Page 407

1       A.   That was before my son --
2    well, my son actually was living in it,
3    and it was before he moved out, and I
4    had -- I -- the location -- it's in the
5    country. I had no inquirers on the house
6    whatsoever.
7       Q.   Do you remember what year you
8    would have advertised it? Would that
9    have been '04? You told me your dad died
10   in '03.
11      A.   Yeah. I do not recall if it
12   was '04 or '05.
13      MR. NELMS: Are you done?
14      Q.   (BY MR. SPOTSWOOD:) Well, I
15   think -- I didn't hear the name of this
16   borrower or purchaser. I just want to
17   make -- remember we were asking about
18   relatives in the Middle District of
19   Alabama. Is Chilton County in the Middle
20   District?
21      MR. NELMS: I think so.
22      Q.   Are there any other relatives
23   that you haven't mentioned to me that

Page 408

1    reside in the Middle District, those
2    counties that we talked about earlier
3    heading all the way down?
4       A.   Just in Chilton County.
5       Q.   Okay. Do you have some other
6    relatives in Chilton County?
7       A.   I have some cousins there.
8       Q.   Can you tell us who they are?
9       A.   I know there's --
10      MR. NELMS: Keep going.
11      A.   Lona Mitchell.
12      Q.   How old is Lona?
13      A.   She's in her forties. I would
14   assume. I don't really know. I'm
15   assuming she's in her forties.
16      Q.   All right. Anyone else?
17      A.   And I have some cousins on my
18   mother's side that I have not seen for
19   years. I have no contact with them.
20      Q.   Okay. Names, last names?
21      A.   Their last name is Brasher,
22   and, like I say, it's been years.
23      MR. NELMS: It is in the

Tyler Eaton Morgan Nichols & Pritchett Inc.

Page 409

1  Middle.
2      Q.   All right.  Anyone else you
3  can think of?
4      A.   That's it.
5          MR. SPOTSWOOD:  All right,
6  sir.  Thank you very much.
7
8  REEXAMINATION BY MR. NELMS:
9      Q.   Why did you not advertise that
10  home for sale?
11      A.   Because when my son moved out,
12  I was already -- I already had to pick up
13  the payments on the house, and it was a
14  struggle then, and Lona and Keith came
15  along -- they knew my situation.  They
16  knew my situation, and they said we'll --
17  they made me an offer.  They said, hey,
18  what -- you know, we'll -- didn't make me
19  an offer.  What they said we'll -- if you
20  want to get rid of the house, we will do
21  this, if you can do this.
22      Q.   And you've already testified
23  the --

Page 410

1      A.   And I just --
2      Q.   You've already testified what
3  they did was they took over the payments?
4      A.   Yes, they took over the
5  payments.  I knew that I could not --
6  needed to get rid of the home as soon as
7  possible.  I could not let it go two or
8  three months down the road sitting on the
9  market making payments on that home.
10      Q.   Why didn't you contract with a
11  realtor for the sale of the home?
12      A.   Because it would take a period
13  of time.  It would not sell Johnny on the
14  spot.  It didn't before when Charlie was
15  in it, and I felt like it would not sell
16  because of the location.
17          MR. NELMS:  Thank you.  On the
18  record, do you want to state that we've
19  agreed to hold open?
20          MR. SPOTSWOOD:  Well, I think
21  we've agreed that, you know, we can go
22  ahead and use the deposition as we see
23  fit in view of the upcoming deadlines,

Page 411

1  but if there is additional testimony
2  that's required based upon the Stearns
3  documents that have not come in that, you
4  know, we both reserve the right to deal
5  with those issues.
6          MR. NELMS:  That's our
7  agreement.
8          MR. SPOTSWOOD:  Okay.
9          MR. NELMS:  We're concluded.
10          MR. SPOTSWOOD:  Yes, sir.
11  (Said deposition was in recess
12  at 3:44 p.m. until 3:54 p.m.,
13  after which the following
14  occurred:)
15  (Whereupon, Defendant's
16  Exhibit AAA was marked for
17  identification.)
18          MR. NELMS:  Present it to him
19  and let him identify it, and that will be
20  it.
21      Q.   (BY MR. SPOTSWOOD:)  Mr.
22  Thornton, Exhibit AAA, is that a copy of
23  the bill of sale that you signed which

Page 412

1  sets forth the -- and reflects the
2  transfer of ownership of your van to the
3  buyer known, listed here as Daniel Wayne
4  Goode, G-O-O-D-E?
5      A.   Yes, sir.
6      Q.   And you signed that document?
7      A.   Yes, sir.
8      Q.   And it's dated May the 25th of
9  2005, is that correct?
10      A.   That's correct.
11      Q.   And that's the date that you
12  signed it?
13      A.   Yes, sir.
14      Q.   And the purchase price as
15  reflected on this bill of sale is
16  $35,763.30, correct?
17      A.   Correct.
18      Q.   And that is, in fact, what you
19  transferred the ownership interest for
20  was that amount of money?
21      A.   Correct.
22          MR. SPOTSWOOD:  Thank you.
23

Page 413

1  FURTHER THE DEPONENT SAITH NOT
2
3  (Said deposition was concluded
4  at 3:55 p.m. on the 16th day
5  of March, 2006.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 414

1  C E R T I F I C A T E
2
3
4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)
6
7       I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotypy, and the
10  questions and answers thereto were
11  reduced to typewriting under my
12  supervision, and that the foregoing
13  represents a true and correct transcript
14  of the deposition given by said witness
15  upon said hearing.
16       I further certify that I am
17  neither of counsel nor of kin to the
18  parties to the action, nor am I in
19  anywise interested in the result of said
20  cause.
21
22
23     COMMISSIONER - NOTARY PUBLIC