EXHIBIT 1 (A)

# In The Matter Of:

## CHARLIE THORNTON
### v.
## FEDEX GROUND PACKAGE SYSTEM

---

## CHARLIE THORNTON
## March 15, 2006

---



**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO:  2:05-CV-00656-DRB

CHARLIE THORNTON,
        Plaintiff,
vs.
FEDEX GROUND PACKAGE SYSTEM, INC.,
        Defendant.


DEPOSITION
OF
CHARLIE THORNTON
15TH DAY OF MARCH, 2006


TAKEN BEFORE:  Gary N. Morgan
        Registered Professional
        Reporter and Notary Public

---

**Page 2**

1          S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED,
3    by and between the parties, through their
4    respective counsel, that the deposition
5    of CHARLIE THORNTON may be taken before
6    Gary N. Morgan, Commissioner, Registered
7    Professional Reporter and Notary Public,
8    State at Large;
9          That the signature to and
10   reading of the deposition by the witness
11   is waived, the deposition to have the
12   same force and effect as if full
13   compliance had been had with all laws and
14   rules of Court relating to the taking of
15   depositions;
16          That it shall not be necessary
17   for any objections to be made by counsel
18   to any questions, except as to form or
19   leading questions, and that counsel for
20   the parties may make objections and
21   assign grounds at the time of trial, or
22   at the time said deposition is offered in
23   evidence, or prior thereto.

---

**Page 3**

1          A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4      Mr. K. Anderson Nelms
5      Attorney at Law
6      Law Offices of Jay Lewis, LLC
7      847 South McDonough Street
8      P. O. Box 5059
9      Montgomery, Alabama 36104
10
11   FOR THE DEFENDANT:
12     Messrs. Robert K. Spotswood and
13         John. R. Parker, Jr.
14     Attorneys at Law
15     Law Offices of Robert K. Spotswood
16     Suite 940
17     2100 Third Avenue North
18     Birmingham, Alabama 35203
19
20   OTHERS PRESENT:
21     Mr. Kent Gastineau
22
23

---

**Page 4**

1          I N D E X
2            PAGE:
3
4
5    EXAMINATION BY MR. SPOTSWOOD          6
6
7
8    Exhibit A              48
9    Exhibit G              61
10   Exhibit B              66
11   Exhibit C              72
12   Exhibit D              83
13   Exhibits E and F          87
14   Exhibit O              97
15   Exhibit R              107
16   Exhibit N              113
17   Exhibits S and T          119
18   Exhibit U              127
19   Exhibit V              132
20   Exhibit X              158
21   Exhibit Y              159
22   Exhibit W              163
23   Exhibit L              187

1 (Pages 1 to 4)

Tyler Eaton Morgan Nichols & Pritchett Inc.

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 5

1           I N D E X (Continued)
2
3     Exhibit Z              192
4     Exhibit H              228
5     Exhibit AA             232
6     Exhibit BB             233
7     Exhibit CC             233
8     Exhibit DD             234
9     Exhibit EE             235
10    Exhibit FF             237
11    Exhibit GG             239
12    Exhibit HH             240
13    Exhibit II             241
14    Exhibit JJ             242
15    Exhibit KK             243
16    Exhibit LL             244
17    Exhibit MM             245
18    Exhibit M              246
19    Exhibit NN             252
20
21
22
23

Page 7

1     Parker, I represent FedEx Ground in
2     connection with the lawsuit that you have
3     filed against it. We're here today for
4     the purpose of taking your deposition.
5     Have you ever had a deposition taken
6     before?
7         A.   One other time.
8         Q.   Okay. And, so, what's going
9     to happen here, and I'm sure this is
10    familiar with you since you've been
11    deposed before, is that I'm going to ask
12    questions, you're going to give me
13    answers. It makes the process a lot
14    easier if you'll take your time with me
15    and I'll take my time with you, and
16    specifically I mean let me finish my
17    question before you give an answer. It's
18    also very important for you to answer out
19    loud with words rather than with a nod of
20    the head or a huh-uh or a uh-huh because
21    that's all subject to interpretation, so
22    please speak up.
23         If at any time during the

Page 6

1          I, Gary N. Morgan, a
2     Registered Professional Reporter of
3     Birmingham, Alabama, and a Notary Public
4     for the State of Alabama at Large, acting
5     as Commissioner, certify that on this
6     date, as provided by the Federal Rules of
7     Civil Procedure of the United States
8     District Court, and the foregoing
9     stipulation of counsel, there came before
10    me at 847 South McDonough Street,
11    Montgomery, Alabama, on the 15th day of
12    March, 2006, commencing at 9:33 a.m.,
13    CHARLIE THORNTON, witness in the above
14    cause, for oral examination, whereupon
15    the following proceedings were had:
16
17       CHARLIE THORNTON,
18    being first duly sworn, was examined and
19    testified as follows:
20
21    EXAMINATION BY MR. SPOTSWOOD:
22        Q.   Mr. Thornton, my name is Bob
23    Spotswood, and, together with J. R.

Page 8

1     course of the day today you have any need
2     for a break, just let us know that, and
3     we'll do whatever you need to do or take
4     a break. If at any time you don't
5     understand any of my questions, it's okay
6     for you to say you don't understand the
7     question. I want you to understand what
8     I'm asking you is the point.
9          If, in the course of the
10    deposition, you think later after you've
11    answered a question that you've got an
12    additional answer you want to give, you
13    want to clarify something that you said,
14    it's okay to bring it up later. I'm
15    trying to get a full story, as you'll see
16    today, about why we're here and in this
17    litigation, so I want you to feel free
18    to, you know, if you've forgotten about
19    something, to come along later and
20    supplement what you said.
21         Are you on any medications of
22    any kind today?
23        A.   The only thing I take is

2 (Pages 5 to 8)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 9

1 something for hypertension.
2 **Q.** And what would that be? I
3 take some of those myself.
4 **A.** It's Uretic I think is the
5 name of it.
6 **Q.** Okay.
7 **A.** It's a very -- it's a low
8 blood pressure tablet.
9 **Q.** Okay. And I'm sitting here
10 looking at you. You look perfectly lucid
11 to me. You're not under the influence of
12 any kind of drugs or alcohol or anything
13 like that that would keep you from
14 answering --
15 **A.** That's correct.
16 **Q.** -- properly and truthfully?
17 And tell us your full name, please, sir.
18 **A.** Charlie Edward Thornton, Sr.
19 **Q.** Where do you live, Mr.
20 Thornton?
21 **A.** 75 Pine Court, Millbrook,
22 Alabama.
23 **Q.** What county is that located

Page 10

1 in?
2 **A.** Elmore.
3 **Q.** What's your date of birth?
4 **A.** 2/7/56.
5 **Q.** What is your place of birth?
6 **A.** Phoenix, Arizona.
7 **Q.** How long have you lived in
8 Alabama?
9 **A.** Since '64.
10 **Q.** Tell me your educational
11 background.
12 **A.** High school, one year of
13 college.
14 **Q.** Where did you go to college?
15 **A.** Isabella High School.
16 **Q.** Where is that located?
17 **A.** Chilton County.
18 **Q.** Where did you go to college?
19 **A.** George C. Wallace. That's in
20 Selma, Alabama.
21 **Q.** That's the community college
22 over there?
23 **A.** Yes, it is.

Page 11

1 **Q.** And what was your course of
2 study at the George C. Wallace Community
3 College?
4 **A.** Electronics.
5 **Q.** Are you married?
6 **A.** Yes, I am.
7 **Q.** What's your wife's name?
8 **A.** Debbie.
9 **Q.** How long have you been married
10 to Debbie?
11 **A.** Eight years.
12 **Q.** Is she employed?
13 **A.** Yes, she is.
14 **Q.** Where does she work?
15 **A.** State Farm Insurance. She's
16 an agent.
17 **Q.** What kind of insurance
18 products does she sell?
19 **A.** Life, health, property and
20 casualty, auto. I guess the whole gamut.
21 **Q.** And where is her office
22 located?
23 **A.** It's on the northern bypass

Page 12

1 here in Montgomery. I don't know the
2 exact address.
3 **Q.** How long has she been a State
4 Farm agent?
5 **A.** With State Farm a year -- a
6 little over a year.
7 **Q.** And before she was a State
8 Farm agent, what did she do by way of
9 employment?
10 **A.** She was in the insurance
11 business.
12 **Q.** And who did she work for?
13 **A.** AIG, American General.
14 **Q.** Yes. What kind of insurance
15 products did she sell for AIG?
16 **A.** Life and health.
17 **Q.** And how long had she worked
18 for AIG before she moved over to State
19 Farm?
20 **A.** I would say a year and a half
21 or so.
22 **Q.** Okay. And what did she do
23 for employment before AIG?

3 (Pages 9 to 12)

Page 13

1    **A.**    She worked for Regions Bank.
2    **Q.**    What was her job with Regions?
3    **A.**    She worked in mortgage
4  finance.  I don't know what her title was
5  in mortgage finance.
6    **Q.**    Did she sell mortgages?
7    **A.**    I could not tell you.  I do
8  not know.
9    **Q.**    Which location of Regions did
10  she work at?
11    **A.**    Downtown, Montgomery.
12    **Q.**    All right.  And how long did
13  she work for Regions?
14    **A.**    21 years.
15    **Q.**    So, did she retire from
16  Regions then?
17    **A.**    Somewhat, yeah.
18    **Q.**    What was the circumstances of
19  her leaving Regions?
20    **A.**    I had -- I had opened up a --
21  a business, and she just -- she wanted a
22  break from that, plus our first
23  grandchild was born, and she wanted to

Page 14

1  spend time.
2    **Q.**    She basically resigned her
3  job, I guess, at Regions, is that
4  correct?
5    **A.**    Yeah, I would think so, yeah.
6    **Q.**    And what was the business that
7  you had opened?
8    **A.**    It was a security business.
9    **Q.**    What kind of security services
10  did you provide?
11    **A.**    Home -- well, residential and
12  business.
13    **Q.**    What was the name of the
14  company?
15    **A.**    It was American Shield.
16    **Q.**    Is that a sort of a franchise
17  operation or --
18    **A.**    No, sir.
19    **Q.**    It was your own --
20    **A.**    Yes.
21    **Q.**    -- company?  And American
22  Shield, was it a partnership, a
23  corporation, a LLC?  What was the

Page 15

1  structure of it?
2    **A.**    It was a LLC.
3    **Q.**    And who had an interest in
4  American Shield other than you?  Your
5  wife, did she have an ownership interest
6  in it apart from, you know, you?
7    **A.**    No.
8    **Q.**    Okay.  Did you have any other
9  employees?
10    **A.**    Yes.
11    **Q.**    How many employees did you
12  have?
13    **A.**    Approximately, 10 to 15.
14    **Q.**    When did you open the doors on
15  American Shield?
16    **A.**    I don't actually recall.
17    **Q.**    Can you give me a year?  From
18  the sounds of it, it must have been
19  like '90 -- 2002 maybe, if that coincides
20  with your wife's departure from Regions?
21    **A.**    It may have -- 2002, 2000 --
22  latter part of 2001.
23    **Q.**    Okay.  And did you later sell

Page 16

1  that business?
2    **A.**    No, we dissolved the business.
3    **Q.**    When did you dissolve the
4  business?
5    **A.**    I do not recall the date of
6  that.
7    **Q.**    Do you recall what year it
8  was?
9    **A.**    No, I do not.
10    **Q.**    You don't know if it was
11  in '04, '03 or --
12    **A.**    Not an accurate date, I surely
13  do not.
14    **Q.**    Okay.  What caused you to
15  dissolve the American Shield business?
16    **A.**    It -- we had some problems
17  within the business.  It just wasn't
18  profitable.
19    **Q.**    Can you be a little bit more
20  specific about what caused its demise?
21    **A.**    Not really.  There was some --
22  some -- well, there were some situations
23  that it -- it just -- as far as money, as

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

**Page 17**

1  far as the profitability of the business.
2  **Q.**  Right.
3  **A.**  It just did not -- it just was
4  not profitable, you know, as far as the
5  bottom line, and we just decided it would
6  be more feasible economically to close
7  the business.
8  **Q.**  Did you put it into
9  bankruptcy?
10  **A.**  No, no.
11  **Q.**  Did you pay off all of your
12  creditors?
13  **A.**  Yes, we did.
14  **Q.**  You've been married to Debbie
15  for eight years?
16  **A.**  Yes.
17  **Q.**  Were you married prior to your
18  marriage to Debbie?
19  **A.**  Yes.
20  **Q.**  How many times have you been
21  married total?
22  **A.**  Twice.
23  **Q.**  What is your first wife's

**Page 18**

1  name?
2  **A.**  Sue -- Sue.
3  **Q.**  And what is her current full
4  name now?
5  **A.**  I do not know.
6  **Q.**  And what was her maiden name?
7  **A.**  Hammond.
8  **Q.**  H-A-M-M-O-N-D?
9  **A.**  Correct.
10  **Q.**  And do you know where she
11  lives?
12  **A.**  Mississippi.
13  **Q.**  Do you know where in
14  Mississippi?
15  **A.**  No, I do not.
16  **Q.**  Do you know if she works?
17  **A.**  I do not.
18  **Q.**  When were you divorced from
19  Sue?  What approximate year?
20  **A.**  '94.
21  **Q.**  You mentioned that you gave a
22  deposition previously.  Was that in
23  connection with that divorce?

**Page 19**

1  **A.**  No.
2  **Q.**  Okay.  And you have how many
3  children?
4  **A.**  I have four biological, and I
5  have two stepchildren.
6  **Q.**  And can you tell me the names
7  and approximate ages of the four
8  biological children?
9  **A.**  Charlie, Jr. is 27.  I hope I
10  get this right.
11  **Q.**  Oh, good.  That's good.  Do
12  your best.
13  **A.**  Seth is 24.  Andy is 18.
14  Shelby is 14.  My stepdaughter, Tammy,
15  she's 32.
16  **Q.**  Yes.
17  **A.**  And my stepson is Justin.
18  He's 23.
19  **Q.**  Where is Charlie living these
20  days, Charlie, Jr.?
21  **A.**  Charlie lives in -- he lives
22  in Chilton County.
23  **Q.**  What's he doing up there?

**Page 20**

1  **A.**  He does construction.
2  **Q.**  And what about Seth, same
3  question?
4  **A.**  Seth is in the military.
5  **Q.**  Where is he right now?
6  **A.**  Fort Hood, Texas.
7  **Q.**  And Andy, your 18-year-old?
8  **A.**  Andy is home with his mom.
9  **Q.**  In Mississippi?
10  **A.**  Yes.
11  **Q.**  And you don't know where that
12  is?
13  **A.**  I don't recall the name of the
14  town.
15  **Q.**  Do you talk to Andy every now
16  and then?
17  **A.**  Yes, I do.
18  **Q.**  When was the last time you saw
19  Andy?
20  **A.**  Two weeks ago.
21  **Q.**  I take it that was here and
22  not Mississippi, then?
23  **A.**  That's correct.

5 (Pages 17 to 20)

Tyler Eaton Morgan Nichols & Pritchett Inc.

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 21

1    **Q.**    And did he drive over here to
2    see you?
3    **A.**    Yes.
4    **Q.**    What about Shelby, where does
5    she live?
6    **A.**    That's a he.
7    **Q.**    I'm sorry.
8    **A.**    He lives with his mother also.
9    **Q.**    And you don't know the town
10   where either of these two children live?
11   **A.**    No, sir, I do not.
12   **Q.**    Do you have a phone number for
13   their residence where you would call
14   them?
15   **A.**    Yes, I do.
16   **Q.**    What's that phone number?
17   **A.**    I do not recall that number.
18   I don't have it memorized.
19   **Q.**    Do you recall the area code?
20   **A.**    I'm sorry?  What was the
21   question?
22   **Q.**    Do you recall the area code
23   where --

---

Page 22

1    **A.**    601.
2    **Q.**    Is it north Mississippi,
3    central Mississippi, southern
4    Mississippi?
5    **A.**    It's in -- around the
6    Hattiesburg area.
7    **Q.**    But it's not in the city of
8    Hattiesburg; it's just near Hattiesburg?
9    **A.**    Right.
10   **Q.**    Do you know where your kids go
11   to high school?
12   **A.**    I do not.
13   **Q.**    Your case is pending here in
14   the Middle District of Alabama which, if
15   my understanding is correct, basically
16   covers Montgomery County, places east of
17   Montgomery County and east of 65 going
18   south.  My question to you is do you have
19   any relatives -- I don't care if they are
20   aunts or uncles or cousins or what have
21   you -- living in Montgomery County or any
22   of those other counties I just mentioned
23   to you geographically?

---

Page 23

1            MR. NELMS:  To help you out,
2    that would also be Elmore and Autauga
3    Counties.  So, you're talking Autauga,
4    Elmore, Montgomery and then everything
5    east of 65 all the way down to the state
6    line in Florida.
7            MR. SPOTSWOOD:  Yes.
8            MR. NELMS:  And then 85 all
9    the way out to the Chattahoochee River,
10   and then north of 85 all the way up to
11   Tallapoosa.
12   **Q.**    You've got a better
13   understanding of the counties in the
14   Middle District than I do.
15           MR. NELMS:  Well, it's my
16   district, though.
17           MR. SPOTSWOOD:  I appreciate
18   it.
19   **A.**    I do not.  I do not have any
20   relatives.
21           MR. NELMS:  Brothers, aunts,
22   sisters, brothers.
23   **A.**    I have no sisters, no

---

Page 24

1    brothers.  I only have one living aunt on
2    my dad's side.  She lives in Chilton
3    County, but I don't think that -- does
4    it?
5            MR. NELMS:  Yeah, Chilton
6    County is part too.
7    **A.**    All right.  Well, I have one
8    aunt.
9    **Q.**    What's her name?
10   **A.**    Beatrice Cagle.
11   **Q.**    How do you spell that?
12   **A.**    B-E-A-T-R-I-C-E.
13   **Q.**    It's the Cagle part that I'm
14   having trouble with.
15   **A.**    Oh, C-A-G-L-E, I assume.
16           MR. NELMS:  I'm one quarter
17   Cagle.
18   **A.**    All right.
19           MR. NELMS:  That's how you
20   spell it.
21   **A.**    Thank you.
22           MR. NELMS:  My maternal
23   grandmother.

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 25

1      **A.**   Really.
2      **Q.**   How about your spouse, does
3   Debbie have any relatives in these areas
4   we've been talking about?
5      **A.**   No.  Her relatives are in
6   Tallahassee, Florida.  Other than my
7   step -- stepchildren.
8      **Q.**   Right.  Right.  And Justin,
9   what is Justin's last name?
10     **A.**   Seithalil.
11     **Q.**   How do you spell that?
12     **A.**   I have not -- I -- let's see.
13   Let me look.
14          MR. NELMS:  You already have a
15   copy of his driver's license, right?
16          MR. SPOTSWOOD:  I think I do,
17   yes.
18          MR. PARKER:  At least the
19   front of the driver's license we do have.
20     **A.**   It's S-E-I-T-H-A-L-I-L.
21     **Q.**   And your 32-year-old, I wrote
22   it down, but I'm having a hard time
23   reading what I wrote down.  What is --

Page 26

1          MR. PARKER:  I didn't get it.
2      **Q.**   -- your 32-year-old's name?
3      **A.**   Lewis -- oh, first name?
4      **Q.**   Yeah.
5      **A.**   Tammy.
6      **Q.**   So, it's Tammy Lewis?
7      **A.**   Yes.
8      **Q.**   And what is Tammy -- is Tammy
9   married?
10     **A.**   Yes, she is.
11     **Q.**   What's her husband's name?
12     **A.**   Steve.
13     **Q.**   And where do Steve and Tammy
14   live?
15     **A.**   They live in Millbrook.
16     **Q.**   Okay.  What do they do for
17   employment up there?
18     **A.**   Steve is a fireman with the
19   Montgomery Fire Department.
20     **Q.**   Yes.
21     **A.**   And Tammy is a pediatric
22   nurse.
23     **Q.**   Does she work in Montgomery?

Page 27

1      **A.**   She's not working at this time
2   because the -- her kids are small.
3      **Q.**   Okay.
4      **A.**   And she's home with them.
5      **Q.**   Right.  And how about Justin,
6   is he married?
7      **A.**   No.
8      **Q.**   What is Justin doing?
9      **A.**   He works in the State Farm
10   office where my wife works.
11     **Q.**   Okay.  Just out of curiosity,
12   you know the State Farm offices, do they
13   have a defined geographic area that they
14   serve, or do they have an exclusive
15   territory, or are they out there
16   competing with each other, those various
17   State Farm offices?
18     **A.**   I really -- I can't answer
19   that.  I do not know.
20     **Q.**   Okay.
21     **A.**   I don't know.
22     **Q.**   But she's on the bypass, you
23   say?

Page 28

1      **A.**   She's on the northern bypass.
2   The agent's name that owns it is Willie
3   Durham.  I do not know the address.
4      **Q.**   Okay.  Thank you.  Are you
5   attending church at this time?
6      **A.**   Yes, I am.
7      **Q.**   And where do you attend
8   church?
9      **A.**   Camellia Baptist Church.
10     **Q.**   Where is that located?
11     **A.**   In Prattville.
12     **Q.**   And what's the name of the
13   pastor there?
14     **A.**   Glenn Brock.
15     **Q.**   What's your involvement there?
16     **A.**   As much as possible.
17     **Q.**   What do you do there?
18     **A.**   Well, I'm just a -- I'm a
19   member there.
20     **Q.**   Right.  But, obviously, based
21   on your prior answer, you do other things
22   and you contribute time, I take it, to
23   other activities.  That's what I'm trying

7 (Pages 25 to 28)

Page 29

1  to --
2      **A.**  Sure.  It's just according to
3  what activities are within the church.
4  I'm not a Sunday School teacher or
5  anything like that.
6      **Q.**  Do you spend time there during
7  the week on various church-related
8  things?
9      **A.**  We do.
10     **Q.**  How many hours a week would
11  you spend at the church-related
12  activities?
13     **A.**  Well, I don't -- I really
14  don't know how many hours per week.
15     **Q.**  More than 10?
16     **A.**  Probably at least 10 to 15.
17     **Q.**  Are you involved in any other
18  community activities outside of the
19  church?
20     **A.**  No, not really unless it's
21  something to do with my -- my grandson's
22  playing sports, you know, when that's
23  in -- in session.

Page 30

1      **Q.**  Right.  Have you ever gone by
2  any name other than Charlie Thornton?
3      **A.**  No, sir.
4      **Q.**  I want to quickly get a handle
5  on what property and investments you own
6  at the present time.  Do you own your
7  home?
8      **A.**  Yes, I do.
9      **Q.**  And you gave me the address of
10  that, I think, if I remember correctly?
11     **A.**  Yes, sir.
12     **Q.**  And is your house subject to a
13  mortgage at this time?
14     **A.**  No, sir.
15     **Q.**  All right.  And could you
16  describe your home for me?
17     **A.**  I really don't understand the
18  question.
19     **Q.**  I mean, is it a three bedroom,
20  split level, six bedroom, whatever?
21     **A.**  Okay.  It's a four-bedroom on
22  a slab.
23     **Q.**  Okay.

Page 31

1      **A.**  Single level.
2      **Q.**  And it's a -- it's not a
3  manufactured home?
4      **A.**  No, sir.
5      **Q.**  It's brick and mortar?
6      **A.**  Right.
7      **Q.**  Do you have any estimate of
8  its present value?
9      **A.**  No, sir, I do not, no.
10     **Q.**  I'm not familiar with the
11  street address.  Where are you located?
12  Are you in Wetumpka, are you --
13     **A.**  No, sir.  We're in the city of
14  Millbrook.
15     **Q.**  Okay.  And how long have you
16  owned your home there?  Actually how long
17  have you lived there is what I meant to
18  ask?
19     **A.**  I've been there eight years.
20     **Q.**  Do you own any rental
21  properties of any kind?
22     **A.**  I own my father's home that
23  was deeded over to me at his death.

Page 32

1      **Q.**  Where is that located?
2      **A.**  That's in Chilton County.
3      **Q.**  And are you the only owner?
4      **A.**  Yes, sir.
5      **Q.**  Do you have an address for
6  that?
7      **A.**  2325 County Road 359,
8  Maplesville.
9      **Q.**  And what does that property
10  consist of?
11     **A.**  A home and acreage.
12     **Q.**  How many acres?
13     **A.**  Total is seven -- seven acres
14  around about.
15     **Q.**  And what's the size of the
16  home?
17     **A.**  I do not know the square
18  footage.
19     **Q.**  Give me bedrooms, just a rough
20  estimate.
21     **A.**  It's a four-bedroom.
22     **Q.**  Is it rented at the moment?
23     **A.**  It is leased with an option to

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 33

1  buy.
2      Q.   At what price?
3      A.   She's making the mortgage
4  payments on it.  Whatever the mortgage
5  is, no extra.
6      Q.   Do you remember roughly what
7  that is?
8      A.   Four -- 458 a month.
9      Q.   And you don't remember,
10  though, what the purchase price on the
11  seven acres and the house would be?
12      A.   I don't understand what you
13  mean by purchase price.
14      Q.   Well, if she's got the option
15  to buy --
16      A.   It will be the -- whatever the
17  amount is owed.
18      Q.   That's what I'm asking you,
19  what's the amount owed?
20      A.   Oh, okay.  Oh, the amount
21  owed, 50 -- 57, 58 thousand.
22      Q.   And when did you inherit the
23  property?

Page 34

1      A.   At the time of my father's
2  death.
3      Q.   Right.  Which would have been
4  when?
5      A.   Two years -- well, Daddy
6  passed away in June will be two years,
7  this coming June.
8      Q.   Okay.  June of '04.
9          MR. NELMS:  Is that correct,
10  he died in June of '04?
11      A.   Yeah, I think that's pretty
12  accurate.
13      Q.   Do you own any other real
14  estate?
15      A.   No.
16      Q.   Do you have any other -- apart
17  from your property interests that you've
18  described, do you have a portfolio of
19  stocks or bonds, a retirement fund or
20  anything like that?
21      A.   No.
22      Q.   Apart from this case, have you
23  been involved in any -- let me stop.  I

Page 35

1  got ahead of myself here.  Do you have
2  any interest at present in any business
3  of any kind?
4      A.   No, sir.
5      Q.   Are you receiving any
6  annuities or any payments on annuities or
7  pension or a disability policy or
8  anything like that?
9      A.   No, sir.
10      Q.   You mentioned earlier that you
11  had been deposed once before.  Can you
12  tell me what that was in connection with?
13      A.   It had to do with a -- with a
14  friend -- I don't even really recall.
15  There was a friend involved in selling a
16  security system to a homeowner, and I was
17  present when the transaction took place.
18  And unknowing to the individual, this
19  individual was under contract with
20  another company, and he did not disclose
21  that information to my friend.  And
22  they -- when they called me in, they just
23  wanted to know how the transaction went

Page 36

1  and what I observed.
2      Q.   So, you were just a witness to
3  this dispute, I guess?
4      A.   Yes, sir, I guess.
5      Q.   And what was the friend's
6  name?
7      A.   David Murabito.
8      Q.   How do I spell?
9      A.   M-U-R-A-B-I-T-O.
10      Q.   And do you know -- remember
11  the name of the customer in question?
12      A.   No, sir, I don't.
13      Q.   But had David been personally
14  sued in connection with the transaction?
15      A.   I do not know.
16      Q.   And why were you with him in
17  connection with the installation?  What
18  brought you there?
19      A.   Well, it wasn't the
20  installation.  It was the -- the sale of
21  the -- of the equipment.  I just happened
22  to be with him that day, and we -- it --
23  he had an appointment to go to the home,

9 (Pages 33 to 36)

Page 37

1 and I went with him to the home.
2    **Q.**   Was this at a time when you
3 had your own --
4    **A.**   No, sir.
5    **Q.**   -- company we talked about?
6 When did this all take place?
7    **A.**   I do not recall.
8    **Q.**   Ancient history, five years
9 ago, ten years ago?
10    **A.**   It's been probably four --
11    **Q.**   Okay.
12    **A.**   -- years or more.
13    **Q.**   Have you ever been named as a
14 defendant in a lawsuit?
15    **A.**   No.
16    **Q.**   Have you ever sued anybody
17 other than FedEx in this case?  In
18 other -- you can forget about your
19 divorce proceeding.
20    **A.**   Right.
21    **Q.**   I know that was a legal
22 proceeding.
23    **A.**   I don't understand what you

Page 38

1 mean by sued.
2    **Q.**   What you did here, you filed a
3 piece of paper in court and claimed
4 compensation from somebody for whatever
5 it is you think they did that caused you
6 harm or injury.
7    **A.**   The only other -- the only
8 other case I had was a workmen's comp
9 case, and that's been years ago.  I don't
10 know if that's suing.
11    **Q.**   Yes.
12    **A.**   But --
13    **Q.**   Who was the employer involved
14 in that case?
15    **A.**   It was Brockway Glass Company.
16    **Q.**   And where were they located?
17    **A.**   Here in Montgomery.
18    **Q.**   And do you remember
19 approximately when that happened?
20    **A.**   Approximately, not
21 accurately --
22    **Q.**   Yes.
23    **A.**   -- '79.

Page 39

1    **Q.**   What was the nature of the
2 dispute there?
3    **A.**   I had a back injury, and I
4 had -- it had to do with my workmen's
5 comp benefits.
6    **Q.**   Did you --
7    **A.**   And --
8    **Q.**   Go ahead.
9    **A.**   Getting disability on my
10 workmen's comp -- or, you know, to
11 determine the amount of workmen's comp.
12    **Q.**   Do you remember whether or not
13 you did get some sort of a permanent,
14 partial disability rating or finding in
15 connection with that?
16    **A.**   I -- I did get a percentage.
17 I don't even recall what that percentage
18 actually was.  I mean, it -- you know,
19 what they did -- I think it's just --
20 just the way that the system is.  I mean,
21 they did award a portion of disability.
22    **Q.**   Okay.  Do you remember or can
23 you recall what the size of the check was

Page 40

1 that you received or if you received just
2 a series of checks over a period of time?
3    **A.**   Well, I received workmen's
4 comp checks --
5    **Q.**   For a while?
6    **A.**   -- when I was out of work.
7    **Q.**   Right.
8    **A.**   And then I think the
9 settlement -- I don't recall the exact
10 amount --
11    **Q.**   Okay.
12    **A.**   -- of what the check was.
13    **Q.**   Can you give me a ballpark?
14    **A.**   To be truthful --
15    **Q.**   Yes.
16    **A.**   -- I really don't -- I really
17 don't remember.
18    **Q.**   Okay.
19    **A.**   I really do not remember.
20    **Q.**   Any other legal proceedings of
21 any kind that you can recall being
22 involved with?
23    **A.**   No, sir.

Page 41

1    Q.   And you've never sought any
2  kind of a disability --
3    A.   No, sir.
4    Q.   -- from any entity, state or
5  federal, Social Security?
6    A.   No, sir.
7    Q.   How's your health right now?
8    A.   Other than the hypertension, I
9  feel like it's pretty good.
10   Q.   All right.  Do you feel like
11 the hypertension is under control with
12 the drugs you're taking?
13   A.   Well, not with just drugs,
14 but, you know -- yes, I feel like it's
15 pretty much under control.
16   Q.   Do you have a cardiologist who
17 you see every six months or so?
18   A.   No, I do not.
19   Q.   Who prescribes your medication
20 for hypertension?
21   A.   Dr. Marla Wool.
22   Q.   How do you spell the last
23 name?

Page 42

1    A.   W-O-O-L.
2    Q.   And where is Marla located?
3    A.   She is located in Millbrook.
4    Q.   And she's just a regular care
5  physician?
6    A.   Yes.
7    Q.   Apart from Marla --
8       (Off-the-record discussion.)
9    Q.   (BY MR. SPOTSWOOD:)  Apart
10 from Marla, are you under the care of any
11 other medical professional, whether it's
12 a psychologist, a psychiatrist --
13   A.   No.
14   Q.   -- anybody else?
15   A.   No, sir.
16      (Off-the-record discussion.)
17   Q.   (BY MR. SPOTSWOOD:)  Yeah, let
18 me just tell you where I'm going here to
19 kind of help bring things along, Mr.
20 Thornton.  What I want to do now is move
21 to your employment history really going
22 both from basically the present backwards
23 to find out where you've actually worked

Page 43

1  basically over about a five-year period.
2  I'm going to do that, I hope, with the
3  help of the tax return information that
4  you've given me, and we have some
5  exhibits here on that, so that's where
6  we're going to start.  And I'd like to
7  start with -- with 2006, and, of course,
8  I know we don't have any tax return
9  information so far, but where are you
10 working right now?
11   A.   UniFirst Corporation.
12   Q.   That's U-N-I-F-I-R-S-T?
13   A.   That's correct.
14   Q.   And where is it located?
15   A.   Branch office is in Millbrook.
16   Q.   And what is the nature of the
17 business?
18   A.   Uniform supply.
19   Q.   What is your job with
20 Uniform -- UniFirst, rather?
21   A.   Territory manager.
22   Q.   And tell me what you do as a
23 territory manager.

Page 44

1    A.   I manage the territory that --
2  protect a territory and, also, I sell in
3  that territory.
4    Q.   Do you have drivers and others
5  that report to you as the manager?
6    A.   No.
7    Q.   Well, how -- what do you do on
8  a regular basis is what I'm trying to get
9  to, what are your regular job functions?
10   A.   It's customer service
11 basically.  I have customers within that
12 territory that I just maintain, manage,
13 make sure everything is going smoothly
14 with their deliveries and stuff like
15 that, and then I report directly to a
16 branch manager.
17   Q.   And, so, there is somebody
18 riding around in a truck that picks up
19 and delivers uniforms --
20   A.   Oh, sure.
21   Q.   -- to various entities, and
22 that's really the nature of the business,
23 correct?

11 (Pages 41 to 44)

Page 45

1    A.   Yes.
2    Q.   So, you are making sure that
3  the service is good and that they don't
4  have any complaints and that, you know,
5  they are paying their bills and you're
6  doing what you are supposed to be doing?
7    A.   My main function is selling.
8    Q.   And, so, how do you go about
9  doing that?  Are you soliciting people,
10 cold calling them?
11   A.   Several different ways.
12   Q.   Okay.  Well, tell me what they
13 are.
14   A.   I do cold calling, solicit,
15 referrals.
16   Q.   And are you paid on a
17 commission basis?
18   A.   Commission plus salary.
19   Q.   And what is -- tell me the
20 exact structure of your compensation.
21   A.   What do you mean by that?
22   Q.   What -- well, let's begin with
23 this:  When did you start working at

Page 46

1  UniFirst?
2    A.   It was approximately eight
3  weeks ago.
4    Q.   What is your base salary?
5    A.   My base salary is six -- six
6  hundred a week.
7    Q.   And what is your -- how is
8  your commission computed?
9    A.   It's computed several
10 different ways.  There's no set way of
11 computing commissions.  It's according --
12 it's based on what you sell, the price
13 you sell it for, length of time for the
14 agreement.
15   Q.   But you have an agreement --
16 you have it written down what your
17 commission arrangement is, I take it?
18   A.   I have a structure according
19 to the -- whatever your sale is.
20   Q.   Okay.  You can figure out,
21 I take it, when you get a paycheck
22 whether or not your paycheck has been
23 properly computed?

Page 47

1    A.   Sure.  Yes.
2    Q.   Can you tell me what your
3  compensation has averaged since you began
4  working eight weeks ago on a weekly
5  basis?
6    A.   Six hundred a week.  I've just
7  got into the commission phase of it.
8    Q.   So, you're just now working --
9    A.   Basically in training.
10 Getting out of training.  Not actually
11 getting out of training.  I've got into
12 the selling mode.  We were in a training
13 mode.
14   Q.   So, beginning what, in April
15 you should start seeing some commission
16 checks, is that what you're saying, maybe
17 next month?
18   A.   Possibly, yeah.
19   Q.   Maybe this month too?
20   A.   Oh, I'm not -- no, it will not
21 be this month.
22   Q.   Who is your immediate
23 supervisor there?

Page 48

1    A.   Acting branch manager is Dan
2  Cohen.
3    Q.   Where is Mr. Cohen located?
4    A.   Millbrook.
5    Q.   Let me ask you to have a look
6  at Defendant's Exhibit A.
7         (Whereupon, Defendant's
8          Exhibit A was marked for
9          identification.)
10        MR. NELMS:  Have you got a
11 copy for me?  Or do you want me to get
12 my --
13        MR. SPOTSWOOD:  Yeah.  Let him
14 look at that, if you don't mind.
15   Q.   (BY MR. SPOTSWOOD:)  What I
16 want to do, first of all, is make sure I
17 have everybody you worked for in 2005,
18 and I show that you worked at True Green
19 Limited is one of the entities reflected
20 on your W-2 for 2005, and then I've
21 got -- frankly, I've got another one here
22 that I can't read.  This is -- this is
23 reflecting wages of $720.  Do you know

12 (Pages 45 to 48)

Page 49

1  who that was?  I can't read this.  It
2  shows an Overland Park, Kansas address.
3  Do you remember who that was?
4       A.   No, sir, I don't.
5       Q.   And, then, I show a THD At
6  Home Services.
7       A.   Yes.
8       Q.   And then I show some
9  compensation from FedEx while you were in
10  the training mode.  All right?
11       A.   Yes.
12       Q.   Apart from the income
13  reflected on these four W-2 forms, did
14  you have any other income in 2005?
15       A.   No, sir.
16       Q.   Now, let's start with --
17       A.   Okay.  I know who this is.
18       Q.   Okay.  Who is that?
19       A.   That was with DHL.
20       Q.   DHL?
21       A.   DHL.
22       Q.   A delivery service?
23       A.   Yes.  You said 2005.

Page 50

1       Q.   Right.
2       A.   Right?
3       Q.   Yes, sir.  Let's talk about --
4  why don't we do these in order.  Which
5  one were you first employed by in 2005?
6       A.   That would have been True
7  Green.
8       Q.   All right.  What did you do
9  for True Green?
10       A.   I was a sales rep.
11       Q.   What was the nature of their
12  business?
13       A.   They do fertilizations,
14  spraying of lawns, insect control.
15       Q.   And who was your supervisor
16  there?
17       A.   I do not even recall his name.
18  I don't know.
19       Q.   How long did you work there?
20       A.   It was a very short period of
21  time.  That was before I -- well,
22  actually it was a very short period of
23  time, and then I went on with the FedEx

Page 51

1  company.
2       Q.   Did you quit that job, or were
3  you terminated from it, what happened?
4       A.   I turned in my -- a notice.
5       Q.   Where was their office
6  located?
7       A.   Here in Montgomery.
8       Q.   Can you help me out a little
9  bit more than that?
10       A.   It's in the north -- it's off
11  the northern bypass.
12       Q.   It would be listed in the
13  Yellow Pages as True Green Limited?
14       A.   No, sir.  It's True Green
15  ChemLawn.
16       Q.   Okay.  And what was your next
17  employer in 2005 other than your training
18  time at FedEx?
19       A.   That would have been with DHL.
20       Q.   All right.  Which location for
21  DHL did you --
22       A.   It's here in Montgomery.
23       Q.   Do you recall roughly where

Page 52

1  the office is located?
2       A.   It's off the northern bypass
3  also.  I don't -- I really don't recall
4  the address.
5       Q.   What kind of facility was it?
6       A.   It's a terminal, delivery
7  terminal.
8       Q.   Who was your supervisor there?
9       A.   I do not recall his name
10  either.
11       Q.   Was it a -- can you give me a
12  description of him?
13       A.   A description of the
14  individual?
15       Q.   Yes.  You know, skin color,
16  hair color.
17       A.   He was a black guy.
18       Q.   Approximate age?
19       A.   Oh, I have no idea.  20s, 30s.
20       Q.   All right.  And what did you
21  do for DHL?
22       A.   I delivered packages.
23       Q.   Were you a -- did you have a

Page 53

1    particular route?
2        A.    Yes, I did.
3        Q.    Where was your route?
4        A.    Elmore County.
5        Q.    Were you an employee or an
6    independent contractor?
7        A.    I was an employee.
8        Q.    How long did you work for DHL?
9        A.    I don't recall that length of
10    time.
11        Q.    A couple of weeks, a month?
12        A.    It was probably around three
13    weeks, looking at the pay.
14        Q.    And do you have any
15    recollection of what period of time it
16    was, whether it was in the summer or was
17    it in --
18        A.    It was in the summer.
19        Q.    And what happened with respect
20    to that job? Why aren't you still
21    working at DHL?
22        A.    Well, at the time I was also
23    trying to get on with -- At-Home Services

Page 54

1    is actually Home Depot, but it was
2    working 60, 70 hours a week, and the pay
3    was -- it was nothing. $400 a week at 60
4    to 70 hours a week. No overtime.
5        Q.    What was your hourly rate?
6        A.    I do not even know because
7    they -- they started us -- started me at
8    400. They started everybody else at 375.
9    The only reason why they started me at
10    four hundred was because I had went
11    through the training at FedEx.
12        Q.    And you were working a minimum
13    of 60 hours a week without any additional
14    compensation?
15        A.    That's exactly right.
16        Q.    You were a salaried employee,
17    is that what you're saying?
18        A.    That's exactly right.
19            MR. NELMS: Off the record.
20            (Off-the-record discussion.)
21        Q.    (BY MR. SPOTSWOOD:) So, in
22    any event, Mr. Thornton, you quit the job
23    because you didn't like the working

Page 55

1    conditions and the compensation package
2    basically?
3        A.    And I had the opportunity to
4    interview with Home Depot. Of course,
5    the pay was -- it was tough, from seven
6    to seven at night and every weekend, you
7    know.
8        Q.    You were working on Saturdays
9    and Sundays?
10        A.    Not Sunday.
11        Q.    But you were working Saturday?
12        A.    Yes.
13        Q.    How many hours on Saturday?
14        A.    Well, that would vary because
15    you had packages to deliver, and you had
16    to complete your -- your route for the
17    day. And during the week it was not like
18    from seven to seven. You worked until
19    you completed your -- your route for that
20    day.
21        Q.    And you don't remember your
22    supervisor's name over there?
23        A.    Honestly, no.

Page 56

1        Q.    Okay. And so, you resigned
2    that job?
3        A.    Yes.
4        Q.    And, then, did you have a job
5    at the time you resigned with Home Depot?
6        A.    What was the question again?
7        Q.    At the time you resigned from
8    DHL, did you have a job with anybody
9    else?
10        A.    I -- yes, I had the job with
11    Home Depot.
12        Q.    And that's, I think, listed on
13    the W-2 form, Exhibit A, as THD At-Home
14    Services?
15        A.    Right, the Home Depot At-Home
16    Services.
17        Q.    All right. And what was your
18    job there?
19        A.    Sales, selling roofing, siding
20    and window products to homeowners.
21        Q.    What location did you work out
22    of?
23        A.    Montgomery.

14 (Pages 53 to 56)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 57

1    **Q.**  Were you actually calling on
2  people at their homes, or was this within
3  a Home Depot store?
4    **A.**  No, this was actually running
5  appointments that were set up through the
6  store.  I didn't have anything to do with
7  the store.  Appointments were set up,
8  sent over to us by e-mail, and then we
9  went to the home, met with the homeowner.
10    **Q.**  And you would then what,
11  decide what they needed and sign them up
12  on a contract to have the roofing, siding
13  or window products purchased and
14  installed?
15    **A.**  That's correct.
16    **Q.**  And how were you compensated
17  for that?
18    **A.**  Strictly commission.
19    **Q.**  What was your commission rate?
20    **A.**  It varied with the product.
21  From eight to ten percent.
22    **Q.**  We showed that you received,
23  according to Exhibit A, your -- your W-2

Page 58

1  earnings $2689?
2    **A.**  Right.
3    **Q.**  How long did you work there?
4    **A.**  I worked with Home Depot up
5  until the time I took the job with
6  UniFirst.
7    **Q.**  So, when did you begin with
8  Home Depot, sometime in the summer?
9    **A.**  Yes.
10    **Q.**  How many hours a week were you
11  working at the Home Depot?
12    **A.**  That would vary, and that was
13  one of the issues with Home Depot.  Of
14  course, you had appointments set up
15  daily.  Sometimes you may have one
16  appointment.  You may have two.  Some
17  weeks you only had maybe two appointments
18  in a whole week.  That was the -- that
19  was the big issue that I had with those
20  guys.  But as far as hours, an
21  appointment would normally take two,
22  possibly three hours, but the
23  appointments were so sporadic there's no

Page 59

1  way to say, well, I had two appointments
2  each day.
3    **Q.**  Well, it seems like -- and
4  your answer may have just explained it.
5  It seems a very modest amount of
6  compensation running over a three-month
7  period of time?
8    **A.**  Well, exactly right.  As far
9  as being competitive in the market, Home
10  Depot in this area was not very
11  competitive at all.  When it comes to the
12  roofing products, in this area there's --
13  to give you an example, there's a hundred
14  and twenty roofing companies in the city
15  of Montgomery, and Home Depot, normally
16  their prices were twice as much as Joe's
17  Roofing out here, to give you an example.
18  So, they were not competitive at all.
19  And -- but I mean, you know, there was a
20  job to be done, and you were to run your
21  appointments.  There was no compensation
22  for mileage.  It was straight commission.
23    **Q.**  During this period -- it

Page 60

1  basically sounds like you were working
2  part-time.  During this period were you
3  working anywhere else?
4    **A.**  No.
5    **Q.**  Were you aware when you
6  accepted the position at Home Depot and
7  resigned from your job at DHL that there
8  was going to be no guarantee of any
9  particular volume of appointments in any
10  particular week?
11    **A.**  I knew that there would be
12  appointments, but I did not know how many
13  appointments.
14    **Q.**  When did you start looking for
15  something else, other than Home Depot?
16    **A.**  I was continually looking for
17  something with a better income from the
18  get-go.
19    **Q.**  I think -- where is that
20  printout?
21    MR. PARKER:  Look at the
22  exhibit list.  It's Exhibit G.
23    MR. NELMS:  While we're off

15 (Pages 57 to 60)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 61

1　the record.
2　　　　MR. SPOTSWOOD:  Yeah.
3　　　　(Off-the-record discussion.)
4　　　　(Said deposition was in recess
5　　　　at 10:32 a.m. until 10:38
6　　　　a.m., after which the
7　　　　following occurred:)
8　　　Q.　(BY MR. SPOTSWOOD:)  Have a
9　look at Exhibit G from the stack over
10　there.
11　　　　(Whereupon, Defendant's
12　　　　Exhibit G was marked for
13　　　　identification.)
14　　　Q.　This was the document I think
15　that was produced to us in response to
16　our request for what other jobs you were
17　looking for during this period of time,
18　and what I want to know is what exactly
19　did you make application for from this
20　list that's shown here on Defendant's
21　Exhibit G?
22　　　A.　Oh, there's -- there's no
23　telling.  There's no way I can tell you

---

Page 62

1　that.  There were several I made
2　application for.  Everything that I
3　clicked on on this right here I made
4　application.  I sent a resume to.
5　　　Q.　But you're not saying you --
6　you -- I mean, what we have here is a
7　website that says careerbuilder.com?
8　　　A.　Exactly right.
9　　　Q.　And it's got a bunch of job
10　titles here, and everything from sales
11　manager to field service representative
12　to driver, there are 18 pages, according
13　to this thing, and at least on this
14　particular one, this is 1-18 of 18.  And
15　I guess what I'm asking you is I assume
16　you didn't apply for all of these jobs.
17　Do you know what you applied for?
18　　　A.　Yes, I did.  I sent resumes to
19　all of these jobs.  Those are the ones
20　that were -- it showed that I applied.
21　As a matter of fact, there's more than
22　that because if you'll see at the top, it
23　says deleted after two months.

---

Page 63

1　　　Q.　Yes.
2　　　A.　I never realized that I would
3　need this until I got the information
4　from Andy, and that's when I went on and
5　tried to catch it and print it off -- off
6　the Internet.
7　　　Q.　And, so, what you're saying,
8　if I look down on the bottom here to the
9　location on the Internet, it says, among
10　other things, careerbuilder.com, job
11　seeker jobs, my saved jobs.  So, on
12　jobs -- on this careerbuilder.com, did
13　you have a list of saved jobs that you
14　were trying to print this from?
15　　　A.　That -- this is the saved jobs
16　list.
17　　　Q.　Okay.
18　　　A.　The ones that I applied to.
19　　　Q.　And are you saying -- it says
20　1-18 of 18, so are -- am I missing
21　something here?  Is this just page one of
22　18 pages worth of jobs that you
23　actually --

---

Page 64

1　　　A.　That's one of 18 of 18.
2　　　Q.　Oh, I see, of the actual jobs
3　listed above.  All right.
4　　　A.　This is all that I could pull
5　off, and then if you go to -- on the back
6　page there's one monster.com.  Those are
7　the ones there that I sent resumes to.
8　But there were several, several more
9　because I -- like I say, it deleted them
10　off after two months.
11　　　Q.　So, you applied -- let's just
12　look over here on the last -- the second
13　to the last page, you applied for a
14　restaurant manager job?
15　　　A.　I surely did.
16　　　Q.　And you applied as a
17　collector?
18　　　A.　Yes.
19　　　Q.　You applied as a benefits
20　recruiter?
21　　　A.　Yes.
22　　　Q.　Had you ever worked in the
23　restaurant business?

16 (Pages 61 to 64)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 65

1    **A.**   No.  But I felt like I had
2    management experience.
3        **Q.**   And can you tell us what
4    companies you were making applications
5    for?  For example, on 1/21/2006, it says
6    managers and assistant managers.  Do you
7    remember who that was?
8        **A.**   No, I do not.
9        **Q.**   It says apply online, question
10   mark.  What does that mean?
11       **A.**   I have no idea.  That's their
12   website.  That's -- I didn't -- these
13   are -- but I know this: These are the
14   ones that I applied to.
15       **Q.**   Okay.  But you were not able
16   to, when you printed this out, to also
17   print out what job it was; you couldn't
18   click on the job and find out what job it
19   was, who you were actually applying to?
20   Surely there's some more detail here.
21       **A.**   I knew I had to have a list of
22   where I had applied.
23       **Q.**   Yes.

---

Page 66

1        **A.**   This is what I went to and
2    printed off.
3        **Q.**   Okay.
4        **A.**   Whether I could have went in
5    and printed off each, I don't know if I
6    could have done that or not.
7        **Q.**   All right.  I want to go to
8    your 2004 tax return, which, along with
9    the W-2 forms, is marked as Exhibit B.
10               (Whereupon, Defendant's
11               Exhibit B was marked for
12               identification.)
13       **A.**   Can I ask you a question
14   outside?
15               MR. SPOTSWOOD:  Sure.  Go
16   ahead.
17       **A.**   If you don't mind, I'd
18   appreciate it.
19               (Said deposition was in recess
20               at 10:44 a.m. until 10:48
21               a.m., after which the
22               following occurred:)
23       **Q.**   (BY MR. SPOTSWOOD:)  Is

---

Page 67

1    Exhibit B the tax return you and your
2    wife filed for the tax year 2004 with the
3    federal government?
4        **A.**   Yes.
5        **Q.**   And does it accurately reflect
6    all of the income that you and she
7    received that year?
8        **A.**   Yes.
9        **Q.**   It reflects that you received
10   some $28,358 in wages from American
11   General Life and Accident Insurance
12   Company, on page --
13       **A.**   Correct.
14       **Q.**   -- two.  What were you doing
15   for American General?
16       **A.**   I was an agent.
17       **Q.**   What kind of products were you
18   selling?
19       **A.**   Life and health.
20       **Q.**   And how long did you have that
21   job?
22       **A.**   It was 14 months.
23       **Q.**   And your wife had a similar

---

Page 68

1    level of income from the same company.
2    What was she doing?
3        **A.**   She was an agent.
4        **Q.**   And where was your office
5    located?
6        **A.**   In Montgomery.
7        **Q.**   Did you guys work out of your
8    home, or were you working from an office?
9        **A.**   No, we worked out of an
10   office.
11       **Q.**   Do you remember what the
12   address was of that office?
13       **A.**   No, sir.  It was on the
14   Atlanta Highway.
15       **Q.**   So, if I'm not mistaken here,
16   from the looks of things, you worked all
17   of 2004 for American General?
18       **A.**   Yes.
19       **Q.**   And why did you -- when did
20   you terminate your employment at American
21   General?
22       **A.**   It would have been December of
23   2004.

---

17 (Pages 65 to 68)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 69

1    Q.    And why did you decide to
2 leave that job?
3    A.    The actual reason was because
4 of chargebacks, people dropping their
5 insurance and them charging me back for
6 the commissions that they had already
7 paid, and that was -- that's the reason.
8    Q.    If I understand the way that
9 works, and please correct me if I'm
10 wrong, the chargeback, the company had a
11 policy that allowed them to come back and
12 deduct from your other commission checks
13 that you were earning certain commissions
14 that you had already been credited when
15 people canceled a policy within a period
16 after the sale?
17    A.    That's correct.
18    Q.    And that was a policy that you
19 didn't care for and didn't think was
20 appropriate?
21    A.    I don't understand your
22 question.
23    Q.    What caused you -- what was

Page 70

1 the problem you had with that policy?
2    A.    I didn't have a -- well, it --
3 you're talking about the company policy.
4 Okay. When you said policy, I'm sorry, I
5 thought you were talking about the
6 insurance policy.
7        It was the amount that hit.
8 It had actually -- over a short period of
9 time going into the latter months of
10 2004, there was so much business that
11 dropped off the books that my pool that I
12 drew my income from was just about
13 nothing, so my income had dropped
14 tremendously.
15    Q.    And that was because there was
16 poor retention, is that the terminology?
17    A.    A very poor retention not --
18 throughout the company, business
19 retention.
20    Q.    So, you thought that was not a
21 good economic deal for you and you quit?
22    A.    It was not, no.
23    Q.    And looked for something else?

Page 71

1    A.    Right.
2    Q.    And what were you --
3    A.    I was still a licensed agent
4 -- agent at the time.
5    Q.    And what did you then look
6 for?
7    A.    I went to work with True
8 Green. As a matter of fact, they lost
9 several agents at the end of 2004 because
10 of the same problem.
11    Q.    Who owned the agency where you
12 worked?
13    A.    It was company owned.
14    Q.    Who was your immediate report,
15 direct supervisor?
16    A.    Lee Crawford.
17    Q.    Is he still there, as far as
18 you know?
19    A.    I do -- I don't know. I
20 really don't know. I haven't -- I don't
21 know.
22    Q.    Did your wife, Deborah, also
23 terminate her employment there?

Page 72

1    A.    Yes, she did. Not at the same
2 time.
3    Q.    It looks like she also worked
4 at least for a period of time with
5 Liberty National. What was she doing
6 there?
7    A.    She was an agent.
8    Q.    Was that before or after her
9 time with American General?
10    A.    That was before. As a matter
11 of fact, she took the job -- I was
12 offered the job at State Farm, but at the
13 time I was with -- going through FedEx,
14 and I declined the job and recommended
15 her -- her the job with State Farm.
16    Q.    And she took that job?
17    A.    And she took that job.
18    Q.    Let's have a look at
19 Defendant's Exhibit C, which is, I
20 believe, your tax return for 2003.
21        (Whereupon, Defendant's
22        Exhibit C was marked for
23        identification.)

18 (Pages 69 to 72)

Page 73

1      Q.   Let me ask you to confirm that
2   Exhibit C is your federal income tax
3   return for the calendar year 2003 plus
4   the W-2 forms reflecting income you and
5   your wife received that year?
6      A.   Yes, sir.
7      Q.   It looks to me from this tax
8   return that you and your wife reported a
9   total of $25,884 in wages and salaries
10  for that year, is that correct?
11     A.   Yes, sir.
12     Q.   And is that -- is that, in
13  fact, the total income that you and she
14  received for that year?
15     A.   Yes, sir.
16     Q.   I may be missing something
17  because it appears that I do not have W-2
18  forms that add up to all that much money.
19     MR. PARKER:  I think he may
20  have had self-employment income.
21     Q.   Is that correct?  Did you have
22  some self-employment income this year,
23  2003?

Page 74

1      A.   No.
2      MR. NELMS:  I don't know.
3      A.   I mean --
4      Q.   Oh, I see.  Okay.  Let's flip
5   over to salary and wages report which
6   is -- which is the -- it looks to me like
7   it's about -- oh, I don't know.  I didn't
8   number these pages.  I'll count them.  If
9   I did that correctly, it's on page 19 of
10  this exhibit.
11     A.   Okay.  That's where we're at.
12     Q.   Yeah.  It looks like we have
13  federal wages from Liberty National Life
14  of $16,713.  Whose wages were those, your
15  wife's or yours?
16     A.   Oh, I -- I don't know.  It's
17  not listed on there which one was which.
18  I have no idea.
19     Q.   Does anybody know what T
20  hyphen S means at the top of that form?
21     MR. NELMS:  I was thinking
22  salary or tips or something like that,
23  but I -- I looked down there and there

Page 75

1   was T's next to them.  And I said, well,
2   that's not right.  They didn't get tips.
3   Taxpayer, maybe, I don't know, spouse --
4      Q.   That's what I thought it might
5   be, spouse and then taxpayer.  Did your
6   wife work that year at J. B. Hunt --
7      A.   No.
8      Q.   -- or American General Life?
9      A.   No, that was me.
10     Q.   I think that's what that
11  probably means then.
12     Would it be your recollection
13  that in 2003 your wife did, in fact, earn
14  the majority of the income from Liberty
15  National, that she worked there a lot
16  longer than you did?
17     A.   She -- yes, she did work there
18  longer than I.
19     Q.   Okay.  So, based on that -- I
20  mean, this indicates that you received
21  wages from J. B. Hunt Transport of $1800,
22  wages of $3900 from American General Life
23  and wages of $3471 from Liberty National?

Page 76

1      A.   Yes.
2      Q.   Would that all suggest to you
3   that it's your wife who earned the
4   $16,713 from Liberty National?
5      A.   All I can say is that she was
6   there longer than I at Liberty National.
7      Q.   Okay.
8      A.   I mean --
9      Q.   I think the form actually is
10  self-explanatory here.  If you note below
11  those figures I just gave you --
12     A.   Right.
13     Q.   -- it says taxpayer $9,171;
14  spouse, $16,713, for a total of $25,884,
15  and you are listed as the taxpayer here
16  on the second line, if joint return, SP
17  first name and initial, which is your
18  spouse.  So, does that clarify things?
19     A.   Some -- somewhat, I guess.
20     MR. NELMS:  If I might, is
21  that your Social Security number?
22     A.   Yes, it is.
23     MR. NELMS:  Okay.  And you're

19 (Pages 73 to 76)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 77

1  identified as taxpayer, right?
2     **A.**  That's what he's saying, yes.
3     **Q.**  And you don't -- you don't
4  have any reason to dispute that is what
5  I'm trying to get to?
6     **A.**  No, sir.
7     **Q.**  All right.  So, good.  Tell me
8  the order of your employment with these
9  companies in 2003.  Who were you employed
10  by?
11     **A.**  Well, it was J. B. Hunt
12  actually first and then Liberty National.
13     **Q.**  And then American General?
14     **A.**  American General.
15     **Q.**  What were you doing for J. B.
16  Hunt Transport?
17     **A.**  J. B. Hunt, I was a recruiter
18  for those guys.
19     **Q.**  What was J. B. Hunt?
20     **A.**  It's a trucking company.  It's
21  a transportation company.
22     **Q.**  Are they an LTL carrier?  Less
23  than truckload?

---

Page 78

1     **A.**  Beg your pardon?
2     **Q.**  What kind of carrier are they?
3     **A.**  Just over-the-road
4  tractor-trailer.
5     **Q.**  And they'll pick up less than
6  a truckload and take it place to place?
7     **A.**  I have no idea.  I do not know
8  that.
9     **Q.**  So, what, you were recruiting
10  drivers for them?
11     **A.**  Yes.  Yes.
12     **Q.**  How would you go about doing
13  that?
14     **A.**  Just solicitation at the
15  different truck stops, fliers.
16     **Q.**  Put ads in the paper?
17     **A.**  I never put any ads in the
18  paper.
19     **Q.**  All right.  And how were you
20  compensated by J. B. Hunt?
21     **A.**  It was -- they paid me weekly.
22     **Q.**  Were you on a salary, or did
23  your success rate --

---

Page 79

1     **A.**  It was a salary.
2     **Q.**  Do you recall what the weekly
3  salary was?
4     **A.**  No, sir, I do not.  I do not
5  recall.
6     **Q.**  And did you quit that job?
7     **A.**  I left there to go to work
8  with Liberty National.
9     **Q.**  So, you resigned from that
10  employment?
11     **A.**  Yes, I did.
12     **Q.**  Where was the location that
13  you worked out of for J. B. Hunt?
14     **A.**  Arkansas.
15     **Q.**  Okay.
16     **A.**  Yeah, it was Arkansas.  Home
17  headquarters.
18     **Q.**  The headquarters for J. B.
19  Hunt?
20     **A.**  Yes.
21     **Q.**  Do you remember the name of
22  your supervisor there?
23     **A.**  No, I do not.

---

Page 80

1     **Q.**  How long did you work for J.
2  B. Hunt total?
3     **A.**  I have no -- I don't -- I have
4  no recollection -- recall of that.  I do
5  not know.  I don't remember.
6     **Q.**  Okay.  And then I think you
7  said you went directly to Liberty after
8  that?
9     **A.**  Yes.
10     **Q.**  And what were you doing for
11  Liberty?
12     **A.**  I was an agent.
13     **Q.**  Selling?
14     **A.**  Life and health.
15     **Q.**  And that was pure commission,
16  salary plus commission?
17     **A.**  There was a training salary,
18  and then it went from the training
19  salary -- you had a training salary, and
20  then you had a commission pool that you
21  drew your pay off of percentagewise.
22     **Q.**  Yes.
23     **A.**  And that's the way that

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 81

1 worked. I don't remember what the
2 training salary was right offhand.
3     Q.   All right. And then you
4 resigned from your employment at Liberty,
5 is that correct?
6     A.   No, actually that was before I
7 was a licensed -- I had my insurance
8 license, and in the state when you take
9 your license to become an agent, you
10 have, if I'm -- I think I'm correct with
11 this. I think you can take your test
12 twice. If you fail it twice, you've got
13 to wait six months before you take your
14 test again.
15     Q.   Yes.
16     A.   And I did not pass my tests.
17 Well, they could not keep me on. So, I
18 moved -- I mean, that ended my job,
19 basically.
20     Q.   Do you remember when you
21 failed the test and had to leave?
22     A.   No, sir, I do not. I don't
23 remember that. I know I went from there

Page 82

1 to -- to American General and went
2 through their training, and, I mean, I
3 had no problems passing the test. I --
4 you know, I -- I received my license at
5 that point in time with American General.
6     Q.   So, did you have a six month
7 period of unemployment there?
8     A.   No, huh-uh. It was just very
9 quick transition, maybe a week to two
10 weeks, you know.
11     Q.   And then you were able to
12 retake the exam --
13     A.   Yes.
14     Q.   -- before that six months
15 period expired?
16     A.   Oh, yes. It was either -- I'm
17 saying six months. It may have been four
18 months. Four to six months you had a
19 downtime that the State would not let you
20 take the test, but I took it, and I
21 passed it.
22     Q.   Did you have any periods of
23 unemployment during 2003, or were you

Page 83

1 employed each week during that year?
2     A.   No, sir, I was employed.
3     Q.   Have a look at, if you would,
4 Defendant's Exhibit D, which is your 2002
5 tax return.
6          (Whereupon, Defendant's
7          Exhibit D was marked for
8          identification.)
9     Q.   This reflects wages, salaries
10 and tips on page three, I'm looking at
11 line seven, of $22,837. And then a
12 business income of $4402 and then a
13 capital loss of $3,000, for total income
14 that year of $25,146. Is that correct?
15 Is that what your total income was that
16 year?
17     A.   Yes.
18     Q.   And on the wages component, it
19 looks like we have for you wages of a
20 little over $5900 from Dixie
21 Homecrafters. That's on page one, the
22 second W-2, correct?
23     A.   Yes, sir.

Page 84

1     Q.   And, then, we have roughly
2 $971 from SCI Management, LP?
3     A.   Yes.
4     Q.   What is that entity?
5     A.   That's -- I worked with --
6 actually it was Green -- Green --
7 Greenwood Funeral Service. Cemetery, not
8 the funeral home, but the cemetery.
9     Q.   What were you doing with them?
10     A.   I was sales, lots.
11     Q.   Selling lots in a cemetery?
12     A.   Yes. And headstones and stuff
13 like that.
14     Q.   And then the next page of the
15 Exhibit D, I show you as having roughly
16 $4800 in income from Sears Home
17 Improvement Products?
18     A.   Yes.
19     Q.   What were you doing with them?
20     A.   It was home improvement.
21     Q.   Was that --
22     A.   Windows and siding.
23     Q.   Were you calling on people, a

21 (Pages 81 to 84)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 85

1 similar deal --
2    A.   Yes.
3    Q.   -- where the store sets up an
4 appointment and --
5    A.   No, sir.  This was not
6 connected to the store at all.  It was
7 actually -- our appointments were
8 generated out of Atlanta through fliers,
9 telemarketing and such, and we would run
10 the leads from that.
11    Q.   By running leads, you would
12 then call on people?
13    A.   Appointments.  No, sir, I
14 didn't, but they did, so it was
15 appointments.  It was set appointments.
16    Q.   Okay.  Was that a commission
17 only deal?
18    A.   Yes, sir, it was.
19    Q.   How long did you work for
20 Sears Home Improvement?
21    A.   Oh, I don't know.  I worked
22 with those guys until they closed the
23 office here in Montgomery.

Page 86

1    Q.   And what were you doing with
2 Dixie Homecrafters?
3    A.   Same -- same thing, a few more
4 products.  They had siding and gutters.
5    Q.   What was the sequence of your
6 employment here in 2002?
7    A.   I was with Home -- I was with
8 Home Depot.  I went with Dixie
9 Homecrafters and then with SCI.
10    Q.   Well, you said Home Depot.
11 Did you mean to say Sears Home
12 Improvement?
13    A.   Oh, I'm sorry.  Yes, Sears
14 Home Improvement.
15    Q.   Okay.  And how long during
16 2002 did you work for each of these?
17    A.   I do not recall.
18    Q.   And Exhibit D is your tax
19 return that you filed with the government
20 for calendar year 2002?
21    A.   Yes, sir.
22    Q.   Why don't you take a quick
23 look at Exhibits E and F?

Page 87

1       (Whereupon, Defendant's
2       Exhibits E and F were marked
3       for identification.)
4    Q.   Are these two -- let's look at
5 E first.  Is Exhibit E your 2001 federal
6 income tax return?
7    A.   Yes, sir, it is.
8    Q.   And does it accurately reflect
9 the income you and your wife received for
10 that year?
11    A.   Yes, sir.
12    Q.   And when I flip over to the
13 same salary and wages report that we just
14 talked about a minute ago for another
15 return, page 11 --
16    A.   Okay.
17    Q.   -- it looks like for the
18 taxpayer, which we determined is you, we
19 have a little over $28,000 for Sears Home
20 Improvement, $3,300 for Swift
21 Transportation --
22    A.   Yes.
23    Q.   -- $418 for Drivers

Page 88

1 Management?
2    A.   Right.
3    Q.   Those are all of the jobs you
4 had that year?
5    A.   Yes.
6    Q.   And were you working with
7 Swift Transportation and then resigned
8 from them --
9    A.   Yes, I did.
10    Q.   -- to go to work at Sears?
11 Correct?
12    A.   Yes.
13    Q.   So, did you work the bulk of
14 the year at Sears, does it appear?
15    A.   I do not recall if it was the
16 bulk of the year on not.
17    Q.   Well, certainly the bulk of
18 your earnings were with Sears that year?
19    A.   Yes.
20    Q.   And, then, what is Drivers
21 Management?
22    A.   It was just a -- I guess a
23 training division of Swift.

22 (Pages 85 to 88)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 89

1     **Q.**   What did you do for Swift?
2     **A.**   I drove for those guys.
3     **Q.**   Were you an over-the-road
4 driver?
5     **A.**   No, a regional.
6     **Q.**   What does that mean?
7     **A.**   Southeast, just the southeast.
8     **Q.**   But you were driving a big
9 tractor-trailer truck?
10     **A.**   Yes.
11     **Q.**   And how was your compensation
12 computed for that?
13     **A.**   So much per mile.
14     **Q.**   And did you own your truck or
15 rent it?
16     **A.**   No, sir, it was company owned.
17     **Q.**   Company-owned truck. I'm
18 sorry.
19     **A.**   Yes, sir.
20     **Q.**   And did you resign that job to
21 go to work at Sears?
22     **A.**   Yes, I did.
23     **Q.**   Okay. Let's go to Exhibit F,

Page 90

1 which is your 2000 federal tax return, is
2 it not?
3     **A.**   Yes, sir.
4     **Q.**   And that's for both you and
5 your wife Deborah?
6     **A.**   That's correct.
7     **Q.**   If you'll flip over to about
8 page five or so, I am seeing an income
9 from partnership and S corporations of
10 roughly $18,986 from an entity called
11 Security Experts, LLC?
12     **A.**   That's correct.
13     **Q.**   Is that the company that you
14 owned?
15     **A.**   That was the -- that was the
16 other company. I had actually two
17 security companies.
18     **Q.**   Okay. And how long had you
19 owned -- who else owned an interest in
20 this, anyone other than you, did your
21 wife?
22     **A.**   Yes.
23     **Q.**   Who else owned an interest in

Page 91

1 it?
2     **A.**   David Murabito.
3     **Q.**   Okay.
4     **A.**   We were just actually
5 partners.
6     **Q.**   Okay. I may have asked this
7 previously, but where is David today?
8     **A.**   David is in Tampa, Sarasota,
9 Florida area.
10     **Q.**   What's he doing down there?
11     **A.**   He works for Home Depot
12 At-Home Services. The last I spoke with
13 him, he was with Home Depot.
14     **Q.**   I see in addition to the
15 income from that entity on the salaries
16 and wages report that we've been looking
17 on the previous tax returns, this one
18 shows taxpayer, namely, you receiving
19 $21,997 from Edison Security?
20     **A.**   Yes.
21     **Q.**   Who owned Edison Security?
22     **A.**   Wes-Tech Edison.
23     **Q.**   And where is it located?

Page 92

1     **A.**   They closed their -- they are
2 no longer in this area.
3     **Q.**   Okay.
4     **A.**   As far as a branch office.
5     **Q.**   Are they still in business
6 now?
7     **A.**   I have no idea.
8     **Q.**   So, you were an employee for
9 them?
10     **A.**   I was a salesman.
11     **Q.**   And did you at the same time
12 have your own security company, as well?
13     **A.**   No, I did not.
14     **Q.**   So, you -- did you resign from
15 Edison to start your own company?
16     **A.**   No, sir, they closed the
17 office, and after that is when I opened
18 Security Experts.
19     **Q.**   Did your wife also work for
20 Edison Security or not?
21     **A.**   No, sir, she did not work for
22 Edison Security.
23     **Q.**   What was she doing at this

23 (Pages 89 to 92)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 93

1    period?
2        A.   I don't know.
3        Q.   Also I see some income from an
4    entity on here called Best Security
5    Systems, Inc. of $1,587?
6        A.   Right.  That was another
7    independently-owned security company here
8    in Montgomery.
9        Q.   And who worked for them, you
10   or your wife?
11       A.   Actually when Edison shut
12   down, I went to work for Best for a very
13   short period of time, then I opened -- I
14   just -- yeah, that's what I was trying to
15   think.  And then David and I opened the
16   Security Experts.
17       Q.   What about the other company
18   that you mentioned previously, was there
19   any income from that reported this year?
20       A.   In 2000?
21       Q.   Yes.
22       A.   No, that was before 2000.
23   Apparently it was before.

---

Page 94

1        Q.   All right.  I don't see any
2    income from Regions at this juncture
3    either as of 2000, so she must have
4    resigned from Regions before that as
5    well?
6        A.   Yes.
7        Q.   Have you ever been arrested
8    for anything?
9        A.   No, sir.
10       Q.   Not as a child or minor?
11       A.   No.
12       Q.   Have you ever had any kind of
13   a misdemeanor charge --
14       A.   No, sir.
15       Q.   -- or any kind of criminal
16   charge against you?
17       A.   No, sir.
18       Q.   -- of any kind?  Say again.
19       A.   No, sir.
20       Q.   What did you do at Best
21   Security Systems in 2000?
22       A.   I was a sales rep.
23       Q.   And was that cold calling

---

Page 95

1    or --
2        A.   Yeah, cold calling.
3        Q.   In 2000, we also see a little
4    bit of income, I think, from Capital
5    Chevrolet, wages and salary report?
6        A.   Yeah, it was for a short
7    period of time I was with those guys as a
8    salesman.
9        Q.   Selling cars?
10       A.   Yes.
11       Q.   New cars, used cars?
12       A.   Yes.
13       Q.   Both?
14       A.   Yes.
15       Q.   And then there's also a
16   reference to Osiris, O-S-I-R-I-S, Holding
17   Company on the wages and salary report?
18       A.   I don't have a clue to what
19   that is.
20       Q.   Okay.  Do you own an
21   automobile at this time?
22       A.   Yes, I do.
23       Q.   Does your wife own one as

---

Page 96

1    well?
2        A.   Yes, we did.  Yes, she does.
3        Q.   Do y'all own them together?
4        A.   Yes, we do.
5        Q.   What are they, make, model,
6    year?
7        A.   I've got a -- she's got a 2000
8    Mazda Miata.  I have a '93 Nissan Sentra
9    that I use for work.
10       Q.   Yes.
11       A.   And I have a 1990 Toyota, a
12   four-wheel-drive.
13       Q.   As a part of the initial
14   disclosures that the court required be
15   produced in this case and that were
16   produced by your counsel last year, we
17   had -- we received some tapes.  We had
18   those tapes transcribed by a court
19   reporter.
20       A.   Right.
21       Q.   And last week we sent the
22   transcript to your counsel and basically
23   asked that you have a look at them and

24 (Pages 93 to 96)

Page 97

1   let us know if you thought they were
2   accurately transcribed or not. Have you
3   done that?
4       A.   I have looked at them.
5       Q.   Okay. Let me ask you to take
6   a look at --
7           MR. PARKER: It should be
8   Exhibit --
9           MR. NELMS: M.
10          MR. PARKER: M and O.
11      Q.   Let me ask you to take a look
12  at Exhibit O first of all.
13          (Whereupon, Defendant's
14          Exhibit O was marked for
15          identification.)
16      A.   Okay.
17      Q.   And I'm going to ask you --
18  and that's -- it has on the cover phone
19  conversations, Charlie Thornton slash
20  FedEx. It has an index which I know is
21  not something that you created. That's
22  something that the court reporter
23  created, and it has a series of names of

Page 98

1   people --
2           MR. PARKER: I don't think
3   that their exhibits have an index.
4       A.   I don't have that.
5           MR. PARKER: The ones, the
6   court reporters and theirs, they just
7   start at the first page.
8       Q.   Okay. Sorry. Okay. In any
9   case, Exhibit O, according to the court
10  reporter who listened to the tapes, is a
11  true and correct transcription of what's
12  on the tapes. My question to you is,
13  having read and reviewed these tapes and
14  having made the tapes and having reviewed
15  these transcripts, do you have any
16  quarrel with the accuracy of what is in
17  front of you as Exhibit O?
18      A.   I have not been able to
19  compare apples to apples as far as
20  reading the total accuracy of the
21  documents here. I cannot say they are
22  100 percent accurate because I did not
23  listen to the tape and then read the

Page 99

1   transcript with it.
2       Q.   Okay.
3       A.   So --
4       Q.   All right. Did you see
5   anything from your own recollection of
6   the tapes in reading through the
7   transcripts that you thought was
8   inaccurate?
9       A.   There again, I can't say. You
10  know --
11      Q.   Why can't you answer that
12  question?
13      A.   Because if I read something --
14  I mean, I'm reading this and knowing
15  what's coming off the tape may be worded
16  differently, I -- I cannot say with
17  100 percent accuracy that it is exactly
18  the way it came off the tape because I
19  did not take the tape, listen to the tape
20  and read the transcript at the same time.
21      Q.   You already told me that.
22  What I'm asking you is, based on reading
23  the transcript, did you see anything in

Page 100

1   it, based on your own participation in
2   these conversations, that you thought was
3   wrong? That's my question.
4       A.   No.
5       Q.   Did you make any recordings of
6   any conversations with any FedEx
7   employees other than those that are
8   reflected in the transcripts in front of
9   you as Exhibit O?
10      A.   No, sir.
11      Q.   It's true, is it not, that you
12  did not tell any of the people whose
13  conversations you recorded as shown in
14  Exhibit O that you were recording the
15  conversations?
16      A.   That is true.
17      Q.   So, none of these people that
18  you were talking to, as reflected on
19  Exhibit O, had any reason to know that
20  you were recording the conversations
21  because you didn't tell them that you
22  were recording them?
23      A.   I did not tell the individuals

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

Page 101

1  that I was recording, no.
2      Q.   It's true, though, that you
3  had a number of conversations with FedEx
4  employees that you did not record,
5  correct?
6      A.   Prior to me recording these,
7  not after I started recording. Every
8  conversation after the fact was recorded.
9      Q.   And when did you make your
10 first recording, what date?
11     A.   I do not recall that date.
12     Q.   Was it May the 19th?
13     A.   I do not recall the date.
14     Q.   Okay. I think we're going to
15 be able to figure that out, but we'll get
16 to that.
17          But your testimony is whatever
18 the earliest date is that we have -- for
19 which we have a recorded conversation,
20 from that point forward, every
21 communication you had with FedEx or with
22 Mr. Primus at the bank was recorded by
23 you?

Page 102

1      A.   Yes, sir.
2          MR. NELMS: Excuse me. Every
3  telephone conversation.
4      A.   Yes, telephone.
5      Q.   Okay. You had other
6  conversations not on the phone with
7  people that were not recorded.
8      A.   No, sir.
9      Q.   Okay. Well, that's what I'm
10 trying to figure out.
11     A.   Okay. No, sir, I did not.
12     Q.   So, whatever the earliest date
13 is where we -- where you recorded a
14 conversation, you had no communications
15 with FedEx, anybody at FedEx, other than
16 one that was actually recorded?
17     A.   That's correct.
18     Q.   And you knew you were calling
19 some people in Pittsburgh, Pennsylvania,
20 correct?
21     A.   That's exactly right.
22     Q.   Are you aware, as you --
23     A.   Well, let me back up. The

Page 103

1  phone numbers -- I talked to one
2  individual that was in Honolulu, Hawaii.
3      Q.   Yes.
4      A.   And I did not know I was
5  calling Honolulu, Hawaii.
6      Q.   But you know that you made
7  several telephone calls to people in
8  Pittsburgh, Pennsylvania, correct?
9      A.   I made phone calls to
10 Pittsburgh, Pennsylvania.
11     Q.   And you recorded the calls?
12     A.   Yes, I did.
13     Q.   Are you aware, as you sit here
14 today, that it is a crime under
15 Pennsylvania law to record a conversation
16 and not tell the other person you're
17 recording it?
18     A.   I was not aware of that. I
19 was making the phone call from the State
20 of Alabama. They did not call me.
21     Q.   Okay. Are you aware of that
22 now?
23     A.   If you're making me aware of

Page 104

1  it.
2      Q.   You've not heard that before
3  today?
4      A.   No, sir, I have not.
5          MR. NELMS: Hang on a minute.
6  You and I talked about it.
7      A.   What?
8          MR. SPOTSWOOD: I didn't mean
9  to inquire into your communications.
10         MR. NELMS: I know, but if
11 you're not telling him about the
12 conversations that you and I have had, I
13 waive any attorney-client privilege.
14 We --
15     A.   Oh, we've talked, sure.
16         MR. NELMS: All right. Did
17 I --
18     A.   I thought he was talking about
19 FedEx.
20         MR. NELMS: Well, y'all be
21 clear.
22     Q.   (BY MR. SPOTSWOOD:) You've
23 just revealed, I guess, that you did have

26 (Pages 101 to 104)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

Page 105

1  some communications with your counsel
2  about that issue. I don't mean to
3  inquire into those, but you did discuss
4  those issues, correct?
5       MR. NELMS: Right. I waive
6  any privilege. Do you wish to waive any
7  privilege that we might have related to
8  this specific issue of whether or not you
9  were aware, of course, of the fact
10  that it is a crime in Pennsylvania to
11  record conversations without letting the
12  party being recorded know that, in fact,
13  they are being recorded? Do you waive
14  that part of the attorney-client
15  privilege?
16      A.  Sure.
17          MR. NELMS: It's your
18  privilege, not mine.
19      A.  I mean, I don't really -- I
20  mean, I'm wanting to understand what
21  you're saying to me.
22      Q.  (BY MR. SPOTSWOOD:) Well, let
23  me just ask it this way.

Page 106

1       A.  Okay.
2       Q.  Before you talked with your
3  counsel, did you have any idea or
4  knowledge of what the law was in
5  Pennsylvania about recording
6  conversations?
7       A.  No, sir, I did not.
8           MR. NELMS: There you go.
9       Q.  When you recorded these
10  conversations, did you record all the
11  conversation or some of it?
12      A.  All the conversation.
13      Q.  What kind of equipment did you
14  use to do that?
15      A.  Just a hand -- a hand-held
16  recorder off of a speaker phone, my home
17  phone.
18          Can I take a moment? I need
19  to run to the restroom.
20          MR. SPOTSWOOD: Absolutely.
21          (Said deposition was in recess
22          at 11:32 a.m. until 11:39
23          a.m., after which the

Page 107

1  following occurred:)
2       Q.  (BY MR. SPOTSWOOD:) On
3  Exhibit O, and I know you guys don't have
4  this -- what's our last exhibit?
5           (Whereupon, Defendant's
6           Exhibit R was marked for
7           identification.)
8       Q.  We'll take a look at this in a
9  second. This is the index that the court
10  reporter did that apparently is not on
11  your -- on your page. It says here,
12  "These conversations were transcribed in
13  the order listed above just as they were
14  recorded on the audiotapes." And my
15  question to you is from -- can you
16  confirm that these are listed here in
17  date order? In other words, the first --
18      A.  No, sir, I can't confirm it.
19  There's no way I can confirm it unless I
20  listen to the tape and heard the dates
21  themselves, but I can't accurately --
22      Q.  Well, I don't believe, with
23  one or two exceptions, that there are

Page 108

1  dates stated on the transcripts.
2       A.  Well, I -- I remember after I
3  said the date on the -- on the tape. I'm
4  not saying I did it on each and every one
5  of them, but I can recall doing that.
6       Q.  I recall one instance where
7  you did, too, and that's what I'm looking
8  for right here to see if I can find it.
9  I read through these, I'll tell you, very
10  recently.
11      A.  Yeah, I noticed one of them.
12  But I know there was more than one
13  occasion that I actually put the date on
14  there.
15      Q.  Here we go. On page 21, that
16  is the first reference I see to a date,
17  and it says -- and page 21 is after
18  your -- the recordings of the
19  conversations of Jeff White, Kent
20  Gastineau and then again Kent Gastineau.
21  And on page 21 it says these calls were
22  made on May 19th '05. Do you see that?
23      A.  Yes, sir.

27 (Pages 105 to 108)

Page 109

1    Q.    And, so, would that be your
2  best recollection that that's when those
3  calls were made, preceding from page one
4  to page 21?
5    A.    I cannot say with 100 percent
6  accuracy that all of these calls were
7  made on the 19th.  Apparently the one
8  that I spoke to, Angela --
9    Q.    Yes?
10    A.    -- what it's saying to me
11  now --
12    Q.    You're the one recording these
13  calls.
14    A.    -- is that this -- this call
15  was made on the 19th.
16    Q.    Can you explain why it says
17  calls, plural?
18    A.    No, I cannot explain that.  I
19  did not -- I did not do this
20  transcription.
21    Q.    Well, I understand that, but I
22  can -- I can assure you this was done by
23  a very competent professional.

Page 110

1    A.    I don't even question that.  I
2  don't question that.
3    MR. NELMS:  Object to the
4  form.
5    A.    What --
6    Q.    I'm really kind of struggling
7  with here is, I mean, why are you having
8  a hard time figuring this out.  These are
9  very straightforward questions here.
10  We've got a phone call to Jeff White, you
11  know, you -- you're trying to find him.
12  You don't have any success.  That's pages
13  one through three, and then starting on
14  page four, which really kind of goes --
15  goes in sequence here.  When you called
16  Jeff White, whom you didn't get, he told
17  this person Cheryl to tell you to call
18  Kent, so that's what you do, you call
19  Kent.
20    A.    Okay.
21    Q.    And then you have this
22  conversation with Kent apparently as
23  recorded here.

Page 111

1    MR. NELMS:  Bob, is there a
2  question in here?
3    MR. SPOTSWOOD:  Yeah, I'm
4  going to get to it.
5    MR. NELMS:  Well, I'm going to
6  object to characterizations of the
7  deponent's willingness or ability to
8  answer the question.  He's answering them
9  as you're asking them.  Characterizations
10  otherwise are really not your province.
11    Q.    Well, I -- my question is very
12  simple.  Why can't you confirm for me
13  with this transcript in front of you that
14  these calls, just as it says here on page
15  19, were made -- I'm sorry, page 22, were
16  made on the 19th of May?
17    MR. NELMS:  I object to the
18  form again because it's asked and
19  answered.
20    MR. SPOTSWOOD:  Well, it
21  hasn't been asked and answered after he's
22  just had a chance to look through what
23  we're talking about, and that's what I'm

Page 112

1  asking you to do, and if you need to read
2  the first 22 pages here --
3    A.    I have read those.
4    Q.    Okay.  Now, my question to you
5  is isn't it true that the calls that
6  precede page 21 were made on the 19th of
7  May just like you say they were?
8    A.    I cannot confirm that.  I
9  cannot.  And I am being honest.  I cannot
10  confirm that.
11    Q.    Okay.  What calls do you think
12  you were talking about near then?  Do we
13  need to get the tape recorder out and
14  listen to the tapes?
15    MR. NELMS:  Object to the
16  form.  Just try to answer his question
17  the best you can.
18    A.    I cannot confirm that, Bob.
19  I'm sorry.
20    MR. NELMS:  Why don't you ask
21  him what his impression is?
22    Q.    I'm glad to do that.  Is it
23  your best impression that these three

28 (Pages 109 to 112)

---

Page 113

1　calls were made on the 19th?
2　　A.　As far as looking at this
3　particular document --
4　　Q.　Yeah.
5　　A.　-- the impression that this
6　document gives me that these calls were
7　made. As far as me knowing they were
8　made, I cannot confirm that.
9　　Q.　Okay.
10　　　MR. NELMS: Let's take a
11　break.
12　　　MR. SPOTSWOOD: Okay. Thank
13　you.
14　　　MR. NELMS: Am I --
15　　　MR. SPOTSWOOD: No, go ahead.
16　　　(Said deposition was in recess
17　　　at 11:46 a.m. until 11:49
18　　　a.m., after which the
19　　　following occurred:)
20　　Q.　(BY MR. SPOTSWOOD:) Let's
21　turn to Exhibit N for a minute.
22　　　(Whereupon, Defendant's
23　　　Exhibit N was marked for

---

Page 114

1　　　identification.)
2　　Q.　Do you have that in front of
3　you?
4　　A.　Yes, sir, I do.
5　　Q.　This is a transcript of a tape
6　that we received from your counsel as a
7　part of the initial disclosures in the
8　case, and it purports to be a statement
9　that you dictated. Does this, in fact,
10　appear to be a statement that you
11　dictated into the tape recorder?
12　　A.　Yes, sir.
13　　Q.　Did you see, in reviewing this
14　transcript, any errors that were
15　noticeable to you, recognizing that you
16　haven't done a word-by-word transcript
17　versus tape comparison?
18　　A.　No, sir.
19　　Q.　I know that when I originally
20　read through this that I wrote on the
21　cover of it May 19th, and I suspect I did
22　that because somewhere in here it says
23　the date you recorded it.

---

Page 115

1　　　MR. PARKER: I believe it's on
2　the last page.
3　　Q.　Yes, it is, on page 53, it
4　says, "Today is the 19th, and that's all
5　I have for today, so I'll end this
6　conversation now."
7　　　So, would it be your best
8　judgment that this would have been
9　recorded by you on the 19th of May?
10　　A.　Yes, sir.
11　　Q.　Of 2005?
12　　A.　Yes, sir.
13　　Q.　Okay. And my recollection is
14　you filed this lawsuit on May the 25th of
15　2005?
16　　A.　I don't recall the date.
17　　Q.　Is this the first time that
18　you had recorded conversations with
19　persons without advising them that you
20　were doing so?
21　　A.　Yes, sir, it is.
22　　Q.　And have you done it since
23　this time?

---

Page 116

1　　A.　No, sir.
2　　Q.　According to your amended
3　complaint, your first introduction to
4　FedEx Ground came when you read a
5　newspaper advertisement for an
6　information session about FedEx Ground
7　independent contractor positions, is that
8　correct?
9　　A.　That's correct.
10　　Q.　What paper did you see this ad
11　in?
12　　A.　The Montgomery Advertiser.
13　　Q.　Do you recall what the ad
14　said?
15　　A.　No, sir, I do not recall it
16　verbatim.
17　　Q.　You don't have a copy of it,
18　do you?
19　　A.　No, sir, I don't.
20　　　MR. NELMS: I'm sorry, a copy
21　of the ad?
22　　　MR. SPOTSWOOD: Yes.
23　　　MR. NELMS: Yeah, it was in

Page 117

1    the initial disclosures.
2         A.   We had several copies.
3              MR. NELMS:  If it's not, I'll
4    give it to you now.
5              MR. PARKER:  I don't think we
6    got it.
7              MR. NELMS:  I've got it.
8    Sorry.
9              MR. PARKER:  We had a list of
10   documents.
11             MR. NELMS:  This is the
12   original.  We can put it in the record.
13   Find it for me, please.
14        A.   What.
15             MR. NELMS:  I forget what
16   it -- is that it (indicating)?  No.
17        A.   (Examining document.)
18             MR. NELMS:  It may not be on
19   that page.  It may be on the other page.
20        A.   Here it is right here.  That's
21   it, independent contractors which were --
22   no, this is for June.
23             MR. NELMS:  This is --

Page 118

1         A.   This is where they was, you
2    know, keeping on advertising.  This is
3    the June paper, but we had a -- I went --
4              MR. NELMS:  Point to it for
5    me.
6         A.   It's right here.
7              MR. NELMS:  All right.
8         A.   That's the same ad.
9              MR. SPOTSWOOD:  Do you want --
10   can we get somebody to take a picture of
11   that?
12             MR. NELMS:  Yeah, do you want
13   me to copy that front page?  We've got
14   whatever our -- where did it go?
15             MR. PARKER:  What are you
16   looking for?
17             MR. GASTINEAU:  A copy of this
18   right here.
19             MR. NELMS:  Oh, all right.
20   You already got a copy.  One second.
21             MR. SPOTSWOOD:  And be sure
22   you get me a date on that, too, if you
23   can arrange to copy it so it has a date

Page 119

1    on it.
2              (Said deposition was in recess
3              at 11:54 a.m. until 11:57
4              a.m., after which the
5              following occurred:)
6              (Whereupon, Defendant's
7              Exhibits S and T were marked
8              for identification.)
9         Q.   All right.  Have a look here,
10   if you would, at Defendant's Exhibit S.
11   This is a copy of a classified ad from
12   the paper June the 12th, 2005.
13             MR. SPOTSWOOD:  And, Counsel,
14   if I understand you correctly, this came
15   from The Montgomery Advertiser, is that
16   correct?
17             MR. NELMS:  Yes.
18        Q.   And is this similar to the ad
19   that you saw back in January?
20        A.   This is the exact ad except
21   for the dates when the sessions would be.
22             MR. NELMS:  I want to put that
23   in.

Page 120

1         Q.   Do you have -- hang on a
2    second.
3              (Off-the-record discussion.)
4         Q.   (BY MR. SPOTSWOOD:)  Do you or
5    your counsel -- I will ask you both this:
6    Is this the only ad like this that y'all
7    have?
8              MR. NELMS:  Charlie says that
9    he went and copied some more.
10        A.   I did not copy them.  I went
11   to the -- to the library, and I went back
12   in the archives of the newspaper and
13   brought the originals.  I cut the
14   original out and brought them in.
15             MR. NELMS:  To me?
16        A.   Yes, brought them to the
17   office, gave them to Audrey.
18             MR. NELMS:  I will get them
19   for you when I can find them.  I don't
20   see them in my file.
21        A.   Because there were times in
22   between January and May the ad was still
23   being run, so I got from January all the

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 121

1   way through May and above -- beyond, and
2   I brought them in and gave them to
3   Audrey.
4       MR. SPOTSWOOD:  And Audrey is
5   an employee here in the firm?
6       MR. NELMS:  Yes, secretary.
7       MR. SPOTSWOOD:  Okay.
8    Q.   (BY MR. SPOTSWOOD:)  Going
9   back to our discussions for just a
10  minute --
11       MR. NELMS:  Keep going, Bob.
12    Q.  -- we've -- you -- you have
13  testified, if I remember it correctly,
14  that you did not record all of your
15  conversations with Kent Gastineau or
16  other employees because some of those
17  conversations either were in person, and
18  you recorded none of those, right, so
19  far?
20    A.  Let me say this:  I had no
21  conversations with anybody face-to-face
22  after I recorded -- started the
23  recordings on the telephone.

Page 122

1    Q.  Okay.
2    A.  Before that there was no
3  recordings --
4    Q.  All right.
5    A.  -- either on the phone, you
6  know, or off, face-to-face.
7    Q.  All right.  Why did you think
8  it was appropriate to record
9  conversations with these individuals who
10  you recorded?
11       MR. NELMS:  Object to the
12  form.  Answer the question.
13    A.  Oh, okay.  I'm sorry.  Because
14  I had prepared myself to go to work.  I
15  had put myself out on a limb.  I had put
16  myself in a position where I really
17  thought I had an excellent, excellent
18  opportunity to go to work for -- to go to
19  work for an excellent company, and the
20  night -- the night before I was to get
21  into that truck and start my job, Kent
22  calls me and tells me I cannot go to
23  work, that he had signed off on some

Page 123

1   documents and signed in the wrong place
2   and was going to have to have them
3   documents e-mailed back to him before I
4   could go to work.  And I had put my
5   livelihood on the line, my credit on the
6   line, and I had a $50,000 vehicle sitting
7   in my driveway with FedEx all over it,
8   and uniforms to this day that are hanging
9   in my closet to go to work.  And I wanted
10  to know what was going on, and if I,
11  Charlie Thornton, did not prepare myself
12  or get my ducks in line, nobody else was
13  going to do it for me.  And I had to have
14  proof of what -- what was going down
15  because I was in a really, really bad
16  situation.  I had a truck sitting out
17  there that had a seven hundred and
18  something dollar payment on it that was
19  due in two weeks and had no -- no job.
20  My livelihood, my wife, my family was on
21  the line.
22      Now, I'm just answering it
23  truthfully, Bob, truthfully.  And I had

Page 124

1   been given the run-around for so long, I
2   had to protect myself.
3    Q.  And why did you record your
4   history that's reflected in Exhibit N?
5    A.  Because it was the best way at
6   the time for me to bring it back in my
7   mind and record it on tape other than
8   writing it down.
9    Q.  Okay.
10    A.  I could think and talk at the
11  same time and put it down.  It would be
12  more accurate this way than writing it.
13    Q.  Is it fair to say that by the
14  time you started recording these
15  conversations that you decided that you
16  were going to sue FedEx?
17    A.  No, sir.  It was not.  It was
18  not.  But I wanted to -- I wanted to have
19  something that I could hold somebody to.
20  Kent had called me, and he had asked me
21  how many years I wanted on the contract.
22  I wanted two years.  He was taking care
23  of it.  I trusted the man.  I trusted

31 (Pages 121 to 124)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

Page 125

1  everybody in FedEx from the trainer I
2  went and trained with in Birmingham to
3  everybody. I was excited because I was
4  not just looking for this for myself. I
5  was looking at it for four boys down the
6  road because I had investigated this, my
7  wife and myself, and I knew that it could
8  possibly be a future for my -- my boys
9  down the road. And, no, I did not. I
10  did not have, when I started recording
11  this, intentions on suing anybody. My
12  intentions were to have a job.
13     Q.   Six days later you filed a
14  lawsuit?
15     A.   Six -- six days. How long
16  does it take you to make up your mind?
17        MR. NELMS: Just answer the
18  question.
19     A.   I knew -- yes, six days later.
20        MR. NELMS: If that was a
21  question.
22        MR. SPOTSWOOD: It was a
23  question.

Page 126

1     Q.   (BY MR. SPOTSWOOD:) Did your
2  wife attend the sessions that you
3  attended, which I think from some -- let
4  me break this question down.
5        When did you attend the
6  informational session about becoming a
7  driver, contractor?
8     A.   January.
9     Q.   Does January 4 stick with you?
10     A.   I cannot recall the date, but
11  it was in January. I believe it was on a
12  Thursday.
13     Q.   Okay. Did anybody attend with
14  you, your wife?
15     A.   Yes, my wife. And she's a
16  sharp lady, I can tell you.
17        MR. NELMS: Answer his
18  questions.
19     Q.   Do you know whether either you
20  or she made any notes of any kind in
21  connection with this?
22     A.   Yes, I did.
23     Q.   Where are those note?

Page 127

1     A.   I gave those notes to Andy.
2        MR. SPOTSWOOD: I'm supposed
3  to have that. I mean, we have asked it
4  every which way known to man for any
5  documents he has related to any of this.
6  We don't have them.
7        MR. NELMS: Off the record if
8  that's all right with you.
9        MR. SPOTSWOOD: Yes.
10        (Off-the-record discussion.)
11        (Said deposition was in recess
12  at 12:06 p.m. until 12:38
13  p.m., after which the
14  following occurred:)
15        (Whereupon, Defendant's
16  Exhibit U was marked for
17  identification.)
18        MR. SPOTSWOOD: I am putting
19  this U on a blank part of this piece of
20  paper here.
21        MR. NELMS: Understood.
22        (Off-the-record discussion.)
23     Q.   (BY MR. SPOTSWOOD:) Mr.

Page 128

1  Thornton --
2     A.   Yes, sir.
3     Q.   -- I'm going to show you what
4  I've marked as Defendant's Exhibit U,
5  which is a two-page -- it's front and
6  back, got writing on the front and back.
7     A.   Yes.
8     Q.   These are notes of yours, are
9  they not?
10     A.   Yes, sir, they are.
11     Q.   And is everything on these two
12  pages in your handwriting?
13     A.   Yes, sir, it is. Okay.
14  Except -- I'm sorry. Let me back up.
15  Except for -- except for one at the
16  bottom of the first page here, you see
17  the little star that says what areas are
18  open.
19     Q.   Yes.
20     A.   My wife wrote that.
21     Q.   All right. And -- okay.
22     A.   And if you see out to the
23  side, I asked that question. It says

CHARLIE THORNTON
March 15, 2006

Page 129

1 Montgomery, Troy and Wetumpka, Elmore.
2    **Q.**   Yes.
3    **A.**   And that was the response --
4 that was a response from Stan.
5    **Q.**   All right.  Where did this
6 session with Stan take place?
7    **A.**   The Holiday Inn 85 in
8 Montgomery.
9    **Q.**   And who else presented
10 information about the company other than
11 Stan?
12    **A.**   No one.
13    **Q.**   How many people were in
14 attendance?
15    **A.**   I do -- I really don't recall.
16 There was probably seven to ten people
17 there.
18    **Q.**   What do you recall, whether
19 you look at these notes or not, that Stan
20 said about the job itself?
21    **A.**   Well, I recall it's pretty
22 much been embedded in my mind.  I recall
23 everything he actually said.  He went

Page 130

1 into the presentation, and everybody left
2 except my wife and one other individual.
3 It was a gentleman.
4    **Q.**   When you say they left, you
5 mean in the middle of the presentation,
6 at the end of the presentation?
7    **A.**   At the end of the
8 presentation.
9    **Q.**   Okay.
10    **A.**   And, so, we at that time was
11 asking him questions, and --
12    **Q.**   What was his presentation
13 basically?  What was the substance of
14 what he provided to you at the
15 presentation?
16    **A.**   Well, the substance of the
17 presentation was that they were in need
18 of contractors and he described the job,
19 how hard the job would be.  He described
20 the pay of the job, the training, and
21 that you had to be able to secure
22 financing on a delivery type vehicle.
23    **Q.**   Did he say anything about

Page 131

1 being an independent contractor?
2    **A.**   Yes, sir.
3    **Q.**   Is that what the job was
4 described as?
5    **A.**   Yes.  He said that -- well, he
6 told us that he was the ground manager,
7 but he was pretty much running both
8 ground and home delivery and that the --
9    **Q.**   This was a seminar for
10 becoming a -- or a presentation or an
11 information session about becoming a home
12 delivery, independent contractor driver?
13    **A.**   Yes, sir.  Yes, sir.
14    **Q.**   Did he describe the contract
15 that the independent contractors would
16 have to sign?
17    **A.**   He did not get into the
18 contractor.
19    **Q.**   Did he tell you, though, you'd
20 have to sign a written contract?
21    **A.**   He did not say that.
22    **Q.**   Okay.  You understood that
23 later, I guess, when you saw that book

Page 132

1 we've been passing around here?
2       MR. NELMS:  Object to the
3 form.
4    **A.**   Does that mean answer?
5    **Q.**   Yes.
6    **A.**   This is new to me.  I don't
7 know.  I signed so many different
8 documents while I was there.  I was under
9 the assumption that I had signed off to
10 be a contractor because the phone call
11 that I received from Kent asking me about
12 the one- or two-year contract, I asked
13 him to explain it to me, and he just said
14 it's either a one- or two-year.  They
15 review your performance, and -- and, you
16 know, it's based on that.  I said
17 definitely I want two years.
18       (Off-the-record discussion.)
19    **Q.**   (BY MR. SPOTSWOOD:)  Let me go
20 ahead and mark that.  This is marked as
21 Defendant's Exhibit V.
22       (Whereupon, Defendant's
23       Exhibit V was marked for

33 (Pages 129 to 132)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 133

1    identification.)
2    **Q.**    This is, I'll state for the
3    record, a document that your counsel
4    produced to us today.  It's called P & D
5    Contractor Business Guide.  It has a
6    number up on the top of the first page,
7    06789 P 149 RES, and it has on the inside
8    a this week fuel supplement page that's
9    dated 3/22, and then it's hard to tell
10   what year of 2000 it is, because it's cut
11   off.  And, then, it has a -- starts with
12   FedEx home delivery standard contractor
13   operating agreement.  Then it has a table
14   of contents, agreement, leased equipment,
15   various attachments.  When did you
16   receive this book?
17       **A.**    As far as the date, I'm not
18   sure.  I can't recall the date when I
19   received it.  It was in -- well, I just
20   don't recall the date.  It was before I
21   received the truck.
22       **Q.**    It was before you received the
23   truck?

Page 134

1        **A.**    Yes, sir.
2        **Q.**    Was it in -- as early as
3    February that you saw that?
4        **A.**    I do not recall.
5        **Q.**    Do you recall whether it was
6    immediately before you received the
7    truck?
8        **A.**    I do not recall.
9        **Q.**    Just before you received the
10   truck?
11       **A.**    I know -- I know that I
12   received it before I received my truck.
13       **Q.**    Okay.  Let me, if I may,
14   Counsel, unless you need it, let me call
15   your attention to the agreement in here
16   which is in the second tab, a standard
17   contractor operating agreement.  Did you
18   read this document?
19       **A.**    Yes, I have.
20       **Q.**    You did?
21       **A.**    Yes, I have.
22       **Q.**    And when we get over here to
23   the end of this document, there is a

Page 135

1    page -- on page 29, there is a signature
2    line for FedEx Home Delivery, and there
3    is a contractor line, and it asks for
4    signature, typed name, witness.  Did you
5    ever sign a contract like this?
6        **A.**    Like I said earlier, I signed
7    so many documents, I do not -- I do not
8    know if it was that document or not.
9        **Q.**    All right.  So, as we sit here
10   today, and I can assure you that --
11       **A.**    I was told that this document
12   here was for me to keep.
13       **Q.**    All right.  Who told you that?
14       **A.**    Kent.
15       **Q.**    What I'm -- what I can tell
16   you is that your lawyers have not
17   produced a signed contract for me, okay?
18   And I take it you never provided one to
19   them?
20       **A.**    I gave Andy everything I have.
21       **Q.**    All right.  And I can tell you
22   that our files do not reflect a signed
23   contract from you.  And your testimony

Page 136

1    today is you can't really remember
2    signing a contract like this?
3        **A.**    I signed so many documents I
4    do not -- I do not recall what documents
5    I actually signed.  But I do know that
6    Kent called me and told me he was putting
7    me in for two years.
8        MR. NELMS:  Just answer his
9    questions.
10       **A.**    Okay.
11       **Q.**    And that that was the contract
12   that he was going to request for you, he
13   was going to request a contract for two
14   years?
15       MR. NELMS:  Object to the
16   form.
17       **A.**    He never --
18       **Q.**    Sir?
19       **A.**    He never said that to me.  He
20   didn't ever --
21       **Q.**    Well, what does it mean to you
22   when he said he was going to put in for
23   two years?  Doesn't that mean request a

34 (Pages 133 to 136)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 137

1   two-year contract for you? Are you
2   trying to tell me something else?
3      **A.**   No, I'm telling you that the
4   phone conversation was he was signing me
5   up for two years.
6      **Q.**   All right.
7      **A.**   And he was submitting it --
8   submitting it.
9      **Q.**   All right.
10     **A.**   There was never a request.
11     **Q.**   Oh, you never requested a
12   two-year contract?
13     **A.**   No.
14        MR. NELMS: Object to the
15   form.
16     **Q.**   You didn't?
17        MR. NELMS: Answer his
18   question, if you can.
19     **Q.**   You didn't?
20     **A.**   What?
21        MR. NELMS: Answer his
22   question if you can.
23     **A.**   Pardon me, re --

---

Page 138

1     **Q.**   You didn't respond to his
2   inquiry about one or two years with a
3   request for a two-year contract?
4     **A.**   I -- what I asked him on the
5   phone was what does the -- what does the
6   one- or two-year contract mean because I
7   was going to be a long-term employee, and
8   he explained it to me this way: FedEx
9   has the right to renew it. It's
10   according to the way you perform in the
11   field. You keep your maintenance up on
12   your truck and keep your -- keep yourself
13   in line with FedEx rules and regulations.
14   I said two years because I -- hey, I'm
15   not going anywhere.
16     **Q.**   But you don't view that as
17   requesting a two-year contract?
18        MR. NELMS: Object to the
19   form.
20     **A.**   No, I do not.
21     **Q.**   Okay.
22     **A.**   He asked me --
23     **Q.**   One-year or two-year and you

---

Page 139

1   said I'd like a two-year, right? It's
2   not hard.
3     **A.**   Right.
4     **Q.**   All right. I know that -- Mr.
5   Thornton, I know that a lot of different
6   things happened that we're going to talk
7   about during the course of this three- or
8   four-month period, and I will tell you
9   that one of the things I really think
10   would be helpful for both of us is that
11   if we try to do this sort of over a time
12   line, so that's what I'm going to try to
13   do. I just want you to know where I'm
14   going.
15        On this sheet, Defendant's
16   Exhibit U here, if I may, can I look at
17   your original --
18     **A.**   Yes.
19     **Q.**   -- because I noticed that
20   there was a little yellow highlighter on
21   the original for W-E-P-T Elmore, which I
22   assume means Wetumpka?
23     **A.**   Yes.

---

Page 140

1     **Q.**   Okay. Why is there this
2   highlighter there?
3     **A.**   No, I have no idea why it's on
4   there.
5     **Q.**   No significance to you?
6     **A.**   No.
7     **Q.**   There's also a question mark
8   by Troy.
9     **A.**   Right.
10     **Q.**   What's the significance of
11   that if you can recall?
12     **A.**   I was told at the time that
13   they had someone that possibly -- would
14   possibly be taking that route over, but
15   it wasn't for sure.
16     **Q.**   Okay. And the specific
17   question that your wife asked, I take it,
18   since you said this is her handwriting in
19   brackets, what areas are open, that was a
20   question that you asked or that she
21   asked?
22     **A.**   She wanted me to ask.
23     **Q.**   And you asked it --

---

Tyler Eaton Morgan Nichols & Pritchett Inc.

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 141

1    A.    Yes, sir, I did.
2    Q.    -- to Stan?  Was that at the
3  conclusion of the session when most
4  everybody else had left?
5    A.    Yes.
6    Q.    And then you wrote down his
7  response?
8    A.    Yes, sir, I did.
9    Q.    Montgomery, maybe Troy, I
10  guess, question mark, Troy and Wetumpka,
11  Elmore?
12    A.    That's correct.
13    Q.    Okay.  Up at the top here you
14  marked down Joe McDonald, Thursday.
15  What's the significance of that?
16    A.    Joe McDonald was the -- well,
17  Thursday actually is the date that the
18  meeting was held, the session.
19    Q.    Yes.
20    A.    Joe McDonald, he was the
21  terminal manager --
22    Q.    Yes.
23    A.    -- in Birmingham, and that's

Page 142

1  who I was to report to for training.
2    Q.    And there's a number listed
3  there.  Is that Stan Trott's number,
4  277-0030?
5    A.    Yes, sir.
6    Q.    And we have another number
7  here listed 395-8387 and underneath that
8  dock.  What is that?
9    A.    I do not recall that number.
10  I know it has something to do with FedEx.
11  It may be a phone number out on the dock.
12  I don't -- I can't remember.
13    Q.    All right.  And you had on the
14  line right next to dock, it says 50,000
15  and then 75,000 year income.
16    A.    Right.
17    Q.    So, that means a range of
18  income 50,000 to 75,000, is that what
19  that meant to you?
20    A.    Yes.
21    Q.    And then it says truck average
22  35,000 per year cost?
23    A.    Right.

Page 143

1    Q.    Okay.  And then there's a
2  462-4690 phone number.  What's that
3  number, if you remember?
4    A.    I don't -- I don't -- I don't
5  recall.  I don't know what that number
6  is.
7    Q.    All right.  And the next item
8  here is eight-day course, you pay.  What
9  does that mean?
10    A.    The course in Birmingham was
11  eight days, and --
12    Q.    What was that course for?
13    A.    It was for training.  It was
14  for Smith driver training.  It was for
15  the hand-held scanner training.  It was
16  with -- taught by Omar Newman.
17    Q.    And was that -- when you say
18  you pay, what does that mean?
19    A.    Well, it was -- we was -- we
20  was asking questions about whether to
21  stay there in Birmingham in a motel or
22  come -- drive back, and he said, well, if
23  you elect to stay, you'll pay.  You'll

Page 144

1  pay for the room.
2    Q.    You were paid for the training
3  time, I take it --
4    A.    Yes, sir.
5    Q.    -- in this course?  And then
6  there's a bracketed benefits, you pay.
7  What does that mean?
8    A.    Okay.  That is your benefits
9  as far as your insurance, your
10  responsibility for your own medical
11  insurance.
12    Q.    As an independent contractor,
13  you pay for all of that stuff on your
14  own?
15    A.    Yes, sir.  Yes, sir.
16    Q.    All right.  And then we have
17  Gastineau, Kent, his phone number.
18  390-0480, is that what that means?
19    A.    That's correct.
20    Q.    And then there's a straight
21  line down the middle of the page there,
22  and to the right of it it says starting
23  time and then three-week month.  What

36 (Pages 141 to 144)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 145

1  does all that mean?
2      A.   The question I asked Stan was
3  once you complete your training in
4  Birmingham and you come out, you've got
5  to drive to the terminal, and how long
6  does that actually take before you're
7  assigned and you're out on the road
8  working.  He said three weeks to a month.
9      Q.   And then the next line is a
10  van number?
11     A.   That was the number they
12  issued me on my van.
13     Q.   Okay.  Well, that -- what I'm
14  trying to figure out, I guess, from this
15  page in part, is that is obviously
16  something you didn't write down on the
17  day of this meeting?
18     A.   No, sir.  You're right.
19     Q.   That's something you wrote
20  down later when you knew that?
21     A.   Right.
22     Q.   Okay.  And then the next item
23  here we've got to the left of the three

Page 146

1  months -- three week month entry, I see
2  S --
3      A.   That's State Farm.
4      Q.   -- Farm.
5      A.   That was the phone number to
6  my wife.
7      Q.   And then Jeff White, a 404
8  number?
9      A.   Yes, sir.  That was --
10     Q.   Is that something written down
11  later?
12     A.   Yes, sir.  It actually was.
13  That was the number to Kent's boss or
14  Stan's boss.
15     Q.   Whom you called much later in
16  the process?
17     A.   Yes.
18     Q.   And then below that we have
19  Tuesday, hyphen, 6 p.m., ground second
20  front on right; what does that mean?
21     A.   That was when I was to report
22  at the terminal here in Montgomery.  It
23  says 6 o'clock in the morning, and that

Page 147

1  was just which door to go in.
2      Q.   6 p.m. at night it looks like,
3  is 6 p.m. right?
4      A.   Well, it was actually in the
5  morning.  I don't know why I put p.m. on
6  it.
7      Q.   Okay.  And that was to report
8  to begin the process of --
9      A.   Of training.
10     Q.   -- training and completing
11  paperwork and that stuff?
12     A.   Yes, I completed a lot of
13  paperwork.
14     Q.   Okay.  And then we got a
15  number on the right 36116.  What does
16  that mean?
17     A.   That -- that is a zip code,
18  that Montgomery route, that is the zip
19  code of that route.
20     Q.   Who told you that?
21     A.   Well, Kent told me that.
22     Q.   Okay.  So, this wasn't
23  something written on this piece of paper

Page 148

1  the presentation day when Stan was there?
2      A.   No, sir.
3      Q.   All right.  Was anything
4  else -- well, no.  I withdraw that.
5          Then we have motel plus
6  Birmingham plus kids.  What does that
7  mean?
8      A.   I don't know.  It was probably
9  something to jog my memory about my kids,
10  but when I was going to be -- well, just
11  the motel Birmingham -- I was just doing
12  some --
13     Q.   Just doodling?
14     A.   Doodling, I guess, on that to
15  jog my memory.
16     Q.   What about underneath the next
17  line there, we have a 1-800 number for
18  Joe McConnell.  Was that something that
19  was written down the day of --
20     A.   That was --
21     Q.   -- the seminar?
22     A.   No, that was after I went to
23  the -- before I ever went to Birmingham,

37 (Pages 145 to 148)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 149

1  I went to the terminal to see Stan
2  because I had to go to the terminal. I
3  had to do paperwork there, and I got this
4  information on who to contact at the
5  Birmingham -- Birmingham terminal where I
6  was going for training, and he gave me
7  Joe's number. He gave me the 1-800
8  number there.
9       Q.   All right. And, then, to the
10  left of that, we have FedEx B'ham, and
11  then -- what was that all about, those
12  entries there, and then it says M-O-R-I-O
13  or M-A.
14       A.   That's Mario. He was a -- he
15  was an individual at the Birmingham
16  terminal that I called to confirm
17  everything, and that's who I spoke to, so
18  I just wrote his name down.
19       Q.   Yes. And then to the left of
20  our exhibit sticker here, we have
21  March 29th, Joe, 423-296-0253. What's
22  that about?
23       A.   I had talked to Joe --

Page 150

1       Q.   Is this Joe McConnell?
2       A.   Yes, it's Joe McConnell -- on
3  a couple of occasions to see what was
4  actually going on because I was getting
5  the runaround as far as asking questions,
6  and nobody seemed to know as far as my
7  paperwork being processed and stuff, so I
8  knew that Joe -- I knew that Joe was
9  coming from Birmingham to Montgomery kind
10  of -- until the transition with Kent took
11  place.
12       Q.   Yes.
13       A.   And I knew he was the go-to
14  man, so that's the reason why I was
15  calling him.
16       Q.   All right. And then
17  underneath the sticker we have in
18  brackets 24 January?
19       A.   Right.
20       Q.   What was the significance of
21  that?
22       A.   Actually that may be the date
23  the session was held on. If not, I

Page 151

1  really don't know.
2       Q.   All right. And then to the
3  right of that we've got more Joe
4  McConnell numbers, it looks like. Is
5  that what those are?
6       A.   Yes, sir. That's just a --
7  other than the 1-800 number.
8       Q.   All right. And then back,
9  next line down, two open, eight day.
10  What does that mean?
11       A.   I have no clue. I don't know.
12       Q.   Is that your handwriting,
13  though?
14       A.   Yes, sir, it is.
15       Q.   And then flip the page over,
16  if you would. What is -- what's the
17  significance of these items? Just start
18  on the top line. We've got a 404 number,
19  which I know is Atlanta.
20       A.   That was a -- when all this
21  was coming down, they were trying to tell
22  me they wanted me to be a contractor out
23  of Anniston, Alabama. DC, these are

Page 152

1  actually the -- the first and last
2  initials of a recruiter for FedEx, and
3  this -- I believe this may have been his
4  cell number or a number that I could
5  locate him because he had called and
6  wanted to talk to me and left his number.
7           Kelly Womble --
8       Q.   When was that?
9       A.   That was -- that was after
10  May. Because that's when they were
11  asking me about going to Anniston, and
12  that was just -- there was no way that
13  was feasible, so I turned around and
14  called the terminal manager in Anniston.
15       Q.   Kelly Womble?
16       A.   No, Tony DeRosa.
17       Q.   Okay.
18       A.   And --
19       Q.   256 looks like that might be
20  an exchange over there.
21       A.   And Tony didn't have a clue to
22  what I was even saying. He said that
23  will never happen, Charlie. The route

38 (Pages 149 to 152)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

Page 153

1    that they are offering you, I already
2    have a guy trained. As a matter of fact,
3    that guy that was training for that
4    particular route was the one who wound up
5    purchasing my truck. But they were
6    saying, oh, we've got one in Anniston,
7    but it just wasn't feasible.
8        Q.   Okay. So, your point is that
9    you had talked to Tony DeRosa who told --
10   what about -- who is Kelly Womble?
11       A.   She's a lady that worked in
12   his office, that answered the phone that
13   day.
14       Q.   Okay. So, when you talked to
15   Tony, you just had the conversation you
16   just described?
17       A.   Right.
18       Q.   Where he said, no, in fact,
19   there wasn't an opportunity there or --
20       A.   Exactly right. He said there
21   was no opportunity there. He didn't know
22   what -- he didn't even know why they was
23   even approaching me with that

Page 154

1    opportunity, that there was no
2    opportunity.
3        Q.   All right. But in any event,
4    you said that was not practical for you
5    to have a route in Anniston?
6        A.   Not living in Elmore County.
7        Q.   All right. Well, let's --
8    let's -- let's look at this next -- this
9    is a one, two, three, four --
10       MR. NELMS: Is that original?
11       MR. SPOTSWOOD: Yeah.
12       A.   Oh, the name of that
13   individual, Joe -- I'm sorry. Bob.
14       Q.   Yes.
15       A.   DC, it was Darrell Clark.
16       Q.   Darrell Clark, okay.
17       A.   Darrell Clark.
18       Q.   What are you looking at there
19   that answered that question for us?
20       A.   Well, this is looking at --
21   this was a meeting that FedEx had on
22   6/14/05, and it was held by Tricia Jones
23   and Darrell Clark, and I believe Kent was

Page 155

1    doing the one in the evenings, and this
2    is some notes I wrote down, MVR, DOT
3    background check, Tuesday through
4    Saturday, which was the schedule that you
5    worked. Home delivery. Peak -- they
6    spoke about the peak season, holiday,
7    home base. They said 60 to 65 a year and
8    over.
9        When I went into the meeting,
10   and there is a tape on this, I asked them
11   specifically about routes. Darrell
12   Clark, his reply to me -- and if they had
13   any contractors that were waiting. He
14   said, yes, we have an individual waiting,
15   but this individual is very picky in what
16   he is wanting, and I knew all along that
17   they was -- they probably were talking
18   about me.
19       Q.   So, where did this meeting
20   take place?
21       A.   At the Holiday Inn.
22       Q.   So, you went to the advertised
23   informational session like the one you

Page 156

1    had attended for Stan?
2        A.   Yes, I did.
3        Q.   And this is obviously after
4    you had filed your lawsuit. And I take
5    it Darrell Clark had no clue who you
6    were?
7        A.   No, sir, he did not.
8        MR. NELMS: By the way, just
9    for the record, he didn't do this per my
10   instructions.
11       Q.   How many people were at this
12   meeting?
13       A.   Probably half a dozen.
14       Q.   Okay. If I heard your
15   testimony correctly, they said that there
16   was a person kind of in line, but that
17   person was very picky, and you figured
18   they were talking about you?
19       A.   I assumed they were, they were
20   talking about me. They said they had a
21   gentleman.
22       Q.   So, what is the significance
23   of 60- to 65-year and over? What does

39 (Pages 153 to 156)

CHARLIE THORNTON
FEDEX GROUND PACKAGE SYSTEM

CHARLIE THORNTON
March 15, 2006

---

Page 157

1  that mean?
2     **A.**   Oh, 60 to 65,000 and over
3  income.
4     **Q.**   I see.  As opposed to, you
5  know, before expenses?
6     **A.**   Oh, they didn't say that.
7     **Q.**   But that would be consistent
8  with what you wrote down from the first
9  meeting, 50 to 75, less expenses.
10    **A.**   Yeah, that's right.
11    **Q.**   Isn't that what Stan had told
12 you?
13    **A.**   Yeah, he said 50 to 75 a year
14 income.  He didn't say less expenses.
15    **Q.**   All right.
16    **A.**   Expenses -- but, yeah.
17    **Q.**   All right.  And then was it
18 your -- your note here says peak season,
19 holiday, home base.  What's the
20 significance of that comment?
21    **A.**   It was just -- there was no
22 significance.  They were going over the
23 peak season of the year, which is during

---

Page 158

1  the holidays.
2     **Q.**   During the Christmastime?
3     **A.**   Right.
4     **Q.**   And home base, what was that a
5  reference to?
6     **A.**   Just home terminal, in the
7  area that you lived.
8     **Q.**   Okay.  And what we've been
9  talking about are the notes reflected on
10 Defendant's Exhibit X here, correct?
11    **A.**   Correct.
12       (Whereupon, Defendant's
13       Exhibit X was marked for
14       identification.)
15    **Q.**   Was there some sort of a
16 sign-up sheet at these meetings?
17    **A.**   No, sir.
18    **Q.**   So, if somebody wasn't
19 interested, they didn't have to leave any
20 indication of having attended?
21    **A.**   It was not -- I did not see a
22 sign-up sheet --
23    **Q.**   Okay.

---

Page 159

1     **A.**   -- when I went in.
2     **Q.**   Anything else on those yellow
3  sheets --
4     **A.**   No, sir.
5     **Q.**   -- or is that unrelated to the
6  litigation or your communications with
7  anybody at FedEx?
8     **A.**   No.
9       MR. NELMS:  Off the record.
10       (Off-the-record discussion.)
11       (Whereupon, Defendant's
12       Exhibit Y was marked for
13       identification.)
14    **Q.**   (BY MR. SPOTSWOOD:)  Yeah, let
15 me -- this is -- it says Iraq and then it
16 says career?
17    **A.**   Well, I had a son that was
18 over there in Iraq fighting.
19    **Q.**   Right.
20    **A.**   And that was a -- actually
21 that has to do with some kind of access
22 number that I had to use to be able to
23 call him.

---

Page 160

1     **Q.**   Okay.
2     **A.**   So, I mean, you know, I'm just
3  doing some doodling because he would
4  e-mail me, and I would write stuff down.
5     **Q.**   All right.
6       MR. NELMS:  Keep that.
7     **A.**   Yeah, I'm going to.
8       MR. NELMS:  Put it in your
9  pocket.
10    **Q.**   Defendant's Exhibit Y here,
11 these are your notes, correct?
12    **A.**   Yes, sir.
13    **Q.**   And it says job apps at the
14 top, 6/13.  It lists several items.
15 What's the significance of this?  Are
16 these places that you were looking for a
17 job?
18    **A.**   Yeah, I had contacted some of
19 these people.  I had contacted Dixie
20 Homecrafters because I knew this guy
21 there.  Friendly Ford.  You know,
22 Wal-Mart in Prattville, I don't know what
23 that really is, if it was a contact.

40 (Pages 157 to 160)